UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MITSUBISHI INTERNATIONAL CORPORATION,

Plaintiff,

-against-

INTERSTATE CHEMICAL CORPORATION,

Defendant.

08 Civ. 00194 (JSR)(GWG)

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

SIMON·LESSER PC
420 Lexington Avenue
New York, New York 10170
212.599.5455

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND ....................................................................................1

PROCEDURAL HISTORY…………………………………………….................. 5

ARGUMENT ...........................................................................................................6

A.   There Are Issues of Fact and Credibility Concerning
     The Terms Included In the Parties' Alleged Agreement ...................................9

B.   There Are Issues of Fact Concerning Whether Interstate's Inability to
     Take Delivery of the Proposed Barge Was Excused Based on Industry Practice...............14

C.   There Are Issues of Credibility Concerning MIC's Core Contention
     That it "Reserved in its Inventory" for Interstate a Barge of Methanol…………...............17

D.   MIC Has Failed To Produce Any Admissible Evidence
     Concerning Its Alleged "Prompt Efforts to Mitigate"
     Which Is Otherwise Contradicted By Independent Market Reports……………..............19

E.   The Promissory Estoppel Claim…………………………………………….. 20

CONCLUSION ........................................................................................................22

### TABLE OF AUTHORITIES

**Case law**                                                                                          **Page(s)**

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92 (2d Cir. 2002) ....................... 15-16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................................................6

*Arbittier v. Russo*, 84 Civ. 6352 (JFK),
1985 U.S. Dist. LEXIS 20571 (S.D.N.Y. Apr. 19, 1985) ........................................................17

*Atronic Int'l, GmbH v. SAT Semispecialists of Am., Inc.* 2007 U.S. Dist.
LEXIS 64185, 63 U.C.C. Rep. Serv. 2d (CBC) 855 (E.D.N.Y. Aug. 9, 2007) ..........................17

*Bazak Int'l Corp. v. Tarrant Apparel Group*,
378 F.Supp 2d 377 (S.D.N.Y 2005) ...................................................................................16, 17

*Berger v. United States*, 87 F.3d 60 (2d Cir. 1996) .............................................................7, 18

*Cyberchron Corp. v. Calldata Sys. Dev.*, 47 F.3d 39 (2d Cir. 1995)....................................20, 21

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) .....................................................18

*Gummo v. Village of Depew*, 75 F.3d 98 (2d Cir. 1996) ..............................................................6

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94 (2d Cir. 2000) ....................................7

*In re Gulf Oil/Cities Service Tender Offer Litigation*,
725 F. Supp. 712 (S.D.N.Y. 1989) .......................................................................................20

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005) .............................................................................6

*Marlene Industries Corp. v.*
*Carnac Textiles, Inc.*, 45 N.Y.2d 327 (1978).............................................................................11

*Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292 (2d Cir. 2003) ...........................................8

*NCC Sunday Inserts Inc. v.*
*World Color Press, Inc.*, 759 F. Supp. 1004 (S.D.N.Y. 1991) ............................................. 20-21

*Pecker Iron Works, Inc. v.*
*Sturdy Concrete Co.*, 96 Misc. 2d 998 (Civ. Ct. 1978) .............................................................10

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) ......................................................................14

# TABLE OF AUTHORITIES
(continued)

*Sec. Ins. Co. of Hartford v.*
*Old Dominion Freight Line, Inc.*, 391 F.3d 77 (2d Cir. 2004) .......................................6

*Spinner Yarn Co., Inc. v. Apprel Retail Corp.*,
614 F. Supp. 1174 (S.D.N.Y. 1985) ..........................................................................10

*Sutera v. Schering Corp.*, 73 F.3d 13 (2d Cir. 1995) ................................................9

*Trebor Sportswear Co. v. The Ltd. Stores, Inc.*,
865 F.2d 506 (2d Cir. 1989) ..................................................................................7, 8

## Statutes

UCC § 1-201 ............................................................................................................14

UCC § 1-205 .......................................................................................................14, 15

UCC § 2-201 ......................................................................................9, 10, 11, 13, 15

UCC § 2-202 ............................................................................................................17

UCC § 2-207 .............................................................................................11, 12, 13, 14

UCC § 2-706 ............................................................................................................19

## Rules

Fed. R. Civ. P. 56(f) ..................................................................................................8

Fed. R .Civ. P. 26(a)(1)(B) .........................................................................................8

## Secondary Sources

R. Dusenberg & L. King,
Sales and Bulk Transfers Under the UCC § 2.04[2][b] (2007) ...................................10

## PRELIMINARY STATEMENT

Defendant Interstate Chemical Corporation ("Interstate") respectfully submits this Memorandum of Law in opposition to the motion of plaintiff Mitsubishi International Corporation ("MIC") for summary judgment filed at the outset of the case. As demonstrated below, MIC's motion should be denied because of its prematurity and because even on the Record developed thus far, there are substantial issues of credibility and fact concerning MIC's claims against Interstate.

## FACTUAL BACKGROUND

On December 4, 2007, Interstate inquired with MIC about the availability of a barge of methanol for possible delivery in late December to Interstate's customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River. The substance of the December 4, 2007 conversation between Zack Ferguson-Steger of MIC and Lori Cirillo of Interstate was that MIC could load a barge of methanol from its barge loading facility in St. Rose, Louisiana for Interstate, but could not commit to any specific loading date. (Interstate 56.1(b) St. ¶ 6). MIC's inability to commit to a firm loading date was in line with Interstate's requirements as Interstate had yet to receive confirmation from OGC that it could accept a methanol barge at its new biodeisel facility. (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 4).

Following the parties' December 4 oral discussion, MIC confirmed its oral advice that it could deliver to Interstate a barge of 10mb of methanol at the market price of $2.55 per gallon "loading Dec. 20 or later." (Complaint Ex. A). This "or later" cautionary language was critical as MIC would not and did not commit to load on a specific date, nor did Interstate commit to a specific delivery date. Rather, MIC simply stated that a

barge could be available for Interstate's purchase sometime after December 20, 2007. (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 6).

The next day, December 5, 2007, MIC transmitted a proposed contract document and requested that Interstate sign and return it. (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 7). Interstate did not do so because the document contained many terms that were materially different than those discussed by the parties the day before, and also included one-sided terms in MIC's favor that were inconsistent with industry practice. (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 8).

Most critically, the proposed contract document had a firm delivery date of "December 20th, 2007," which was materially different from the parties' December 4 oral discussion and MIC's December 4 e-mail advising that it was prepared to deliver a barge loading sometime "December 20 or later." (Interstate 56.1(b) ¶ 10). Even Mr. Ferguson-Steger's Affidavit -- the exclusive foundation for MIC's 56.1(a) Statement -- is inconsistent on the delivery terms MIC now claims were included in the alleged agreement created by the parties' December 4, 2007 oral discussion and follow-up e-mail correspondence. In one sentence, he asserts that MIC's proposed contract document with a Shipment term of "December 20th, 2007" was the delivery term agreed to. (Ferguson-Steger Aff. ¶ 8). In another sentence, however, he says that the delivery term was just sometime "in December 2007." (Ferguson-Steger Aff. ¶ 21). Neither inconsistent claim correctly reflects the parties' oral discussion wherein MIC just advised that it was prepared to deliver a barge of methanol loading sometime "December 20 or later." (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 9).

MIC's proposed contract document also had a one-sided *force majure* clause excusing MIC's performance "for any cause beyond its reasonable control." While it is

industry practice to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief. (Interstate 56.1(b) St. ¶ 10(b)).

MIC's proposed contract document also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction. The parties did not agree to this as MIC acknowledged when it commenced this litigation as opposed to an arbitration proceeding. (Interstate 56.1(b) St. ¶ 10(b)).

On Thursday, December 13, 2007, MIC modified its proposal to Interstate and stated that it could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to its facility in St. Rose, Louisiana with methanol. (Interstate 56.1(b) St. ¶ 11). MIC is a bulk trader of methanol, which it either produces in Venezuela, or otherwise purchases from other Venezuelan producers. (Interstate 56.1(b) St. ¶ 20). Interstate believes that the "vessel coming in" to MIC's facility in St. Rose, Louisiana was methanol that MIC either produced in Venezuela or otherwise purchased from another Venezuelan producer.

The following Tuesday, December 18, 2007, Interstate received word that OGC could not take delivery of a barge of methanol due to delay in receiving U.S. Coast Guard/Homeland Security approval for its new biodeisel facility on the Ohio River where the barge was to be delivered. Interstate informed MIC of this the morning of December 18, which was just ten (10) business days after the parties' initial oral discussion, and five (5) calendar days after MIC advised Interstate that no delivery to Interstate could take place before December 24 when MIC had a "vessel" of methanol "coming in" to its St.

Rose facility.  (Interstate 56.1(b) St. ¶ 20).  There is no dispute that Interstate's advice to MIC about OGC's inability to take delivery of the barge was well before MIC loaded any methanol for delivery to Interstate.

Based on industry practice, Interstate's advice to MIC on December 18, 2007 concerning OGC's inability to take delivery of a methanol barge should have relieved Interstate from any obligation to pay MIC for a barge that had yet to be loaded and which was only supposed to be first loaded sometime "December 20 or later." (Interstate 56.1(b) St. ¶ 22).  Instead, MIC sent a series of e-mails to Interstate threatening to sue, which it then followed through with by this lawsuit.  (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 19).

MIC claims that it is entitled to recover from Interstate the difference between the proposed price on December 4 of $2.55 per gallon, and the price at which MIC allegedly sold a methanol barge to its customer Tauber Petrochemical Company ("Tauber").  (MIC 56.1(a) St. ¶¶ 20, 21).  Exhibit D to MIC's Complaint reflects a sale of 10mb of methanol at $2.05 per gallon to Tauber for delivery sometime between December 21, 2007 and January 10, 2008.  No evidence has been submitted by MIC establishing if and when the delivery actually occurred, or where and to whom it was delivered.  (Interstate 56.1(b) St. ¶ 20).  Moreover, market reports reflect that the market price for a "spot" barge of methanol in the United States during the last two weeks of December, 2007 was between $2.52 and $2.33 per gallon.  (Interstate 56.1(b) St. ¶ 21).

MIC's claims against Interstate are also predicated upon its contention that the methanol sold to Tauber was "reserved for sale to Interstate." (MIC 56.1(a) St. ¶ 20); *see also* Ferguson-Steger Aff. ¶ 18 ("In reliance upon Interstate's promise to purchase the

barge of methanol, we reserved the barge of methanol in our inventory.").  However, no evidence has been submitted by MIC establishing this so-called "reservation of inventory."  Nonetheless, this alleged "reservation of inventory" is contradicted by MIC's advice to Interstate on December 18, 2007 that no methanol would be available for Interstate until December 24, 2007 at the earliest, because that was when MIC "had a vessel coming in" with product.  (Interstate 56.1(b) St. ¶ 19).

## PROCEDURAL HISTORY

MIC commenced this action on January 9, 2008 by filing its Complaint, a copy of which is attached as Exhibit 1 to Mr. Ferguson-Steger's Affidavit.  The Complaint asserts two Causes of Action against Interstate - breach of contract and promissory estoppel.  Interstate Answered on February 28, 2008.  *See* Ferguson-Steger Aff. Ex. 2.

On March 12, 2008, the Court conducted the Initial Conference setting down the Case Management Plan.  Discovery is set to close on July 14, 2008, and the case is to be ready for trial by August 12, 2008.

On March 19, 2008, MIC served its Initial Disclosures, including its list of documents relevant to the dispute.  (Interstate 56.1(b) St. Ex. E).  However, MIC has not produced the identified documents.  Also on March 19, 2008, Interstate served its Document Requests and Notice of Deposition to MIC.  (Interstate 56.1(b) St. Ex. D).  MIC has not yet responded to Interstate's discovery demands.

Notwithstanding that it has yet to produce any meaningful disclosure to Interstate, including the documents listed on its March 19, 2008 Initial Disclosures, on March 26, 2008, MIC filed its Motion for Summary Judgment, supported entirely by the Affidavit of Mr. Ferguson-Steger, its "marketing manager."  As demonstrated below, MIC has

clearly not satisfied its burden of establishing a right to judgment as a matter of law against Interstate, especially at this early stage of the litigation.

## ARGUMENT

"Summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82 (2d Cir. 2004). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.* (*quoting Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996), *cert. denied*, 517 U.S. 1190 (1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986)(summary judgment is only proper when "there can be but one reasonable conclusion as to the verdict").

"The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford*, 391 F.3d at 83; *see also Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005)("In determining whether there are genuine issues of material fact, we draw all permissible inferences in favor of the non-moving party.").

The summary judgment burden is substantially heightened where, as here, the motion is made before any meaningful discovery has taken place. Indeed, the Second

Circuit has expressly cautioned that "only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). The Second Circuit has also held:

> Summary judgment should only be granted if *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof. The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.

*Id.* (brackets and emphasis in original).

Based on this rule, the Second Circuit has denied motions for summary judgment as premature in cases where the nonmoving party did not have "a fully adequate opportunity for discovery." *Hellstrom*, 201 F.3d at 97; *see also Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996)("The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment."); *see also Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995)(reversing summary judgment granted "before any discovery had taken place."); *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989)("The nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment [and] must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.").

Here, MIC has not satisfied its burden of establishing its entitlement to summary judgment as there are several disputed issues of material fact concerning: (a) what terms were included in the parties' alleged agreement; (b) whether Interstate's inability to take delivery of the proposed barge was excused based on industry practice; (c) the credibility

7

of MIC's core contention that it "reserved in its inventory" the barge of methanol for Interstate based on the parties December 4, 2007 communications; and (d) MIC's alleged "prompt efforts to mitigate;" and its claim that it is entitled to recover from Interstate the difference between the proposed price on December 4 of $2.55 per gallon, and the price at which MIC allegedly sold a methanol barge to its customer Tauber sometime after December 24, 2007.

Moreover, as reflected in its opposition papers, Interstate has satisfied its own burden under Fed. R. Civ. P. 56(f) of establishing that MIC's failure to produce its documents and submit to depositions as noticed has prevented Interstate from fully responding to MIC's core contentions that: (a) the methanol sold to Tauber was "reserved in MIC's inventory for sale to Interstate" (Ferguseon-Steger Aff. ¶ 18); and (b) that "despite MIC's prompt efforts to mitigate, MIC was only able to sell the methanol to [Tauber] at a price of $2.05 per gallon" (Complaint ¶ 22). *See Trebor Sportswear Co.*, 865 F.2d at 511 ("Under Rule 56(f), summary judgment may be inappropriate where the party opposing it shows that he cannot at the time present facts essential to justify his opposition."); *see also Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003)("[The non-movant] cannot be faulted for failing to advise the district court precisely what information he might learn during discovery given that the facts sought were exclusively within defendants' possession and that he had no previous opportunity to develop the record through discovery."). Here, MIC has neither responded to Interstate's discovery requests, nor bothered to produce all of its documents identified in its Initial Disclosures under Fed. R .Civ. P. 26(a)(1)(B).

Based on these controlling standards, MIC's motion should be denied in all respects.

**A.    There Are Issues of Fact and Credibility Concerning
The Terms Included In the Parties' Alleged Agreement**

MIC's motion papers rely primarily upon UCC § 2-201(2), commonly referred to as the "merchant memo" rule, which essentially provides that evidence of the formation of a contract may be established through some written confirming memorandum, even if that memorandum is not signed by the party to be charged.  It states:

> (1)    Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

> (2)    Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

U.C.C. § 2-201.[1]

In other words:

> An oral contract for the sale of goods [is] enforceable against a party who signed nothing, if that party received a written confirmation of the existing oral agreement and does not give written notice of objection to its contents within 10 days after it is received.  Failure to object in writing within 10 days *does not signify assent to the terms of the writing*; it merely deprives the recipient of the opportunity to raise the Statute of Frauds as a defense.

---

[1]    Interstate, a Pennsylvania corporation, does not concede that New York law necessarily applies to the parties' dispute.  However, as both Pennsylvania and New York have adopted the UCC, a full choice-of-law analysis need not be undertaken for purposes of MIC's instant summary judgment motion.

*Pecker Iron Works, Inc. v. Sturdy Concrete Co.*, 96 Misc. 2d 998, 1003, 410 N.Y.S.2d 251, 254 (Civ. Ct. 1978)(emphasis added); *see also Spinner Yarn Co., Inc. v. Apprel Retail Corp.*, 614 F. Supp. 1174, 1179 (S.D.N.Y. 1985)("The *only* effect of failure to object to a written confirmation of an oral offer or agreement under Section 2-201 is to take away from the receiving merchant the defense of the Statute of Frauds.")(emphasis in original)(citation omitted).

Here, MIC argues that its December 4, 2007 e-mail is a sufficient "merchant memo" under UCC 2-201(2). The e-mail said: "We confirm 10mb @ $2.55/gal loading Dec 20 or later. If we can ship earlier, we'll inform you." (Complaint Ex. A). MIC concedes that on December 18, 2007, ten (10) business days after the parties' December 4 discussion and MIC's "confirming memo," Interstate sought to cancel the order. (MIC 56.1(a) St ¶ 12).

The UCC does not expressly dictate whether the 10-day objection period under § 2-201(2) is calendar days, as opposed to business days. *See* R. Dusenberg & L. King, Sales and Bulk Transfers Under the UCC § 2.04[2][b] (2007)("How to measure the ten-day period for giving notice of objection to a memorandum is also left unaddressed by [the code]."). Yet even accepting that § 2-201(2) speaks of calendar and not business days, the only effect of Interstate's alleged failure to object to MIC's December 4, 2007 e-mail four (4) days sooner than it did is to take away a Statute of Frauds defense to the alleged formation of an agreement.

What terms are included in that agreement, however, is an entirely different question. UCC § 2-201 deals only with contract formation; it is § 2-207 that dictates what

10

terms are included in the contract.  In this regard, the New York Court of Appeals has

observed the following concerning the interplay between §§ 2-201 and 2-207:

> The courts below erred in applying subdivision (2) of section 2-201, for
> that statute deals solely with the question whether a contract exists which
> is enforceable in the face of a Statute of Frauds defense; it has no
> application to a situation such as this, in which it is conceded that a
> contract does exist and the dispute goes only to the terms of that contract.
> In light of the disparate purposes of the two sections, application of the
> wrong provision will often result in an erroneous conclusion.  As has been
> noted by a recognized authority on the code, "[the] easiest way to avoid
> the miscarriages this confusion perpetrates is simply to fix in mind that the
> two sections have nothing to do with each other. Though each has a
> special rule for merchants sounding very much like the other, their
> respective functions are unrelated. Section 2-201(2) has its role in the
> context of a challenge to the use of the statute of frauds to prevent proof of
> an alleged agreement, whereas the merchant rule of section 2-207(2) is for
> use in determining what are the terms of an admitted agreement."

*Marlene Industries Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327, 331, 408 N.Y.S.2d

410, 411 (1978)(citation omitted).

U.C.C. 2-207 provides:

(1)    A definite and seasonable expression of acceptance or a written
confirmation which is sent within a reasonable time operates as an acceptance
even though it states terms additional to or different from those offered or
agreed upon, unless acceptance is expressly made conditional on assent to the
additional or different terms.

(2)    The additional terms are to be construed as proposals for addition to the
contract. Between merchants such terms become part of the contract unless:
(a) the offer expressly limits acceptance to the terms of the offer; (b) they
materially alter it; or (c) notification of objection to them has already been
given or is given within a reasonable time after notice of them is received.

(3)    Conduct by both parties which recognizes the existence of a contract is
sufficient to establish a contract for sale although the writings of the parties do not
otherwise establish a contract. In such case the terms of the particular contract
consist of those terms on which the writings of the parties agree, together with
any supplementary terms incorporated under any other provisions of this Act.

UCC § 2-207.

Pursuant to § 2-207(2), terms in a "merchant memo" confirming an oral proposal or agreement that materially alter what the parties orally discussed do not become part of their agreement. It is for this reason that MIC's proposed written contract document sent with Mr. Ferguson-Steger's December 5 e-mail, which was admittedly never signed by Interstate, is not enforceable against Interstate.

Most critically, the proposed contract document had a firm delivery date of "December 20th, 2007," which was materially different from the parties' December 4 oral discussion and MIC's December 4 e-mail advising that MIC was prepared to deliver a barge loading sometime "December 20 or later." (Interstate 56.1(b) ¶ 10). Even Mr. Ferguson-Steger's Affidavit, which is the exclusive foundation for MIC's 56.1(a) Statement, is inconsistent on the delivery terms he now claims were included in the alleged agreement created by the parties' December 4, 2007 oral discussion. In one sentence, he asserts that MIC's proposed contract document with a Shipment term of "December 20th, 2007" was the delivery term agreed to. (Ferguson-Steger Aff. ¶ 8). Yet in another sentence, he says that the delivery term was just sometime "in December 2007." (Ferguson-Steger Aff. ¶ 21). Neither inconsistent claim correctly reflects the parties' oral discussion wherein MIC just advised that it was prepared to deliver a barge of methanol loading sometime "December 20 or later." (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 9).

MIC's proposed contract document also had a one-sided *force majure* clause excusing MIC's performance "for any cause beyond its reasonable control." While, as demonstrated in Point B *infra*, it is industry custom to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their

12

reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief. (Interstate 56.1(b) St. ¶ 10(b)).

MIC's proposed contract document also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction. The parties did not agree to this as MIC acknowledged when it commenced this litigation as opposed to an arbitration proceeding. (Interstate 56.1(b) St. ¶ 10(c)).

Thus, at most, MIC's UCC § 2-201 argument establishes a written confirmation on December 4, not barred by the Statute of Frauds, of an oral order placed by Interstate for a barge of methanol at a set price "loading December 20 or later." Significantly, however, on December 13, 2007, MIC modified its December 4 confirmation when Mr. Ferguson-Steger informed Ms. Cirillo that MIC could not deliver a barge of methanol to Interstate anytime before December 24, 2007 because that was when MIC first "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol. (Interstate 56.1(b) St. ¶ 11). Five (5) days later, on December 18, 2007, Interstate cancelled the order because of Coast Guard and U.S. Homeland Security delay in approving barge delivery to OGC's new biodeisel facility, where the barge was to be delivered. (Interstate 56.1(b) St. ¶ 22).

MIC disputes that the December 18, 2007 modification occurred. *See* MIC 56.1(a) St. ¶ 11 ("From December 5, 2007, up until December 18, 2007, Interstate did not communicate with MIC regarding the methanol barge."). In fact, Mr. Ferguson-Steger swears that he "heard nothing" from Interstate between December 4 and December 18. (Ferguson-Steger Aff. ¶ 10). Ms. Cirillo categorically disputes this and avows that Mr. Ferguson-Steger called her on December 13 to say that MIC could not deliver a barge of methanol to Interstate anytime before December 24, 2007 because that was when MIC

first "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol.
(Cirillo Aff. ¶ 15).

The conflicting accounts of the parties' key witnesses are sufficient grounds alone to defeat MIC's summary judgment motion. *See, e.g., Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

**B.      There Are Issues of Fact Concerning Whether Interstate's Inability to Take Delivery of the Proposed Barge Was Excused Based on Industry Practice**

The conclusions MIC draws from the limited Record developed so far are wrong as a matter of law because they ignore the commercial reality of the chemical sales industry and are not supported by the UCC. Several provisions of the UCC demonstrate the Code's pragmatism with respect to the formation of contracts. By dispensing with certain legal formalities, these provisions provide a flexible framework for contracting which is adjusted to commercial realities and especially the particular custom and practice in the parties' industry. This framework is illustrated by the Code's definition of an "agreement" under § 1-201(3). It provides:

> "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1-205 and 2-208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1-103).

U.C.C. § 1-201(3).

Thus, the UCC expressly incorporates trade usage into the terms of the parties' agreement. The term "usage of trade" is defined in UCC § 1-205(2) as:

> [a]ny practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be

observed with respect to the transaction in question. The existence and
scope of such a usage are to be proved as facts. If it is established that
such a usage is embodied in a trade code or similar record, the
interpretation of the record is a question of law.

UCC § 1-205(2).

UCC § 1-205(3) further dictates that:

[A]ny usage of trade in the vocation or trade in which [the parties] are
engaged or of which [they] are or should be aware give particular meaning
to and supplement or qualify the terms of an agreement.

UCC § 1-205(3).

Another provision which explicitly acknowledges usage of trade as a means to

explain or supplement an agreement is UCC § 2-202, which provides:

Terms with respect to which the confirmatory memorandum of the parties
agree or which are otherwise set forth in a writing intended by the parties as a
final expression of their agreement with respect to such terms as are included
therein may not be contradicted by evidence of any prior agreement or of a
contemporaneous oral agreement *but may be explained or supplemented . . .
by course of dealing or usage of trade* (Section 1-205). . .

UCC § 2-202 (emphasis added).

The Second Circuit has spoken to the importance of trade usage or industry

practice in defining the terms of a parties' agreement under the UCC:

[T]he importance of industry practices in the interpretation of contracts for
the sale of goods permeates the entire UCC. *See* James J. White & Robert
S. Summers, Uniform Commercial Code § 3-3 (2d ed. 1980). This is clear
from its definition of "usage of trade": "A usage of trade is any practice or
method of dealing having such regularity of observance in a place, vocation
or trade as to justify an expectation that it will be observed with respect to
the transaction in question." N.Y. U.C.C. § 1-205(2). Moreover, "it is not
necessary for both parties to be consciously aware of the trade usage. It is
enough if the trade usage is such as to 'justify an expectation' of its
observance." White & Summers, *supra.* Furthermore, "[usage of trade is]
relevant not only to the interpretation of express contract terms, but may
[itself] constitute contract terms." *Id.* Thus, standard industry practices are
always relevant when interpreting contracts governed by the UCC.

15

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 102 (2d Cir. 2002)(brackets

in original); *see also Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F.Supp 2d 377,

390 (S.D.N.Y 2005)("Usage of trade is relevant not only to the interpretation of express

contract terms, but may also itself constitute contract terms").

Here, Interstate has submitted evidence that it is industry practice in the bulk

chemical sales industry to include a broad *force majeure* term, permitting either the buyer or

seller to a bulk chemical procurement transaction to cancel before delivery based on any

cause beyond their reasonable control. (Interstate 56.1(b) St. ¶ 22). That evidence includes

Affidavit and Declaration testimony of industry professionals with multiple decades worth

of industry experience. *See* Puntureri Aff. (56.1(b) St. Ex. B) ¶¶ 3-7; Jukiewics Aff.

(56.1(b) St. Ex. F) ¶¶ 4-5; Swinderman Dec. (56.1(b) St. Ex. G) ¶¶ 6-9.

Application of such industry practice to the operative facts of this case is

summarized in ¶ 22 of Interstate's 56.1(b) Statement.

> MIC initially proposed on December 4, 2007 that it could supply a barge
> of methanol for Interstate "loading Dec. 20 or later." *See* Cirillo Aff. (Ex.
> A) ¶¶ 4, 5. On December 13, 2007, MIC modified its proposal by stating
> that it could not deliver a barge of methanol to Interstate anytime before
> December 24, 2007 because that was when MIC "had a vessel coming in"
> with methanol; MIC otherwise made no commitment as to when delivery
> could and would in fact take place. *See* Cirillo Aff. (Ex. A) ¶ 15. Five
> days later, on December 18, 2007, Interstate explained to MIC that it
> could not take delivery of a barge which had yet to be loaded and which
> MIC conceded that it could not have loaded until sometime after
> December 24, 2007 at the earliest, because of the delay in OGC receiving
> approval from the U.S. Coast Guard and the U.S. Department of
> Homeland Security for its new biodeisel facility on the Ohio River where
> the barge of methanol was to be delivered. *See* Cirillo Aff. (Ex. A) ¶¶ 16,
> 17. Interstate had no other place to put the barge. *See* Puntureri Aff. (Ex.
> B) ¶ 21. Based on the industry practice, OGC's inability to take delivery
> of a barge of methanol that had yet to be loaded should have relieved
> Interstate from any obligation to pay for the barge. *See* Cirillo Aff. (Ex.
> A) ¶ 18; Puntureri Aff. (Ex. B) ¶¶ 3-7; 20; *see also* April 10, 2008

> Affidavit of Rich Jukiewics, Exhibit F hereto ¶¶ 4-5; *see also* April 14
> Declaration of Edward Swinderman. Exhibit G hereto ¶¶ 6-9.

(Interstate 56.1(b) St. ¶ 22).

Interstate's evidence of trade usage precludes the award of summary judgment to MIC. *See Bazak Int'l Corp.,* 378 F.Supp 2d at 390 ("The court finds that Bazak has presented adequate evidence to demonstrate a genuine issue of fact concerning trade usage that, if found by a jury, could demonstrate the company's intent to be bound."); *see also Atronic Int'l, GmbH v. SAT Semispecialists of Am., Inc.,* 2007 U.S. Dist. LEXIS 64185 *23-*24, 63 U.C.C. Rep. Serv. 2d (CBC) 855 (E.D.N.Y. Aug. 9, 2007)("SAI presented sufficient evidence at summary judgment to demonstrate a genuine issue of fact concerning the parties' usage of trade and course of performance that, if credited by a jury, could demonstrate the parties' intent to be bound by the oral 'open' and 'subject to prior sale' conditions."); *see also Arbittier v. Russo,* 84 Civ. 6352 (JFK), 1985 U.S. Dist. LEXIS 20571 *2 (S.D.N.Y. Apr. 19, 1985)("There is a genuine issue concerning the terms of the agreement between plaintiff and defendant. In particular, the parties dispute the usage of the trade and their course of dealing, evidence of which is normally read into the contract for purposes of ascertaining the meaning of its language. This is such even if usage of trade or course of dealing contradicts the apparently unambiguous language of the writing.").

**C.    There Are Issues of Credibility Concerning MIC's Core Contention
That it "Reserved in its Inventory" for Interstate a Barge of Methanol**

MIC's claims against Interstate are predicated upon its contention that the methanol sold to Tauber was "reserved for sale to Interstate." (MIC 56.1(a) St. ¶ 20); *see also* Ferguson-Steger Aff. ¶ 18 ("In reliance upon Interstate's promise to purchase the barge of methanol, we reserved the barge of methanol in our inventory.").

However, MIC has submitted nothing other than the conclusory assertion by Mr. Ferguson-Steger establishing this so-called "reservation of inventory." MIC's failure to support this core contention with admissible evidence warrants the denial of its motion for summary judgment on this ground as well. *See Giannullo v. City of New York*, 322 F.3d 139, 140-141 (2d Cir. 2003)("[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing.).

MIC's alleged "reservation of inventory" claim is otherwise contradicted by its advice to Interstate on December 18, 2007 that no methanol would be available for Interstate until December 24, 2007 at the earliest, because that was when MIC "had a vessel coming in" with product. (Interstate 56.1(b) St. ¶ 19). Moreover, despite Interstate's discovery requests, MIC has failed to submit any evidence establishing this so-called "reservation of inventory" that MIC allegedly made as a result of the December 4, 2007 communications between Ms. Cirillo and Mr. Ferguson-Steger. *See* Interstate's Document Requests, Exhibit D hereto, Request Nos. 7, 8, 11, and 12.

Without submitting evidence as to MIC's purchasing and storage activity for the methanol that was sold to Tauber, Interstate has no way of addressing the credibility of MIC's conclusory "reservation of inventory" assertion. *See Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996)("The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.").

**D.    MIC Has Failed To Produce Any Admissible Evidence
Concerning Its Alleged "Prompt Efforts to Mitigate"
<u>Which Is Otherwise Contradicted By Independent Market Reports</u>**

MIC claims that it is entitled to recover from Interstate the difference between the proposed price on December 4 of $2.55 per gallon, and the price at which MIC allegedly sold a methanol barge to Tauber. (MIC 56.1(a) St. ¶¶ 20, 21). MIC apparently seeks to rely upon UCC § 2-706(1) which gives an aggrieved seller the right to resell the goods concerned or the undelivered balance thereof. That section, however, expressly limits such resale to those done in good faith and in a commercially reasonable manner:

> Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price.

UCC § 2-706(1).

Here, MIC has not produced any evidence establishing that its transaction with Tauber was the type of "good faith and commercially reasonable" transaction that would permit MIC to recover from Interstate the difference between the resale price and the contract price even if it were able to ultimately prevail on its breach of contract claim. Exhibit D to MIC's Complaint reflects a sale of 10mb of methanol at $2.05 per gallon to Tauber for delivery sometime between December 21, 2007 and January 10, 2008. No evidence has been submitted by MIC establishing if and when the delivery actually occurred, or where and to whom it was delivered. (Interstate 56.1(b) St. ¶ 20). Moreover, market reports reflect that the market price for a "spot" barge of methanol in the United States during the last two weeks of December, 2007 was between $2.52 and $2.33 per gallon. (Interstate 56.1(b) St. ¶ 21).

Despite Interstate's requests, MIC has failed to produce any documents or correspondence concerning its purported efforts to obtain a market price for a barge of methanol on or after the morning of December 18, 2007, when Ms. Cirillo informed Mr. Ferguson-Steger of Interstate's inability to take delivery of a barge.  Nor has MIC produced documents reflecting its relationship with Tauber sufficient for Interstate to probe into whether the $2.05 price MIC gave Tauber was based upon other business consideration between those companies.  In any event, MIC's bald and conclusory assertions in its Brief and 56.1(a) Statement that "[it] sought the best price it could," and "was forced to accept" the $2.05 price from Tauber, are insufficient to satisfy MIC's summary judgment burden.  (MIC Brief at 21; 56.1(a) St. ¶ 21).

### E.     The Promissory Estoppel Claim

Summary judgment should also be denied on MIC's equitable claim of promissory estoppel.

"In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev.,* 47 F.3d 39, 44 (2d Cir. 1995).  Promissory estoppel is a "narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F. Supp. 712, 735 (S.D.N.Y. 1989). As succinctly stated in *NCC Sunday Inserts Inc. v. World Color Press, Inc.,* 759 F. Supp. 1004 (S.D.N.Y. 1991):

> An action for promissory estoppel generally lies when there is no written contract, or the contract cannot be enforced for one reason or another. Thus, it is an action outside the contract. When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract.

*Id.* at 1011.

Because of this, "some courts will apply the doctrine only when enforcement is necessary to avoid injustice." *Cyberchron Corp.,* 47 F.3d at 44.

Here, for the same reasons that MIC is not entitled to summary judgment on its UCC breach of contract claim, it is also not entitled to summary judgment on its equitable claim of promissory estoppel. As noted above, for example, no admissible evidence has been submitted by MIC to support its claim of purported detrimental reliance – its contention that the methanol sold to Tauber was "reserved for sale to Interstate." (MIC 56.1(a) St. ¶ 20); *see also* Ferguson-Steger Aff. ¶ 18 ("In reliance upon Interstate's promise to purchase the barge of methanol, we reserved the barge of methanol in our inventory."). Also as noted above, MIC's "reservation of inventory" allegation is otherwise contradicted by MIC's advice to Interstate on December 18, 2007 that no methanol would be available for Interstate until December 24, 2007 at the earliest, because that was when MIC "had a vessel coming in" with product. (Interstate 56.1(b) St. ¶ 19). And finally, despite Interstate's discovery requests, MIC has failed to submit any evidence establishing this so-called "reservation of inventory," without which, Interstate is unable to fully respond to the contention.

21

## CONCLUSION

Based on the foregoing, MIC's Motion for Summary Judgment should be denied as there are several disputed issues of material fact concerning: (a) what terms were included in the parties' alleged agreement; (b) whether Interstate's inability to take delivery of the proposed barge was excused based on industry practice; (c) the credibility of MIC's core contention that it "reserved in its inventory" the barge of methanol for Interstate based on the parties December 4, 2007 communications; and (d) MIC's alleged "prompt efforts to mitigate," and its claimed right to recover from Interstate the difference between the market price of methanol on December 4, 2007 and the price at which it sold a barge of methanol to Tauber sometime after December 24, 2007.

Interstate also respectfully requests such other and further relief as this Court deems just and proper.

Dated: New York, New York
      April 14, 2008

SIMON•LESSER PC

By: _____
    Leonard F. Lesser, Esq.

420 Lexington Avenue
New York, New York 10170
T:212.599.5455
F:212.599.5459
llesser@simonlesser.com

Attorneys for defendant Interstate Chemical Corporation

22