UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

       Plaintiff,

  -against-

INTERSTATE CHEMICAL CORPORATION,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)


**DEFENDANT'S LOCAL
RULE 56.1(b) STATEMENT
IN OPPOSITION TO
PLAINTIFF'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**


  Defendant Interstate Chemical Corporation ("Interstate") submits this Local Rule 56.1(b)

Statement in opposition to the Motion for summary judgment filed by plaintiff Mitsubishi

International Corporation ("MIC"), and in specific response to numbered paragraphs of its Local

Rule 56.1(a) Statement.

  1.  For purposes of this motion, Interstate does not dispute ¶ 1 of MIC's 56.1(a) Statement.

  2.  Not disputed.

  3.  For purposes of this motion, Interstate does not dispute ¶ 3 of MIC's 56.1(a) Statement.

  4.  Not disputed.

  5.  Not disputed.

  6.  Disputed.  On December 4, 2007, Interstate inquired with MIC about the

availability of a barge of methanol for possible delivery in late December to Interstate's customer

Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant

on the Ohio River.  The substance of the December 4, 2007 conversation between Zack

Ferguson-Steger of MIC and Lori Cirillo of Interstate was that MIC could load a barge of

methanol from its barge loading facility in St. Rose, Louisiana for Interstate, but could not

commit to any specific loading date.  *See* April 11, 2008 Affidavit of Lori Cirillo ("Cirillo Aff."),

Exhibit A hereto ¶¶ 3, 4.

　　　7.　　　Not disputed.

　　　8.　　　Not disputed.

　　　9.　　　Interstate does not dispute that on December 5, 2007, Mr. Ferguson-Steger sent an e-

mail to Ms. Cirillo, but does dispute the characterization of the content of that e-mail which speaks

for itself.

　　　10.　　　Disputed.  The "form contract" attached to Mr. Ferguson-Steger's December 5,

2007 e-mail does not "contain the same material terms MIC and Interstate agreed to the day before"

as alleged.  Rather, the document contained many terms that were materially different than those

discussed by the parties the day before, and also included one-sided terms in MIC's favor never

discussed that were inconsistent with industry practice, including, but not limited to:

　　　(a)　　　The proposed contract document had a firm delivery date of "December 20th,

2007," which was materially different from the parties' oral discussions, and Mr. Ferguson-

Steger's December 4, 2007 e-mail advising only that MIC could deliver a barge "loading Dec. 20

or later."  Even in his Affidavit, Mr. Ferguson-Steger is inconsistent on the delivery term he now

claims was included in the alleged "agreement" created by the parties' December 4, 2007 oral

discussion.  In one sentence, he asserts that MIC's proposed contract document which had a

"Shipment" term of "December 20th, 2007," was the term the parties allegedly agreed to.  *See*

Ferguson-Steger Aff. ¶ 8.   Yet in another sentence, he says that the delivery term was just

sometime "in December 2007." *See* Ferguson-Steger Aff. ¶ 21.

　　　(b)　　　The proposed contract document also had a one-sided *force majure* clause

excusing MIC's performance "for any cause beyond its reasonable control."  While it is industry

custom to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief.

(c)     The proposed contract also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction.  The parties did not agree to this as MIC acknowledged by the fact that it commenced this litigation as opposed to an arbitration proceeding.  *See* Cirillo Aff. (Ex. A) ¶¶ 8-13; *see also* April 11, 2008 Affidavit of Albert R. Puntureri ("Puntureri Aff."), Exhibit B hereto ¶¶ 3-7.

11.     Disputed.  On Thursday, December 13, 2007, Mr. Ferguson-Steger called Ms. Cirillo to say that MIC could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol.  *See* Cirillo Aff. (Ex. A) ¶ 15.

12.     Interstate disputes the characterization of a "contract" between the parties. Interstate otherwise states that by e-mail the morning of December 18, 2007, Ms. Cirillo of Interstate informed Mr. Ferguson-Steger that it could not take delivery of a barge of Methanol because of OGC's delay in obtaining Coast Guard/Homeland Security approval for its new biodeisel facility on the Ohio River where the barge of methanol was to be delivered.  *See* Cirillo Aff. (Ex. A) ¶¶ 8-13; Puntureri Aff. (Ex. B) ¶¶ 13, 14; *see also* April 10, 2008 Affidavit of Mark Carlisle ("Carlisle Aff."), Exhibit C hereto ¶¶ 3-7.

13.     Interstate does not dispute that on December 19, 2007, Mr. Ferguson-Steger sent an e-mail to Ms. Cirillo, but does dispute the characterization of the e-mail which speaks for itself.

14.     Interstate does not dispute that Ms. Cirillo responded to Mr. Ferguson-Steger's e-mail, but does dispute the characterization of that response which speaks for itself.

15.     Interstate does not dispute that Mr. Ferguson-Steger replied to Ms. Cirillo's response, but does dispute the characterization of that reply which speaks for itself.

16.     Interstate does not dispute that Ms. Cirillo sent additional e-mails to Mr. Ferguson-Steger's on December 19 and 20, but does dispute the characterization of those e-mails which speak for themselves.

17.     Interstate does not dispute that Mr. Ferguson-Steger sent an e-mail to Ms. Cirillo on December 20, 2007, but does dispute the characterization of that e-mail which speaks for itself.

18.     Not disputed.

19.     Disputed.  On Thursday, December 13, 2007, Mr. Ferguson-Steger called Ms. Cirillo to say that MIC could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol.  *See* Cirillo Aff. (Ex. A) ¶ 15.

20.     Disputed.  On Thursday, December 13, 2007, Mr. Ferguson-Steger called Ms. Cirillo to say that MIC could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol.  *See* Cirillo Aff. (Ex. A) ¶ 15.  No evidence has been submitted by MIC that the "vessel it had coming in" on or around December 24, 2007 was ordered after the December 4, 2007 communication between MIC and Interstate.  Interstate also disputes that the methanol MIC alleges it sold to Tauber Petrochemical Company ("Tauber") on December 21, 2007 was product purportedly "reserved for sale" to Interstate."  Exhibit D to MIC's Complaint reflects a sale of 10mb of methanol to Tauber for delivery sometime between December 21, 2007 and January 10, 2008.  No evidence has been submitted by MIC establishing if and when the delivery actually occurred, or where and to whom it was delivered.  Nor has MIC submitted any evidence

establishing this so-called "reservation of inventory" allegedly made as a result of the December 4, 2007 communications between MIC and Interstate. It is Interstate's understanding that MIC produces methanol in Venezuela, and also purchases Venezuelan methanol from importers such as Metcall LLC. MIC then stores the methanol in its facilities for resale to brokers, distributors, and direct customers. Without submitting evidence as to MIC's purchasing and storage activity for the methanol that was sold to Tauber, Interstate has no way of addressing the credibility of MIC's contention that such methanol was "reserved for sale" to Interstate. *See* Puntureri Aff. (Ex. B) ¶¶ 16-19. Interstate has requested such information from MIC, which has not been produced. *See* Interstate's Document Requests, Exhibit D hereto, Request Nos. 7, 8, 11, and 12.

21.     Disputed. Industry market reports reflect that the market price for a "US Spot" barge of methanol for the last two weeks of December, 2007 was between $2.52 per gallon and $2.33 per gallon. Interstate believes that MIC and Tauber had an existing relationship, and that the price paid by Tauber for the barge in question was not at market price, but at a favorable rate in consideration for other business between the companies. *See* Puntureri Aff. (Ex. B) ¶¶ 24-26. Interstate has requested all documents and correspondence concerning MIC's purported "prompt efforts to mitigate" as alleged in ¶ 22 of its Complaint (including the documents listed in MIC's March 19, 2008 Initial Disclosures), as well as all documents and correspondence between MIC and Tauber. *See* Interstate's Document Requests (Exhibit D), Request Nos. 7, 8, 11, and 12; *see also* MIC's Initial Disclosures, Exhibit E hereto. MIC has yet to produce any of the requested disclosure.

22.     Interstate otherwise disputes MIC's core contention that Interstate was obligated to purchase a barge of methanol from MIC at the price of $2.55 per gallon based on the parties' oral and written communications. MIC initially proposed on December 4, 2007 that it could

supply a barge of methanol for Interstate "loading Dec. 20 or later." *See* Cirillo Aff. (Ex. A) ¶¶ 4, 5. On December 13, 2007, MIC modified its proposal by stating that it could not deliver a barge of methanol to Interstate anytime before December 24, 2007 because that was when MIC "had a vessel coming in" with methanol; MIC otherwise made no commitment as to when delivery could and would in fact take place. *See* Cirillo Aff. (Ex. A) ¶ 15. Five days later, on December 18, 2007, Interstate explained to MIC that it could not take delivery of a barge which had yet to be loaded -- and which MIC represented it could not have loaded until sometime after December 24, 2007 at the earliest -- because of the delay in OGC receiving approval from the U.S. Coast Guard and the U.S. Department of Homeland Security for its new biodeisel facility on the Ohio River where the barge was to be delivered. *See* Cirillo Aff. (Ex. A) ¶¶ 16, 17. Interstate had no other place to put the barge. *See* Puntureri Aff. (Ex. B) ¶ 21. Based on industry practice, OGC's inability to take delivery of a barge of methanol that had yet to be loaded should have relieved Interstate from any obligation to pay for the barge. *See* Cirillo Aff. (Ex. A) ¶ 18; Puntureri Aff. (Ex. B) ¶¶ 3-7; 20; April 10, 2008 Affidavit of Rich Jukiewics, Exhibit F hereto ¶¶ 4-5; April 14, 2008 Declaration of Edward Swinderman, Exhibit G hereto ¶¶ 6-9.

WHEREFORE, based on the points and authorities set forth in Interstate's Memorandum of Law, MIC's Motion for summary judgment should be denied as there are several disputed issues of material fact concerning: (a) what terms were included in the parties' alleged agreement; (b) whether Interstate's inability to take delivery of the proposed barge was excused based on industry practice; (c) the credibility of MIC's core contention that it "reserved in its inventory" the barge of methanol for Interstate based on the parties December 4, 2007 communications; and (d) MIC's alleged "prompt efforts to mitigate," and its claimed right to recover from Interstate the difference

between the market price of methanol on December 4, 2007 and the price at which it sold a barge

of methanol to Tauber sometime after December 24, 2007.

Interstate also respectfully requests such other and further relief as this Court deems just

and proper.

Dated: New York, New York
       April 14, 2008

SIMON·LESSER PC

By: _____
       Leonard F. Lesser, Esq.
       420 Lexington Avenue
       New York, New York 10170
       T:212.599.5455
       F:212.599.5459
       llesser@simonlesser.com

Attorneys for defendant Interstate Chemical
Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                    Plaintiff,

     -against-

INTERSTATE CHEMICAL CORPORATION,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**<u>AFFIDAVIT</u>**

STATE OF PENNSYLVANIA   )
                         ) ss.:
COUNTY OF ALLEGHENY    )

     Lori Cirillo, being sworn deposes and says:

     1.     I am the Director of Chemical Procurement at Interstate Chemical Corporation ("Interstate"). I have personal knowledge of the facts set forth below.

     2.     I submit this affidavit to correct some inaccuracies contained in the Affidavit of Zack Ferguson-Steger of Mitsubishi International Corporation ("MIC").

     3.     In connection with the anticipated transaction at issue in this lawsuit, I initially spoke with Mr. Ferguson-Steger on December 4, 2007 inquiring about the availability of a barge of Methanol for possible delivery in late December to Interstate's customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River.

     4.     Mr. Ferguson-Steger stated that MIC could load a barge of Methanol from barge loading facility in St. Rose, Louisiana on the Mississippi River, but could not commit to any

specific delivery date, which was in line with Interstate's requirements as I had yet to receive confirmation from OGC that it could accept a Methanol barge at its new biodeisel facility.

5.    Following that oral discussion, Mr. Ferguson-Steger sent his e-mail to me dated December 4, 2007 at 4:04 p.m. confirming his oral advice that MIC could load a barge of 10mb of Methanol at the then market price of $2.55 per gallon "loading Dec. 20 or later."

6.    This "or later" cautionary language was critical as MIC would not and did not commit to load on a specific date, nor did I on behalf of Interstate commit to a specific delivery date. Rather, MIC simply stated that a barge could be available for Interstate's purchase sometime after December 20, 2007.

7.    The next day, December 5, 2007, Mr. Ferguson-Steger sent me a proposed contract document for this transaction and asked that I sign it and fax it back to him.

8.    I did not do so as the document contained many terms that were materially different than those we discussed the day before, and also included one-sided terms in MIC's favor that were inconsistent with Interstate's prior dealings with MIC, and inconsistent with industry practice in general.

9.    Most critically, the proposed contract document had a firm delivery date of "December 20th, 2007," which was materially different from my oral discussion with Mr. Ferguson-Steger and his December 4, 2007 e-mail advising that MIC was prepared to deliver a barge loading sometime "December 20 or later."

10.    Even in his Affidavit, Mr. Ferguson-Steger is inconsistent on the delivery terms he now claims were included in alleged "agreement" created by our December 4, 2007 oral discussion. In one sentence he asserts that his proposed contract document with a Shipment term of "December 20th, 2007" was the delivery term we agreed to. *See* Ferguson-Steger Aff. ¶ 8.

2

Yet in another sentence, he says that the delivery term was just sometime "in December 2007." *See* Ferguson-Steger Aff. ¶ 21.

11.    However, neither inconsistent claim correctly reflects our oral discussion wherein Mr. Ferguson-Steger just advised that MIC was prepared to deliver a barge loading sometime "December 20 or later."

12.    The proposed contract also had a one-sided force majure clause excusing MIC's performance "for any cause beyond its reasonable control." While it is industry custom to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief.

13.    The proposed contract also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction. I never agreed to this, nor did MIC.

14.    In his Affidavit, Mr. Ferguson-Steger acknowledges that I did not sign or otherwise agree to the terms of the proposed contract he transmitted to me on December 5, 2007. Instead, he says the document "contains the same material terms MIC and Interstate agreed to the day before." *See* Ferguson-Steger Aff. at ¶ 8. As I've shown, that is not accurate.

15.    On Thursday, December 13, 2007, Mr. Ferguson-Steger called me to say that MIC could not deliver a barge of Methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with Methanol.

16.    The following Tuesday, December 18, 2007, I received word from Al Puntureri, President of Interstate, that OCG could not take delivery of a barge of Methanol because of a delay in receiving Coast Guard/Homeland Security approval for its new biodeisel facility on the Ohio River where the barge of Methanol was to be delivered.

17.    Mr. Puntureri instructed me to immediately inform MIC of this fact, which I did by e-mail the morning of December 18, 2007, which was just ten (10) business days after my initial oral discussion with Mr. Ferguson-Steger on December 4, 2007.  My advice to Mr. Ferguson-Steger on December 18 was well before MIC loaded the barge with the Methanol it now claims "it reserved in its inventory" for Interstate.  *See* Ferguson-Steger Aff. at ¶ 18.  It was also a week before MIC even had the ability to deliver any Methanol to Interstate according to what Mr. Ferguson-Steger told me on December 13.

18.    Based on the industry practice and my prior dealings with Mr. Ferguson-Steger, my advice to him on December 18, 2007 concerning OCG's inability to take delivery of a Methanol barge should have relieved Interstate from any obligation to pay MIC for a barge that had yet to be loaded and which was only supposed to be first loaded sometime "December 20 or later."

19.    Instead, Mr. Ferguson-Steger sent me a series of e-mails that threatened to sue Interstate for purported damages.  MIC then followed that threat with this lawsuit.

*Lori Cirillo*
Lori Cirillo

Sworn to before me this
11th day of April, 2008

*Jeanne M Zacherl*
Notary Public

NOTARIAL SEAL
JEANNE M ZACHERL
Notary Public
CITY OF HERMITAGE, MERCER COUNTY
My Commission Expires Apr 29, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                    Plaintiff,

     -against-

INTERSTATE CHEMICAL CORPORATION,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**AFFIDAVIT**

STATE OF PENNSYLVANIA  )
                        ) ss.:
COUNTY OF ALLEGHENY  )

    Albert R. Puntureri, being sworn deposes and says:

    1.     I am the President of Interstate Chemical Corporation ("Interstate"), defendant in this action.  I have personal knowledge of the facts set forth below.

    2.     I founded Interstate in 1968, and since that time, it has become a preeminent chemical manufacturing and distribution company.

    3.     During my forty (40) years in chemical procurement, I have had substantial experience in contract and "spot" business arrangements both as purchaser and seller.  I also have experience in trading activity where barges of chemicals such as Methanol are either purchased from producers or broker/traders or sold to end customers or other broker/traders.

    4.     During my forty (40) years of experience in the industry, I have witnessed the cancellation of orders placed by both contract and "spot" customers on a regular basis either by the seller or purchaser.  Such cancellations have been the result of lack of inventory, lack of

delivery equipment, force majure, change in requirement needs, or sometimes, even no express reason at all.

5.     On many occasions, Interstate has ordered bulk chemicals from suppliers who canceled the orders without reason and without recourse to Interstate.

6.     It is also industry practice to include as a term in a chemical procurement transaction a broad force majure understanding wherein both buyer and seller may cancel the order for any cause beyond their reasonable control.

7.     Such cancellations are common place in the chemical industry given the dangerous nature of the products, and increased regulation in the industry.  Anytime a broker or customer places an order but is unable to accept delivery for any reason beyond its reasonable control, it is industry practice to permit cancellation of the order without penalty so long as the cancellation takes place before the chemicals have been loaded onto the truck, tank car, or barge and shipped.

8.     I have read the Complaint filed by plaintiff Mitsubishi International Corporation ("MIC"), and the Affidavit of its marketing manager, Zack Ferguson-Steger in support of its Motion for Summary Judgment, and believe that MIC's position is over zealous, at best, and flies in the face of industry practice.

9.     On December 4, 2007, Mr. Ferguson-Steger and Interstate's Director of Chemical Procurement, Lori Cirillo, had an oral discussion wherein Ms. Cirillo inquired about the availability of a barge of Methanol for possible delivery in late December to its customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River.

2

10.     Following that oral discussion, Mr. Ferguson-Steger confirmed by his e-mail dated December 4, 2007 at 4:04 p.m. that MIC could deliver a barge of 10mb of Methanol at the then market price of $2.55 per gallon "loading Dec. 20 or later."

11.     By stating that MIC could offer a barge of Methanol "loading Dec 20 or later," MIC was only confirming that it could ultimately supply Interstate with the Methanol barge, although without a firm commitment as to when it would be available for actual shipment.

12.     I understand from Ms. Cirillo that on Thursday, December 13, 2007, Mr. Ferguson-Steger called to tell her that MIC could not deliver a barge of Methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with Methanol.

13.     The following Tuesday, December 18, 2007, I was informed by OCG that it could not take delivery of the barge of Methanol because of a delay in receiving approval from the U.S. Coast Guard and the U.S. Department of Homeland Security for its new biodeisel facility on the Ohio River where the barge of Methanol was to be delivered.

14.     I immediately instructed Ms. Cirillo to inform MIC of this fact, which she did the morning of December 18, 2007, which was within ten (10) business days after her December 4, 2007 oral discussion with Mr. Ferguson-Steger.

15.     Even more important, Ms. Cirillo's advice to Ferguson-Steger was before MIC loaded the barge with the Methanol it now claims "it reserved in its inventory" for Interstate. *See* Ferguson-Steger Aff. at ¶ 18.

16.     It appears from Exhibit D to its Complaint that MIC is claiming that the Methanol it purportedly "reserved in its inventory" for Interstate was sold to Tauber Petrochemical Company ("Tauber"), which is a chemical broker based in Houston, Texas.

17.     That transaction reflects a sale of 10mb of Methanol for delivery sometime between December 21, 2007 and January 10, 2008. No evidence has been submitted by MIC reflecting if and when the delivery actually occurred, or where and to whom it was delivered. Indeed, based on Mr. Ferguson-Steger's advice to Mr. Cirillo on December 13, 2007, MIC was not in a position to deliver any Methanol out of St. Rose, Louisiana before Christmas.

18.     Nor has MIC submitted any evidence establishing this so-called "reservation of inventory" that MIC made as a result of the December 4, 2007 communications between Ms. Cirillo and Mr. Ferguson-Steger.

19.     It is my understanding that MIC is a bulk trader of chemicals and other products. With respect to Methanol, it is my understanding that MIC produces Methanol in Venezuela, and also purchases Venezuelan Methanol from importers such as Metcall LLC. MIC then stores the Methanol in its facilities for resale to brokers, distributors, and direct customers. Without submitting evidence as to MIC's purchasing and storage activity, I have no way of addressing the credibility of MIC's claimed "reservation of inventory" for Interstate. This is especially true in light of Mr. Ferguson-Steger's statement to Mr. Cirillo on December 13, 2007 that MIC was not in a position to deliver any Methanol out of St. Rose, Louisiana before December 24, 2007 because that was when they first "had a vessel coming in" with Methanol. Interstate has requested such information from MIC, which has yet to be produced.

20.     In any event, based on the industry practice I explained above, OCG's inability to take delivery of the barge of Methanol should have relieved Interstate from any obligation to pay for a barge that had yet to be loaded by MIC and, that MIC had only committed to making available "December 20 or later."

4

21.     Instead, MIC decided to sue Interstate because of its inability to take possession
of a Methanol barge yet to be loaded with no place to put it.  Interstate's customer OGC was
unable to take possession of the barge due to the delayed Coast Guard/Homeland Security
approval of its new biodiesel facility.  Interstate had no other place to store the barge of
Methanol.

22.     MIC also now claims that it is entitled to recover from Interstate the price
difference between the market price on December 4, 2007 and the price it sold a Methanol barge
to Tauber.

23.     According to Mr. Ferguson-Steger's Affidavit, the price paid by Tauber was
$2.05 per gallon which was "the highest price [MIC] could get" and which "MIC was forced to
accept." *See* Ferguson-Steger Aff. at ¶¶ 18, 19.

24.     However, industry market reports reflect that the market price for a "US Spot"
barge of Methanol for the last two week of December, 2007 was between $2.52 per gallon and
$2.33 per gallon.  I have attached hereto a copy of the Global Methanol Report issued by Jim
Jordan & Associates ("JJ&A"), the leading market analysis and intelligence provider to the
Global Methanol, Ethanol & Transportation Fuels Industries which reflect such market prices.

25.     It is my belief that MIC and Tauber had an existing relationship, and that the price
paid by Tauber for the barge in question was not at market price, but at a favorable rate in
consideration for other business between the companies.

26.     Despite our requests, MIC has failed to produce any documents or

correspondence concerning its purported efforts to obtain a market price for a barge of Methanol

on or after the morning December 18, 2007, when Ms. Cirillo informed Mr. Ferguson-Steger of

Interstate's inability to take delivery of a barge.


_Albert R. Puntureri_
Albert R. Puntureri


Sworn to before me this
11th day of April, 2008

_Jeanne M Zacherl_
Notary Public

NOTARIAL SEAL
JEANNE M ZACHERL
Notary Public
CITY OF HERMITAGE, MERCER COUNTY
My Commission Expires Apr 29, 2008



# Global Methanol Report

**JIM JORDAN & ASSOCIATES, LLP**     **December 21, 2007   ISSUE 239**

## Global Prices

| Global Prices | DECEMBER | | | | NOVEMBER | |
|---|---|---|---|---|---|---|
| **North America** | CPG | US $/mt | | | CPG | US $/mt |
| US Contract Index - range | 245-280 | 815-931 | ↑ | index range | 195-205 | 649-682 |
| US Contract Index - wtd avg | 257.5 | 856 | ↑ | index wt avg | 199 | 662 |
| Methanex - US MNDRP | 250 | 832 | ↑ | | 200 | 665 |
| SCC - US MPP | 280 | 931 | ↑ | | 205 | 682 |
| **US Spot   GC barge** | | | | | | |
| Wk Dec 21 | 233.00-235.00 | 775-782 | ↔/↓ | Wk Nov 30 | 260.00-270.00 | 865-898 |
| Wk Dec 14 | 233.00-252.00 | 775-838 | | Wk Nov 23 | 275.00-280.00 | 915-931 |
| Wk Dec 07 | 245.00-260.00 | 815-865 | | Wk Nov 16 | 280.00-285.00 | 931-948 |
| | | | | Wk Nov 09 | 285.00-295.00 | 948-981 |
| | | | | Wk Nov 02 | 255.00-265.00 | 848-881 |
| | | | | spot wtd avg | 276.6 | 920 |
| **Truck/Railcar** terminal postings | CPG | US $/mt | | | CPG | US $/mt |
| FOB US GC | 287.00-295.00 | 955-981 | ↑ | | 222.00-260.00 | 738-865 |
| FOB US NE | 287.00-295.00 | 955-981 | ↑ | | 222.00-240.00 | 738-798 |
| FOB US SE | 287.00-290.00 | 955-965 | ↑ | | 222.00-240.00 | 738-798 |
| FOB US MW | 300.00-308.00 | 998-1024 | ↑ | | 235.00-245.00 | 782-815 |
| Ashland - Chicago net benchmark | suspended | suspended | | | 237.00 | 788 |
| Ashland - FOB GC net benchmark | suspended | suspended | | | 222.00 | 738 |
| SCCD - Distribution price, FOB terminal | 305.00 | 1014 | ↑ | | — | — |
| Methanex - W Canada distributor | CAD $932/mt | US$936 | ↑ | | CAD $765/mt | US$792 |
| **US Natural Gas** | | $/MMBtu | | | | $/MMBtu |
| 'Inside Ferc' | Houston Ship Channel | 6.87 | | | | 6.92 |
| Nymex, front month | COB Dec 20 | 7.137 | | | | |
| **Asia** | CPG | US $/mt | | | CPG | US $/mt |
| China, CFR (notional) | 132-135 | 440-450 | ↓ | | 135-150 | 450-500 |
| SE Asia, CFR (notional) | 168-171 | 560-570 | ↓ | | 162-183 | 540-610 |
| Taiwan, CFR (notional) | 168-171 | 560-570 | ↓ | | 165-180 | 550-600 |
| Korea, CFR (notional) | 171-174 | 570-580 | ↓ | | 168-186 | 560-620 |
| **Methanex AP Contract** | 216 | 720 | ↑ | | 186 | 620 |
| **Europe** | €/mt | US $/mt | | | €/mt | US $/mt |
| Contract -      Q4 2007 | 380 | 546 | ↑ | | 380 | 551-563 |
| **Methanex (MEPCP)** Q4 2007 | 390 | 560 | ↑ | | 390 | 566-578 |
| Spot FOB Rdam T2, nominal | 480-505 | 690-725 | ↓ | | 500-540 | 725-791 |

**Currency:** $1 USD = € 0.6961; GBP 0.504; JPY 113.97; CNY 7.3685; CAD $0.995; BRL 1.789; MX peso 10.821

Jim Jordan
Marybeth Maloy Gebauer
Etienne Dor
Bob Starkey
Dexter Miller
Shameek Ghosh

**JJ&A USA:**
12941 North Freeway
Suite 226
Houston, TX 77060  USA
Tel: 281-877-7009
Fax: 281-877-7267
www.jordan-associates.com
info@jordan-associates.com

**JJ&A Europe:**
Brussels, Belgium
+32 10 45 42 81
etienne.dor@skynet.be

**Inside This Issue -**

Global production     2-3
update & price
snapshot

Americas update     3-5

Europe market     6
update

Asia market update     7

US natural gas     8
update

©Copyright 2003-2007
Jim Jordan & Associates, LLP
All Rights Reserved



| JJ&A  Global Methanol Report | December 21, 2007 | Issue 239 | Page 2 |

**US Dec Contract Postings**

|  | cpg | $/mt |
|---|---|---|
| Methanex | 250.00 | 832 |
| SCC | 280.00 | 931 |

**US Nov Contract Postings**

|  | cpg | $/mt |
|---|---|---|
| Methanex | 200.00 | 665 |
| SCC | 205.00 | 682 |

**JJ&A US Contract Index**

|  |  |  |
|---|---|---|
| Nov | 199.00 | 662 |

**US Spot - FOB GC**

|  | cpg | $/mt |
|---|---|---|
| current month | 233.00-235.00 | 775-782 |

Trend: down

**Europe Spot - FOB T2**

|  | €/mt | $/mt |
|---|---|---|
| Rotterdam | 480-505 | 690-725 |

Trend:  down

**Europe Contract**

| Q4 2007 | 380 | 546 |
|---|---|---|

**Methanex Posted Contract Price**

| Q4 2007 | 390 | 560 |
|---|---|---|

**India - CFR WC**

| cpg | $/mt |
|---|---|
| 165-171 | 550-570 |

## World Methanol Prices

**Asia Spot**

| China FOB* | 530-560 | $/mt |
|---|---|---|
| China CFR | 440-450 | $/mt |
| SE Asia CFR | 560-570 | $/mt |
| Taiwan CFR | 560-570 | $/mt |
| Korea CFR | 570-580 | $/mt |

Trend: downward pressure

\* Not all China FOB export product meets IMPCA specifications

**Methanex A-P Contract**

| December | 720 | $/mt |
|---|---|---|
| November | 620 | $/mt |

## Global Production Update

### Americas

In **Chile**, 3 plants totalling about 3 million MT per were down from early June through November due to natural gas constraints. Through November, we estimate that Chile volume lost this year exceeds 1.4 million metric tons. There is no speculation on how much gas will be available and how soon from Chile.  Nothing has changed with the Argentina situation, but hopes for any significant gas from that country anytime soon appear to be fading.

### Europe/Middle East/Africa

In the **Netherlands**, the BioMCN unit has rescheduled its 5-7 day shutdown for some bio-unit tie-in work to early next year.

In the **Middle East** and **Africa**, a number of planned outages have been delayed. The Atlantic Methanol plant in Equatorial Guinea has delayed its planned outage of approximately 10 days to some time in the 1st quarter of 2008.  The outage will include the installation of a new compressor which is expected to increase capacity from approximately 1 million MT/year to 1.15 million.

In **Algeria**, the ENIP Arzew plant (120kTpa) suffered an explosion earlier in November and force majeure conditions were declared.  Production is planned to be restarted end-December/early January.

### Asia

The 600 KTA methanol plant at Hainan Island in **China** experienced an unexpected shutdown in early November. It is expected to restart late December or early January.  In **Indonesia**, KMI has postponed its planned November outage of the 660 KTA plant until January 7th when the plant will be taken down for a planned 3 weeks.

| JJ&A  Global Methanol Report | December 21, 2007 | Issue 239 | Page 3 |

## Global Snapshot

Things heated up in **Europe** this week as many consumers began insisting that the Q1 contract be settled at a number below the €500/MT level. In support of this position, one major consumer/producer made numerous spot sales at €480/MT in a market that most observers believed was above €500/MT. Ultimately, it appears that buyers prevailed with several consumers agreeing with one producer at €490 and at least one other producer accepting that level. More details on this situation will be discussed in the Europe market section of this report.



The **US** market was very quiet this week in the pre-holiday period. Many market players were more focused on holiday activities than the market and the period from now through January 1st most likely will be very dull with more focus celebrating the Holidays. As many had anticipated, Methanex notified customers on Wednesday, that the company is rolling its Methanex Non-discounted Reference Price (MNDRP) at 250 cpg ($831.50/MT) for January. Thus far, Southern Chemical has not notified the market of their intentions. The direction of spot pricing is down although the market was relatively quiet this week.

In **Asia**, markets were quiet this week, but sentiment is down as buyers say spot methanol is becoming more available at prices that continue to favor buyers. Most markets saw spot prices erode this week between $10 and $20/MT.

## North America Update

We completed our calculation for the December contract index price this week. The range was quite wide, with sellers reporting numbers as low as 245 cpg ($815/MT) up to the high end of 280 cpg ($931/MT). Our weighted average for the month is 257.5 cpg ($856 per MT) up a sizeable 58.5 cpg ($195 per MT) from November. Spreads such as we see this month can create multiple problems for buyers and sellers. Newsletter indexes are likely to be wide ranging. Our index is well above some posted prices. Others likely will be as well. Will 'meet competition clauses' be imposed? Will contracts that are indexed have to be modified or at least exceptions granted? These are confusing times and when producers see the market so differently, it does create unusual circumstances.



*North America Update, continued*

The US market showed further signs of softness this week and consumers continue to comment that they believe the worst is over. Most were not at all surprised that Methanex held the MNDRP at 250 cpg for January, but most consumers believe that future months will see declining prices. The Southern Chemical price for December is 280 cpg ($931/MT). Southern commented they will announce their price ideas for January next week. News that the European market appears headed for a €490 (214 cpg) settlement for Q1 will have US buyers pressing hard for prices that do not put them at a competitive disadvantage with their competitors in Europe. There is no way producers will drop US prices that much for January, but later in the quarter, the pressure will be on from consumers.

The continuing demise of the housing industry cannot be ignored as a possible precursor to recession in the US. Housing starts for single family homes are at the lowest level in 16 years. Starts in November were down 24 percent from November of last year. This is getting very serious. While the numbers of starts do not tell the entire story, they cannot be ignored. The average home size is going up and homes today contain more formaldehyde resins based products than in the early 1990's so fewer homes contain more formaldehyde, but the magnitude of the decline still has an almost unprecedented impact on those formaldehyde and acetic acid



U.S. Privately-Owned Housing Unit Starts

based products that go into the housing industry. At this stage, it is questionable that the Fed can do much more to turn the situation around. Interest rates are certainly low enough that financing should not be a problem, but it is becoming more difficult to qualify for loans since many lenders have lost billions of dollars due to default on sub-prime loans that are coming due and decimating not only the lenders, but the homeowners that cannot afford to make the new (increased) payment amounts.

The methanol **spot** market was relatively quiet in the typical pre-Christmas/New Year holiday lull—but there was a steady flow of business conducted behind the scenes. Most of the attention was focused on January trading, although some residual December business was conducted as well. December prices generally consolidated towards the low end of last week's trading range, with general bid/ask ideas near 230/235 cpg ($765/782 per MT) for most of the week—although a few players were still holding selling offers as high as 240 cpg ($798). Firm selling offers in the low 230's failed to attract buying interest for most of the week. Light trade was confirmed within the aforementioned 230-235 cpg range on a private and confidential basis.

January spot prices were in a much wider range this week, as price ideas began to slip rather sharply week-on-week. Early in the week, bid/ask ideas were in a range of 210-220 cpg ($698-732), and several p+c deals were confirmed within this range. Sub-210 cpg January business was reported later in the week.

## US Methanol Imports

The latest trade data for October was released this week by the US Census Bureau. As shown in the map below, we see the first shipment of methanol into the Columbia-Snake River Region of the Pacific Northwest (the result of the closure of Canadian methanol production).



### United States Methanol Trade 2007

#### IMPORTS in MT

| Country | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD 2007 | YTD 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Trinidad | 285,340 | 411,240 | 330,278 | 261,422 | 262,968 | 344,810 | 224,200 | 367,864 | 232,240 | 250,183 | | | 2,970,545 | 3,493,821 |
| Venezuela | 51,209 | 64,485 | 32,473 | 74,421 | 36,242 | 52,928 | 71,707 | 49,423 | 53,772 | 42,661 | | | 529,321 | 935,565 |
| Eq. Guinea* | 82,000 | - | 40,242 | 28,351 | 72,197 | 31,190 | 40,723 | 76,395 | 40,742 | 59,581 | | | 471,421 | 259,480 |
| Chile | 40,301 | 152 | 121 | 76,047 | 40,071 | 87,456 | 18,341 | 21,307 | 3,988 | 142 | | | 287,926 | 119,321 |
| Argentina | 33,295 | - | 41,648 | 15,227 | 24,464 | 11,848 | - | 4,721 | - | 31,736 | | | 162,939 | 178,209 |
| Bahrain | - | 5,246 | 14,989 | 5,318 | 9,995 | 10,057 | 12,304 | 6,095 | - | - | | | 64,004 | 54,980 |
| Canada | 15,215 | 13,181 | 10,927 | 11,540 | 1,266 | 11 | - | 85 | 33 | 229 | | | 52,487 | 306,970 |
| Russia | - | - | - | - | - | - | - | - | 11,450 | - | | | 11,450 | 51,109 |
| China | - | 92 | 106 | 67 | 330 | 57 | 359 | 193 | 441 | 1,751 | | | 3,396 | - |
| Other | 511 | | - | 114 | 128 | 7 | 23 | 123 | 117 | 120 | | | 1,143 | - |
| TOTAL | 507,871 | 494,396 | 470,678 | 472,507 | 447,661 | 538,364 | 367,657 | 526,206 | 342,783 | 386,403 | | | 4,554,632 | 5,399,455 |



## US Methanol Imports - YTD OCT 2007

| Alaska | |
|---|---|
| Canada | 1.0 |

| Seattle | |
|---|---|
| Chile | 64.6 |
| Canada | 20.9 |
| Trinidad | 27.3 |

| Columbia-Snake | |
|---|---|
| Trinidad | 8.5 |

| Great Falls | |
|---|---|
| Canada | 24.3 |

| Pembina | |
|---|---|
| Canada | 1.6 |

| Duluth | |
|---|---|
| Canada | 3.4 |

| Detroit | |
|---|---|
| Trinidad | 0.3 |
| Canada | - |

| Upstate NY | |
|---|---|
| Trinidad | 38.3 |
| Canada | 0.8 |

| Maine | |
|---|---|
| Chile | 1.2 |
| Canada | .3 |

| NY City | |
|---|---|
| Venezuela | 112.0 |
| Bahrain | 23.7 |
| Trinidad | 5.3 |
| Russia | 1.7 |

| Wilmington | |
|---|---|
| Trinidad | 303.3 |
| Bahrain | 13.0 |
| Venezuela | 0.0 |

| Charleston | |
|---|---|
| Trinidad | 47.7 |
| Venezuela | 6.3 |

| Savannah | |
|---|---|
| Trinidad | 81.7 |

| Virgin Isl. | |
|---|---|
| Venezuela | 0.0 |

| Puerto Rico | |
|---|---|
| Trinidad | 6.3 |

### US Methanol Imports YTD OCT 2007 (in KT)

| | Oct 2007 | YTD 2007 |
|---|---|---|
| Total | 386.4 | 4,554.6 |

| Gulf Coast, TX/LA (port not specified) | |
|---|---|
| Equatorial Guinea | 471.4 |

| Pt. Arthur, TX | |
|---|---|
| Trinidad | 221.0 |
| Chile | 41.0 |

| Houston | |
|---|---|
| Trinidad | 1,169.5 |
| Venezuela | 246.5 |
| Argentina | 162.9 |
| Chile | 81.3 |
| Bahrain | 27.2 |
| Russia | 9.7 |

| New Orleans | |
|---|---|
| Trinidad | 953.2 |
| Venezuela | 164.3 |
| Chile | 86.0 |
| Bahrain | 0.0 |

| Mobile | |
|---|---|
| Trinidad | 107.5 |
| Chile | 13.4 |

## Europe Methanol Update

It was quite an interesting week on the European methanol scene. While the public positions of the various players did not demonstrate a lot of flexibility, negotiations seemingly blocked and opinions irreconcilable, behind the scene discussions and analyses showed no lack of determination and/or tactical creativity.

Producers' opinions bravely stuck behind their interpretation of the S/D situation, best summarised by "… improving but still dangerously stretched…" while consumers increasingly pointed to eroding spot prices in



### Europe Methanol Prices

all regions to back their claims for a contract price that by "all means" would have to be below €500 FOB Rotterdam.

Spot transactions recorded during the week indeed showed price erosion … but were also the subject of lots of criticism by many players as to their "validity". A December shipment was done at €505 FOB R'Dam and Jan/Feb transactions were done at €480 FOB. These transactions are confirmed, the buyers include consumer(s), producer(s) and the sellers are multiple: they fully qualify under the usual criteria for spot "postings", but are essentially the result of an unprecedented move by methanol consumer(s). Discouraged to consume high-priced methanol into the derivate sector, a consumer decided to offer unneeded product on the spot market. While the quantities are not negligible, it is not enough to solve the structural S/D shortfalls.  But these sales did influence the spot market which "otherwise" had been stable in the €520-525 range.  If not accepted by all, many players were advocating that in essence this is "tactically" no different than producers buying, or "drying-up" the spot market to "achieve their goals".  We can only say that **in both** cases we are far from the usual understanding of market operations where sellers **always** sell with the objective to MAXIMISE the price and buyers **always** buy to MINIMISE the price and both players negotiating within these rules (no different treatment depending on who the buyer/seller is).

Resulting from the above, the contract negotiations suddenly accelerated during the last days prior to the Christmas holidays.  On Thursday, a major consumer publicly stated his frustration about the ongoing deadlock and threatened to harden his position if no solution could be found before January. On Friday morning Methanex announced their intention to post their MEPCP for Q1 at €525 FOB Rotterdam, below the publicly announced levels, but "around" what was understood to be the "negotiable position" of EQCP producers.

To many players it came as a surprise, but mid-Friday the announcements came out that agreements had been reached between several buyers and a producer for a Q1 EQCP at €490 ($712/MT) FOB Rotterdam. This was subsequently followed by more buyers and at least one more producer. Other producers prefered to "digest" the news before making their position known (but it will be difficult to generate another consensual number).

Similarly, Methanex has decided not to officially post a MEPCP before having had the time to make a full analysis of the market and will communicate with its customers within the next few days. If many are relieved by the fact that the holiday season can now really start, some will not be celebrating without some heartburn.  The €490 contract number is clearly below what most producers anticipated, and we must say, also below what many consumers anticipated just 2-3 weeks ago.

## Asia Methanol Update

Consumers in Asia seem to be winning the waiting game as spot prices continued a steady downward trend again this week. Price ideas across the entire region softened this week as China sellers continued lowering their offers to attract buyers in Korea and elsewhere. News that multiple spot deals were getting done in Europe at €480 ($690/MT) encouraged buyers that global prices were declining and few bids were heard—and those that were bidding were only looking for "deals". Offers near the levels of last week received no interest whatsoever.

In **Southeast Asia,** no deals were reported, but sentiment was clearly down as most market participants were winding down for the holidays. Regional sellers continue to comment that the market is delicately balanced to short, but concede that buyers are no longer interested in spot numbers above the $550-$560 level. Most are covered on term contracts and closely watching inventories at year-end with the expectation that prices will fall further during the first quarter of next year. **Taiwan** was similarly quiet this week as no bids were heard and offers from China at numbers that would net $560-$565/MT on an FOB basis had no interest for consumers.

Buyers in **Korea** remained on the sidelines, expressing no interest in China offers of $540-$560 FOB China. Korea buyers are speculating that the Methanex contract price announcement for January will be down, in recognition of declining spot values and falling prices in China. **India** prices are nominally lower with little activity heard. Buyers appear to be adequately covered with contract volumes and prices continue under downward pressure with offers for export heard at around $550/MT FOB, but no buyers stepped forward as prices in Europe and the US continue to experience downward pressure. No buyer wants to commit at current prices, not knowing how far prices could fall before arrival at a potential customer location. Buyers are not interested in a declining market.

In **China** this week, it is more of the same. Local prices continue to fall with weak demand and export opportunities declining. There were some mixed signals this week as local prices were placed in a very wide range, between CNY 3300 and 3500, depending on the source. There is clearly some confusion and price ideas are quite different depending on the source and which day of the week. However, the trend is down and with the Lunar New Year holidays looming, sellers are hoping for a resurgence within the next 2 weeks; but buyers seem very scarce with demand still quite sluggish. Offers for export continue to be heard between $530 and $560 FOB and while some export sales are quietly being concluded, some sellers are concerned that when the Hainan Island plant re-starts (planned early January), there will be additional downward pressure on prices.

## JJ&A Holiday Publishing Schedule

JJ&A's offices will be closed December 24, 2007 through January 1, 2008. We will not be publishing a Global Methanol Report the week of December 24th in observation of the Holiday Season.

Our warmest thoughts and best wishes for a wonderful Holiday and Happy New Year.

## Natural Gas Snapshot

Near-month futures prices were relatively steady this week. Since moving into front month position at the end of November, the January natural gas futures contract on the NYMEX has traded in an average range either side of $7.00-7.40 per MMBtu. The January futures contract closed the report week Thursday at $7.137 per MMBtu, posting a week-on-week decline of $0.056 per MMBtu.

The 12-month natural gas futures strip on the NYMEX (Jan 2008 — Dec 2008) closed the week Thursday at $7.588, posting a very slight week-on-week decrease of $0.016. At $7.588, the 12-month strip was trading at a premium of $0.408 to the Henry Hub spot price. The lowest priced contract over the next 12 months is the near-month January 2008 contract, which closed the week at $7.137 per MMBtu, as noted above. The highest priced contract over the next 12 months is the December 2008 contract, which closed the week at $8.541 per MMBtu. The average futures strip price for the remaining winter heating season contracts (Jan 2008 - March 2008) was $7.215 per MMBtu, which is down from the week-ago level of $7.284 per MMBtu.

Henry Hub spot prices were fairly steady this week, trading in a relatively narrow range. The average Henry Hub spot price closed the week at $7.18, which was down $0.21 per MMBtu from last week's close.

The U.S. EIA's latest storage report for the week ending December 14th showed a 121 Bcf net withdrawal from underground storage, which was below average expectations for a 133 Bcf withdrawal. Total gas in storage is now reported at 3,173 Bcf. According to EIA data, this week's 121 Bcf withdrawal compares with the 5 year average net withdrawal of 128 Bcf and the year-ago net withdrawal of 85 Bcf for the same report week. The current level of gas in U.S. storage is now 4 Bcf (0.1 percent) less than last year's level of 3,177 and 266 Bcf (9.2 percent) above the 5-year average inventory level of 2,907 Bcf for the report week.



U.S. Natural Gas & Crude Oil
near-month futures

### U.S. Natural Gas Prices

| Benchmark | Dec 14 | Dec 17 | Dec 18 | Dec 19 | Dec 20 |
|---|---|---|---|---|---|
| Henry Hub cash | 7.09 | 7.07 | 7.16 | 7.18 | 7.18 |
| Jan futures contract | 7.025 | 7.035 | 7.141 | 7.179 | 7.137 |
| Feb futures contract | 7.153 | 7.176 | 7.278 | 7.299 | 7.237 |

| 'Inside FERC' - Dec | | |
|---|---|---|
| Houston Ship Channel | 6.87 | |
| Henry Hub | 7.21 | |
| Chicago city-gates | 7.78 | |
| U.S. national average | 6.87 | Natural Gas Prices in US $/MMBtu |
| *TCPL Alberta, AECO-C# | 6.21 | *TCPL Alberta, AECO-C# prices are in Canadian$/GJ |

### U.S. EIA Energy Price Outlook

| | Year | | | |
|---|---|---|---|---|
| forecast as of Nov 2007 | 2005 | 2006 | 2007 | 2008 |
| Crude oil; WTI, $/bbl | 56.49 | 66.02 | 71.36 | 80.00 |
| Natural gas; Henry Hub, $/mcf | 9.00 | 6.90 | 7.30 | 8.01 |

JJ&A



U.S. Natural Gas In Underground Storage
Billion Cubic Feet - Week ending December 14, 2007

Source: U. S. Energy Information Administration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                          Plaintiff,

              -against-

INTERSTATE CHEMICAL CORPORATION,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)


**AFFIDAVIT**


STATE OF KENTUCKY  )
                   ) ss.:
COUNTY OF DAVIES   )

      Mark Carlisle, being sworn deposes and says:

      1.    I am the Vice President of Operations for the Owensboro Grain Company, LLC

("OGC"). I have personal knowledge of the facts set forth below.

      2.    OGC produces edible oils and soy products at its headquarters near the Ohio River

in western Kentucky.

      3.    In or about November, 2007, OGC began commissioning its new biodiesel plant.

The new biodiesel plant will have a capacity of some 50 million gallons of yearly biodiesel, and

is one of the largest biodiesel plants in the entire continental United States.

      4.    At that time, it was our intention to order a barge of methanol for use in the

biodiesel plant.

      5.    Given the size of the plant and its location on the Ohio River, before we could

accept delivery of a barge of methanol at the plant, OGC needed to obtain approvals from the

United States Coast Guard and from the United States Department of Homeland Security. OGC

had previously submitted its Operations Manual and newly developed Security Plan to the Coast Guard.

6.    Although OGC had anticipated such approvals to be received by the end of 2007, to date, such approvals have not been received. As of today's date, the United States Coast Guard is still reviewing the Security Plan and considering Homeland Security issues that still prevents OGC from receiving methanol by barge at the plant.

7.    I understand that Interstate Chemical Company ("Interstate") placed an order with Mitsubishi International Corporation ("Mitsubishi") for a methanol barge to be delivered to us at the end of December, 2007. However, due to the delays in receiving approvals from the United States Coast Guard and the United States Department of Homeland Security, OGC was unable to receive that barge, and is still unable to receive it today.

Mark Carlisle

Sworn to before me this
10 th day of April, 2008

Notary Public

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------

MITSUBISHI INTERNATIONAL CORPORATION,

                              Plaintiff,

        -against-

INTERSTATE CHEMICAL CORPORATION,

                              Defendant.

---------------------------------------------------

08 Civ. 00194 (JSR)(GWG)

**DEFENDANT'S FIRST SET
OF DOCUMENT REQUESTS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, defendant

Interstate Chemical Corporation ("Interstate") demands that plaintiff Mitsubishi

International Corporation ("Mitsubishi") produce for inspection, examination and copying

the following documents and tangible things at the offices of Simon Lesser PC, 420

Lexington Avenue, New York, New York 10170, or such other location as the parties may

designate, within thirty (30) days from the date of service hereof.

## RULES OF CONSTRUCTION

1.      These document requests are to be regarded as continuing to the extent set

forth in Rule 26(e) of the Federal Rules of Civil Procedure, and Mitsubishi is required to

provide supplementary responses in accordance with that Rule within ten (10) days of

obtaining or becoming aware of additional information pertaining to these document

requests.

2.      "Mitsubishi," "Plaintiff," and "you" means the plaintiff in this action,

including all of its parents, affiliates, subsidiaries, officers, directors, employees, agents,

and representatives.

3.    Mitsubishi is required in responding to these document requests to obtain and furnish all information that is in its possession or under its control, or in the possession or the control of any of its representatives, employees, agents, servants or attorneys.

4.    If any of the documents requested below are withheld under a claim of a privileged communication, you are requested for each such document withheld, to state that you are claiming a privilege thereof and the ground(s) on which said privilege rests, and to identify the document for which the privilege is claimed by specifying:

(a)    its title or other identifying data;

(b)    the identity of the author thereof, the parties thereto, and any person who assisted in its preparation;

(c)    the date of the document or if no date appears thereon, the approximate date;

(d)    the exact nature and substance of the document;

(e)    the identity of each person having possession, care, custody, or control of the original and any copies thereof; and

(f)    the identity of each person to whom the document's contents were disclosed.

5.    If any documents requested herein were, but no longer are in Mitsubishi's possession or subject to Mitsubishi's control, identify such documents and state what disposition was made of such documents.

6.    If any documents requested herein have been destroyed, or otherwise discarded, you are requested for each such document to state the reason for its destruction or

2

discard, identify the person(s) who authorized such destruction or discard, and identify the document by specifying:

(a)    its title or other identifying data;

(b)    the identity of the author thereof, the parties thereto, and any person who assisted in its preparation;

(c)    the date of the document or if no date appears thereon, the approximate date;

(d)    the exact nature and substance of the document;

(e)    the identity of each person who had possession, care, custody, or control of the original and any copies thereof; and

(f)    the identity of each person to whom the document's contents were disclosed.

7.    If any information or data is withheld because such information is stored only electronically, Mitsubishi shall identify such information by the subject matter of the information or data, the storage mode, and the place or places where such information is maintained.

8.    Each document request which seeks information relating in any way to communications to, from or within a business and/or corporate entity, is hereby designated to mean, and should be construed to include, all communications by and between representatives, employees, agents and/or servants of the business and/or corporate entity.

9.    No answer is to be left blank.  If the response to the document request in none or unknown, the words "none" or "unknown" must be written and supplied as the

response. If the response to a document request is inapplicable, "n/a" must be written and supplied as the response.

10.    Unless expressly indicated otherwise, the time period covered by these document requests is January 1, 2004 through the trial of this action.

## DEFINITIONS

Interstate adopts, and Mitsubishi is directed to observe the uniform definitions for discovery requests set forth in subparagraphs (c) and (d) of Rule 47 of the Joint Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, in addition to the following definitions which are applicable to these document requests.

## DOCUMENT REQUESTS

1.    All documents concerning the "agreement" as alleged in the Complaint.

2.    All documents concerning any and all communications concerning the "agreement" as alleged in the Complaint.

3.    All written communications between Mitsubishi and Interstate.

4.    All documents concerning any and communications between Mitsubishi and Interstate.

5.    All documents concerning any and all transactions between Mitsubishi and Interstate prior to December 4, 2007.

6.    All documents concerning the allegation in ¶ 20 of the Complaint that "MIC was willing and able to deliver the methanol to Interstate. . . ."

7.    All documents evidencing the "prompt efforts to mitigate" as alleged in ¶ 21 of the Complaint.

8.     All written communications between Mitsubishi and Tauber Petrochemical Company since January 1, 2006.

9.     All documents concerning any and communications between Mitsubishi and Tauber Petrochemical Company since January 1, 2006.

10.     All documents concerning any and all transactions between Mitsubishi and Tauber Petrochemical Company since January 1, 2006.

11.     All documents concerning the price Mitsubishi paid for the Methanol it allegedly sold at $2.05 per gallon as alleged ¶ 27 of the Complaint.

12.     All documents concerning the allegation in ¶ 26 of the Complaint that "in reliance upon Interstate's promise, MIC reserved the barge of methanol in its inventory," including but not limited to any and all documents evidencing such "reservation."

13.     All documents, to the extent not produced in response to the foregoing Requests, that Mitsubishi will rely upon to support its claims or to rebut Interstate's Affirmative Defenses.

Dated: New York, New York
         March 19, 2008

SIMON LESSER PC

By: _____
         Leonard F. Lesser, Esq. (LL-4054)
         420 Lexington Avenue
         New York, New York 10170
         t: 212.599.5455
         f: 212.599.5459
         Attorneys for defendant Interstate Chemical
         Corporation

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

Plaintiff,

-against-

INTERSTATE CHEMICAL CORPORATION,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**NOTICE OF DEPOSITION**

      PLEASE TAKE NOTICE that pursuant to Rules 30 and 34 of the Federal Rules of Civil Procedure, defendant Interstate Chemical Corporation ("Interstate") will conduct the deposition of plaintiff Mitsubishi International Corporation ("Mitsubishi"), by one or more of its officers, directors, managing agents, employees or other persons whom it shall designate pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure as having the most knowledge concerning the matters set forth in Schedule A annexed hereto.

      The deposition will commence on April 30, 2008, beginning at 9:30 a.m. and continue from day to day until completed. The deposition will be stenographically recorded. The deposition will take place at the offices of Simon Lesser PC, 420 Lexington Avenue, New York, New York 10170. In addition, Mitsubishi is requested to provide the undersigned counsel, at least five (5) days before the deposition, with a written designation of the names and positions of each designee who will testify on behalf of Mitsubishi, and the subject matter categories set forth in Schedule A as to which each designee will testify.

You are invited to attend and cross-examine.

Dated: New York, New York
       March 19, 2008

                                    SIMON LESSER PC

                                    By: _____

                                          Leonard F. Lesser, Esq.
                                    420 Lexington Avenue
                                    New York, New York 10170
                                    t: 212.599.5455
                                    f: 212.599.5459
                                    Attorneys for defendant Interstate Chemical
                                    Corporation

## SCHEDULE A

## SUBJECTS OF INQUIRY

1.      The documents produced in response to Interstate's First Set of Document

Requests, dated March 19, 2008.

2.      The allegations contained in the Complaint.

3.      All transactions between Mitsubishi and Interstate.

4.      All transactions between Mitsubishi and Tauber Petrochemical

Corporation.

5.      The price Mitsubishi paid for the methanol it sold at $2.05 per gallon as

alleged in ¶ 27 of the Complaint.

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MITSUBISHI INTERNATIONAL        :
CORPORATION,                                08 CV 00194(JSR)(GWG)
                                :
          Plaintiff,            :    **PLAINTIFF'S INITIAL**
                                     **DISCLOSURES PURSUANT**
          -against-             :    **TO RULE 26(a)(1)**
                                :
INTERSTATE CHEMICAL CORPORATION,            ECF Case
                                :
          Defendant.            :
----------------------------------X

     In accordance with Rule 26(a)(1), Fed. R. Civ. P., plaintiff
Mitsubishi International Corporation makes the following initial
disclosures:


A.   Name, address, and telephone number of each individual
     likely to have discoverable information that the disclosing
     party may use to support its claims or defenses, including
     subjects of the information:

     i.   Zack Ferguson-Steger
          Mitsubishi International Corporation
          655 Third Avenue
          New York, New York 10017
          (212) 605-2000

          Mr. Ferguson-Steger has knowledge of the circumstances
          surrounding the negotiation and confirmation of the
          agreement between Mitsubishi International Corporation
          and Interstate Chemical Corporation for the sale of a
          barge of methanol that is the subject of the complaint
          in this action, as well as Interstate Chemical
          Corporation's refusal to perform that agreement.

     ii.  Lori Cirillo
          Interstate Chemical Corporation
          2797 Freedland Road

Hermitage, Pennsylvania 16148
(724) 981-3771

Ms. Cirillo has knowledge of the circumstances
surrounding the negotiation and confirmation of the
agreement between Mitsubishi International Corporation
and Interstate Chemical Corporation for the sale of a
barge of methanol that is the subject of the complaint
in this action, as well as Interstate Chemical
Corporation's refusal to perform that agreement.

B.  Description by category and location of all documents, data
compilations, and tangible things in possession, custody, or
control of the party that the party may use to support its
claims or defenses:

Plaintiff has in its possession, custody or control the
following documents:

- Documents regarding the negotiation and
  confirmation of the agreement between
  Mitsubishi International Corporation and
  Interstate Chemical Corporation for the sale
  of a barge of methanol that is the subject of
  the complaint in this action.

- Documents detailing Interstate Chemical
  Corporation's refusal to perform the
  agreement that is the subject of the
  complaint in this action.

- Documents detailing Mitsubishi International
  Corporation's attempts to mitigate the
  damages caused by Interstate Chemical
  Corporation's breach of the agreement.

- Documents setting forth the spot price for
  methanol during the dates relevant to the
  action.

C.  Computation of any category of damages claimed by the
disclosing party:

Mitsubishi International Corporation has been damaged
by defendant's breach in the amount of at least
$210,000 plus interest.  This reflects the difference

2

between the purchase price of methanol agreed upon by
the parties (420,000 gallons of methanol at $2.55 per
gallon, or $1,071,000.00) and the price Mitsubishi
International Corporation received on the spot market
when it was forced to sell the barge of methanol it had
been reserving for defendant in order to mitigate its
damages (420,000 gallons of methanol at $2.05 per
gallon, or $861,000).


D.    Any insurance agreement under which any person carrying on
an insurance business may be liable to satisfy part or all
of a judgment which may be entered in the action or to
indemnify or reimburse for payments made to satisfy the
judgment:

        On information and belief, there are no relevant
insurance agreements.



Dated:    New York, New York
          March 19, 2008



                        KORNSTEIN VEISZ WEXLER & POLLARD, LLP


                        By:  Daniel J. Kornstein (DK - 3264)

                        757 Third Avenue
                        New York, New York 10017
                        (212) 418-8600

                        Attorneys for Plaintiff
                        Mitsubishi International Corporation



TO:  Leonard F. Lesser, Esq.
     SIMON LESSER PC
     420 Lexington Avenue
     New York, New York 10170
     Attorneys for Defendant
     Interstate Chemical Corporation


                              3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                       Plaintiff,

       -against-

INTERSTATE CHEMICAL CORPORATION,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**AFFIDAVIT**

| | |
|---|---|
| STATE OF OHIO | ) |
| | ) ss.: |
| COUNTY OF CUYAHOGA | ) |

       Rich Jukiewicz, being sworn deposes and says:

       1.     I am a Senior Purchasing Agent for Research Organics, Inc. ("Research Organics"). I have personal knowledge of the facts set forth below.

       2.     Research Organics is a primary manufacturer and leading worldwide supplier of high purity biochemicals for use in molecular biology, diagnostics, cell culture, pharmaceuticals, biopharmaceuticals, life sciences and biotechnology.

       3.     I have been involved as a commercial purchaser of chemical products for forty (40) years.

       4.     It is industry practice that purchase orders for chemicals be cancelled or changed on a frequent basis. Such cancellations frequently occur when end customers cancel their orders with us, causing a domino effect of having to cancel the order for material from our supplier and the end user is now unavailable.

5.      It is also industry practice for purchase orders to be cancelled as a result of *force majure,* such as when the end customer is unable to take the material as a result of government intervention, transportation issues, weather related issues, and other events that are beyond our control.

Rich Jukiewicz

Sworn to before me this
10_th day of April, 2008

Notary Public

DIANN C. HARLAN
NOTARY PUBLIC-STATE OF OHIO
MY COMMISSION EXPIRES 7/2/11

2