```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- x
MITSUBISHI INTERNATIONAL CORPORATION,   :
                                        :
            Plaintiff,                  :      08 Civ. 194 (JSR)
                                        :
       -v-                              :      MEMORANDUM
                                        :
INTERSTATE CHEMICAL CORPORATION,        :
                                        :
            Defendant.                  :
--------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Plaintiff Mitsubishi International Corporation ("MIC") seeks to recover damages it allegedly suffered when defendant Interstate Chemical Corporation ("Interstate") breached the parties' contract for sale of a barge of methanol.  MIC moved for summary judgment prior to discovery, and by Order dated May 6, 2008, the Court denied the motion.  This Memorandum sets forth the reasons for that ruling.

Both MIC and Interstate are in the business of trading and distributing chemical products. See Plaintiff's Local Civil Rule 56.1(a) Statement ("Pl. 56.1") ¶¶ 1-2.  On December 4, 2007, Zack Ferguson-Steger, marketing manager of MIC, spoke by telephone with Lori Cirillo, Director of Chemical Procurement at Interstate, regarding the possibility of MIC selling Interstate a barge of methanol.  Id. ¶ 5.  During that conversation, the parties agreed that Interstate would purchase one barge (420,000 gallons, or 10 mb) of methanol at a price of $2.55 per gallon, although the parties dispute whether they agreed to a firm delivery date at that point. See Pl. 56.1 ¶ 6; Defendant's Local Civil Rule 56.1(a) Statement in Opposition to Plaintiff's Motion for Summary Judgment ("Def. 56.1") ¶

6. Later that day, Cirillo emailed Ferguson-Steger, stating: "We would like to purchase your methanol barge.  Please give me a call." Email of Dec. 4., 2007, Ex. A to Complaint ("Compl."). Ferguson-Steger responded by email: "We confirm 10 mb @ $2.55/gal loading Dec 20 or later.  If we can ship earlier, we'll inform you.  I'll send over a spot contract a little later." Email of Dec. 4, 2007, Ex. B to Compl.  The following day, Ferguson-Steger emailed Cirillo a contract for the purchase that MIC had prepared and asked Cirillo to sign it and send it back.  See Email of Dec. 5, 2007, Ex. B to Compl.; Contract, attachment to Ex. B to Compl.  Interstate never signed and returned the contract.

According to Interstate, on December 13, Ferguson-Steger called Cirillo to say that MIC could not deliver the barge anytime before December 24, 2007.  Def. 56.1 ¶ 11.  MIC does not recall any such communication.  Pl. 56.1 ¶ 11.

On December 18, 2007, Cirillo emailed Ferguson-Steger, informing him that Interstate was "having a problem with this barge" because the Coast Guard had not yet approved the receipt of barges at its intended destination, Owensboro, Kentucky, where Interstate's customer had a biodeisel plant.  Email of Dec. 18, 2007, Ex. B to Compl.  The following day, Ferguson-Steger responded by email: "We can postpone delivery of the barge if needed but we cannot cancel." Email of Dec. 19, 2007, Ex. B to Compl.  Cirillo replied that Interstate "ha[d] no choice but to cancel because the customer canceled due to the coast guard restrictions." Id.  Ferguson-Steger

2

answered that MIC "c[ould ]not allow [Interstate] to walk away from this spot contract, even if the customer claims they cannot receive the barge," that MIC had "reserved this product in [its] inventory," and that if Interstate were to cancel, MIC "would have to hold [Interstate] responsible for the damages." Id. Cirillo responded that Interstate could not "hold" the barge until its customer could receive it, and that Interstate did not believe it was obligated to buy the barge. Id. Ferguson-Steger replied that MIC would "suffer substantial damages if it [were] forced to seek a new buyer for the methanol," that as of the close of business on that day MIC would be able to sell the methanol at $2.18 per gallon only, and that if Interstate had not confirmed its intention to abide by the contract by 10:00 a.m. the following morning, MIC would sell the methanol to another buyer and seek "prompt legal recourse" to recover its losses from Interstate. Email of Dec. 20, 2007, Ex. C to Compl. MIC heard nothing from Interstate.

On December 21, 2007, MIC sold the methanol to Tauber Petrochemical Company for $2.05 per gallon, for delivery between December 21, 2007 and January 10, 2008. Contract # 07-2068, Ex. D to Compl. MIC received $210,000 less from this sale than it would have received had it sold the methanol to Interstate at $2.55. Pl. 56.1 ¶¶ 20-21.

Section 2-201(1) of the New York Uniform Commercial Code ("N.Y. U.C.C.") sets forth the general rule that a contract for a sale of goods is not enforceable unless it is memorialized in a

3

writing signed by the party against whom enforcement is sought. Under the so-called "merchant exception" to that rule, however, an oral contract may be enforced against a merchant who received, but did not sign, a "writing in confirmation of the contract" so long as the receiving merchant does not object within ten days of receiving the confirmation. See N.Y. U.C.C. § 2-201(2); Bazak Int'l. Corp. v. Mast Indus., Inc., 73 N.Y.2d 113, 119 (1989). The one "indispensable" term that the confirmation must contain is quantity. Bazak, 73 N.Y.2d at 119.

Here, the telephone exchange and confirmatory email occurred on December 4, and Interstate indicated its desire to "cancel the barge" on December 18, more than 10 days later. Consequently, the "writing in confirmation of the contract" – the email in which MIC "confirm[ed] 10 mb @ $2.55/gal loading Dec 20 or later," which includes a quantity term – constitutes a contract enforceable against Interstate despite Interstate's failure to sign any writing.[1]

---

[1] Interstate claims that there was some "inconsisten[cy]" between the delivery date agreed upon during the oral conversation and the one expressed in the December 4 confirmatory email. Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 12. Because the confirmatory email contains the indispensable quantity term, however, any inconsistency regarding delivery date would not render the remainder of the terms in the confirmatory email unenforceable. See N.Y. U.C.C. 2-201(1) ("A writing is not insufficient because it omits or incorrectly states a term agreed upon . . . .").

Interstate also draws the Court's attention to various "inconsistencies" and "material[] alter[ations]" between the confirmatory email and the unsigned spot contract emailed by Ferguson-Steger on December 5. Id.; see N.Y. U.C.C. § 2-207(1)-(2) (providing that "different" or "additional" terms contained in a written confirmation of an oral contract become part of the contract unless "they materially alter it"). But any

This, however, is not the end of the inquiry, as the Court must determine not only that an enforceable contract existed, but also what terms that contract contained.  Section 2-202 of the U.C.C. provides that "[t]erms with respect to which the confirmatory memoranda of the parties agree . . . may be explained or supplemented . . . by course of dealing or usage of trade."  N.Y. U.C.C. § 2-202(a).  "Usage of trade," in turn, is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."  N.Y. U.C.C. § 1-205(2).  "The existence and scope of such a usage are to be proved as facts."  Id.

Interstate argues that under section 2-202, the contract terms discussed in Ferguson-Steger's and Cirillo's conversation and contained in the confirmatory email should be supplemented with terms reflecting the custom and practice of the chemical sales industry.  Specifically, Interstate alleges that in the chemical sales trade, "either the buyer or seller to a bulk chemical procurement

---

discrepancies between the confirmatory email and the spot contract are wholly immaterial, as MIC is seeking to enforce only the terms contained in the confirmatory email, not those in the unsigned spot contract.  The unsigned spot contract is best understood as a proposal to amend the existing contract (i.e., the one discussed orally and confirmed via the December 4 email) which Interstate rejected.

Similarly, the disputed December 13 phone call, in which Interstate claims Ferguson-Steger told Cirillo that the barge would not be delivered until on or after December 24, 2007, is irrelevant to the present dispute.  The call, as described by Interstate, amounts to a proposal, accepted by Interstate, to amend the contract with respect to a term not relevant here – the delivery date.

5

transaction [may] cancel before delivery based on any cause beyond their reasonable control." Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 16.

To support its view of chemical sales usage of trade, Interstate provides a number of affidavits from participants in the industry. Albert Puntureri, President of Interstate, contends that in his forty years of experience with chemical sales, he has seen "cancellation of orders placed by both contract and 'spot' customers on a regular basis either by the seller or the purchaser" resulting from "lack of inventory, lack of delivery equipment, force majeure, change in requirement needs, or sometimes, even no express reason at all," and that "it is industry practice to permit cancellation of the order without penalty so long as the cancellation takes place before the chemicals have been loaded on to the truck, tank car, or barge and shipped." Affidavit of Albert Puntureri ("Puntureri Aff."), Ex. B to Def. 56.1, at ¶¶ 4, 7. Rich Jukiewicz, a Senior Purchasing Agent for Research Organics, Inc., a manufacturer and supplier of biochemicals, attests that:

> It is industry practice that purchase orders for chemicals be cancelled or changed on a frequent basis. Such cancellations frequently occur when end customers cancel their orders with us, causing a domino effect of having to cancel the order for material from our supplier and the end user is now unavailable.
> It is also industry practice for purchase orders to be cancelled as a result of <u>force majeure</u>, such as when the end customer is unable to take the material as a result of government intervention, transportation issues, weather related issues, and other events that are beyond our control.

Affidavit of Rich Jukiewicz, Ex. F to Def. 56.1, at ¶¶ 4-5. Finally, Edward Swinderman, formerly the Methanol Business Manager for Lyondell Chemical and now an independent contractor in the chemical trading industry, avers that during his twenty-five years of experience he has witnessed frequent cancellations resulting from: "(a) lack of inventory; (b) lack of equipment; (c) force majeure; (d) change in requirement need; (e) no reason at all" and that these mostly occur "without penalty," although he notes that there may be a charge for diversion to another buyer "[i]f a truck, tank car or barge is already loaded and shipped." Affidavit of Edward Swinderman ("Swinderman Aff."), Ex. G to Def. 56.1, at ¶¶ 6-9.

MIC responds by contending – with ample case law support - that when contracts do contain force majeure provisions, New York courts interpret those provisions narrowly, such that "[o]rdinarily, only if the force majeure clause specifically includes the event that actually prevents a party's performance will that party be excused." Kel Kim Corp. v. Cent. Markets, Inc., 70 N.Y.2d 900, 902-903 (1987). This point, though well-taken, is inapposite to the dispute here, where the Court is not being asked to interpret an existing force majeure clause. Rather, the Court must determine whether there is a practice in this industry of excusing contract performance on the basis of events (such as the delivery problems experienced here) that has "such regularity of observance . . . as to justify an expectation" of its observance, N.Y. U.C.C. § 1-205.

The affidavits submitted by Interstate do raise a number of questions for the Court.  For example, as MIC noted at oral argument, one could not read into contracts the more extreme view espoused in certain portions of the affidavits – that contracts permissibly could be canceled for "no reason at all" – without doing violence to the basic principles of contract law.  Moreover, the Court perceives a distinct possibility, raised by one affiant, that cancellations are tolerated not out of industry practice regarding the treatment of contracts, but rather to "maintain good customer relations," Swinderman Aff. ¶¶ 6-9.  Finally, the Court is not clear whether Interstate is claiming that usage of trade excuses nonperformance even for reasons that, although beyond the non-performer's control, could have been known to that party at the time it agreed to the contract, as MIC suggests is the case here.  Nonetheless, what amounts to "usage of trade" is an issue of fact, see N.Y. U.C.C. § 1-205(2), and while it may yet prove to be the case that the usage of trade applicable here, if any, is not as broad as Interstate contends, it may still be broad enough to preclude summary judgment.  In short, there are disputed issues of fact precluding a grant of summary judgment on MIC's breach of contract claim.[2]

---

[2] Interstate also argues that there are "issues of credibility" regarding whether MIC in fact "reserved in its inventory" a barge of methanol for Interstate, and thus whether MIC exhibited reliance.  However, MIC is not required to establish its reliance in order to make out a breach of contract claim.  See K. Bell & Assocs. v. Lloyd's Underwriters, 827 F. Supp. 985, 988 (S.D.N.Y. 1993)(elements of breach of contract claim are (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach).  While

8

In addition, the Court observes that there appear to be disputed issues of fact with respect to whether MIC mitigated its damages "in good faith and in a commercially reasonable manner," N.Y. U.C.C. § 2-706(1), and, consequently, over the amount of damages Interstate would owe if found to be in breach. In particular, Interstate disagrees with MIC that $2.05 per gallon, the price at which MIC resold the methanol on December 21, 2005, reflected the market price for methanol on that date.[3] To support its contention, Interstate provides an issue of <u>Global Methanol Report</u> indicating that, according to the Court's reading, the market price for a "US Spot" barge of methanol for the week of December 21 was between $233.00 and $235.00 per gallon. <u>See</u> Jim Jordan & Associates, LLP, <u>Global Methanol Report</u> (December 21, 2007), Ex. to Puntureri Aff. Despite MIC's claim that it sought the best price it could and acted as quickly as possible, the Court believes that the <u>Global Methanol Report</u> creates a disputed issue of material fact with regard to damages.

---

the issue of reliance might have been relevant to MIC's alternative claim on a theory of promissory estoppel, the Court has now found that a contract exists that governs the transaction, and so MIC will be unable to recover on its quasi-contract claim. <u>See, e.g.</u>, <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 70 N.Y.2d 382, 388 (1987) (holding that the existence of an enforceable contract governing a particular subject matter "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter").

[3] Interstate also claims that a disputed issue of fact exists with respect to whether the delivery was ever made at all, because MIC has not produced proof of the date and circumstances of delivery. The Court sees no reason to question that the sale actually went through; in any event, the Court expects that MIC will produce evidence of the delivery in discovery.

For the foregoing reasons, the Court by Order dated May 6, 2008, denied the motion for summary judgment.

Dated: New York, NY
       May 18, 2008

_____
JED S. RAKOFF, U.S.D.J.