Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MITSUBISHI INTERNATIONAL          :
CORPORATION,                          08 CV 00194(JSR)(GWG)
                                  :
        Plaintiff,                    **AFFIDAVIT**
                                  :
          -against-
                                  :   ECF Case
INTERSTATE CHEMICAL CORPORATION,
                                  :
        Defendant.
----------------------------------X

STATE OF NEW YORK   )
                    )   ss.:
COUNTY OF NEW YORK  )

    DANIEL J. KORNSTEIN, being duly sworn, deposes and says:

    1.  I am a member of Kornstein Veisz Wexler & Pollard, LLP,
counsel for the plaintiff in this action, Mitsubishi
International Corporation ("MIC").  I have personal knowledge of
the facts set forth in this affidavit, which I make in further
support of plaintiff's motion for summary judgment.

Exhibits

    2.  A copy of the complaint in this action is annexed
hereto as Exhibit A, and a copy of defendant Interstate Chemical
Corporation's ("Interstate") answer to the complaint is annexed
hereto as Exhibit B.

3250001AFFACG.00006.wpd

3.   Annexed as Exhibit C hereto is a copy of the Notice of Motion, dated March 26, 2008, by which MIC made a pre-discovery motion for summary judgment in this action.

4.   Annexed as Exhibit D hereto is a copy of the Affidavit of Zack Ferguson-Steger, sworn to on March 26, 2008, which was submitted in support of MIC's pre-discovery summary judgment motion.

5.   Annexed as Exhibit E hereto is a copy of Plaintiff's Rule 51.6(a) Statement, dated March 26, 2008, which was submitted in support of MIC's pre-discovery summary judgment motion.

6.   Annexed as Exhibit F hereto is a copy of Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, dated March 26, 2008, which was submitted in support of MIC's pre-discovery summary judgment motion.

7.   Annexed as Exhibit G hereto is a copy of Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, dated April 14, 2008, which was submitted in opposition to MIC's pre-discovery summary judgment motion.

8.   Annexed as Exhibit H hereto is a copy of the Affidavit of Lori Cirillo, sworn to on April 11, 2008, which was submitted in opposition to MIC's pre-discovery summary judgment motion.

9.   Annexed as Exhibit I hereto is a copy of the Affidavit of Albert R. Puntureri, sworn to on April 11, 2008, which was

submitted in opposition to MIC's pre-discovery summary judgment motion.

10. Annexed as Exhibit J hereto is a copy of the Affidavit of Edward Swinderman, dated April 14, 2008, which was submitted in opposition to MIC's pre-discovery summary judgment motion.

11. Annexed as Exhibit K hereto is a copy of the Affidavit of Rich Jukiewicz, sworn to on April 10, 2008, which was submitted in opposition to MIC's pre-discovery summary judgment motion.

12. Annexed as Exhibit L hereto is a copy of the Order dated May 6, 2008, by which this Court denied MIC's pre-discovery summary judgment motion. Annexed as Exhibit M hereto is a copy of this Court's May 18, 2008 Memorandum setting forth the reasons for this denial of summary judgment.

13. Annexed as Exhibit N hereto is a copy of this Court's Case Management Plan for this action, dated March 12, 2008.

14. Annexed as Exhibit O hereto is a copy of the reply Affidavit of Zack-Ferguson-Steger, sworn to on April 18, 2008, which was submitted in further support of MIC's pre-discovery summary judgment motion.

15. Annexed as Exhibit P hereto is a copy of Plaintiff's Reply Memorandum of Law in Further Support of Summary Judgment, dated April 18, 2008, which was submitted in further support of MIC's pre-discovery summary judgment motion.

3

Discovery

16. Once this Court denied MIC's pre-discovery summary judgment motion, the parties proceeded to discovery based on the Court's Case Management Plan.

17. The cutoff date for expert discovery under the Case Management Plan was June 16, 2008.  The cutoff date for all fact discovery under the Case Management Plan was originally July 14, 2008.

18. By agreement of the parties, and with the Court's permission, the cutoff date for fact discovery was adjourned twice, first to July 28, 2008, and then to August 12, 2008.

19. Defendant produced no expert discovery, either before or after the June 16, 2008 expert discovery cutoff.

20. Although the parties have communicated regarding depositions and other discovery issues, defendant never requested additional time to offer expert discovery.  Nor has defendant's counsel ever indicated to my office that any expert discovery will be forthcoming.

21. All discovery in this case closed as of August 12, 2008.

4

22.     For these reasons, MIC's motion for summary judgment should be granted.

_____
DANIEL J. KORNSTEIN

Sworn to this 13th
day of August, 2008

_____
Notary Public

AMY C. GROSS
Notary Public, State of New York
No. 02GR6133341
Qualified in New York County
Commission Expires Sept. 12, 20__

5

EXHIBIT "A"

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MITSUBISHI INTERNATIONAL                 :
CORPORATION,
                                         :
          Plaintiff,
                                         :    **COMPLAINT**
          -against-
                                         :    ECF Case 08CV00194 (JSR)(FWG)
INTERSTATE CHEMICAL CORPORATION,
                                         :
          Defendant.
----------------------------------X

        Plaintiff, by its attorneys Kornstein Veisz Wexler & Pollard,

LLP, for its complaint alleges:


                        FIRST CLAIM
                    (Breach of Contract)

Jurisdiction and Venue

        1.   The Court has subject matter jurisdiction over the

lawsuit under 28 U.S.C. § 1332(a)(1) because plaintiff and

defendant are citizens of different states and the amount in

controversy exceeds $75,000 excluding interest and costs.

        2.   Venue in this District is proper under 28 U.S.C. § 1391.


Parties

        3.   Plaintiff Mitsubishi International Corporation ("MIC") is

a New York corporation with its principal place of business at 655

Third Avenue, New York, New York 10017.  At all relevant times, plaintiff has been engaged in the business of international trade of products and services across a range of industry sectors. Plaintiff is a merchant within the meaning of the Uniform Commercial Code.

4.    Defendant Interstate Chemical Corporation ("Interstate") is, on information and belief, a Pennsylvania corporation with its corporate headquarters located at 2797 Freedland Road, Hermitage, Pennsylvania 16148.  At all relevant times, defendant has been engaged in the business of buying and selling chemical products. Defendant is a merchant within the meaning of the Uniform Commercial Code.

<u>Substantive Allegations</u>

5.    On December 4, 2007, the parties orally agreed that Interstate would buy 420,000 gallons of methanol from MIC at a price of $2.55 per gallon.  On that day, Zack Ferguson-Steger, marketing manager of MIC, and Lori Cirillo, Director of Chemical Procurement of Interstate, had a phone conversation regarding the possibility of MIC selling a barge of methanol to Interstate. During that phone conversation, Ferguson-Steger and Cirillo reached an oral agreement that MIC would sell one barge (420,000 gallons, or 10 mb) of methanol to Interstate at a price of $2.55 per gallon.

6.    The parties confirmed this agreement and its material terms in writing later that day.  Cirillo emailed Ferguson-Steger,

2

confirming: "We would like to purchase your Methanol barge.  Please give me a call."  A copy of that email and MIC's reply to it are attached hereto as Exhibit A.

7.    Less than an hour later, Ferguson-Steger responded to Cirillo via email, stating: "We confirm 10 mb @ $2.55/gal loading Dec. 20 or later.  If we can ship earlier, we'll inform you.  I'll send over a spot contract a little later."  A copy of this email is also attached hereto as part of Exhibit A.

8.    The next day, December 5, 2007, MIC reconfirmed the agreement and its material terms in an email to Interstate. Ferguson-Steger sent an email to Cirillo, attaching a form contract and stating: "Please see attached contract for the 10mb barge agreed to yesterday."  The attached contract contains the same material terms the parties had agreed to the day before.  A copy of the email and attached contract, along with later email correspondence between MIC and Interstate, is attached hereto as Exhibit B.

9.    Neither Cirillo nor anybody else at Interstate objected to the terms of the agreement as embodied in the emails sent by MIC on December 4 and 5, 2007.

10.   Interstate said nothing further about the agreement until December 18, 2007, when it sought to cancel the contract.  On that day, fourteen days after the parties confirmed their agreement and thirteen days after MIC sent an email and form contract further

3

embodying the agreement, Cirillo sent an email to Ferguson-Steger, stating: "We are having a problem with this barge. We are planning to ship this to Owensboro, KY and there is still not coast guard approval yet for receiving barges at this destination. We do not have another home for this barge. Can we cancel this barge because of this coast guard issue?" A copy of this email is also attached hereto as part of Exhibit B.

11. The next day, December 19, 2007, Ferguson-Steger responded to Cirillo, stating: "We can postpone the delivery of the barge if needed but we cannot cancel." A copy of that email is also attached hereto as part of Exhibit B.

12. A few minutes later, Cirillo responded to Ferguson-Steger's email, reiterating Interstate's desire to cancel the agreement. A copy of that email is also attached hereto as part of Exhibit B.

13. Ferguson-Steger responded to Cirillo shortly thereafter, explaining:

> Unfortunately, we cannot allow you to walk away from this spot contract, even if the customer claims they cannot receive the barge. We reserved this product in our inventory and if we were to liquidate now, we would have to hold you responsible for the damages, which we calculate to be around $0.35/ gal x 420,000 = $147,000. This is based on the $2.55/gal price that we fixed compared with the expected sales price today of $2.20/gal.

A copy of this email is also attached hereto as part of Exhibit B.

4

14.  Later on December 19, and again on the following day, Cirillo reiterated that Interstate would be canceling the contract. A copy of the December 19, 2007 email is also attached hereto as part of Exhibit B.  A copy of the December 20, 2007 email and MIC's response to it are attached hereto as Exhibit C.

15.  Later on December 20, Ferguson-Steger responded to Cirillo, reminding her of Interstate's contract with MIC and stating:

> As you know, the market is falling, and MIC will suffer substantial damages if it is forced to seek a new buyer for this methanol if you repudiate you obligation to purchase. The contract price i[s] $2.55/gal, and as of the close of business today, we would be able to get only approximately $2.18/gallon on the spot market for this load.  If we are forced to sell the material at a loss we will hold Interstate fully responsible for our damages.
>
> In order to mitigate our damages as much as possible in this falling market, we will seek to sell the material to another buyer by tomorrow, December 21, if we do not receive your confirmation by 10:00 a.m. that Interstate will fulfill its obligations under our agreement. We will then seek prompt legal recourse to recover the full amount of our losses in connection with that sale from Interstate.

A copy of this email is also attached hereto as part of Exhibit C.

16.  Interstate did not respond to Ferguson-Steger's December 20, 2007 email.

17. On December 21, 2007, after Interstate refused to perform the agreement, MIC mitigated its damages by selling the methanol Interstate had agreed to purchase to another company for $2.05 per gallon. The contract reflecting this sale is attached hereto as Exhibit D.

18. The parties had a valid agreement, confirmed in writing, pursuant to N.Y. U.C.C. § 2-201(1).

19. The agreement is also valid pursuant to N.Y. U.C.C. § 2-201(2) because MIC sent Interstate a writing confirming the parties' agreement, Interstate had reason to know the writing's contents, and Interstate did not object to its contents within ten days of receiving it.

20. MIC was willing and able to deliver the methanol to Interstate at the agreed-upon price of $2.55 per gallon.

21. Interstate nevertheless breached the agreement between the parties by refusing to purchase the methanol.

22. Despite MIC's prompt efforts to mitigate its damages, MIC was only able to sell the methanol to another buyer at a price of $2.05 per gallon.

23. As a result of defendant's breach of contract, plaintiff has sustained compensatory damages of $210,000 (420,000 gallons of methanol, sold at a price $.50 per gallon lower than the price agreed to by Interstate) plus interest.

6

SECOND CLAIM
(Promissory Estoppel)

24. MIC realleges the allegations in paragraphs 1 to 23 of this complaint.

25. Interstate's representative promised MIC's representative, both orally over the telephone and in writing via a later email, that Interstate would purchase a barge of methanol from MIC at the agreed-upon purchase price.

26. In reasonable reliance upon Interstate's promise, MIC reserved the barge of methanol in its inventory.

27. Between the time the parties agreed to the sale of the barge of methanol and the time Interstate initially refused to perform the agreement, the price of methanol had dropped from $2.55 per gallon to approximately $2.20 per gallon. By the time MIC was able to mitigate its damages by selling the barge of methanol to another buyer, the price had dropped further, to $2.05 per gallon.

28. MIC was therefore injured by Interstate's failure to perform the agreement to purchase in the face of falling spot prices for methanol.

29. As a result of its reliance upon Interstate's broken promise to purchase the barge of methanol, plaintiff has sustained compensatory damages of $210,000 (420,000 gallons of methanol, sold at a price $.50 per gallon lower than the price agreed to by Interstate) plus interest.

7

WHEREFORE, plaintiff demands judgment as follows:

       a.   On the first claim, awarding plaintiff the sum of $210,000 in compensatory damages plus interest;

       b.   On the second claim, awarding plaintiff the sum of $210,000 in compensatory damages plus interest; and

       c.   Awarding such other relief as may be just and proper, together with the costs and disbursements of this action.

Dated:    New York, New York
          January 9, 2008

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By:  Daniel J. Kornstein (DK - 3264)

757 Third Avenue
New York, New York 10017
(212) 418-8600

Attorneys for Plaintiff

8

EXHIBIT A

```
|-----------+----------------------------------------->
|           |                                          |
|           |          ZACK FERGUSON-STEGER            |
|           |       12/04/2007 04:04 PM                |
|           |                                          |
|           |                                          |
|           |                                          |
|           |                                          |
|-----------+----------------------------------------->
|  >------------------------------------------
-------------------------------|
|     |
|  |
|  |
|  >-----------------------------------------------------------
-------------------------------|

|------------------->
|         To:  |
|------------------->
|  >-----------------------------------------------------------+--------|
 |"Lori Cirillo" <lcirillo@interstatechemical.com>
|     |
 |    |
|  |    |
|  >-----------------------------------------------------------+--------|
-------------------------------------------------------------------+--------|
|------------------->
|         cc:  |
|------------------->
|  >-----------------------------------------------------------+--------|
 |thomas.reszler@mitsubishicorp.com@MITSUBISHI CORP
|     |
 |kathy.flood@mitsubishicorp.com
|  |    |
|  |    |
|------------------------------------------------------------+--------|
|------------------->
|                   |
|------------------->
|  >-----------------------------------------------------------+--------|
|     |
|  |    |
|  >-----------------------------------------------------------+--------|
|------------------->
|                   |
|------------------->
```

```
    >----------------------------------------------------------------
-----------------------------------------------+---------|
    |
|   >----------------------------------------------------------------
----------------------------------------------+---------|
|------------------->
|                   |
|------------------->
    >----------------------------------------------------------------
----------------------------------------------+---------|
        |
|       |                                                         ----
-----------------------------------------------+---------|
|------------------->
|                   |
|------------------->
    >----------------------------------------------------------------
----------------------------------------------+---------|
        |
|       |
    >----------------------------------------------------------------
----------------------------------------------+---------|
|------------------->
|                   |
|------------------->
    >----------------------------------------------------------------
----------------------------------------------+---------|
    |
|       |
    >----------------------------------------------------------------
----------------------------------------------+---------|
|------------------->
|        Subject:  |
|------------------->
    >----------------------------------------------------------------
----------------------------------------------+---------|
    |Re: Methanol(Document link: ZACK FERGUSON-STEGER)
|   |
    >----------------------------------------------------------------
----------------------------------------------+---------|
```

Lori,

We confirm 10mb @ $2.55/gal loading Dec 20 or later.
If we can ship earlier, we'll inform you.
I'll send over a spot contract a little later.

Best Regards,

Zack

12/4/2007 3:35:09 PM "Lori Cirillo" <lcirillo@interstatechemical.com>
wrote:
>
>Hi Zack -
>
>We would like to purchase your Methanol barge.
>
>Please give me a call.
>
>Thanks.
>
>Lori Cirillo
>Director of Chemical Procurement
>724-981-3771  #1118

EXHIBIT B

```
|-----------+-------------------------------------------------------------
------->     |
|            |
|            |          "Lori Cirillo" <lcirillo@interstatechemical.com>
|            |
|            |
|            |          12/19/2007 02:36 PM
|            |
|            |
|            |
|            | .
|            |
|            |
|-----------+-------------------------------------------------------------
------->
     >----------------------------------------------------------------------
----------|
     |
  |  |
  |  |
     >----------------------------------------------------------------------
----------|


|------------------->
|             To:  |
|------------------->
     >-------------------------------------------------------------+---------|
  |<zack.ferguson-steger@mitsubishicorp.com>
  |          |
  |          |
     >-------------------------------------------------------------+---------|
|------------------->
|             cc:  |
|------------------->
     >-------------------------------------------------------------+---------|
     |
  |          |
  |          |
     >-------------------------------------------------------------+---------|
|------------------->
|                  |
|------------------->
     >-------------------------------------------------------------+---------|
     |
  |          |
```

```
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
|-------------------->
|                    |
|-------------------->
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
    |
|        |
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
|-------------------->
|                    |
|-------------------->
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
    |
|        |
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
|-------------------->
|                    |
|-------------------->
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
    |
|        |
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
|-------------------->
|                    |
|        Subject:    |
|-------------------->
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
|RE: Methanol
|        |
    >----------------------------------------------------------------
----------------------------------------------------------+--------|
```

I met again with management and unfortunately, I am caught in the middle.
The account can not take the product for 90 days or more and we can't hold
the barge. Management here is saying they did not sign a contract so they
really feel they should not be obligated to buy the barge or pay a damage
differential.

Again, this puts me in the middle and in a real jam. Would it help if we
commit to the next spot barge when our tanks are at the level where we can
hold a spot barge? We can not guarantee when that will be.


Lori Cirillo
Director of Chemical Procurement

724-981-3771  #1118

-----Original Message-----
From: zack.ferguson-steger@mitsubishicorp.com
[mailto:zack.ferguson-steger@mitsubishicorp.com]
Sent: Wednesday, December 19, 2007 11:59 AM
To: Lori Cirillo
Cc: Janice Perilli; kathy.flood@mitsubishicorp.com;
thomas.reszler@mitsubishicorp.com
Subject: RE: Methanol


Lori,

If they prefer to pick-up via T/Ts from our tank, that is fine.
Unfortunately, we cannot allow you to walk away from this spot contract,
even if the customer claims they cannot receive the barge.  We reserved
this product in our inventory and if we were to liquidate now, we would
have to hold you responsible for the damages, which we calculate to be
around $0.35/ gal x 420,000 = $147,000.   This is based on the $2.55/gal
price that we fixed compared with the expected sales price today of
$2.20/gal.  We hope that you are able to convince them to take the product

Best Regards,
Zack




12/19/2007 10:40:43 AM "Lori Cirillo" <lcirillo@interstatechemical.com>
wrote:
>
>I just spoke to Al and he tried to squeeze the customer.  We have no
choice but
>
>to cancel because the customer cancelled due to the coast guard
restrictions.
>
>The customer made arrangements to receive TT's of Methanol from Ashland
because
>
>of their inability to receive barges.  We really have no option but to
cancel
>
>on this one.
>
>
>Lori Cirillo
>Director of Chemical Procurement
>724-981-3771  #1118
>
>-----Original Message-----
>From: zack.ferguson-steger@mitsubishicorp.com
>[mailto:zack.ferguson-steger@mitsubishicorp.com]
>Sent: Wednesday, December 19, 2007 10:21 AM
>To: Lori Cirillo

>Cc: Janice Perilli; thomas.reszler@mitsubishicorp.com;
>kathy.flood@mitsubishicorp.com
>Subject: RE: Methanol
>
>
>Lori,
>
>We can postpone the delivery of the barge if needed but we cannot cancel.
>Feel free to contact me if you have any questions.
>
>Best Regards,
>
>Zack
>
>12/18/2007 11:26:34 AM "Lori Cirillo" <lcirillo@interstatechemical.com>
>wrote:
>>
>>Zack -
>>
>>We are having a problem with this barge.  We are planning to ship this
>>to Owensboro, KY and there is still not coast guard approval yet for
>receiving
>>barges at this destination.  We do not have another home for this barge.
>>
>>Can we cancel this barge because of this coast guard issue?
>>
>>
>>Lori Cirillo
>>Director of Chemical Procurement
>>724-981-3771  #1118
>>
>>-----Original Message-----
>>From: zack.ferguson-steger@mitsubishicorp.com
>>[mailto:zack.ferguson-steger@mitsubishicorp.com]
>>Sent: Wednesday, December 05, 2007 12:31 PM
>>To: Lori Cirillo
>>Subject: Re: Methanol
>>
>>
>>
>>Lori,
>>
>>Please see the attached contract for the 10mb barge agreed to yesterday.
>>Please sign and fax back.
>>(See attached file: Interstate10mb 12-4-07.doc)  Thanks,
>>
>>Zack
>>
>>=================================================================
>>Zack Ferguson-Steger
>>Mitsubishi Int'l Corporation
>>655 Third Ave New York, NY 10017
>>Tel 212-605-2419
>>Fax 212-605-1058
>>Cell 917-847-5323
>>email: zack.ferguson-steger@mitsubishicorp.com
>>=================================================================

```
>>
>>12/4/2007 3:35:09 PM "Lori Cirillo" <lcirillo@interstatechemical.com>
>>wrote:
>>>
>>>Hi Zack -
>>>
>>>We would like to purchase your Methanol barge.
>>>
>>>Please give me a call.
>>>
>>>Thanks.
>>>
>>>Lori Cirillo
>>>Director of Chemical Procurement
>>>724-981-3771  #1118
>
>
```



# Mitsubishi International Corporation

655 Third Avenue, New York, NY 10017
Tel: (212) 605-2447     Fax: (212) 605-1058

December 5, 2007

To:   Interstate Chemical co.
Attn:  Lori Cirillo
Fax:   724-981-3675

RE:   Methanol Sales FOB StRose, LA, December 20, 2007

Dear Lori:

We are pleased to reconfirm the details of our sales transaction agreed on December 4, 2007 as follows:

| | |
|---|---|
| 1. Contract type | Sales |
| 2. Contract number | S-MeOH-1284 |
| 3. Seller | Mitsubishi International Corporation |
| | 655 Third Avenue |
| | New York, NY 10017 |
| 4. Buyer | Interstate Chemical Co. |
| | 2797 Freedland Road |
| | Hermitage, PA 16148 |
| 5. Product | Methanol in bulk |
| 6. Shipment | December 20th, 2007. Buyer to provide seller with a five (5) working days notice. Such notice to be received by 12.00 noon EST, any nomination received later will be considered next business day. |
| 7. Quality | As per ASTM D-1152-97 |
| 8. Delivery | FOB IMTT StRose, LA into buyer's nominated barge |
| 9. Volume | 10,000 bbls +/- 5% at buyer's option |
| 10. Price | Fixed and flat at $2.5500/gallon |
| 11. Payment | In US dollars, by wire transfer net thirty (30) days from B/L date into seller's designated account. |
| 12. Inspection | Inspection on both quality and quantity at seller's shore tank prior to the loading at the loading port carried out by an independent surveyor appointed by mutual agreement shall be taken as final. Inspector fees to be equally shared among all parties involved. |
| 13. Maritime conditions | as per charter party |
| 14. Public Terminal Clause | Barges loading at a public terminal are loaded on a first come first served basis only. Mitsubishi International will not be held responsible for any delays incurred due to dock congestion |

| 16. Incoterms | Incoterms 2000 and latest amendments are applicable, unless stated otherwise herein. |
| 17. Law | New York Law to govern this transaction. |
| 18. Others | Mitsubishi International Corp. General Terms and Conditions to apply where not inconsistent with the above. |

| 19. Contact for scheduling | Zack Ferguson-Steger |
| | Tel 212-605-2419 |
| | Fax 212-605-1058 |
| | Email: zack.ferguson-steger@mitsubishicorp.com |

This confirmation constitutes the entire contract and represents our understanding of the terms and conditions of our agreement. We are pleased to have concluded this transaction with you. Any apparent discrepancies or omissions must be brought to our attention within the next two working days or are deemed waived.

## GENERAL TERMS AND CONDITIONS OF SALE

1.      **WARRANTIES:** Seller warrants only that the Goods conform to the description stated on the face hereof. **SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, OR ARISING UNDER LAW OR EQUITY OR CUSTOM OF TRADE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.** No agent, employee or representative of Seller has any authority to bind Seller to any affirmation, representation or warranty concerning the Goods not expressly included herein.

2.      **SOLE REMEDY; LIMITATION OF LIABILITY:** Seller's sole liability and Buyer's exclusive remedy in connection with the transaction(s) described on the face hereof will be replacement of any non-conforming goods or, at Seller's option, refund of all or a portion of the purchase price.  **IN NO EVENT WILL SELLER BE LIABLE FOR, AND BUYER HEREBY WAIVES ANY RIGHT TO, ANY LOST PROFITS, LOSS OF USE, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED AND, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, WHETHER OR NOT EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.** Buyer shall confirm the accuracy of all shipments, as to the identity, quantity and quality of the Goods upon receipt. Buyer waives all claims of non-conformity with respect to the Goods or their shipment or delivery unless made in writing by Buyer to Seller, specifically stating the details of such non-conformity, within five (5) days after Buyer receives the Goods. Non-conforming goods may be returned to Seller only with prior notice by Buyer to Seller and with Seller's approval for such return. **Seller's liability shall in no event be greater in amount than the purchase price of the Goods in respect of which damages are claimed.** Any action by Buyer for breach of contract must be commenced within one (1) year after the cause of action has accrued.

3.      **TAXES; INCREASED COSTS:** Buyer shall pay all taxes, excises, fees or charges with respect to the sale or transportation of the Goods.  Any increase in Seller's costs of performance after the date stated in the box marked DATE OF CONTRACT on the face hereof resulting from increased freight rates, increased or additional freight surcharges, additional taxes, duties, assessments or other charges imposed or collected by any governmental or taxing authority, increased insurance rates, and all other additional charges relating to the sale, loading, unloading, delivery, storage, and transportation of the Goods, shall be for Buyer's account.

4.      **SHIPMENT:** All shipment or delivery dates are approximate. The date of the bill of lading shall constitute conclusive evidence of the date of shipment. Partial shipment and/or transshipment shall be permitted. No non-conforming tender, or delay or failure in the shipment or delivery of any one lot shall excuse Buyer from accepting tender of any remaining installments hereunder. In case of failure of performance by Buyer hereunder, Seller may defer or suspend further shipments or deliveries or, at its option, cancel this Contract as to any Goods which have not been



# Mitsubishi International Corporation
655 Third Avenue,  New York, NY  10017
Tel:  (212) 605-2447      Fax: (212) 605-1058

shipped or delivered, and any losses, liabilities, costs or expenses resulting from such deferral or cancellation shall be for Buyer's account.

**5.     BUYER'S SOLVENCY; PURCHASE MONEY SECURITY INTEREST:** Buyer represents and warrants to Seller that it is not insolvent, as that term is defined in the Uniform Commercial Code (U.C.C.).  Buyer hereby grants to Seller a purchase money security interest in the Goods identified on the face hereof.

**6.     FORCE MAJEURE:** Seller shall not be liable for any delay of or failure to perform its obligations hereunder for any cause beyond its reasonable control, which affects Seller or any other person (whether known or unknown to Buyer) involved in the sale, manufacturing, supply, shipment or delivery of the Goods. Shipment or delivery dates shall be extended for a period equal to the time lost by reason of any such cause; provided, however, that if any such delay exceeds ninety (90) days, either party shall have the right to cancel this Contract with respect to such shipment or delivery by written notice to the other party without any liabilities to the other party.  Force majeure shall not excuse any nonpayment by Buyer.  Except as otherwise provided herein, U.C.C. Section 2-615 shall govern the rights of both parties hereto in the event of such delay or non-performance.

**7.     INDEMNIFICATION:** Seller shall not be liable to Buyer in any way for losses, liabilities, settlements, costs or expenses (including attorneys' fees) paid or incurred by Buyer resulting from any claim that the Goods or their sale infringe any patent, trademark, copyright, design or other intellectual or industrial property right of any third party and, if Buyer has furnished the specifications for the Goods, Buyer shall indemnify and defend Seller against any and all losses, liabilities, settlements, costs and expenses (including attorneys' fees) paid or incurred by Seller resulting from any such claim.  Buyer agrees to defend, indemnify and hold Seller harmless against claims by any third party (including Buyer's employees and customers) arising out of Buyer's use, storage, handling or resale of the Goods.

**8.     LATE CHARGE; SETOFF RIGHTS; COLLECTION COSTS:** If any invoice amount is not paid in full when due, Seller reserves the right to request advance payment for future shipments.  If any of the purchase price is not paid in full when due, Buyer shall pay a late charge on the amount unpaid for each day from the due date until paid in full at a rate of five percent above the prime commercial lending rate announced from time to time by the Chase Manhattan Bank, N.A. at its principal New York City office or the maximum lawful rate allowed under permitted applicable law, whichever is lower.  Late charges shall be payable upon demand.  The parties hereby agree that if for any reason, Buyer has not made payment in full to Seller for any amount owing to Seller on or prior to the due date for such amount, Seller may, in its sole discretion, set off such outstanding amount against any amount owed by Seller that is or becomes due and payable.  In the event that Buyer fails to cure any nonpayment within thirty (30) days after Buyer's receipt of notice from Seller describing such breach, then Buyer agrees to pay all of Seller's costs of collection, including, but not limited to, reasonable attorneys' fees.

**9.     TERM AND TERMINATION:** This Contract shall take effect on the DATE OF CONTRACT on the face hereof.  Either party may terminate this Contract immediately without giving notice under the following conditions associated with the other party: (1) Insolvency or bankruptcy; (2) Assignment for the benefit of creditors; (3) Expropriation of business assets; (4) Dissolution or liquidation; or (5) Appointment of a trustee or receive for all or any part of assets.  Seller may terminate this Contract in the event that Buyer fails to cure any breach of the Contract within thirty (30) days after Buyer's receipt of notice from Seller describing such breach.  Purchase orders confirmed by Seller cannot be cancelled or modified by Buyer without the prior written consent of Seller.

**10.     ENTIRE AGREEMENT; AMENDMENT AND NON-WAIVER:** Acceptance of Buyer's purchase order is expressly conditioned upon Buyer's acceptance of the terms and conditions herein and the exclusion of any conflicting terms that may be contained in Buyer's purchase order.  Any objection to any terms herein must be in writing and shall not be deemed timely unless received by Seller within seven (7) days of the date of this Contract.  This Contract, including the face hereof, is intended by the parties as the final, complete, and exclusive expression of their agreement relating to the subject matter hereof, and supersedes any prior agreement or understanding between them. No parol evidence, course of dealing, conduct, performance or usage of the trade shall be relevant to supplement or explain it.  No waiver, amendment modification of any of the provisions hereof shall be effective, unless made in writing and signed by both parties.  Failure by either party to exercise or enforce any right conferred by this Contract shall not be deemed to be a waiver of any such right nor operate so as to bar the exercise or enforcement thereof or any other right on any later occasion.

11.     **NO ASSIGNMENT:** Buyer shall not assign its rights or delegate its duties under this Contract without the prior written consent of Seller.

12.     **GOVERNING LAW; ARBITRATION:** This Contract shall be governed by and construed in accordance with the law of the State of New York, without regards to its choice-of-law provisions. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to any purchases made hereunder. Seller and Buyer agree that any controversy or claim arising out of or relating to this Contract, or the breach hereof, shall be settled by arbitration in New York, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The award of the arbitrator(s) shall be final and binding upon the parties hereto and judgment on the award may be entered in any court of competent jurisdiction.
jurisdiction.

13.     **SELLER'S RIGHT FOR DEMANDING ADEQUATE ASSURANCE:** If Buyer's failure to make payment or otherwise perform its obligations hereunder is reasonably anticipated, Seller may demand adequate assurance, satisfactory to Seller, of the due performance of this Contract by Buyer and withhold shipment or delivery of the undelivered Goods. Unless Buyer gives Seller such assurance within forty-eight (48) hours of Seller's demand, Seller may, without prejudice to any other remedies it may have, cancel the portion of this Contract which relates to the undelivered Goods, and all accounts payable by Buyer to Seller for the Goods delivered under this contract shall, upon Seller's declaration, become immediately due and payable in cash in full.

14.     **SELLER'S RIGHTS AND REMEDIES:** If any of the following events shall occur:(a) failure by the Buyer to perform any provision of this Contract or any other agreement with Seller, if any, and such failure not being cured within thirty (30) days after the date of notice thereof being dispatched by the Seller to the Buyer requiring the Buyer to remedy such failure;(b) insolvency, bankruptcy, liquidation or dissolution of the Buyer;(c) institution of any proceeding against the Buyer under the provisions of any insolvency or bankruptcy law or any law for the relief of debtors;(d) appointment of a trustee, receiver, administrator or, liquidator over any of the Buyer's assets or property;(e) issuance of an order for the attachment of the Buyer's assets or property; (f) general assignment by the Buyer for the benefit of its creditors; (g) cancellation or deduction of trade credit insurance coverage insured for Seller against risk of Buyer's failure to make the payment of contract price or any other amount payable by Buyer to Seller hereunder in such way as Seller reasonably judges that such cancellation or deduction would impair Seller's interest or benefit from this Contract, or (h) any material adverse change (as determined by MIC in its sole discretion) shall have occurred in (x) Buyer's financial condition or (y) Buyer's business, or any other change shall have occurred that may have an adverse effect on Buyer's ability to perform its obligations under this Contract, then the Seller may, without prejudice to the other rights and remedies which it may have,(i) forthwith terminate this Contract in whole or in part by notice in writing to the Buyer,(ii) delay or suspend shipment or delivery of the Goods,(iii) stop the Goods in transit, and/or (iv) forthwith demand immediate payment of all sums payable by the Buyer under this Contract or any other agreement with the Buyer, whereupon the same shall become immediately due and payable.


Interstate Chemical Co.          Mitsubishi International Corp.


_____          _____

By:                              By:
Title:                           Title:

EXHIBIT C

```
|----------+------------------------------------------------->
|          |                                                 |
|          |            ZACK FERGUSON-STEGER                 |
|          |                                                 |
|          |            12/20/2007 06:09 PM                  |
|          |                                                 |
|          |                                                 |
|          |                                                 |
|          |                                                 |
|          |                                                 |
|----------+------------------------------------------------->
   >-----------------------------------------------------------------
----------------------------------------|
      |                                  |
  |       |
  |
   >-----------------------------------------------------------------
----------------------------------------|
```

```
|-------------------->
|            To: |
|-------------------->
-----------------------------------------------------------+---------|
 |"Lori Cirillo" <lcirillo@interstatechemical.com>
 |       |
 |       |
 |   >--------------------------------------------------------
-----------------------------------------------------------+---------|
```

```
|-------------------->
|            cc: |
|-------------------->
   >--------------------------------------------------------
------------------------------------------------------------+---------|
 |"Albert R. Puntureri" <apuntureri@interstatechemical.com>
 |       |
 |thomas.reszler@mitsubishicorp.com@MITSUBISHI CORP
 |       |
 |kevin.fallon@mitsubishicorp.com
 |       |
 |DIANE KNOX/AM/MITSUBISHI CORP@MITSUBISHI CORP
 |       |
 |       |
   >--------------------------------------------------------
------------------------------------------------------------+---------|
```

```
|-------------------->
|                 |
|-------------------->
   >--------------------------------------------------------
------------------------------------------------------------+---------|
 |
 |       |
```

```
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
|-------------------->
|                    |
|-------------------->
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
     |
 |       |
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
|-------------------->
|                    |
|-------------------->
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
     |
 |       |
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
|-------------------->
|                    |
|-------------------->
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
     |
 |       |
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
|-------------------->
|                    |
|-------------------->
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
     |
 |       |
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
|-------------------->
|       Subject:   |
|-------------------->
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
   |Re: Methanol(Document link: DIANE KNOX)
 |       |
  >-------------------------------------------------------------------
-----------------------------------------------------+------|
```

Dear Lori

It appears that your legal department may have offered you an opinion about
Interstate's obligation without having all the facts.  Even without a
signed writing, we clearly have a contract for the sale of 10mb of methanol
@$2.55/gal., and we expect Interstate to honor that contract.

As you know, the market is falling, and MIC will suffer substantial damages if it is forced to seek a new buyer for this methanol if you repudiate your obligation to purchase. The contract price is $2.55/gal, and as of the close of business today, we would be able to get only aproximately $2.18/gallon the spot market for this load. If we are forced to sell the material at a loss we will hold Interstate fully responsible for our damages.

In order to mitigate our damages as much as possible in this falling market, we will seek to sell the material to another buyer tomorrow, December 21, if we do not receive your confirmation by 10:00 a.m. that Interstate will fulfill its obligations under our agreement. We will then seek prompt legal recourse to recover the full amount of our losses in connection with that sale from Interstate.

You may want to explain more fully to your legal department our course of dealing in connection with Interstate's purchase. On December 4, you and I reached an oral agreement that Interstate would purchase 10mb of methanol at a price of 2.55/gal., for delivery December 20 or later. You confirmed the purchase by email that same day, and I responded to your email with a confirming email of my own shortly thereafter. You later sought to "cancel" the purchase by an email dated December 18 (when we were out of the office).

Even in the absence of a signed writing, we clearly have an enforceable contract for this purchase. You may want to refer your legal department to UCC 2-201(2) if they are under the impression that our contract requires a signed writing to be enforceable.

   I remain hopeful that we might be able to go forward with this deal and with a continuing mutually beneficial business relationship.

I look forward to hearing from you.

Zack

=================================================================
Zack Ferguson-Steger
Mitsubishi Int'l Corporation
655 Third Ave New York, NY 10017
Tel 212-605-2419
Fax 212-605-1058
Cell 917-847-5323
email: zack.ferguson-steger@mitsubishicorp.com
=================================================================

12/20/2007 11:49:49 AM "Lori Cirillo" <lcirillo@interstatechemical.com> wrote:
>
>Zack -
>
>After speaking to our legal department, I am told that placement of an order
>does not constitute a contract. Our verbal cancellation took place 6 to 7 days
>

>prior to the ship/load date of the barge.   Interstate is not obligated to
>purchase a barge when our tanks are full.   When our manufacturing plant
calls
>
>for additional inventory, then we can pursue a new purchase order with
>Mitsubishi at prevailing pricing, whether up or down from the current
>$2.55/gallon price level.
>
>Lori Cirillo
>Director of Chemical Procurement
>724-981-3771  #1118

# EXHIBIT D

CONTRACT#:07-2068
TO:        MITSUBISHI INT'L CORPORATION
ATTN:      THOMAS RESZLER
FROM:      STARSUPPLY GFI
DATE:      21 DECEMBER 2007

The Client and Starsupply, A Division of GFI Brokers LLC ("GFI") agree that this communication confirms the terms and conditions of the transaction entered into as of the trade date specified below as follows:
*****************************************************************************************************
MITSUBISHI INT'L CORPORATION / TAUBER PETROCHEMICAL COMPANY METHANOL SALE DATED DECEMBER 21, 2007
*****************************************************************************************************
FOLLOWING IS CONFIRMATION OF SALE BETWEEN MITSUBISHI INT'L CORPORATION AND TAUBER PETROCHEMICAL COMPANY FOR A TOTAL OF APPROXIMATELY 10,000 BARRELS OF METHANOL

**SELLER:**
MITSUBISHI INT'L CORPORATION
655 THIRD AVE
NEW YORK, NY 10017
ATTENTION: THOMAS RESZLER
FAX: +12126051058

**BUYER:**
TAUBER PETROCHEMICAL COMPANY
55 WAUGH DRIVE
SUITE 700
HOUSTON, TX 77007
ATTENTION: STEVE ELLIOTT
FAX: +17138628228

**PRODUCT:**
METHANOL

**VOLUME:**
10,000 BARRELS, PLUS/MINUS 5 PERCENT IN BUYER'S OPTION.

**PRICE:**
USD 2.05 PER GALLON

**QUALITY**
METHANOL ASTM-D1152-97

**DELIVERY:**
F.O.B. ST. ROSE, LA INTO BUYER'S NOMINATED BARGE OR VESSEL AT SELLER'S BERTH

**DELIVERY DATES:**
DECEMBER 21, 2007 - JANUARY 10, 2008 , BUYER TO PROVIDE SELLER WITH 5 WORKING DAYS NOTICE OF LOADING

**LAYTIME AND DEMURRAGE AT LOAD**
PER CHARTER PARTY

**PAYMENT:**
IN USD VIA WIRE TRANSFER 30 (THIRTY) DAYS FROM B/L DATE INTO SELLER'S DESIGNATED ACCOUNT

**GENERAL TERMS AND CONDITIONS:**
PER BARGE/VESSEL CHARTER PARTY

**COMMISSION:**
USD 630.00 PAYABLE BY MITSUBISHI INT'L CORPORATION WITHIN THIRTY (30) DAYS AFTER CARGO LOAD AND RECEIPT OF INVOICE.

WE THANK YOU FOR THE OPPORTUNITY OF ARRANGING THIS TRANSACTION ON YOUR BEHALF. WE WOULD APPRECIATE YOUR CONFIRMATION THAT THE ABOVE ACCURATELY RECORDS THE AGREEMENT AS ARRANGED.

VERY TRULY YOURS,
STARSUPPLY GFI - A DIVISION OF GFI BROKERS LLC

**Buyer and Seller understand that GFI has acted as agent for both parties solely for the purposes of matching up the parties for the transaction. GFI shall have no liability to any party if any party is for any reason prohibited or restricted from entering into this transaction. The fee charged to you in this transaction is a negotiated fee, which may not be the same as charged in similar transactions. The fee is payable upon receipt of our invoice.**

**All aspects and terms of the transaction were determined and agreed to solely by the Buyer and Seller and compliance with the terms of**

this transaction is strictly their obligation. In the event of an error please contact GFI immediately but no later than 24 hrs after receipt of the confirmation. If any dispute occurs, the Buyer and Seller agree to hold GFI, its affiliates and their respective successors harmless from any liabilities, which may result therefrom. This Confirmation shall inure to the benefit of GFI, its affiliates and their respective successors.

**EXHIBIT "B"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

MITSUBISHI INTERNATIONAL CORPORATION,

                                    Plaintiff,

            -against-

INTERSTATE CHEMICAL CORPORATION,

                                    Defendant.

------------------------------------------------

08 Civ. 00194 (JSR)(GWG)

**ANSWER**

Case 1:08-cv-00194-JSR    Document 6    Filed 02/28/2008    Page 1 of 5

Defendant Interstate Chemical Corporation ("Interstate"), by its attorneys, Simon Lesser PC, hereby answers and responds to the complaint filed by plaintiff Mitsubishi Chemical Corporation ("MIC") in this matter.

These responses are made without waiving, but expressly reserving, all rights that Interstate has to file appropriate motions addressed to some or all of the claims asserted therein.

"First Claim"

1.      The allegations in Paragraph 1 assert legal conclusions to which no response is required.  To the extent a response is required, Interstate admits that it is a citizen of Pennsylvania and that based upon the assertions in the complaint, the amount in controversy exceeds $75,000.

2.      The allegations in Paragraph 2 assert legal conclusions to which no response is required.  To the extent a response is required, the allegations of this paragraph are denied.

3.      Interstate lacks information sufficient to respond to the allegations contained in Paragraph 3.

4.      In response to Paragraph 4, Interstate admits that it is a Pennsylvania based corporation engaged in chemical manufacturing and distribution.

5.      In response to Paragraph 5, Interstate admits that on December 4, 2007, the

parties had a phone conversation regarding the possibility of MIC selling a barge of methanol to

Interstate on December 20, 2007 or later.  The allegations are otherwise denied.

6.      In response to Paragraph 6, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

7.      In response to Paragraph 7, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

8.      In response to Paragraph 8, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

9.      Interstate denies the allegations contained in Paragraph 9.

10.     Interstate denies the allegations contained in Paragraph 10, and otherwise refers to

the documents referenced which speak for themselves.

11.     In response to Paragraph 11, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

12.     In response to Paragraph 12, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

13.     In response to Paragraph 13, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

14.     In response to Paragraph 14, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

15.     In response to Paragraph 15, Interstate refers to the documents referenced which

speak for themselves.  The allegations are otherwise denied.

16.     Interstate denies the allegations contained in Paragraph 16.

17.    Upon information and belief, Interstate denies the allegations contained in Paragraph 17.

18.    Interstate denies the allegations contained in Paragraph 18.

19.    Interstate denies the allegations contained in Paragraph 19.

20.    Interstate lacks information sufficient to respond to the allegations contained in

Paragraph 20.

21.    Interstate denies the allegations contained in Paragraph 21.

22.    Upon information and belief, Interstate denies the allegations contained in Paragraph 22.

23.    Interstate denies the allegations contained in Paragraph 23.

"Second Claim"

24.    Interstate incorporates by reference its responses above as its response to Paragraph 24.

25.    Interstate denies the allegations contained in Paragraph 25.

26.    Interstate denies the allegations contained in Paragraph 26.

27.    Interstate denies the allegations contained in Paragraph 27.

28.    Interstate denies the allegations contained in Paragraph 28.

29.    Interstate denies the allegations contained in Paragraph 29.

## FIRST AFFIRMATIVE DEFENSE

30.    The Complaint fails to state a claim for breach of contract upon which relief may be granted.

3

## SECOND AFFIRMATIVE DEFENSE

31.    The Complaint fails to state a claim for promissory estoppel upon which relief

may be granted.

## THIRD AFFIRMATIVE DEFENSE

32.    Venue is not appropriate in this Court.

## FOURTH AFFIRMATIVE DEFENSE

33.    Plaintiff's claims are barred in whole or part by the statute of frauds.

## FIFTH AFFIRMATIVE DEFENSE

34.    Plaintiff suffered no damages by reason of defendant's alleged conduct.

## SIXTH AFFIRMATIVE DEFENSE

35.    Plaintiff's claims are barred because the relief requested relief would result in

unjust enrichment.

## SEVENTH AFFIRMATIVE DEFENSE

36.    Plaintiff failed to reasonably mitigate any alleged damages.

## EIGTH AFFIRMATIVE DEFENSE

37.    Defendant's performance under the alleged contract was excused due to a *force

majeure*.

## NINTH AFFIRMATIVE DEFENSE

38.    Defendant's performance under the alleged contract was excused due to

impossibility.

## TENTH AFFIRMATIVE DEFENSE

39.    Defendant hereby gives notice that it intends to rely upon all other defenses that

may become apparent during the course of this action.

WHEREFORE, defendant Interstate Chemical Corporation requests a judgment against

plaintiff Mitsubishi International Corporation:

    (a)      Dismissing this action with prejudice; and

    (b)      Awarding such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, defendant Interstate

Chemical Corporation hereby demands a trial by jury of any issue triable of right by a jury.

Dated: New York, New York
       February 28, 2008

SIMON•LESSER PC

By: _____
     Leonard F. Lesser, Esq.
    420 Lexington Avenue
    New York, New York 10170
    T:212.599.5455
    F:212.599.5459
    llesser@simonlesser.com

    Attorneys for defendant Interstate Chemical
    Corporation

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,    | 08 Civ. 00194 (JSR)(GWG)

                     Plaintiff,

                     **RULE 7.1 STATEMENT**

      -against-

INTERSTATE CHEMICAL CORPORATION,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, Defendant Interstate

Chemical Corporation ("Interstate"), by its attorneys, Simon Lesser PC states as follows:

Interstate is a privately held corporation, and no publicly held corporation holds 10% or

more of its stock.

Dated: New York, New York
       February 28, 2008

                         SIMON•LESSER PC

                         By: _____
                             Leonard F. Lesser, Esq.
                           420 Lexington Avenue
                           New York, New York 10170
                           T:212.599.5455
                           F:212.599.5459
                           llesser@simonlesser.com

                         Attorneys for defendant Interstate Chemical
                         Corporation

**EXHIBIT "C"**

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MITSUBISHI INTERNATIONAL                 :
CORPORATION,                                          08 CV 00194(JSR)(GWG)
                                         :
          Plaintiff,
                                         :
                                                     **NOTICE OF MOTION**
          -against-
                                         :           ECF Case
INTERSTATE CHEMICAL CORPORATION,
                                         :
          Defendant.
----------------------------------X


     PLEASE TAKE NOTICE that upon the Affidavit of Zack

Ferguson-Steger sworn to on March 26, 2008 and the exhibits

annexed thereto, and plaintiff's Local Rule 56.1(a) Statement,

plaintiff will move this Court before the HONORABLE JED S.

RAKOFF, United States District Judge, at the United States

Courthouse at 500 Pearl Street, New York, New York 10007,

Courtroom 14B, on April 25, 2008, at 4:00 p.m., for an order

pursuant to Fed R. Civ. P. 56 granting summary judgment to

plaintiff, together with such other and further relief as to the

Court may seem just and proper.

J2S0\01\NOTACU 0\001.wpd

PLEASE TAKE FURTHER NOTICE that pursuant to this Court's Case Management Plan dated March 12, 2008, answering papers, if any, shall be served on or before April 4, 2008, and reply papers, if any, shall be served on or before April 18, 2008.

Dated:     New York, New York
           March 26, 2008


                         KORNSTEIN VEISZ WEXLER & POLLARD, LLP

                         By:  Daniel J. Kornstein (DK - 3264)

                         757 Third Avenue
                         New York, New York 10017
                         (212) 418-8600

                         Attorneys for Plaintiff



TO:   Leonard F. Lesser, Esq.
      SIMON LESSER PC
      420 Lexington Avenue
      New York, New York 10170
      Attorneys for Defendant

2

**EXHIBIT "D"**

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MITSUBISHI INTERNATIONAL                :
CORPORATION,                                        08 CV 00194(JSR)(GWG)
                                        :
          Plaintiff,                    **AFFIDAVIT**
                                        :
          -against-
                                        :    ECF Case
INTERSTATE CHEMICAL CORPORATION,
                                        :
          Defendant.
------------------------------------X

STATE OF NEW YORK      )
                       )     ss.:
COUNTY OF NEW YORK     )

     ZACK FERGUSON-STEGER, being duly sworn, deposes and says:

     1.   I am the marketing manager of Mitsubishi International

Corporation ("MIC").  I have personal knowledge of the facts set

forth in this affidavit, which I make in support of plaintiff's

motion for summary judgment.

     2.   A copy of the complaint in this action is annexed

hereto as Exhibit 1, and a copy of defendant Interstate Chemical

Corporation's ("Interstate") answer to the complaint is annexed

hereto as Exhibit 2.

     3.   MIC engages in the business of international trade of

products -- including methanol -- and services across a range of

industry sectors.

A25001AFFAOG16X001.wpd

<u>The Oral Agreement</u>

4.  On December 4, 2007, I had a telephone conversation with Lori Cirillo, Director of Chemical Procurement for Interstate, regarding the possibility of MIC selling a barge of methanol to Interstate.  During that conversation, Ms. Cirillo and I agreed that MIC would sell one 10 mb (420,000 gallon) barge of methanol to Interstate at a price of $2.55 per gallon, to be loaded on or after December 20, 2007.

5.  Later that day, Ms. Cirillo sent me an email, confirming that Interstate "would like to purchase your Methanol barge.  Please give me a call." <u>See</u> Ex. A to Ex. 1.

<u>Written Confirmation</u>

6.  Less than an hour later, I responded to Ms. Cirillo via email, stating:  "We confirm 10 mb @ $2.55/gal loading Dec. 20 or later.  If we can ship earlier, we'll inform you.  I'll send over a spot contract a little later." <u>See</u> Ex. A to Ex. 1.

7.  The next day, December 5, 2007, I reconfirmed the agreement and its material terms in an email to Ms. Cirillo.  I attached a form contract to that email and stated:  "Please see the attached contract for the 10mb barge agreed to yesterday." <u>See</u> Ex. B to Ex. 1.

8.  The form contract attached to this December 5, 2007

2

email contains the same material terms MIC and Interstate agreed to the day before.  See Ex. B to Ex. 1.

9.  So far as I am aware, neither Ms. Cirillo nor anybody else at Interstate objected to the terms of the agreement.

### Attempted Cancellation

10.  I heard nothing further from Interstate about the agreement until December 18, 2007, when it sought to cancel the contract.  On that day, Ms. Cirillo sent me an email stating: "We are having a problem with this barge.  We are planning to ship this to Owensboro, KY and there is still not coast guard approval yet for receiving barges at this destination.  We do not have another home for this barge.  Can we cancel this barge because of this coast guard issue?"  See Ex. B to Ex. 1.

11.  The next day, December 19, 2007, I responded to Ms. Cirillo, stating:  "We can postpone the delivery of the barge if needed but we cannot cancel."  See Ex. B to Ex. 1.

12.  A few minutes later, Ms. Cirillo responded to me, repeating Interstate's desire to cancel the agreement and explaining that Interstate's "customer cancel[]ed" and had arranged to receive methanol from another supplier.  See Ex. B to Ex. 1.

13.  I responded to Ms. Cirillo shortly thereafter, explaining:

3

> Unfortunately, we cannot allow you to walk
> away from this spot contract, even if the
> customer claims they cannot receive the
> barge.  We reserved this product in our
> inventory and if we were to liquidate now, we
> would have to hold you responsible for the
> damages, which we calculate to be around
> $0.35/ gal x 420,000 - $147,000.  This is
> based on the $2.55/gal price that we fixed
> compared with the expected sales price today
> of $2.20/gal.

<u>See</u> Ex. B to Ex. 1.

14. Later on December 19, and again on the following day,
Ms. Cirillo reiterated that Interstate would be canceling the
contract.  <u>See</u> Ex. B and C to Ex. 1.

15. Later on December 20, I responded to Ms. Cirillo,
reminding her of Interstate's contract with MIC and stating:

> As you know, the market is falling, and MIC
> will suffer substantial damages if it is
> forced to seek a new buyer for this methanol
> if you repudiate your obligation to purchase.
> The contract price is $2.55/gal, and as of
> the close of business today, we would be able
> to get only approximately $2.18/gallon on the
> spot market for this load.  If we are forced
> to sell the material at a loss we will hold
> Interstate fully responsible for our damages.
>
> In order to mitigate our damages as much as
> possible in this falling market, we will seek
> to sell the material to another buyer by
> tomorrow, December 21, if we do not receive
> your confirmation by 10:00 a.m. that
> Interstate will fulfill its obligations under
> our agreement.  We will then seek prompt
> legal recourse to recover the full amount of
> our losses in connection with that sale from
> Interstate.

4

See Ex. C to Ex. 1.

16. Interstate did not respond to my December 20, 2007 email.

17. MIC was ready, willing, and able to deliver the methanol to Interstate at the agreed-upon price of $2.55 per gallon.

18. In reliance upon Interstate's promise to purchase the barge of methanol, we reserved the barge of methanol in our inventory until it became clear that Interstate was not going to honor its promise to purchase it.

## Mitigation of Damages

19. On December 21, 2007, after Interstate refused to perform our agreement, MIC attempted to limit its losses by selling the methanol Interstate agreed to purchase to another company, Tauber Petrochemical Company, for $2.05 per gallon, the highest price we could get.  See Ex. D to Ex. 1.

20. As a result, MIC lost $210,000, the difference between the price of the barge of methanol at the $2.55 purchase price Interstate agreed to and the $2.05 price MIC was forced to accept on December 21.

21. Interstate had a contract with MIC to purchase a barge of methanol at $2.55 per gallon in December 2007.   Because Interstate failed to live up to that agreement, MIC's motion for summary judgment should be granted.

_____
ZACK FERGUSON-STEGER

Sworn to this 26th
day of March, 2008

_____
Notary Public

DIANE G. KNOX
Notary Public, State of New York
No. 02KN6000525
Qualified in New York County
Commission Expires April 12, 2010

**EXHIBIT "E"**

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
MITSUBISHI INTERNATIONAL            :
CORPORATION,                                    08 CV 00194(JSR)(GWG)
                                    :
          Plaintiff,                        **PLAINTIFF'S LOCAL CIVIL**
                                    :       **RULE 56.1(a) STATEMENT**
          -against-
                                    :       ECF Case
INTERSTATE CHEMICAL CORPORATION,
                                    :
          Defendant.
-----------------------------------X

       Plaintiff Mitsubishi International Corporation ("MIC"), by

and through its undersigned counsel, submits, pursuant to Local

Civil Rule 56.1(a), the following statement of material facts as

to which there is no genuine issue to be tried:

       1.  MIC engages in the business of international trade of

products -- including methanol -- and services across a range of

industry sectors.  Ferguson-Steger Aff. at ¶ 3.[1]

       2.  Defendant Interstate Chemical Corporation

("Interstate") both manufactures and distributes chemical

products.  Ex. 2, ¶ 4.

       3.  MIC is a New York corporation with its principal place

_____

       [1] "Ferguson-Steger Aff." refers to the Affidavit of Zack
Ferguson-Steger, sworn to on March 26, 2008 and submitted
herewith.  Unless otherwise specified, cites to "Ex." are to the
exhibits annexed to the Ferguson-Steger Aff.

of business at 655 Third Avenue, New York, New York 10017.  Ex. 1, ¶ 3.

    4.  Interstate is a Pennsylvania-based corporation.  Ex. 2, ¶ 4.

    5.  On December 4, 2007, Zack Ferguson-Steger, marketing manager of MIC, spoke by telephone with Lori Cirillo, Director of Chemical Procurement at Interstate, regarding the possibility of MIC selling a barge of methanol to Interstate.  Ferguson-Steger Aff. at ¶ 4; Ex. 1, ¶ 5; Ex. 2, ¶ 5.

    6.  During that December 4, 2007 telephone conversation, MIC and Interstate reached an oral agreement that MIC would sell one barge (420,000 gallons, or 10 mb) of methanol to Interstate at a price of $2.55 per gallon, to be loaded on or after December 20, 2007.  Ferguson-Steger Aff. at ¶ 4; Ex. A to Ex. 1.

    7.  Later that day, Ms. Cirillo emailed Mr. Ferguson-Steger, confirming that Interstate "would like to purchase your Methanol barge.  Please give me a call."  Ferguson-Steger Aff. at ¶ 5; Ex. 1, ¶ 6 and Ex. A; Ex. 2, ¶ 6.

    8.  Less than an hour later, Mr. Ferguson-Steger responded to Ms. Cirillo via email, stating:  "We confirm 10 mb @ $2.55/gal loading Dec. 20 or later.  If we can ship earlier, we'll inform you.  I'll send over a spot contract a little later."  Ferguson-Steger Aff. at ¶ 6; Ex. 1, ¶ 7 and Ex. A; Ex. 2, ¶ 7.

    9.  The next day, December 5, 2007, Mr. Ferguson-Steger

reconfirmed the agreement and its material terms in an email to Ms. Cirillo. He attached a form contract to that email and stated: "Please see the attached contract for the 10mb barge agreed to yesterday." Ferguson-Steger Aff. at ¶ 7; Ex. 1, ¶ 8 and Ex. B; Ex. 2, ¶ 8.

10. The form contract attached to this email contains the same material terms MIC and Interstate agreed to the day before. Ex. B to Ex. 1.

11. From December 5, 2007, up until December 18, 2007, Interstate did not communicate with MIC regarding the methanol barge purchase. Ferguson-Steger Aff. at ¶ 10.

12. On December 18, 2007, Interstate sought to cancel the contract via an email from Ms. Cirillo to Mr. Ferguson-Steger stating: "We are having a problem with this barge. We are planning to ship this to Owensboro, KY and there is still not coast guard approval yet for receiving barges at this destination. We do not have another home for this barge. Can we cancel this barge because of this coast guard issue?" Ferguson-Steger Aff. at ¶ 10; Ex. 1, ¶ 10 and Ex. B; Ex. 2, ¶ 10.

13. The next day, December 19, 2007, Mr. Ferguson-Steger responded to Ms. Cirillo, stating: "We can postpone the delivery of the barge if needed but we cannot cancel." Ferguson-Steger Aff. at ¶ 11; Ex. 1, ¶ 11 and Ex. B; Ex. 2, ¶ 11.

14. A few minutes later, Ms. Cirillo responded to Mr. Ferguson-Steger, repeating Interstate's desire to cancel the agreement and explaining that Interstate's "customer cancel[]ed" and arranged to receive methanol from another supplier. Ferguson-Steger Aff. at ¶ 12; Ex. 1, ¶ 12 and Ex. B; Ex. 2, ¶ 12.

15. Mr. Ferguson-Steger responded to Ms. Cirillo shortly thereafter, explaining:

> Unfortunately, we cannot allow you to walk away from this spot contract, even if the customer claims they cannot receive the barge. We reserved this product in our inventory and if we were to liquidate now, we would have to hold you responsible for the damages, which we calculate to be around $0.35/ gal x 420,000 - $147,000. This is based on the $2.55/gal price that we fixed compared with the expected sales price today of $2.20/gal.

Ferguson-Steger Aff. at ¶ 13; Ex. 1, ¶ 13 and Ex. B; Ex. 2, ¶ 13.

16. Later on December 19, and again on the following day, Ms. Cirillo reiterated that Interstate would be canceling the contract. Ferguson-Steger Aff. at ¶ 14; Ex. 1, ¶ 14 and Exs. B and C; Ex. 2, ¶ 14.

17. Later on December 20, Mr. Ferguson-Steger responded to Ms. Cirillo, reminding her of Interstate's contract with MIC and stating:

> As you know, the market is falling, and MIC will suffer substantial damages if it is forced to seek a new buyer for this methanol

> if you repudiate your obligation to purchase.
> The contract price is $2.55/gal, and as of
> the close of business today, we would be able
> to get only approximately $2.18/gallon on the
> spot market for this load.  If we are forced
> to sell the material at a loss we will hold
> Interstate fully responsible for our damages.
>
> In order to mitigate our damages as much as
> possible in this falling market, we will seek
> to sell the material to another buyer by
> tomorrow, December 21, if we do not receive
> your confirmation by 10:00 a.m. that
> Interstate will fulfill its obligations under
> our agreement.  We will then seek prompt
> legal recourse to recover the full amount of
> our losses in connection with that sale from
> Interstate.

Ferguson-Steger Aff. at ¶ 15; Ex. 1, ¶ 15 and Ex. C; Ex. 2, ¶ 15.

18. Interstate did not respond to Mr. Ferguson-Steger's

December 20, 2007 email.  Ferguson-Steger Aff. at ¶ 16.

19. MIC was able and willing to deliver the methanol to

Interstate at the agreed-upon price of $2.55 per gallon.

Ferguson-Steger Aff. at ¶ 17.

20. On December 21, 2007, MIC sold the methanol it had

reserved for sale to Interstate to another company, Tauber

Petrochemical Company, for $2.05 per gallon.  Ferguson-Steger

Aff. at ¶ 19; Ex. 1, ¶ 17 and Ex. D.

21. As a result of Interstate's refusal to perform the

agreement with MIC, MIC lost $210,000, the difference between the

price of the barge of methanol at the $2.55 purchase price

Interstate agreed to and the $2.05 price MIC was forced to accept on December 21.


Dated:    New York, New York
          March 26, 2008



                    KORNSTEIN VEISZ WEXLER & POLLARD, LLP



                    By:  Daniel J. Kornstein (DK - 3264)

                    757 Third Avenue
                    New York, New York 10017
                    (212) 418-8600

                    Attorneys for Plaintiff

6

**EXHIBIT "F"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MITSUBISHI INTERNATIONAL            :
CORPORATION,
                                    :
              Plaintiff,                      08 CV 00194 (JSR) (GWG)
                                    :
        -against-
                                    :
INTERSTATE CHEMICAL CORPORATION,
                                    :
              Defendant.
----------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


Kornstein Veisz Wexler & Pollard, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600
Attorneys for Plaintiff
Mitsubishi International Corporation

# TABLE OF CONTENTS

Page(s)

Why Summary Judgment Is Proper . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . 3

    The Parties . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Agreement . . . . . . . . . . . . . . . . . . . . . . . 3

    Interstate's Breach . . . . . . . . . . . . . . . . . . . . 5

    MIC Mitigates Damages . . . . . . . . . . . . . . . . . . . 7

THIS PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . 8

ARGUMENT

I    SINCE INTERSTATE FAILED TO TAKE DELIVERY AND PAY
    FOR THE METHANOL AS AGREED, IT BREACHED ITS AGREEMENT
    WITH MIC . . . . . . . . . . . . . . . . . . . . . . . . . 9

II   SINCE MIC RELIED ON INTERSTATE'S PROMISE TO BUY
    METHANOL,AND INTERSTATE BROKE THAT PROMISE, MIC
    IS ENTITLED TO SUMMARY JUDGMENT ON THAT THEORY,
    AS WELL . . . . . . . . . . . . . . . . . . . . . . . . . 15

III  SINCE INTERSTATE HAS NOT PROPERLY PLEADED ITS
    AFFIRMATIVE DEFENSES, AND SINCE ITS ALLEGED
    "COAST GUARD ISSUE" WAS NEITHER EXTREME NOR
    UNANTICIPATED, INTERSTATE HAS RAISED NO VALID
    EXCUSE FOR ITS FAILURE TO PERFORM . . . . . . . . . . . 16

    A. No Facts Pleaded . . . . . . . . . . . . . . . . . . . 16

    B. No Substance . . . . . . . . . . . . . . . . . . . . . 17

        1. No Impossibility . . . . . . . . . . . . . . . . 18

        2. No Force Majeure . . . . . . . . . . . . . . . . 20

IV    SINCE MIC PROMPTLY SOLD TO AVOID FURTHER
      FALLING PRICES, IT TOOK ALL REASONABLE STEPS
      TO MITIGATE DAMAGES . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 22

**TABLE OF AUTHORITIES**

Page(s)

Cases

Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.,
       531 F. Supp. 2d 620 (S.D.N.Y. 2008) . . . . . . . . . 17

B & R Textile Corp. v. Domino Textiles Inc.,
       77 A.D.2d 539, 430 N.Y.S.2d 89(1st Dep't 1980) . . . . . 12

Bazak Int'l Corp. v. Mast Indust., Inc.,
       73 N.Y.2d 113, 538 N.Y.S.2d 503 (1989) . . . . . 10, 12, 14

Bazak Int'l Corp. v. Tarrant Apparel Group,
       378 F. Supp. 2d 377 (S.D.N.Y. 2005) . . . . . . . . . 10

Celotex Corp. v. Catrett,
       477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . 8

Esquire Radio & Electronics, Inc. v. Montgomery
       Ward & Co., Inc., 804 F.2d 787 (2d Cir. 1986) . . . . . 15

Fujitsu Ltd. v. Fed. Exp. Corp.,
       247 F.3d 423 (2d Cir. 2001) . . . . . . . . . . . . . . 8

Henneberry v. Sumitomo Corp. of Am.,
       -- F. Supp. 2d. --, 2007 WL 2068346 (S.D.N.Y. 2007). . . 15

Kel Kim Corp. v. Central Markets, Inc.,
       70 N.Y.2d 900, 524 N.Y.S.2d 384 (1987) . . . . . . . 18, 19

MacAlloy Corp. v. Mettalurg, Inc.,
       284 A.D.2d 227, 728 N.Y.S.2d 14 (1st Dep't 2001) . . . . 20

Premier Mountings, Inc. v. Clyde Duneier, Inc.,
       No. 02 Civ. 4897(DLC), 2003 WL 21800082,
       (S.D.N.Y. Aug. 6, 2003) . . . . . . . . . . . . . . 10-11

S.E.C. v. Kern,
       425 F.3d 143 (2d Cir. 2005) . . . . . . . . . . . . . . 8

Scotto v. Almenas,
       143 F.3d 105 (2d Cir. 1998) . . . . . . . . . . . . . . 8

Shechter v. Comptroller of City of N.Y.,
     79 F.3d 265 (2d Cir. 1996) . . . . . . . . . . . . . . .   17

The Millgard Corp. v. E.E. Cruz/NAB/Fronier-Kemper,
     No. 99 Civ 2952 (LBS), 2004 WL 1488534 (S.D.N.Y.
     July 2, 2004), amended on denial of reconsideration,
     2004 WL 1900359 (S.D.N.Y. Aug. 24, 2004) . . . . . . . 18-19

Zupnick v. Jean Mgmt. Assocs., Corp.,
     205 F.3d 1327 (2d Cir. 2000). . . . . . . . . . . . . .   22

**Statutes and Other Authorities**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 56(d)(2). . . . . . . . . . . . . . . . . . .22

Fed. R. Civ. P. 56(e)(2) . . . . . . . . . . . . . . . . . . .8

N.Y. U.C.C. § 2-104(1) . . . . . . . . . . . . . . . . . .   12

N.Y. U.C.C. § 2-201(1) . . . . . . . . . . . . . . . . . .   10

N.Y. U.C.C. § 2-201(2) . . . . . . . . . . . . . . . . . . 1, 10

Daniel J. Kornstein (DK - 3264)
Amy C. Gross (AG - 8836)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MITSUBISHI INTERNATIONAL                 :
CORPORATION,                                          08 CV 00194(JSR)(GWG)
                                         :
          Plaintiff,
                                         :    ECF Case
          -against-
                                         :
INTERSTATE CHEMICAL CORPORATION,
                                         :
          Defendant.
------------------------------------X


### PLAINTIFF'S MEMORANDUM OF LAW IN
### SUPPORT OF MOTION FOR SUMMARY JUDGMENT


     This diversity action presents a simple, textbook case of

one merchant breaching a contract with another merchant.  It

calls for straightforward application of section 2-201(2) of the

Uniform Commercial Code and elementary principles of contract

law.  According to N.Y. U.C.C. § 2-201(2):

> Between merchants if within a reasonable time
> a writing in confirmation of the contract and
> sufficient against the sender is received and
> the party receiving it has reason to know its
> contents, it [is not subject to a statute of
> frauds defense] unless written notice of
> objection to its contents is given within ten
> days after it is received.

32S000IIBIACG100002.wpd

That provision of the UCC governs the undisputed material facts
and requires, as a matter of law, a ruling in plaintiff's favor.

## Why Summary Judgment Is Proper

As clear, indisputable correspondence between the parties
demonstrates, defendant Interstate Chemical Corporation
("Interstate") orally agreed to buy a barge of methanol from
plaintiff Mitsubishi International Corporation ("MIC") on
December 4, 2007.  That same day, Interstate confirmed the
purchase in writing and MIC confirmed the details of the
agreement in writing, and the next day, MIC re-confirmed it in
writing.  Interstate never objected to the terms of the agreement
-- in fact, Interstate said nothing further about the agreement
at all for the next 13 days.

Then, on December 18, 2007, Interstate unilaterally sought
to cancel the contract.  MIC spent the next two days trying to
persuade Interstate to live up to the contract, to no avail.  To
mitigate its damages, MIC, faced with falling prices, on December
21, 2007 sold the barge of methanol it had reserved for
Interstate, at significantly less than the contract price.

The undisputed correspondence between the parties also
demonstrates that Interstate has no valid defense.  The vague
noises Interstate makes in its answer about impossibility and
force majeure do not suffice for those defenses.  And,
regardless, they could have been anticipated by the parties

before the contract was made, and the risk of such an event could have been allocated by the contract.   Further, once MIC was certain that Interstate was not going to perform, MIC acted with all due diligence in seeking to minimize its losses caused by Interstate's breach.

In these circumstances, the Court should grant MIC's motion for summary judgment.

**STATEMENT OF FACTS**

The facts relevant to this motion are undisputed and drawn primarily from unambiguous correspondence between the parties.

The Parties

Federal jurisdiction is based on diversity of citizenship. MIC, a New York corporation, engages in the business of international trade of products -- including methanol -- and services across a range of industry sectors.   Affidavit of Zack Ferguson-Steger dated March 26, 2008 ("Ferguson-Steger Aff.") at ¶ 3; Ex. 1, ¶ 3.   (Unless otherwise specified, cites to "Ex." are to the exhibits annexed to the Ferguson-Steger Aff.)   Interstate, a Pennsylvania-based corporation, both manufactures and distributes chemical products.   Ex. 2, ¶ 4.

The Agreement

On December 4, 2007, Zack Ferguson-Steger, marketing manager of MIC, spoke by telephone with Lori Cirillo, Director of

3

Chemical Procurement at Interstate, regarding the possibility of
MIC selling a barge of methanol to Interstate.  <u>Ferguson-Steger</u>
<u>Aff.</u> at ¶ 4; Ex. 1, ¶ 5; Ex. 2, ¶ 5.  In that telephone call,
Cirillo and Ferguson-Steger orally agreed that MIC would sell one
barge (420,000 gallons, or 10 mb) of methanol to Interstate at a
price of $2.55 per gallon.  <u>Ferguson-Steger Aff.</u> at ¶ 4; Ex. A to
Ex. 1.

Later that same day, Cirillo emailed Ferguson-Steger,
confirming, "We would like to purchase your Methanol barge.
Please give me a call."  <u>Ferguson-Steger Aff.</u> at ¶ 5; Ex. 1, ¶ 6
and Ex. A; Ex. 2, ¶ 6.  Less than an hour later, Ferguson-Steger
responded to Cirillo via email, stating:  "We confirm 10 mb @
$2.55/gal loading Dec. 20 or later.  If we can ship earlier,
we'll inform you.  I'll send over a spot contract a little
later."  <u>Ferguson-Steger Aff.</u> at ¶ 6; Ex. 1, ¶ 7 and Ex. A; Ex.
2, ¶ 7.

The next day, December 5, 2007, Ferguson-Steger sent an
email to Cirillo, attaching a form contract and stating:  "Please
see the attached contract for the 10mb barge agreed to
yesterday."  <u>Ferguson-Steger Aff.</u> at ¶ 7; Ex. 1, ¶ 8 and Ex. B;
Ex. 2, ¶ 8.  MIC then heard nothing from Interstate regarding the
methanol barge purchase for the next 13 days.  <u>Ferguson-Steger</u>
<u>Aff.</u> at ¶ 10.

4

<u>Interstate's Breach</u>

The next time MIC heard from Interstate about the barge purchase was on December 18, 2007, when Interstate sought to cancel the contract.  <u>Ferguson-Steger Aff.</u> at ¶ 10.  On that day, Cirillo sent an email to Ferguson-Steger, stating:

> We are having a problem with this barge.  We are planning to ship this to Owensboro, KY and there is still not coast guard approval yet for receiving barges at this destination. We do not have another home for this barge. Can we cancel this barge because of this coast guard issue?

<u>Id.</u> at ¶ 10; Ex. 1, ¶ 10 and Ex. B; Ex. 2, ¶ 10.

The next day, December 19, 2007, Ferguson-Steger responded to Cirillo, stating:  "We can postpone the delivery of the barge if needed but we cannot cancel."  <u>Ferguson-Steger Aff.</u> at ¶ 11; Ex. 1, ¶ 11 and Ex. B; Ex. 2, ¶ 11.  A few minutes later, Cirillo responded to Ferguson-Steger's email, reiterating Interstate's desire to cancel the agreement and explaining that Interstate's "customer cancel[]ed" and arranged to receive methanol from another supplier.  <u>Ferguson-Steger Aff.</u> at ¶ 12; Ex. 1, ¶ 12 and Ex. B; Ex. 2, ¶ 12.  Ferguson-Steger responded to Cirillo shortly thereafter, explaining:

> Unfortunately, we cannot allow you to walk away from this spot contract, even if the customer claims they cannot receive the barge.  We reserved this product in our inventory and if we were to liquidate now, we

> would have to hold you responsible for the
> damages, which we calculate to be around
> $0.35/ gal x 420,000 = $147,000. This is
> based on the $2.55/gal price that we fixed
> compared with the expected sales price today
> of $2.20/gal.

Ferguson-Steger Aff. at ¶ 13; Ex. 1, ¶ 13 and Ex. B; Ex. 2, ¶ 13.

Later on December 19, and again the next day, Cirillo reiterated

that Interstate would be canceling the contract.    Ferguson-Steger

Aff. at ¶ 14; Ex. 1, ¶ 14 and Exs. B and C; Ex. 2, ¶ 14.

    Later on December 20, Ferguson-Steger responded to Cirillo,

reminding her of Interstate's contract with MIC and the "falling

market":

> As you know, the market is falling, and MIC
> will suffer substantial damages if it is
> forced to seek a new buyer for this methanol
> if you repudiate your obligation to purchase.
> The contract price is $2.55/gal, and as of
> the close of business today, we would be able
> to get only approximately $2.18/gallon on the
> spot market for this load. If we are forced
> to sell the material at a loss we will hold
> Interstate fully responsible for our damages.
>
> In order to mitigate our damages as much as
> possible in this falling market, we will seek
> to sell the material to another buyer by
> tomorrow, December 21, if we do not receive
> your confirmation by 10:00 a.m. that
> Interstate will fulfill its obligations under
> our agreement. We will then seek prompt
> legal recourse to recover the full amount of
> our losses in connection with that sale from
> Interstate.

6

Ferguson-Steger Aff. at ¶ 15; Ex. 1, ¶ 15 and Ex. C; Ex. 2, ¶ 15.
Interstate did not respond to this email.  Ferguson-Steger Aff.,
at ¶ 16.

MIC Mitigates Damages

MIC heard nothing from Interstate on December 21, 2007.  MIC
was ready, willing, and able to deliver the methanol barge to
Interstate as agreed.  Ferguson-Steger Aff. at ¶ 17.  However, on
December 21, 2007, after its numerous attempts to persuade
Interstate to perform the agreement failed, and with the methanol
spot market still falling, MIC mitigated its damages by selling
the methanol it had reserved for Interstate to another company
for $2.05 per gallon.  Id. at ¶ 19; Ex. 1, ¶ 17 and Ex. D.  As a
result, MIC lost $210,000, the difference between the price of
the barge of methanol at the $2.55 purchase price Interstate
agreed to and the $2.05 price MIC was forced to accept on
December 21.  Ferguson-Steger Aff. at ¶ 20.

**THIS PROCEEDING**

On January 9, 2008, MIC commenced this action to recover the
losses it sustained due to Interstate's breach of its agreement
to buy the methanol barge.  The complaint asserts two claims, one
for breach of contract and one for promissory estoppel.  Ex. 1.
Interstate answered the complaint on February 28, 2008.  Ex. 2.
MIC now moves for summary judgment.

7

## SUMMARY JUDGMENT STANDARD

The criteria for summary judgment are familiar.  Fed. R. Civ. P. 56(c) permits summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); S.E.C. v. Kern, 425 F.3d 143, 147 (2d Cir. 2005).

A properly supported motion for summary judgment cannot be defeated by "mere[] allegations or denials" of a pleading; rather, it must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The non-movant cannot rely on "conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  Instead, it "must produce specific facts indicating that a genuine factual issue exists," and "there must be evidence on which the jury could reasonably find for the non-movant."  Id. (quotations omitted).  See also Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 428 (2d Cir. 2001).

Plaintiff's motion meets these criteria.

**ARGUMENT**

I

**SINCE INTERSTATE FAILED TO TAKE
DELIVERY AND PAY FOR THE METHANOL AS
AGREED, IT BREACHED ITS AGREEMENT WITH MIC**

None of the material facts about the agreement or its breach are genuinely in dispute. In this action, Interstate cannot and does not dispute the authenticity of any of the writings it exchanged with MIC with respect to Interstate's agreement to buy the methanol barge. The undisputed record thus demonstrates that MIC and Interstate made an agreement for the sale of 420,000 gallons of methanol at a price of $2.55 per gallon to be delivered on or after December 20, 2007, and confirmed the material terms of that agreement in writing.

Interstate has not offered, and cannot offer, a logical explanation for the contents of these writings beyond that which is clear from their face -- MIC and Interstate had an agreement. The weak and unsupported denials in Interstate's answer do not change this fact, and thus Interstate is liable to MIC for MIC's losses based on Interstate's breach of contract.

The oral agreement, confirmed in writing, between MIC and Interstate for the sale of bulk methanol was a binding contract under the UCC:

> [A] contract for the sale of goods for the
> price of $500 or more is not enforceable by

9

> way of action or defense unless there is some
> writing sufficient to indicate that a
> contract for sale has been made between the
> parties and signed by the party against whom
> enforcement is sought. . . . A writing is not
> insufficient because it omits or incorrectly
> states a term agreed upon but the contract is
> not enforceable under this paragraph beyond
> the quantity of goods shown in such writing.

N.Y. U.C.C. § 2-201(1).  An oral agreement confirmed in writing,

such as the one between MIC and Interstate, qualifies as a

"writing sufficient to indicate that a contract for sale has been

made":

> Between merchants if within a reasonable time
> a writing in confirmation of the contract and
> sufficient against the sender is received and
> the party receiving it has reason to know its
> contents, it satisfies the requirements of
> subsection (1) against such party unless
> written notice of objection to its contents
> is given within ten days after it is
> received.

N.Y. U.C.C. § 2-201(2).  See also Bazak Int'l Corp. v. Mast

Indust., Inc., 73 N.Y.2d 113, 120, 538 N.Y.S.2d 503, 506 (1989);

Premier Mountings, Inc. v. Clyde Duneier, Inc., No. 02 Civ.

4897(DLC), 2003 WL 21800082, at *3 (S.D.N.Y. Aug. 6, 2003).

Email is a valid form of "writing" for purposes of UCC § 2-

201(2).  See Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F.

Supp. 2d 377, 383-84 (S.D.N.Y. 2005).

Summary judgment for the plaintiff is appropriate where, as

here:

> There is no dispute that the plaintiff and
> defendant are merchants, that the [writings]
> were sent within a reasonable time after the
> alleged agreement, that they were received by
> someone with reason to know of their
> contents, that no written objection was made
> to the [writings] within ten days, and that
> the [writings] are sufficient to indicate the
> existence of an agreement.

Premier Mountings, Inc., supra, 2003 WL 21800082, at *4.  In

Premier Mountings, Inc., defendant, a jewelry reseller, ordered

jewelry from plaintiff, a jewelry manufacturer.  Along with

various goods, plaintiff sent invoices to defendant that listed a

description of the goods, price, quantity, and total amount due.

Defendant made no written objection to the terms of those

invoices within ten days of receiving them.  Accordingly, the

Court granted summary judgment to plaintiff "on the issue that

the invoices reflect a contract between the parties."  Id.

Here, an enforceable contract between merchants under UCC §

2-201 exists just as plainly as in Premier Mountings, Inc., for

numerous reasons:

1.  Both parties are merchants.  Interstate admits that it

distributes chemical products.  See Ex. 2, ¶ 4.  It cannot

dispute that MIC regularly buys and sells chemical products.

Thus, both parties are "merchants" under the UCC -- that is, they

"deal[] in goods of the kind or otherwise . . . hold[]

[themselves] out as having knowledge or skill peculiar to the

11

practices or goods involved in the transaction."  N.Y. U.C.C. §
2-104(1).

    2.  <u>The writings the parties exchanged suffice to indicate
the existence of an agreement.</u>  The contract falls squarely
within the provisions of UCC § 2-201(2).  Interstate does not
dispute that its representative spoke with MIC's representative
on December 4, 2007 regarding purchase of a barge of methanol.
Nor does Interstate dispute that its representative sent MIC an
email stating its desire to purchase the barge, or that MIC sent
two emails over the next two days confirming the key terms of the
agreement.  <u>See also</u> <u>Bazak</u>, 73 N.Y.2d at 119, 538 N.Y.S.2d at 505
(stating that the "only indispensable term" in a UCC 2-201
contract is quantity); <u>B & R Textile Corp. v. Domino Textiles
Inc.</u>, 77 A.D.2d 539, 539-40, 430 N.Y.S.2d 89, 90 (1st Dep't 1980)
(explaining that confirmatory writing listed parties to the sale,
date, payment terms, price, quantity, and description of goods).

    Interstate acknowledged the promise when it asked if it
could "cancel [the] barge" on December 18, 2007.  Only when MIC
responded that it would enforce the contract did Interstate
become coy and disingenuous about whether a valid contract
existed.

    3.  <u>The writings were sent within a reasonable period of
time.</u>  MIC sent its first confirmatory writing the same day it

12

made its agreement with Interstate. It sent an additional
confirmatory writing the next day.

4. <u>Cirillo of Interstate received the writings and knew of
their contents.</u> Interstate has not disputed the existence or its
receipt of any of the writings establishing MIC's claims that MIC
sent to Cirillo. In fact, she herself knew of the agreement, as
shown by her request to "cancel" it on December 18, 2007.

5. <u>Interstate made no written objection to the writings
within ten days.</u> Between the time MIC confirmed and reconfirmed
the terms of the agreement on December 4 and 5, 2007, and the
time Interstate sought to cancel the agreement thirteen or
fourteen days later, MIC heard nothing from Interstate about the
methanol purchase. Even after these 13 or 14 days passed,
Interstate did not object to any of the terms of the writings --
it simply sought to cancel them.

In sum, after agreeing to buy the barge of methanol from MIC
and inducing MIC to hold that barge in its inventory to ensure
that it could perform the agreement, Interstate unilaterally
decided not to perform. As the New York Court of Appeals has
explained, this is exactly the type of misbehavior UCC 2-201(2)
was meant to address:

> Section 2-201(2) recognized the common
> practice among merchants, particularly small
> businesses, to enter into oral sales
> agreements later confirmed in writing by one
> of the parties. Absent such a provision,

> only the party receiving the confirmatory
> writing could invoke the Statute of Frauds,
> giving that party the option of enforcing the
> contract or not, depending on how
> advantageous the transaction proved to be.
> UCC 2-201(2) was intended to address that
> inequity . . .
>
> [A] rule requiring explicit confirmatory
> language or an express reference to the prior
> agreement . . . would reintroduce the very
> unfairness addressed by the reform, for the
> sending merchant still would be bound by the
> writing while the recipient could ignore it
> or enforce it at will.

Bazak, 73 N.Y.2d at 121-22, 538 N.Y.S.2d at 507 (citations omitted).

Interstate has not disputed and cannot dispute the authenticity of MIC's confirmatory writings, and it cannot point to any timely objections to those writings sufficient to raise a material issue of disputed fact.  Had MIC refused to sell a barge of methanol to Interstate on December 20, 2007, Interstate could have sued MIC for breach of contract based on MIC's confirmatory emails -- and won!  The agreement is therefore valid, and MIC is accordingly entitled to summary judgment on its breach of contract claim.

14

II

### SINCE MIC RELIED ON INTERSTATE'S PROMISE TO BUY METHANOL, AND INTERSTATE BROKE THAT PROMISE, MIC IS ENTITLED TO SUMMARY JUDGMENT ON THAT THEORY, AS WELL

Apart from the contract between MIC and Interstate, and in the alternative, Interstate's promise to purchase methanol from MIC is binding under the doctrine of promissory estoppel. Under New York law, a promissory estoppel claim requires (a) a clear, unambiguous promise; (b) reasonable and foreseeable reliance on the promise; and (c) reliance by the party to whom the promise was made, to that party's detriment. See Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., Inc., 804 F.2d 787, 793 (2d Cir. 1986); Henneberry v. Sumitomo Corp. of Am., -- F. Supp. 2d. --, 2007 WL 2068346, at *8 (S.D.N.Y. 2007).

The undisputed writings between the parties make plain that Interstate promised to buy a barge of methanol from MIC and led MIC to believe that it would in fact make such a purchase under the terms reflected in those writings. Interstate said it "would like to purchase [MIC's] barge," then stood by in silence after receiving two writings from MIC confirming the agreement and indicating that MIC would reserve a barge of methanol to satisfy it. Interstate can offer no reason why MIC should not have relied upon Interstate's promise, and cannot dispute that MIC was damaged by its reliance when the price for methanol ultimately

15

dropped to $.50 below the contract price before MIC could mitigate.

MIC is therefore entitled to summary judgment on its promissory estoppel claim as well as on its breach of contract claim.

### III

**SINCE INTERSTATE HAS NOT PROPERLY PLEADED ITS
AFFIRMATIVE DEFENSES, AND SINCE ITS ALLEGED
"COAST GUARD ISSUE" WAS NEITHER EXTREME
NOR UNANTICIPATED, INTERSTATE HAS RAISED
<u>NO VALID EXCUSE FOR ITS FAILURE TO PERFORM</u>**

None of Interstate's affirmative defenses has any merit.  In opposition to this motion, Interstate will probably talk about impossibility and <u>force majeure</u>.  But such reliance would be misplaced.

In the first place, Interstate has not properly pleaded its affirmative defenses.  Instead, it offers only bare conclusory statements without facts.  Secondly, apart from any facial defect, Interstate cannot point to any circumstances that constitute impossibility or <u>force majeure</u> that might excuse its nonperformance.

A. <u>No Facts Pleaded</u>

Interstate has not properly pleaded either impossibility or <u>force majeure</u> (or, for that matter, any other affirmative defense).  Affirmative defenses consisting solely of "bald

16

assertion[s] . . . which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy." <u>Shechter v. Comptroller of City of N.Y.</u>, 79 F.3d 265, 270 (2d Cir. 1996) (quotations omitted). <u>See also</u> <u>Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.</u>, 531 F. Supp. 2d 620, 623 (S.D.N.Y. 2008) (granting motion to strike affirmative defenses as insufficiently pleaded where defendant alleged no facts, not "even general facts to support them").

Interstate raises both impossibility and <u>force majeure</u> with the most conclusory statements possible, devoid of any factual allegations, stating only: "Defendant's performance under the alleged contract was excused due to a <u>force majeure</u>[/impossibility]." Ex. 2, Eighth and Ninth Affirmative Defenses.

B. <u>No Substance</u>

Not only does Interstate fail to meet even notice pleading standards for its affirmative defenses, but any impossibility or <u>force majeure</u> defenses based on the few relevant statements in Interstate's correspondence also cannot bear scrutiny. As best we can tell, based on the correspondence, Interstate claimed that <u>its</u> client decided not to accept delivery of the methanol at the delivery site in Owensboro, Kentucky, because the site did not yet have coast guard approval to receive barges. In the words of Interstate's Cirillo:

> We are having a problem with this barge.  We
> are planning to ship this to Owensboro, KY
> and there is still not coast guard approval
> yet for receiving barges at this destination.
> We do not have another home for this barge.
> Can we cancel this barge because of this
> coast guard issue?

See Ex. 1, Ex. B.  Cirillo went on to explain that Interstate's

"customer cancel[]ed" and arranged to receive methanol from

another supplier.  Id.  True or not, such facts raise no valid

defense.


1. No Impossibility

Interstate's claim of impossibility is insupportable.

Impossibility defenses:

> have been applied narrowly, due in part to
> judicial recognition that the purpose of
> contract law is to allocate the risks that
> might affect performance and that performance
> should be excused only in extreme
> circumstances.  Impossibility excuses a
> party's performance only when the destruction
> of the subject matter of the contract or the
> means of performance makes performance
> objectively impossible.  Moreover, the
> impossibility must be produced by an
> unanticipated event that could not have been
> foreseen or guarded against in the contract.

Kel Kim Corp. v. Central Markets, Inc., 70 N.Y.2d 900, 902, 524

N.Y.S.2d 384, 385 (1987) (citations omitted).  Similarly, in The

Millgard Corp. v. E.E. Cruz/NAB/Fronier-Kemper, No. 99 Civ. 2952

(LBS), 2004 WL 1488534, at *11 (S.D.N.Y. July 2, 2004), amended

18

on denial of reconsideration, 2004 WL 1900359 (S.D.N.Y. Aug. 24, 2004), this Court found that impossibility is often barred as a defense, even where performance is actually impossible, where the risk was foreseeable at the time the contract was made and could have been accounted for in the contract.

Interstate's apparent reason for its inability to perform its agreement with MIC is a vaguely and insufficiently explained difficulty with an Interstate customer rejecting one delivery point due to coast guard regulations.  This, on its own, does not raise the "extreme" or "unanticipated" circumstances necessary to sustain a defense of impossibility.

In Kel Kim Corp., supra, the Court held that a party's inability to obtain and maintain an insurance policy necessary for the operation of a roller rink was "not within the embrace of the doctrine of impossibility."  Kel Kim Corp., 70 N.Y.2d at 902, 524 N.Y.S.2d at 385.  Similarly, here, Interstate's customer's refusal or inability to secure a delivery point that complied with coast guard regulations -- regulations that Interstate has never asserted were new or unknown -- was in no way the extreme, unforeseen circumstance contemplated by the impossibility doctrine.  In any event, the unavailability of a single delivery point hardly presents an insurmountable obstacle to performance, even under the "dictionary" definition of impossibility.

2. No Force Majeure

A force majeure defense is similarly narrow. Id., 70 N.Y.2d at 902-03, 524 N.Y.S.2d at 385-86. "Ordinarily, only if the force majeure clause specifically includes the event that actually prevents a party's performance will that party be excused." Id., 70 N.Y.2d at 402-03, 524 N.Y.S.2d at 385. For example, in MacAlloy Corp. v. Mettalurg, Inc., 284 A.D.2d 227, 728 N.Y.S.2d 14 (1st Dep't 2001), plaintiff shut down its plant due to financial issues related to environmental regulations. In finding that the shutdown did not relieve plaintiff of its obligation to perform, despite "plant shutdown" language in the contract's force majeure provision, the court explained that "plaintiff was fully aware of the environmental regulations, and the Environmental Protection Agency's intention to enforce them fully, prior to entering into the contract with defendant." Id., 284 A.D.2d at 227-28, 728 N.Y.S.2d at 14-15.

Similarly, here, even if a contractual force majeure provision existed to address the "coast guard issue" (and no such provision exists) that Interstate claims excuses its performance, Interstate has never asserted that this issue implicated a new regulation, or one of which Interstate was unaware. Accordingly, unless Interstate can credibly demonstrate that the "coast guard issue" was not something it could have anticipated before it made

the contract with MIC, its <u>force majeure</u> defense, like its impossibility defense, lacks validity on its face.

## IV

### SINCE MIC PROMPTLY SOLD TO AVOID FURTHER FALLING PRICES, IT TOOK ALL REASONABLE STEPS TO MITIGATE DAMAGES

Interstate's assertion (in its affirmative defenses and likely in its opposition to this motion) that MIC did not sufficiently mitigate its damages is likewise meritless. MIC had no idea, before Cirillo's December 18, 2007 email, that Interstate did not intend to perform under the contract. On receiving this email, MIC then spent two days attempting to convince Interstate to perform. None of the writings reflecting these efforts is disputed by Interstate.

On December 21, 2007, a mere three days after first receiving notification that Interstate did not intend to perform, and in the face of falling prices on the spot market, MIC sold the methanol it had reserved for Interstate, for $.50 less per gallon than the contract price.

MIC sought the best price it could get on the spot market. Any suggestion that MIC, in waiting three days in a climate of falling prices to sell its methanol, waited too long adds insult to injury, as most of those three days were taken up with MIC trying to salvage the contract that Interstate chose to breach.

21

In any event, the undisputed proof of breach means, at a minimum, that summary judgment should be granted on liability, followed by an inquest to determine the precise amount of damages. "An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages." Fed. R. Civ. P. 56(d)(2). See also Zupnick v. Jean Mgmt. Assocs., Corp., 205 F.3d 1327, 2000 WL 232014 (2d Cir. 2000).

## CONCLUSION

Interstate has not disputed the core documents underlying MIC's claims. These documents establish as a matter of law that MIC and Interstate had a merchants' contract for sale of a barge of methanol, and that Interstate -- which has never denied refusing to perform -- breached it. These same documents also establish Interstate's liability under a theory of promissory estoppel.

Interstate has failed to fulfill even the most basic pleading requirements in attempting to assert its affirmative defenses. But even if Interstate had properly pleaded these defenses, Interstate's client's problem with a delivery site is not legally sufficient to invoke either impossibility or force majeure as an excuse for nonperformance. Nor can Interstate credibly argue that MIC was anything but reasonable and diligent in mitigating its damages.

22

For the reasons given, plaintiff's motion for summary
judgment should be granted.

Dated:    New York, New York
          March 26, 2008


                        Respectfully submitted,

                        KORNSTEIN VEISZ WEXLER & POLLARD, LLP


                        By:  Daniel J. Kornstein (DK - 3264)
                             Amy C. Gross (AG - 8836)

                        757 Third Avenue
                        New York, New York 10017
                        (212) 418-8600

                        Attorneys for Plaintiff


                              23

**EXHIBIT "G"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MITSUBISHI INTERNATIONAL CORPORATION,            08 Civ. 00194 (JSR)(GWG)

                                    Plaintiff,

        -against-

INTERSTATE CHEMICAL CORPORATION,

                                    Defendant.

# DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION
# TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

SIMON•LESSER PC
420 Lexington Avenue
New York, New York 10170
212.599.5455

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND .........................................................................................1

PROCEDURAL HISTORY..................................................................................... 5

ARGUMENT ..........................................................................................................6

A.    There Are Issues of Fact and Credibility Concerning
      The Terms Included In the Parties' Alleged Agreement ....................................9

B.    There Are Issues of Fact Concerning Whether Interstate's Inability to
      Take Delivery of the Proposed Barge Was Excused Based on Industry Practice................14

C.    There Are Issues of Credibility Concerning MIC's Core Contention
      That it "Reserved in its Inventory" for Interstate a Barge of Methanol..........................17

D.    MIC Has Failed To Produce Any Admissible Evidence
      Concerning Its Alleged "Prompt Efforts to Mitigate"
      Which Is Otherwise Contradicted By Independent Market Reports...........................19

E.    The Promissory Estoppel Claim.................................................... 20

CONCLUSION .........................................................................................22

## TABLE OF AUTHORITIES

**Case law**                                                                                                     **Page(s)**

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92 (2d Cir. 2002) ........................ 15-16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................6

*Arbittier v. Russo*, 84 Civ. 6352 (JFK),
1985 U.S. Dist. LEXIS 20571 (S.D.N.Y. Apr. 19, 1985) ............................................................17

*Atronic Int'l, GmbH v. SAT Semispecialists of Am., Inc.* 2007 U.S. Dist.
LEXIS 64185, 63 U.C.C. Rep. Serv. 2d (CBC) 855 (E.D.N.Y. Aug. 9, 2007) ...........................17

*Bazak Int'l Corp. v. Tarrant Apparel Group*,
378 F.Supp 2d 377 (S.D.N.Y 2005) ....................................................................................16, 17

*Berger v. United States*, 87 F.3d 60 (2d Cir. 1996) ..............................................................7, 18

*Cyberchron Corp. v. Calldata Sys. Dev.*, 47 F.3d 39 (2d Cir. 1995).....................................20, 21

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) ........................................................18

*Gummo v. Village of Depew*, 75 F.3d 98 (2d Cir. 1996) ..............................................................6

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94 (2d Cir. 2000) ......................................7

*In re Gulf Oil/Cities Service Tender Offer Litigation*,
725 F. Supp. 712 (S.D.N.Y. 1989) ...........................................................................................20

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005) ...........................................................................6

*Marlene Industries Corp. v.*
*Carnac Textiles, Inc.*, 45 N.Y.2d 327 (1978).........................................................................11

*Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292 (2d Cir. 2003) ...........................................8

*NCC Sunday Inserts Inc. v.*
*World Color Press, Inc.*, 759 F. Supp. 1004 (S.D.N.Y. 1991) .............................................. 20-21

*Pecker Iron Works, Inc. v.*
*Sturdy Concrete Co.*, 96 Misc. 2d 998 (Civ. Ct. 1978) .............................................................10

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) .....................................................................14

## TABLE OF AUTHORITIES
### (continued)

*Sec. Ins. Co. of Hartford v.*
*Old Dominion Freight Line, Inc.*, 391 F.3d 77 (2d Cir. 2004) ....................................................6

*Spinner Yarn Co., Inc. v. Apprel Retail Corp.*,
614 F. Supp. 1174 (S.D.N.Y. 1985) ...............................................................................10

*Sutera v. Schering Corp.*, 73 F.3d 13 (2d Cir. 1995) ....................................................9

*Trebor Sportswear Co. v. The Ltd. Stores, Inc.*,
865 F.2d 506 (2d Cir. 1989) ...................................................................................7, 8

**Statutes**

UCC § 1-201 ..................................................................................................................14

UCC § 1-205 .............................................................................................................14, 15

UCC § 2-201 .................................................................................9, 10, 11, 13, 15

UCC § 2-202 ..................................................................................................................17

UCC § 2-207 ..............................................................................................11, 12, 13, 14

UCC § 2-706 ..................................................................................................................19

**Rules**

Fed. R. Civ. P. 56(f) ........................................................................................................8

Fed. R .Civ. P. 26(a)(1)(B) ............................................................................................8

**Secondary Sources**

R. Dusenberg & L. King,
Sales and Bulk Transfers Under the UCC § 2.04[2][b] (2007) ....................................10

## PRELIMINARY STATEMENT

Defendant Interstate Chemical Corporation ("Interstate") respectfully submits this Memorandum of Law in opposition to the motion of plaintiff Mitsubishi International Corporation ("MIC") for summary judgment filed at the outset of the case. As demonstrated below, MIC's motion should be denied because of its prematurity and because even on the Record developed thus far, there are substantial issues of credibility and fact concerning MIC's claims against Interstate.

## FACTUAL BACKGROUND

On December 4, 2007, Interstate inquired with MIC about the availability of a barge of methanol for possible delivery in late December to Interstate's customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River. The substance of the December 4, 2007 conversation between Zack Ferguson-Steger of MIC and Lori Cirillo of Interstate was that MIC could load a barge of methanol from its barge loading facility in St. Rose, Louisiana for Interstate, but could not commit to any specific loading date. (Interstate 56.1(b) St. ¶ 6). MIC's inability to commit to a firm loading date was in line with Interstate's requirements as Interstate had yet to receive confirmation from OGC that it could accept a methanol barge at its new biodeisel facility. (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 4).

Following the parties' December 4 oral discussion, MIC confirmed its oral advice that it could deliver to Interstate a barge of 10mb of methanol at the market price of $2.55 per gallon "loading Dec. 20 or later." (Complaint Ex. A). This "or later" cautionary language was critical as MIC would not and did not commit to load on a specific date, nor did Interstate commit to a specific delivery date. Rather, MIC simply stated that a

barge could be available for Interstate's purchase sometime after December 20, 2007.
(Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 6).

The next day, December 5, 2007, MIC transmitted a proposed contract document
and requested that Interstate sign and return it.  (Cirillo Aff., Interstate 56.1(b) St. Ex. A
at ¶ 7).  Interstate did not do so because the document contained many terms that were
materially different than those discussed by the parties the day before, and also included
one-sided terms in MIC's favor that were inconsistent with industry practice.  (Cirillo
Aff., Interstate 56.1(b) St. Ex. A at ¶ 8).

Most critically, the proposed contract document had a firm delivery date of
"December 20th, 2007," which was materially different from the parties' December 4 oral
discussion and MIC's December 4 e-mail advising that it was prepared to deliver a barge
loading sometime "December 20 or later."  (Interstate 56.1(b) ¶ 10).  Even Mr. Ferguson-
Steger's Affidavit -- the exclusive foundation for MIC's 56.1(a) Statement -- is inconsistent
on the delivery terms MIC now claims were included in the alleged agreement created by the
parties' December 4, 2007 oral discussion and follow-up e-mail correspondence.  In one
sentence, he asserts that MIC's proposed contract document with a Shipment term of
"December 20th, 2007" was the delivery term agreed to.  (Ferguson-Steger Aff. ¶ 8).  In
another sentence, however, he says that the delivery term was just sometime "in December
2007."  (Ferguson-Steger Aff. ¶ 21).  Neither inconsistent claim correctly reflects the parties'
oral discussion wherein MIC just advised that it was prepared to deliver a barge of methanol
loading sometime "December 20 or later."  (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 9).

MIC's proposed contract document also had a one-sided *force majure* clause
excusing MIC's performance "for any cause beyond its reasonable control."  While it is

2

industry practice to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief. (Interstate 56.1(b) St. ¶ 10(b)).

MIC's proposed contract document also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction. The parties did not agree to this as MIC acknowledged when it commenced this litigation as opposed to an arbitration proceeding. (Interstate 56.1(b) St. ¶ 10(b)).

On Thursday, December 13, 2007, MIC modified its proposal to Interstate and stated that it could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to its facility in St. Rose, Louisiana with methanol. (Interstate 56.1(b) St. ¶ 11). MIC is a bulk trader of methanol, which it either produces in Venezuela, or otherwise purchases from other Venezuelan producers. (Interstate 56.1(b) St. ¶ 20). Interstate believes that the "vessel coming in" to MIC's facility in St. Rose, Louisiana was methanol that MIC either produced in Venezuela or otherwise purchased from another Venezuelan producer.

The following Tuesday, December 18, 2007, Interstate received word that OGC could not take delivery of a barge of methanol due to delay in receiving U.S. Coast Guard/Homeland Security approval for its new biodeisel facility on the Ohio River where the barge was to be delivered. Interstate informed MIC of this the morning of December 18, which was just ten (10) business days after the parties' initial oral discussion, and five (5) calendar days after MIC advised Interstate that no delivery to Interstate could take place before December 24 when MIC had a "vessel" of methanol "coming in" to its St.

3

Rose facility. (Interstate 56.1(b) St. ¶ 20). There is no dispute that Interstate's advice to MIC about OGC's inability to take delivery of the barge was well before MIC loaded any methanol for delivery to Interstate.

Based on industry practice, Interstate's advice to MIC on December 18, 2007 concerning OGC's inability to take delivery of a methanol barge should have relieved Interstate from any obligation to pay MIC for a barge that had yet to be loaded and which was only supposed to be first loaded sometime "December 20 or later." (Interstate 56.1(b) St. ¶ 22). Instead, MIC sent a series of e-mails to Interstate threatening to sue, which it then followed through with by this lawsuit. (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 19).

MIC claims that it is entitled to recover from Interstate the difference between the proposed price on December 4 of $2.55 per gallon, and the price at which MIC allegedly sold a methanol barge to its customer Tauber Petrochemical Company ("Tauber"). (MIC 56.1(a) St. ¶¶ 20, 21). Exhibit D to MIC's Complaint reflects a sale of 10mb of methanol at $2.05 per gallon to Tauber for delivery sometime between December 21, 2007 and January 10, 2008. No evidence has been submitted by MIC establishing if and when the delivery actually occurred, or where and to whom it was delivered. (Interstate 56.1(b) St. ¶ 20). Moreover, market reports reflect that the market price for a "spot" barge of methanol in the United States during the last two weeks of December, 2007 was between $2.52 and $2.33 per gallon. (Interstate 56.1(b) St. ¶ 21).

MIC's claims against Interstate are also predicated upon its contention that the methanol sold to Tauber was "reserved for sale to Interstate." (MIC 56.1(a) St. ¶ 20); *see also* Ferguson-Steger Aff. ¶ 18 ("In reliance upon Interstate's promise to purchase the

barge of methanol, we reserved the barge of methanol in our inventory."). However, no evidence has been submitted by MIC establishing this so-called "reservation of inventory." Nonetheless, this alleged "reservation of inventory" is contradicted by MIC's advice to Interstate on December 18, 2007 that no methanol would be available for Interstate until December 24, 2007 at the earliest, because that was when MIC "had a vessel coming in" with product. (Interstate 56.1(b) St. ¶ 19).

## PROCEDURAL HISTORY

MIC commenced this action on January 9, 2008 by filing its Complaint, a copy of which is attached as Exhibit 1 to Mr. Ferguson-Steger's Affidavit. The Complaint asserts two Causes of Action against Interstate - breach of contract and promissory estoppel. Interstate Answered on February 28, 2008. *See* Ferguson-Steger Aff. Ex. 2.

On March 12, 2008, the Court conducted the Initial Conference setting down the Case Management Plan. Discovery is set to close on July 14, 2008, and the case is to be ready for trial by August 12, 2008.

On March 19, 2008, MIC served its Initial Disclosures, including its list of documents relevant to the dispute. (Interstate 56.1(b) St. Ex. E). However, MIC has not produced the identified documents. Also on March 19, 2008, Interstate served its Document Requests and Notice of Deposition to MIC. (Interstate 56.1(b) St. Ex. D). MIC has not yet responded to Interstate's discovery demands.

Notwithstanding that it has yet to produce any meaningful disclosure to Interstate, including the documents listed on its March 19, 2008 Initial Disclosures, on March 26, 2008, MIC filed its Motion for Summary Judgment, supported entirely by the Affidavit of Mr. Ferguson-Steger, its "marketing manager." As demonstrated below, MIC has

clearly not satisfied its burden of establishing a right to judgment as a matter of law against Interstate, especially at this early stage of the litigation.

## ARGUMENT

"Summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82 (2d Cir. 2004). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.* (*quoting Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996), *cert. denied,* 517 U.S. 1190 (1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986)(summary judgment is only proper when "there can be but one reasonable conclusion as to the verdict").

"The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford,* 391 F.3d at 83; *see also Kapps v. Wing,* 404 F.3d 105, 112 (2d Cir. 2005)("In determining whether there are genuine issues of material fact, we draw all permissible inferences in favor of the non-moving party.").

The summary judgment burden is substantially heightened where, as here, the motion is made before any meaningful discovery has taken place. Indeed, the Second

Circuit has expressly cautioned that "only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000). The Second Circuit has also held:

> Summary judgment should only be granted if *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof. The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.

*Id.* (brackets and emphasis in original).

Based on this rule, the Second Circuit has denied motions for summary judgment as premature in cases where the nonmoving party did not have "a fully adequate opportunity for discovery." *Hellstrom,* 201 F.3d at 97; *see also Berger v. United States,* 87 F.3d 60, 65 (2d Cir. 1996)("The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment."); *see also Sutera v. Schering Corp.,* 73 F.3d 13, 18 (2d Cir. 1995)(reversing summary judgment granted "before any discovery had taken place."); *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989)("The nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment [and] must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.").

Here, MIC has not satisfied its burden of establishing its entitlement to summary judgment as there are several disputed issues of material fact concerning: (a) what terms were included in the parties' alleged agreement; (b) whether Interstate's inability to take delivery of the proposed barge was excused based on industry practice; (c) the credibility

of MIC's core contention that it "reserved in its inventory" the barge of methanol for Interstate based on the parties December 4, 2007 communications; and (d) MIC's alleged "prompt efforts to mitigate;" and its claim that it is entitled to recover from Interstate the difference between the proposed price on December 4 of $2.55 per gallon, and the price at which MIC allegedly sold a methanol barge to its customer Tauber sometime after December 24, 2007.

Moreover, as reflected in its opposition papers, Interstate has satisfied its own burden under Fed. R. Civ. P. 56(f) of establishing that MIC's failure to produce its documents and submit to depositions as noticed has prevented Interstate from fully responding to MIC's core contentions that: (a) the methanol sold to Tauber was "reserved in MIC's inventory for sale to Interstate" (Ferguseon-Steger Aff. ¶ 18); and (b) that "despite MIC's prompt efforts to mitigate, MIC was only able to sell the methanol to [Tauber] at a price of $2.05 per gallon" (Complaint ¶ 22). *See Trebor Sportswear Co.,* 865 F.2d at 511 ("Under Rule 56(f), summary judgment may be inappropriate where the party opposing it shows that he cannot at the time present facts essential to justify his opposition."); *see also Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir. 2003)("[The non-movant] cannot be faulted for failing to advise the district court precisely what information he might learn during discovery given that the facts sought were exclusively within defendants' possession and that he had no previous opportunity to develop the record through discovery."). Here, MIC has neither responded to Interstate's discovery requests, nor bothered to produce all of its documents identified in its Initial Disclosures under Fed. R .Civ. P. 26(a)(1)(B).

8

Based on these controlling standards, MIC's motion should be denied in all respects.

**A.    There Are Issues of Fact and Credibility Concerning The Terms Included In the Parties' Alleged Agreement**

MIC's motion papers rely primarily upon UCC § 2-201(2), commonly referred to as the "merchant memo" rule, which essentially provides that evidence of the formation of a contract may be established through some written confirming memorandum, even if that memorandum is not signed by the party to be charged. It states:

> (1)    Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

> (2)    Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

U.C.C. § 2-201.[1]

In other words:

> An oral contract for the sale of goods [is] enforceable against a party who signed nothing, if that party received a written confirmation of the existing oral agreement and does not give written notice of objection to its contents within 10 days after it is received. Failure to object in writing within 10 days *does not signify assent to the terms of the writing*; it merely deprives the recipient of the opportunity to raise the Statute of Frauds as a defense.

---

[1]    Interstate, a Pennsylvania corporation, does not concede that New York law necessarily applies to the parties' dispute. However, as both Pennsylvania and New York have adopted the UCC, a full choice-of-law analysis need not be undertaken for purposes of MIC's instant summary judgment motion.

*Pecker Iron Works, Inc. v. Sturdy Concrete Co.*, 96 Misc. 2d 998, 1003, 410 N.Y.S.2d

251, 254 (Civ. Ct. 1978)(emphasis added); *see also Spinner Yarn Co., Inc. v. Apprel*

*Retail Corp.*, 614 F. Supp. 1174, 1179 (S.D.N.Y. 1985)("The *only* effect of failure to

object to a written confirmation of an oral offer or agreement under Section 2-201 is to

take away from the receiving merchant the defense of the Statute of Frauds.")(emphasis

in original)(citation omitted).

     Here, MIC argues that its December 4, 2007 e-mail is a sufficient "merchant

memo" under UCC 2-201(2).  The e-mail said: "We confirm 10mb @ $2.55/gal loading

Dec 20 or later.  If we can ship earlier, we'll inform you."  (Complaint Ex. A).  MIC

concedes that on December 18, 2007, ten (10) business days after the parties' December

4 discussion and MIC's "confirming memo," Interstate sought to cancel the order.  (MIC

56.1(a) St ¶ 12).

     The UCC does not expressly dictate whether the 10-day objection period under

§ 2-201(2) is calendar days, as opposed to business days.  *See* R. Dusenberg & L. King,

Sales and Bulk Transfers Under the UCC § 2.04[2][b] (2007)("How to measure the ten-

day period for giving notice of objection to a memorandum is also left unaddressed by

[the code].").  Yet even accepting that § 2-201(2) speaks of calendar and not business

days, the only effect of Interstate's alleged failure to object to MIC's December 4, 2007

e-mail four (4) days sooner than it did is to take away a Statute of Frauds defense to the

alleged formation of an agreement.

     What terms are included in that agreement, however, is an entirely different

question.  UCC § 2-201 deals only with contract formation; it is § 2-207 that dictates what

terms are included in the contract.  In this regard, the New York Court of Appeals has

observed the following concerning the interplay between §§ 2-201 and 2-207:

> The courts below erred in applying subdivision (2) of section 2-201, for
> that statute deals solely with the question whether a contract exists which
> is enforceable in the face of a Statute of Frauds defense; it has no
> application to a situation such as this, in which it is conceded that a
> contract does exist and the dispute goes only to the terms of that contract.
> In light of the disparate purposes of the two sections, application of the
> wrong provision will often result in an erroneous conclusion.  As has been
> noted by a recognized authority on the code, "[the] easiest way to avoid
> the miscarriages this confusion perpetrates is simply to fix in mind that the
> two sections have nothing to do with each other. Though each has a
> special rule for merchants sounding very much like the other, their
> respective functions are unrelated. Section 2-201(2) has its role in the
> context of a challenge to the use of the statute of frauds to prevent proof of
> an alleged agreement, whereas the merchant rule of section 2-207(2) is for
> use in determining what are the terms of an admitted agreement."

*Marlene Industries Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327, 331, 408 N.Y.S.2d

410, 411 (1978)(citation omitted).

U.C.C. 2-207 provides:

(1)    A definite and seasonable expression of acceptance or a written
confirmation which is sent within a reasonable time operates as an acceptance
even though it states terms additional to or different from those offered or
agreed upon, unless acceptance is expressly made conditional on assent to the
additional or different terms.

(2)    The additional terms are to be construed as proposals for addition to the
contract. Between merchants such terms become part of the contract unless:
(a) the offer expressly limits acceptance to the terms of the offer; (b) they
materially alter it; or (c) notification of objection to them has already been
given or is given within a reasonable time after notice of them is received.

(3)    Conduct by both parties which recognizes the existence of a contract is
sufficient to establish a contract for sale although the writings of the parties do not
otherwise establish a contract. In such case the terms of the particular contract
consist of those terms on which the writings of the parties agree, together with
any supplementary terms incorporated under any other provisions of this Act.

UCC § 2-207.

11

Pursuant to § 2-207(2), terms in a "merchant memo" confirming an oral proposal or agreement that materially alter what the parties orally discussed do not become part of their agreement. It is for this reason that MIC's proposed written contract document sent with Mr. Ferguson-Steger's December 5 e-mail, which was admittedly never signed by Interstate, is not enforceable against Interstate.

Most critically, the proposed contract document had a firm delivery date of "December 20th, 2007," which was materially different from the parties' December 4 oral discussion and MIC's December 4 e-mail advising that MIC was prepared to deliver a barge loading sometime "December 20 or later." (Interstate 56.1(b) ¶ 10). Even Mr. Ferguson-Steger's Affidavit, which is the exclusive foundation for MIC's 56.1(a) Statement, is inconsistent on the delivery terms he now claims were included in the alleged agreement created by the parties' December 4, 2007 oral discussion. In one sentence, he asserts that MIC's proposed contract document with a Shipment term of "December 20th, 2007" was the delivery term agreed to. (Ferguson-Steger Aff. ¶ 8). Yet in another sentence, he says that the delivery term was just sometime "in December 2007." (Ferguson-Steger Aff. ¶ 21). Neither inconsistent claim correctly reflects the parties' oral discussion wherein MIC just advised that it was prepared to deliver a barge of methanol loading sometime "December 20 or later." (Cirillo Aff., Interstate 56.1(b) St. Ex. A at ¶ 9).

MIC's proposed contract document also had a one-sided *force majeure* clause excusing MIC's performance "for any cause beyond its reasonable control." While, as demonstrated in Point B *infra*, it is industry custom to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their

12

reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief. (Interstate 56.1(b) St. ¶ 10(b)).

MIC's proposed contract document also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction. The parties did not agree to this as MIC acknowledged when it commenced this litigation as opposed to an arbitration proceeding. (Interstate 56.1(b) St. ¶ 10(c)).

Thus, at most, MIC's UCC § 2-201 argument establishes a written confirmation on December 4, not barred by the Statute of Frauds, of an oral order placed by Interstate for a barge of methanol at a set price "loading December 20 or later." Significantly, however, on December 13, 2007, MIC modified its December 4 confirmation when Mr. Ferguson-Steger informed Ms. Cirillo that MIC could not deliver a barge of methanol to Interstate anytime before December 24, 2007 because that was when MIC first "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol. (Interstate 56.1(b) St. ¶ 11). Five (5) days later, on December 18, 2007, Interstate cancelled the order because of Coast Guard and U.S. Homeland Security delay in approving barge delivery to OGC's new biodeisel facility, where the barge was to be delivered. (Interstate 56.1(b) St. ¶ 22).

MIC disputes that the December 18, 2007 modification occurred. *See* MIC 56.1(a) St. ¶ 11 ("From December 5, 2007, up until December 18, 2007, Interstate did not communicate with MIC regarding the methanol barge."). In fact, Mr. Ferguson-Steger swears that he "heard nothing" from Interstate between December 4 and December 18. (Ferguson-Steger Aff. ¶ 10). Ms. Cirillo categorically disputes this and avows that Mr. Ferguson-Steger called her on December 13 to say that MIC could not deliver a barge of methanol to Interstate anytime before December 24, 2007 because that was when MIC

13

first "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol. (Cirillo Aff. ¶ 15).

The conflicting accounts of the parties' key witnesses are sufficient grounds alone to defeat MIC's summary judgment motion. *See, e.g., Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

**B.     There Are Issues of Fact Concerning Whether Interstate's Inability to Take Delivery of the Proposed Barge Was Excused Based on Industry Practice**

The conclusions MIC draws from the limited Record developed so far are wrong as a matter of law because they ignore the commercial reality of the chemical sales industry and are not supported by the UCC. Several provisions of the UCC demonstrate the Code's pragmatism with respect to the formation of contracts. By dispensing with certain legal formalities, these provisions provide a flexible framework for contracting which is adjusted to commercial realities and especially the particular custom and practice in the parties' industry. This framework is illustrated by the Code's definition of an "agreement" under § 1-201(3). It provides:

> "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1-205 and 2-208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1-103).

U.C.C. § 1-201(3).

Thus, the UCC expressly incorporates trade usage into the terms of the parties' agreement. The term "usage of trade" is defined in UCC § 1-205(2) as:

> [a]ny practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be

14

observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.

UCC § 1-205(2).

UCC § 1-205(3) further dictates that:

[A]ny usage of trade in the vocation or trade in which [the parties] are engaged or of which [they] are or should be aware give particular meaning to and supplement or qualify the terms of an agreement.

UCC § 1-205(3).

Another provision which explicitly acknowledges usage of trade as a means to explain or supplement an agreement is UCC § 2-202, which provides:

Terms with respect to which the confirmatory memorandum of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement *but may be explained or supplemented . . . by course of dealing or usage of trade* (Section 1-205). . .

UCC § 2-202 (emphasis added).

The Second Circuit has spoken to the importance of trade usage or industry practice in defining the terms of a parties' agreement under the UCC:

[T]he importance of industry practices in the interpretation of contracts for the sale of goods permeates the entire UCC. *See* James J. White & Robert S. Summers, Uniform Commercial Code § 3-3 (2d ed. 1980). This is clear from its definition of "usage of trade": "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." N.Y. U.C.C. § 1-205(2). Moreover, "it is not necessary for both parties to be consciously aware of the trade usage. It is enough if the trade usage is such as to 'justify an expectation'' of its observance." White & Summers, *supra.* Furthermore, "[usage of trade is] relevant not only to the interpretation of express contract terms, but may [itself] constitute contract terms." *Id.* Thus, standard industry practices are always relevant when interpreting contracts governed by the UCC.

15

*Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 102 (2d Cir. 2002)(brackets

in original); *see also Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F.Supp 2d 377,

390 (S.D.N.Y 2005)("Usage of trade is relevant not only to the interpretation of express

contract terms, but may also itself constitute contract terms").

 Here, Interstate has submitted evidence that it is industry practice in the bulk

chemical sales industry to include a broad *force majure* term, permitting either the buyer or

seller to a bulk chemical procurement transaction to cancel before delivery based on any

cause beyond their reasonable control.  (Interstate 56.1(b) St. ¶ 22).  That evidence includes

Affidavit and Declaration testimony of industry professionals with multiple decades worth

of industry experience.  *See* Puntureri Aff. (56.1(b) St. Ex. B) ¶¶ 3-7; Jukiewics Aff.

(56.1(b) St. Ex. F) ¶¶ 4-5; Swinderman Dec. (56.1(b) St. Ex. G) ¶¶ 6-9.

 Application of such industry practice to the operative facts of this case is

summarized in ¶ 22 of Interstate's 56.1(b) Statement.

> MIC initially proposed on December 4, 2007 that it could supply a barge
> of methanol for Interstate "loading Dec. 20 or later." *See* Cirillo Aff. (Ex.
> A) ¶¶ 4, 5.  On December 13, 2007, MIC modified its proposal by stating
> that it could not deliver a barge of methanol to Interstate anytime before
> December 24, 2007 because that was when MIC "had a vessel coming in"
> with methanol; MIC otherwise made no commitment as to when delivery
> could and would in fact take place. *See* Cirillo Aff. (Ex. A) ¶ 15.  Five
> days later, on December 18, 2007, Interstate explained to MIC that it
> could not take delivery of a barge which had yet to be loaded and which
> MIC conceded that it could not have loaded until sometime after
> December 24, 2007 at the earliest, because of the delay in OGC receiving
> approval from the U.S. Coast Guard and the U.S. Department of
> Homeland Security for its new biodeisel facility on the Ohio River where
> the barge of methanol was to be delivered. *See* Cirillo Aff. (Ex. A) ¶¶ 16,
> 17.  Interstate had no other place to put the barge. *See* Puntureri Aff. (Ex.
> B) ¶ 21.  Based on the industry practice, OGC's inability to take delivery
> of a barge of methanol that had yet to be loaded should have relieved
> Interstate from any obligation to pay for the barge. *See* Cirillo Aff. (Ex.
> A) ¶ 18; Puntureri Aff. (Ex. B) ¶¶ 3-7; 20; *see also* April 10, 2008

Affidavit of Rich Jukiewics, Exhibit F hereto ¶¶ 4-5; *see also* April 14
Declaration of Edward Swinderman. Exhibit G hereto ¶¶ 6-9.

(Interstate 56.1(b) St. ¶ 22).

Interstate's evidence of trade usage precludes the award of summary judgment to

MIC. *See Bazak Int'l Corp.*, 378 F.Supp 2d at 390 ("The court finds that Bazak has

presented adequate evidence to demonstrate a genuine issue of fact concerning trade usage

that, if found by a jury, could demonstrate the company's intent to be bound."); *see also*

*Atronic Int'l, GmbH v. SAT Semispecialists of Am., Inc.*, 2007 U.S. Dist. LEXIS 64185 *23-

*24, 63 U.C.C. Rep. Serv. 2d (CBC) 855 (E.D.N.Y. Aug. 9, 2007)("SAI presented

sufficient evidence at summary judgment to demonstrate a genuine issue of fact concerning

the parties' usage of trade and course of performance that, if credited by a jury, could

demonstrate the parties' intent to be bound by the oral 'open' and 'subject to prior sale'

conditions."); *see also Arbittier v. Russo*, 84 Civ. 6352 (JFK), 1985 U.S. Dist. LEXIS

20571 *2 (S.D.N.Y. Apr. 19, 1985)("There is a genuine issue concerning the terms of the

agreement between plaintiff and defendant. In particular, the parties dispute the usage of

the trade and their course of dealing, evidence of which is normally read into the contract

for purposes of ascertaining the meaning of its language. This is such even if usage of trade

or course of dealing contradicts the apparently unambiguous language of the writing.").

**C.    There Are Issues of Credibility Concerning MIC's Core Contention
That it "Reserved in its Inventory" for Interstate a Barge of Methanol**

MIC's claims against Interstate are predicated upon its contention that the

methanol sold to Tauber was "reserved for sale to Interstate." (MIC 56.1(a) St. ¶ 20); *see*

*also* Ferguson-Steger Aff. ¶ 18 ("In reliance upon Interstate's promise to purchase the

barge of methanol, we reserved the barge of methanol in our inventory.").

17

However, MIC has submitted nothing other than the conclusory assertion by Mr. Ferguson-Steger establishing this so-called "reservation of inventory." MIC's failure to support this core contention with admissible evidence warrants the denial of its motion for summary judgment on this ground as well. *See Giannullo v. City of New York*, 322 F.3d 139, 140-141 (2d Cir. 2003)("[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing.).

MIC's alleged "reservation of inventory" claim is otherwise contradicted by its advice to Interstate on December 18, 2007 that no methanol would be available for Interstate until December 24, 2007 at the earliest, because that was when MIC "had a vessel coming in" with product. (Interstate 56.1(b) St. ¶ 19). Moreover, despite Interstate's discovery requests, MIC has failed to submit any evidence establishing this so-called "reservation of inventory" that MIC allegedly made as a result of the December 4, 2007 communications between Ms. Cirillo and Mr. Ferguson-Steger. *See* Interstate's Document Requests, Exhibit D hereto, Request Nos. 7, 8, 11, and 12.

Without submitting evidence as to MIC's purchasing and storage activity for the methanol that was sold to Tauber, Interstate has no way of addressing the credibility of MIC's conclusory "reservation of inventory" assertion. *See Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996)("The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.").

D.     **MIC Has Failed To Produce Any Admissible Evidence**
       **Concerning Its Alleged "Prompt Efforts to Mitigate"**
       **Which Is Otherwise Contradicted By Independent Market Reports**

MIC claims that it is entitled to recover from Interstate the difference between the

proposed price on December 4 of $2.55 per gallon, and the price at which MIC allegedly

sold a methanol barge to Tauber.  (MIC 56.1(a) St. ¶¶ 20, 21).  MIC apparently seeks to

rely upon UCC § 2-706(1) which gives an aggrieved seller the right to resell the goods

concerned or the undelivered balance thereof.  That section, however, expressly limits such

resale to those done in good faith and in a commercially reasonable manner:

> Where the resale is made in good faith and in a commercially reasonable
> manner the seller may recover the difference between the resale price and
> the contract price.

UCC § 2-706(1).

Here, MIC has not produced any evidence establishing that its transaction with

Tauber was the type of "good faith and commercially reasonable" transaction that would

permit MIC to recover from Interstate the difference between the resale price and the

contract price even if it were able to ultimately prevail on its breach of contract claim.

Exhibit D to MIC's Complaint reflects a sale of 10mb of methanol at $2.05 per gallon to

Tauber for delivery sometime between December 21, 2007 and January 10, 2008.  No

evidence has been submitted by MIC establishing if and when the delivery actually

occurred, or where and to whom it was delivered.  (Interstate 56.1(b) St. ¶ 20).

Moreover, market reports reflect that the market price for a "spot" barge of methanol in

the United States during the last two weeks of December, 2007 was between $2.52 and

$2.33 per gallon.  (Interstate 56.1(b) St. ¶ 21).

Despite Interstate's requests, MIC has failed to produce any documents or correspondence concerning its purported efforts to obtain a market price for a barge of methanol on or after the morning of December 18, 2007, when Ms. Cirillo informed Mr. Ferguson-Steger of Interstate's inability to take delivery of a barge. Nor has MIC produced documents reflecting its relationship with Tauber sufficient for Interstate to probe into whether the $2.05 price MIC gave Tauber was based upon other business consideration between those companies. In any event, MIC's bald and conclusory assertions in its Brief and 56.1(a) Statement that "[it] sought the best price it could," and "was forced to accept" the $2.05 price from Tauber, are insufficient to satisfy MIC's summary judgment burden. (MIC Brief at 21; 56.1(a) St. ¶ 21).

E.    **The Promissory Estoppel Claim**

Summary judgment should also be denied on MIC's equitable claim of promissory estoppel.

"In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev.,* 47 F.3d 39, 44 (2d Cir. 1995). Promissory estoppel is a "narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F. Supp. 712, 735 (S.D.N.Y. 1989). As succinctly stated in *NCC Sunday Inserts Inc. v. World Color Press, Inc.,* 759 F. Supp. 1004 (S.D.N.Y. 1991):

20

> An action for promissory estoppel generally lies when there is no written
> contract, or the contract cannot be enforced for one reason or another.
> Thus, it is an action outside the contract. When an enforceable contract
> does exist, the parties cannot assert a claim for promissory estoppel based
> on alleged promises that contradict the written contract.

*Id.* at 1011.

Because of this, "some courts will apply the doctrine only when enforcement is

necessary to avoid injustice." *Cyberchron Corp.,* 47 F.3d at 44.

Here, for the same reasons that MIC is not entitled to summary judgment on its

UCC breach of contract claim, it is also not entitled to summary judgment on its equitable

claim of promissory estoppel. As noted above, for example, no admissible evidence has

been submitted by MIC to support its claim of purported detrimental reliance – its

contention that the methanol sold to Tauber was "reserved for sale to Interstate." (MIC

56.1(a) St. ¶ 20); *see also* Ferguson-Steger Aff. ¶ 18 ("In reliance upon Interstate's

promise to purchase the barge of methanol, we reserved the barge of methanol in our

inventory."). Also as noted above, MIC's "reservation of inventory" allegation is

otherwise contradicted by MIC's advice to Interstate on December 18, 2007 that no

methanol would be available for Interstate until December 24, 2007 at the earliest,

because that was when MIC "had a vessel coming in" with product. (Interstate 56.1(b)

St. ¶ 19). And finally, despite Interstate's discovery requests, MIC has failed to submit

any evidence establishing this so-called "reservation of inventory," without which,

Interstate is unable to fully respond to the contention.

## CONCLUSION

Based on the foregoing, MIC's Motion for Summary Judgment should be denied as there are several disputed issues of material fact concerning: (a) what terms were included in the parties' alleged agreement; (b) whether Interstate's inability to take delivery of the proposed barge was excused based on industry practice; (c) the credibility of MIC's core contention that it "reserved in its inventory" the barge of methanol for Interstate based on the parties December 4, 2007 communications; and (d) MIC's alleged "prompt efforts to mitigate," and its claimed right to recover from Interstate the difference between the market price of methanol on December 4, 2007 and the price at which it sold a barge of methanol to Tauber sometime after December 24, 2007.

Interstate also respectfully requests such other and further relief as this Court deems just and proper.

Dated: New York, New York
     April 14, 2008

SIMON•LESSER PC

By: _____
    Leonard F. Lesser, Esq.

420 Lexington Avenue
New York, New York 10170
T:212.599.5455
F:212.599.5459
llesser@simonlesser.com

Attorneys for defendant Interstate Chemical Corporation

22

**EXHIBIT "H"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------

MITSUBISHI INTERNATIONAL CORPORATION,

                  Plaintiff,

    -against-

INTERSTATE CHEMICAL CORPORATION,

                  Defendant.

-----------------------------------------------

08 Civ. 00194 (JSR)(GWG)

**AFFIDAVIT**

STATE OF PENNSYLVANIA   )
                            ) ss.:
COUNTY OF ALLEGHENY    )

    Lori Cirillo, being sworn deposes and says:

    1.     I am the Director of Chemical Procurement at Interstate Chemical Corporation ("Interstate"). I have personal knowledge of the facts set forth below.

    2.     I submit this affidavit to correct some inaccuracies contained in the Affidavit of Zack Ferguson-Steger of Mitsubishi International Corporation ("MIC").

    3.     In connection with the anticipated transaction at issue in this lawsuit, I initially spoke with Mr. Ferguson-Steger on December 4, 2007 inquiring about the availability of a barge of Methanol for possible delivery in late December to Interstate's customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River.

    4.     Mr. Ferguson-Steger stated that MIC could load a barge of Methanol from barge loading facility in St. Rose, Louisiana on the Mississippi River, but could not commit to any

specific delivery date, which was in line with Interstate's requirements as I had yet to receive confirmation from OGC that it could accept a Methanol barge at its new biodeisel facility.

5.    Following that oral discussion, Mr. Ferguson-Steger sent his e-mail to me dated December 4, 2007 at 4:04 p.m. confirming his oral advice that MIC could load a barge of 10mb of Methanol at the then market price of $2.55 per gallon "loading Dec. 20 or later."

6.    This "or later" cautionary language was critical as MIC would not and did not commit to load on a specific date, nor did I on behalf of Interstate commit to a specific delivery date. Rather, MIC simply stated that a barge could be available for Interstate's purchase sometime after December 20, 2007.

7.    The next day, December 5, 2007, Mr. Ferguson-Steger sent me a proposed contract document for this transaction and asked that I sign it and fax it back to him.

8.    I did not do so as the document contained many terms that were materially different than those we discussed the day before, and also included one-sided terms in MIC's favor that were inconsistent with Interstate's prior dealings with MIC, and inconsistent with industry practice in general.

9.    Most critically, the proposed contract document had a firm delivery date of "December 20th, 2007," which was materially different from my oral discussion with Mr. Ferguson-Steger and his December 4, 2007 e-mail advising that MIC was prepared to deliver a barge loading sometime "December 20 or later."

10.    Even in his Affidavit, Mr. Ferguson-Steger is inconsistent on the delivery terms he now claims were included in alleged "agreement" created by our December 4, 2007 oral discussion. In one sentence he asserts that his proposed contract document with a Shipment term of "December 20th, 2007" was the delivery term we agreed to. *See* Ferguson-Steger Aff. ¶ 8.

2

Yet in another sentence, he says that the delivery term was just sometime "in December 2007." *See* Ferguson-Steger Aff. ¶ 21.

11.    However, neither inconsistent claim correctly reflects our oral discussion wherein Mr. Ferguson-Steger just advised that MIC was prepared to deliver a barge loading sometime "December 20 or later."

12.    The proposed contract also had a one-sided force majure clause excusing MIC's performance "for any cause beyond its reasonable control." While it is industry custom to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief.

13.    The proposed contract also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction. I never agreed to this, nor did MIC.

14.    In his Affidavit, Mr. Ferguson-Steger acknowledges that I did not sign or otherwise agree to the terms of the proposed contract he transmitted to me on December 5, 2007. Instead, he says the document "contains the same material terms MIC and Interstate agreed to the day before." *See* Ferguson-Steger Aff. at ¶ 8. As I've shown, that is not accurate.

15.    On Thursday, December 13, 2007, Mr. Ferguson-Steger called me to say that MIC could not deliver a barge of Methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with Methanol.

16.    The following Tuesday, December 18, 2007, I received word from Al Puntureri, President of Interstate, that OCG could not take delivery of a barge of Methanol because of a delay in receiving Coast Guard/Homeland Security approval for its new biodeisel facility on the Ohio River where the barge of Methanol was to be delivered.

3

17.    Mr. Puntureri instructed me to immediately inform MIC of this fact, which I did by e-mail the morning of December 18, 2007, which was just ten (10) business days after my initial oral discussion with Mr. Ferguson-Steger on December 4, 2007.  My advice to Mr. Ferguson-Steger on December 18 was well before MIC loaded the barge with the Methanol it now claims "it reserved in its inventory" for Interstate.  *See* Ferguson-Steger Aff. at ¶ 18.  It was also a week before MIC even had the ability to deliver any Methanol to Interstate according to what Mr. Ferguson-Steger told me on December 13.

18.    Based on the industry practice and my prior dealings with Mr. Ferguson-Steger, my advice to him on December 18, 2007 concerning OCG's inability to take delivery of a Methanol barge should have relieved Interstate from any obligation to pay MIC for a barge that had yet to be loaded and which was only supposed to be first loaded sometime "December 20 or later."

19.    Instead, Mr. Ferguson-Steger sent me a series of e-mails that threatened to sue Interstate for purported damages.  MIC then followed that threat with this lawsuit.

*Lori Cirillo*
_____
Lori Cirillo

Sworn to before me this
11th day of April, 2008

*Jeanne M Zacherl*
_____
Notary Public

NOTARIAL SEAL
JEANNE M ZACHERL
Notary Public
CITY OF HERMITAGE, MERCER COUNTY
My Commission Expires Apr 29, 2008

4

**EXHIBIT "I"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MITSUBISHI INTERNATIONAL CORPORATION, | 08 Civ. 00194 (JSR)(GWG) |
| Plaintiff, | |
| -against- | **AFFIDAVIT** |
| INTERSTATE CHEMICAL CORPORATION, | |
| Defendant. | |

STATE OF PENNSYLVANIA )
                     ) ss.:
COUNTY OF ALLEGHENY )

    Albert R. Puntureri, being sworn deposes and says:

    1.    I am the President of Interstate Chemical Corporation ("Interstate"), defendant in this action. I have personal knowledge of the facts set forth below.

    2.    I founded Interstate in 1968, and since that time, it has become a preeminent chemical manufacturing and distribution company.

    3.    During my forty (40) years in chemical procurement, I have had substantial experience in contract and "spot" business arrangements both as purchaser and seller. I also have experience in trading activity where barges of chemicals such as Methanol are either purchased from producers or broker/traders or sold to end customers or other broker/traders.

    4.    During my forty (40) years of experience in the industry, I have witnessed the cancellation of orders placed by both contract and "spot" customers on a regular basis either by the seller or purchaser. Such cancellations have been the result of lack of inventory, lack of

delivery equipment, force majure, change in requirement needs, or sometimes, even no express reason at all.

5.     On many occasions, Interstate has ordered bulk chemicals from suppliers who canceled the orders without reason and without recourse to Interstate.

6.     It is also industry practice to include as a term in a chemical procurement transaction a broad force majure understanding wherein both buyer and seller may cancel the order for any cause beyond their reasonable control.

7.     Such cancellations are common place in the chemical industry given the dangerous nature of the products, and increased regulation in the industry.  Anytime a broker or customer places an order but is unable to accept delivery for any reason beyond its reasonable control, it is industry practice to permit cancellation of the order without penalty so long as the cancellation takes place before the chemicals have been loaded onto the truck, tank car, or barge and shipped.

8.     I have read the Complaint filed by plaintiff Mitsubishi International Corporation ("MIC"), and the Affidavit of its marketing manager, Zack Ferguson-Steger in support of its Motion for Summary Judgment, and believe that MIC's position is over zealous, at best, and flies in the face of industry practice.

9.     On December 4, 2007, Mr. Ferguson-Steger and Interstate's Director of Chemical Procurement, Lori Cirillo, had an oral discussion wherein Ms. Cirillo inquired about the availability of a barge of Methanol for possible delivery in late December to its customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River.

10.    Following that oral discussion, Mr. Ferguson-Steger confirmed by his e-mail dated December 4, 2007 at 4:04 p.m. that MIC could deliver a barge of 10mb of Methanol at the then market price of $2.55 per gallon "loading Dec. 20 or later."

11.    By stating that MIC could offer a barge of Methanol "loading Dec 20 or later," MIC was only confirming that it could ultimately supply Interstate with the Methanol barge, although without a firm commitment as to when it would be available for actual shipment.

12.    I understand from Ms. Cirillo that on Thursday, December 13, 2007, Mr. Ferguson-Steger called to tell her that MIC could not deliver a barge of Methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with Methanol.

13.    The following Tuesday, December 18, 2007, I was informed by OCG that it could not take delivery of the barge of Methanol because of a delay in receiving approval from the U.S. Coast Guard and the U.S. Department of Homeland Security for its new biodeisel facility on the Ohio River where the barge of Methanol was to be delivered.

14.    I immediately instructed Ms. Cirillo to inform MIC of this fact, which she did the morning of December 18, 2007, which was within ten (10) business days after her December 4, 2007 oral discussion with Mr. Ferguson-Steger.

15.    Even more important, Ms. Cirillo's advice to Ferguson-Steger was before MIC loaded the barge with the Methanol it now claims "it reserved in its inventory" for Interstate. *See* Ferguson-Steger Aff. at ¶ 18.

16.    It appears from Exhibit D to its Complaint that MIC is claiming that the Methanol it purportedly "reserved in its inventory" for Interstate was sold to Tauber Petrochemical Company ("Tauber"), which is a chemical broker based in Houston, Texas.

17.     That transaction reflects a sale of 10mb of Methanol for delivery sometime between December 21, 2007 and January 10, 2008. No evidence has been submitted by MIC reflecting if and when the delivery actually occurred, or where and to whom it was delivered. Indeed, based on Mr. Ferguson-Steger's advice to Mr. Cirillo on December 13, 2007, MIC was not in a position to deliver any Methanol out of St. Rose, Louisiana before Christmas.

18.     Nor has MIC submitted any evidence establishing this so-called "reservation of inventory" that MIC made as a result of the December 4, 2007 communications between Ms. Cirillo and Mr. Ferguson-Steger.

19.     It is my understanding that MIC is a bulk trader of chemicals and other products. With respect to Methanol, it is my understanding that MIC produces Methanol in Venezuela, and also purchases Venezuelan Methanol from importers such as Metcall LLC. MIC then stores the Methanol in its facilities for resale to brokers, distributors, and direct customers. Without submitting evidence as to MIC's purchasing and storage activity, I have no way of addressing the credibility of MIC's claimed "reservation of inventory" for Interstate. This is especially true in light of Mr. Ferguson-Steger's statement to Mr. Cirillo on December 13, 2007 that MIC was not in a position to deliver any Methanol out of St. Rose, Louisiana before December 24, 2007 because that was when they first "had a vessel coming in" with Methanol. Interstate has requested such information from MIC, which has yet to be produced.

20.     In any event, based on the industry practice I explained above, OCG's inability to take delivery of the barge of Methanol should have relieved Interstate from any obligation to pay for a barge that had yet to be loaded by MIC and, that MIC had only committed to making available "December 20 or later."

4

21.    Instead, MIC decided to sue Interstate because of its inability to take possession of a Methanol barge yet to be loaded with no place to put it.  Interstate's customer OGC was unable to take possession of the barge due to the delayed Coast Guard/Homeland Security approval of its new biodiesel facility.  Interstate had no other place to store the barge of Methanol.

22.    MIC also now claims that it is entitled to recover from Interstate the price difference between the market price on December 4, 2007 and the price it sold a Methanol barge to Tauber.

23.    According to Mr. Ferguson-Steger's Affidavit, the price paid by Tauber was $2.05 per gallon which was "the highest price [MIC] could get" and which "MIC was forced to accept." *See* Ferguson-Steger Aff. at ¶¶ 18, 19.

24.    However, industry market reports reflect that the market price for a "US Spot" barge of Methanol for the last two week of December, 2007 was between $2.52 per gallon and $2.33 per gallon.  I have attached hereto a copy of the Global Methanol Report issued by Jim Jordan & Associates ("JJ&A"), the leading market analysis and intelligence provider to the Global Methanol, Ethanol & Transportation Fuels Industries which reflect such market prices.

25.    It is my belief that MIC and Tauber had an existing relationship, and that the price paid by Tauber for the barge in question was not at market price, but at a favorable rate in consideration for other business between the companies.

5

26.    Despite our requests, MIC has failed to produce any documents or correspondence concerning its purported efforts to obtain a market price for a barge of Methanol on or after the morning December 18, 2007, when Ms. Cirillo informed Mr. Ferguson-Steger of Interstate's inability to take delivery of a barge.

*Albert R. Puntureri*
Albert R. Puntureri

Sworn to before me this
11th day of April, 2008

*Jeanne M Zacherl*
Notary Public

NOTARIAL SEAL
JEANNE M ZACHERL
Notary Public
CITY OF HERMITAGE, MERCER COUNTY
My Commission Expires Apr 29, 2008

**EXHIBIT "J"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,                    08 Civ. 00194 (JSR)(GWG)

                                        Plantiff,

            -against-                                    **AFFIDAVIT**

INTERSTATE CHEMICAL CORPORATION,

                                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -


STATE OF TEXAS              )
                           ) ss,:
COUNTY OF HARRIS           )

        Edward Swinderman says:

        1.      I am currently an independent contract in the Chemical Trading

Industry.  I have personal knowledge of the facts set forth below.

        2.      Previous to this and other entities, I retired in 2003 as the Methanol Business

                Manager for Lyondell Chemical.

        3.      Previous assignments with ARCO Chemical and Oxirane Chemical included

numerous duties in marketing and production.

        4.      During my 25 years of commercial experience with the firms mentioned above, I

                have experience

in contract and or spot business arrangements with numerous customers.

        5.      I also have experience in trading activity where barges of chemicals were either

purchased from producers or broker/trader or sold to end user customers or other broker/traders.

        6.      In my years of experience, I have witnessed cancellations of orders that

have been placed by both contract and spot customers on a regular basis.

     7.    There cancellations have been as a result of

       A:    lack of inventory

       B:    lack of equipment

       C:    force majeure

       D:    change in requirement need

       E:    no reason at all

Each of these cancellations that are commonplace in the Chemical Industry and most have occured without penalty.

     8.    If a truck, tank car or barge is already loaded and shipped, then on occasion there is a charge for diverting the loaded equipment to another buyer. Usually the freight differential that would be charged for the change of destination.

     9.    Anytime a prospect or customer places an order and is unable to receive the material, for whatever reason, it is no uncommon practice to allow the cancellation without penalty to maintain good customer relations.

I declare under penalty of perjury that the foregoing is true and correct.

Edward Swinderman

4/14/08

**EXHIBIT "K"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                      Plaintiff,

      -against-

INTERSTATE CHEMICAL CORPORATION,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**AFFIDAVIT**

STATE OF OHIO          )
                    ) ss.:
COUNTY OF CUYAHOGA  )

       Rich Jukiewicz, being sworn deposes and says:

      1.    I am a Senior Purchasing Agent for Research Organics, Inc. ("Research Organics"). I have personal knowledge of the facts set forth below.

      2.    Research Organics is a primary manufacturer and leading worldwide supplier of high purity biochemicals for use in molecular biology, diagnostics, cell culture, pharmaceuticals, biopharmaceuticals, life sciences and biotechnology.

      3.    I have been involved as a commercial purchaser of chemical products for forty (40) years.

      4.    It is industry practice that purchase orders for chemicals be cancelled or changed on a frequent basis. Such cancellations frequently occur when end customers cancel their orders with us, causing a domino effect of having to cancel the order for material from our supplier and the end user is now unavailable.

5.    It is also industry practice for purchase orders to be cancelled as a result of *force majure,* such as when the end customer is unable to take the material as a result of government intervention, transportation issues, weather related issues, and other events that are beyond our control.


Rich Jukiewicz

Sworn to before me this
10th day of April, 2008

Notary Public

DIANN C. HARLAN
NOTARY PUBLIC-STATE OF OHIO
MY COMMISSION EXPIRES 7/2/11

2

**EXHIBIT "L"**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
MITSUBISHI INTERNATIONAL CORPORATION, :
                                      :
             Plaintiff,               :        08 Civ. 194 (JSR)
                                      :
             -v-                      :        ORDER
                                      :
INTERSTATE CHEMICAL CORPORATION,      :
                                      :
             Defendant.               :
------------------------------------ :
                                      x
JED S. RAKOFF, U.S.D.J.
```

Plaintiff Mitsubishi International Corporation, which seeks to recover damages allegedly suffered upon defendant Interstate Chemical Corporation's breach of a contract between the parties, has moved for summary judgment.  The motion is denied.

An opinion setting forth the reasons for this ruling will follow in due course.

SO ORDERED

Dated: New York, NY
       May 6, 2008

JED S. RAKOFF, U.S.D.J.

EXHIBIT "M"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
MITSUBISHI INTERNATIONAL CORPORATION, :
                                      :
              Plaintiff,              :         08 Civ. 194 (JSR)
                                      :
          -v-                         :              MEMORANDUM
                                      :
INTERSTATE CHEMICAL CORPORATION,      :
                                      :
              Defendant.              :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        Plaintiff Mitsubishi International Corporation ("MIC") seeks

to recover damages it allegedly suffered when defendant Interstate

Chemical Corporation ("Interstate") breached the parties' contract

for sale of a barge of methanol.  MIC moved for summary judgment

prior to discovery, and by Order dated May 6, 2008, the Court denied

the motion.  This Memorandum sets forth the reasons for that ruling.

        Both MIC and Interstate are in the business of trading and

distributing chemical products.  See Plaintiff's Local Civil Rule

56.1(a) Statement ("Pl. 56.1") ¶¶ 1-2.  On December 4, 2007, Zack

Ferguson-Steger, marketing manager of MIC, spoke by telephone with

Lori Cirillo, Director of Chemical Procurement at Interstate,

regarding the possibility of MIC selling Interstate a barge of

methanol.  Id. ¶ 5.  During that conversation, the parties agreed

that Interstate would purchase one barge (420,000 gallons, or 10 mb)

of methanol at a price of $2.55 per gallon, although the parties

dispute whether they agreed to a firm delivery date at that point.

See Pl. 56.1 ¶ 6; Defendant's Local Civil Rule 56.1(a) Statement in

Opposition to Plaintiff's Motion for Summary Judgment ("Def. 56.1") ¶

6.  Later that day, Cirillo emailed Ferguson-Steger, stating: "We would like to purchase your methanol barge.  Please give me a call." Email of Dec. 4., 2007, Ex. A to Complaint ("Compl.").  Ferguson-Steger responded by email: "We confirm 10 mb @ $2.55/gal loading Dec 20 or later.  If we can ship earlier, we'll inform you.  I'll send over a spot contract a little later."  Email of Dec. 4, 2007, Ex. B to Compl.  The following day, Ferguson-Steger emailed Cirillo a contract for the purchase that MIC had prepared and asked Cirillo to sign it and send it back.  See Email of Dec. 5, 2007, Ex. B to Compl.; Contract, attachment to Ex. B to Compl.  Interstate never signed and returned the contract.

According to Interstate, on December 13, Ferguson-Steger called Cirillo to say that MIC could not deliver the barge anytime before December 24, 2007.  Def. 56.1 ¶ 11.  MIC does not recall any such communication.  Pl. 56.1 ¶ 11.

On December 18, 2007, Cirillo emailed Ferguson-Steger, informing him that Interstate was "having a problem with this barge" because the Coast Guard had not yet approved the receipt of barges at its intended destination, Owensboro, Kentucky, where Interstate's customer had a biodeisel plant.  Email of Dec. 18, 2007, Ex. B to Compl.  The following day, Ferguson-Steger responded by email: "We can postpone delivery of the barge if needed but we cannot cancel." Email of Dec. 19, 2007, Ex. B to Compl.  Cirillo replied that Interstate "ha[d] no choice but to cancel because the customer canceled due to the coast guard restrictions."  Id.  Ferguson-Steger

2

answered that MIC "c[ould ]not allow [Interstate] to walk away from this spot contract, even if the customer claims they cannot receive the barge," that MIC had "reserved this product in [its] inventory," and that if Interstate were to cancel, MIC "would have to hold [Interstate] responsible for the damages." Id. Cirillo responded that Interstate could not "hold" the barge until its customer could receive it, and that Interstate did not believe it was obligated to buy the barge. Id. Ferguson-Steger replied that MIC would "suffer substantial damages if it [were] forced to seek a new buyer for the methanol," that as of the close of business on that day MIC would be able to sell the methanol at $2.18 per gallon only, and that if Interstate had not confirmed its intention to abide by the contract by 10:00 a.m. the following morning, MIC would sell the methanol to another buyer and seek "prompt legal recourse" to recover its losses from Interstate. Email of Dec. 20, 2007, Ex. C to Compl. MIC heard nothing from Interstate.

On December 21, 2007, MIC sold the methanol to Tauber Petrochemical Company for $2.05 per gallon, for delivery between December 21, 2007 and January 10, 2008. Contract # 07-2068, Ex. D to Compl. MIC received $210,000 less from this sale than it would have received had it sold the methanol to Interstate at $2.55. Pl. 56.1 ¶¶ 20-21.

Section 2-201(1) of the New York Uniform Commercial Code ("N.Y. U.C.C.") sets forth the general rule that a contract for a sale of goods is not enforceable unless it is memorialized in a

3

writing signed by the party against whom enforcement is sought.
Under the so-called "merchant exception" to that rule, however, an
oral contract may be enforced against a merchant who received, but
did not sign, a "writing in confirmation of the contract" so long as
the receiving merchant does not object within ten days of receiving
the confirmation.  See N.Y. U.C.C. § 2-201(2); Bazak Int'l. Corp. v.
Mast Indus., Inc., 73 N.Y.2d 113, 119 (1989).  The one
"indispensable" term that the confirmation must contain is quantity.
Bazak, 73 N.Y.2d at 119.

Here, the telephone exchange and confirmatory email occurred
on December 4, and Interstate indicated its desire to "cancel the
barge" on December 18, more than 10 days later.  Consequently, the
"writing in confirmation of the contract" – the email in which MIC
"confirm[ed] 10 mb @ $2.55/gal loading Dec 20 or later," which
includes a quantity term – constitutes a contract enforceable against
Interstate despite Interstate's failure to sign any writing.[1]

--------------------------------------------------

[1]  Interstate claims that there was some "inconsisten[cy]"
between the delivery date agreed upon during the oral
conversation and the one expressed in the December 4 confirmatory
email.  Defendant's Memorandum of Law in Opposition to
Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 12.
Because the confirmatory email contains the indispensable
quantity term, however, any inconsistency regarding delivery date
would not render the remainder of the terms in the confirmatory
email unenforceable.  See N.Y. U.C.C. 2-201(1) ("A writing is not
insufficient because it omits or incorrectly states a term agreed
upon . . . .").
    Interstate also draws the Court's attention to various
"inconsistencies" and "material[] alter[ations]" between the
confirmatory email and the unsigned spot contract emailed by
Ferguson-Steger on December 5.  Id.; see N.Y. U.C.C. § 2-207(1)-
(2) (providing that "different" or "additional" terms contained
in a written confirmation of an oral contract become part of the
contract unless "they materially alter it").  But any

This, however, is not the end of the inquiry, as the Court must determine not only that an enforceable contract existed, but also what terms that contract contained. Section 2-202 of the U.C.C. provides that "[t]erms with respect to which the confirmatory memoranda of the parties agree . . . may be explained or supplemented . . . by course of dealing or usage of trade." N.Y. U.C.C. § 2-202(a). "Usage of trade," in turn, is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." N.Y. U.C.C. § 1-205(2). "The existence and scope of such a usage are to be proved as facts." Id.

Interstate argues that under section 2-202, the contract terms discussed in Ferguson-Steger's and Cirillo's conversation and contained in the confirmatory email should be supplemented with terms reflecting the custom and practice of the chemical sales industry. Specifically, Interstate alleges that in the chemical sales trade, "either the buyer or seller to a bulk chemical procurement

---

discrepancies between the confirmatory email and the spot contract are wholly immaterial, as MIC is seeking to enforce only the terms contained in the confirmatory email, not those in the unsigned spot contract. The unsigned spot contract is best understood as a proposal to amend the existing contract (i.e., the one discussed orally and confirmed via the December 4 email) which Interstate rejected.

Similarly, the disputed December 13 phone call, in which Interstate claims Ferguson-Steger told Cirillo that the barge would not be delivered until on or after December 24, 2007, is irrelevant to the present dispute. The call, as described by Interstate, amounts to a proposal, accepted by Interstate, to amend the contract with respect to a term not relevant here — the delivery date.

transaction [may] cancel before delivery based on any cause beyond their reasonable control."  Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 16.

To support its view of chemical sales usage of trade, Interstate provides a number of affidavits from participants in the industry.  Albert Puntureri, President of Interstate, contends that in his forty years of experience with chemical sales, he has seen "cancellation of orders placed by both contract and 'spot' customers on a regular basis either by the seller or the purchaser" resulting from "lack of inventory, lack of delivery equipment, force majeure, change in requirement needs, or sometimes, even no express reason at all," and that "it is industry practice to permit cancellation of the order without penalty so long as the cancellation takes place before the chemicals have been loaded on to the truck, tank car, or barge and shipped."  Affidavit of Albert Puntureri ("Puntureri Aff."), Ex. B to Def. 56.1, at ¶¶ 4, 7.  Rich Jukiewicz, a Senior Purchasing Agent for Research Organics, Inc., a manufacturer and supplier of biochemicals, attests that:

> It is industry practice that purchase orders for chemicals be cancelled or changed on a frequent basis. Such cancellations frequently occur when end customers cancel their orders with us, causing a domino effect of having to cancel the order for material from our supplier and the end user is now unavailable.
> It is also industry practice for purchase orders to be cancelled as a result of <u>force majeure,</u> such as when the end customer is unable to take the material as a result of government intervention, transportation issues, weather related issues, and other events that are beyond our control.

6

Affidavit of Rich Jukiewicz, Ex. F to Def. 56.1, at ¶¶ 4-5.  Finally,
Edward Swinderman, formerly the Methanol Business Manager for
Lyondell Chemical and now an independent contractor in the chemical
trading industry, avers that during his twenty-five years of
experience he has witnessed frequent cancellations resulting from:
"(a) lack of inventory; (b) lack of equipment; (c) force majeure; (d)
change in requirement need; (e) no reason at all" and that these
mostly occur "without penalty," although he notes that there may be a
charge for diversion to another buyer "[i]f a truck, tank car or
barge is already loaded and shipped."  Affidavit of Edward Swinderman
("Swinderman Aff."), Ex. G to Def. 56.1, at ¶¶ 6-9.

        MIC responds by contending – with ample case law support –
that when contracts do contain force majeure provisions, New York
courts interpret those provisions narrowly, such that "[o]rdinarily,
only if the force majeure clause specifically includes the event that
actually prevents a party's performance will that party be excused."
Kel Kim Corp. v. Cent. Markets, Inc., 70 N.Y.2d 900, 902-903 (1987).
This point, though well-taken, is inapposite to the dispute here,
where the Court is not being asked to interpret an existing force
majeure clause.  Rather, the Court must determine whether there is a
practice in this industry of excusing contract performance on the
basis of events (such as the delivery problems experienced here) that
has "such regularity of observance . . . as to justify an
expectation" of its observance, N.Y. U.C.C. § 1-205.

7

The affidavits submitted by Interstate do raise a number of questions for the Court. For example, as MIC noted at oral argument, one could not read into contracts the more extreme view espoused in certain portions of the affidavits - that contracts permissibly could be canceled for "no reason at all" - without doing violence to the basic principles of contract law. Moreover, the Court perceives a distinct possibility, raised by one affiant, that cancellations are tolerated not out of industry practice regarding the treatment of contracts, but rather to "maintain good customer relations," Swinderman Aff. ¶¶ 6-9. Finally, the Court is not clear whether Interstate is claiming that usage of trade excuses nonperformance even for reasons that, although beyond the non-performer's control, could have been known to that party at the time it agreed to the contract, as MIC suggests is the case here. Nonetheless, what amounts to "usage of trade" is an issue of fact, see N.Y. U.C.C. § 1-205(2), and while it may yet prove to be the case that the usage of trade applicable here, if any, is not as broad as Interstate contends, it may still be broad enough to preclude summary judgment. In short, there are disputed issues of fact precluding a grant of summary judgment on MIC's breach of contract claim.[2]

---

[2]   Interstate also argues that there are "issues of credibility" regarding whether MIC in fact "reserved in its inventory" a barge of methanol for Interstate, and thus whether MIC exhibited reliance. However, MIC is not required to establish its reliance in order to make out a breach of contract claim. See K. Bell & Assocs. v. Lloyd's Underwriters, 827 F. Supp. 985, 988 (S.D.N.Y. 1993)(elements of breach of contract claim are (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach). While

In addition, the Court observes that there appear to be disputed issues of fact with respect to whether MIC mitigated its damages "in good faith and in a commercially reasonable manner," N.Y. U.C.C. § 2-706(1), and, consequently, over the amount of damages Interstate would owe if found to be in breach.  In particular, Interstate disagrees with MIC that $2.05 per gallon, the price at which MIC resold the methanol on December 21, 2005, reflected the market price for methanol on that date.[3]  To support its contention, Interstate provides an issue of Global Methanol Report indicating that, according to the Court's reading, the market price for a "US Spot" barge of methanol for the week of December 21 was between $233.00 and $235.00 per gallon.  See Jim Jordan & Associates, LLP, Global Methanol Report (December 21, 2007), Ex. to Puntureri Aff. Despite MIC's claim that it sought the best price it could and acted as quickly as possible, the Court believes that the Global Methanol Report creates a disputed issue of material fact with regard to damages.

---

the issue of reliance might have been relevant to MIC's alternative claim on a theory of promissory estoppel, the Court has now found that a contract exists that governs the transaction, and so MIC will be unable to recover on its quasi-contract claim.  See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987) (holding that the existence of an enforceable contract governing a particular subject matter "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter").

[3]  Interstate also claims that a disputed issue of fact exists with respect to whether the delivery was ever made at all, because MIC has not produced proof of the date and circumstances of delivery.  The Court sees no reason to question that the sale actually went through; in any event, the Court expects that MIC will produce evidence of the delivery in discovery.

9

For the foregoing reasons, the Court by Order dated May 6,

2008, denied the motion for summary judgment.


Dated: New York, NY
       May 18, 2008                    JED S. RAKOFF, U.S.D.J.


10

EXHIBIT "N"

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3-12-08_

Revised Form D—For cases assigned to Judge Rakoff                    Effective March 29, 2004
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Mitsubishi International Corporation
                    Plaintiff(s),                    CIVIL CASE MANAGEMENT PLAN
                                                           (JUDGE RAKOFF)

        -v-                                            08 Civ. 0194 (JSR)

Interstate Chemical Corporation
                    Defendant(s).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

*[handwritten margin notes]* Moving Papers -3/26 Answering Papers -4/11/4  4/18  Reply Oral Arg c/25 at 4pm.

        This Court requires that this case shall be **ready for trial** on
                            **AUGUST 12, 2008.**

        After consultation with counsel for the parties, the following Case Management Plan is adopted.
This plan is also a scheduling order pursuant to Rules 16 and 26(f) of the Federal Rules of Civil Procedure.

A.    The case (is) (is not) to be tried to a jury. [Circle as appropriate]    is

B.    Joinder of additional parties must be accomplished by *April 15, 2008* .

C.    Amended pleadings may be filed without leave of Court until *April 15, 2008* .

D.    Discovery (in addition to the disclosures required by Fed. R. Civ. P. 26(a)):

      1.    **Documents.** First request for production of documents, if any, must be served by
      *March 31, 2008* . Further document requests may be served as required, but no document
      request may be served later than 30 days prior to the date of the close of discovery as set forth in item
      6 below. *(March 19, 2008)*                    *(March 19, 2008)*

      2.    **Interrogatories.** Interrogatories pursuant to Rule 33.3(a) of the Local Civil Rules of the Southern
      District of New York must be served by *March 31, 2008* . No other interrogatories are
      permitted except upon prior express permission of Judge Rakoff. No Rule 33.3(a) interrogatories
      need be served with respect to disclosures automatically required by Fed. R. Civ. P. 26(a).
                                                           *19*

      3.    **Experts.** Every party-proponent of a claim (including any counterclaim, cross-claim, or third-
      party claim) that intends to offer expert testimony in respect of such claim must make the disclosures
      required by Fed. R. Civ. P. 26(a)(2) by *June 30, 2008* . Every party-opponent of such
      claim that intends to offer expert testimony in opposition to such claim must make the disclosures
      required by Fed. R. Civ. P. 26(a)(2) by *July 15, 2008* . No expert testimony (whether
      designated as "rebuttal" or otherwise) will be permitted by other experts or beyond the scope of the
      opinions covered by the aforesaid disclosures except upon prior express permission of the Court,
      application for which must be made no later than 10 days after the date specified in the immediately
      preceding sentence. All experts may be deposed, but **such depositions must occur within the time
      limit for all depositions set forth below.**

                        *(June 30, 2008)*

*(14)*

4.  <u>Depositions</u>. All depositions (including any expert depositions, see item 3 above) must be completed by *July 16, 2008* . Unless counsel agree otherwise or the Court so orders, depositions shall not commence until all parties have completed the initial disclosures required by Fed. R. Civ. P. 26(a)(1) or until four weeks from the date of this Order, whichever is earlier. Depositions shall proceed concurrently, with no party having priority, and no deposition shall extend beyond one business day without prior leave of the Court.

5.  <u>Requests to Admit</u>. Requests to Admit, if any, must be served by *June 13, 2008* [insert date that is no later than 30 days prior to date of close of discovery as set forth in item 6 below].

6.  All discovery is to be completed by *July 16, 2008* . Interim deadlines for items 1–5 above may be extended by the parties on consent without application to the Court, provided the parties are <u>certain</u> they can still meet the discovery completion date set forth in this paragraph, which shall not be adjourned except upon a showing to the Court of extraordinary circumstances.

*August 4, 2008*

E.  Post-discovery summary judgment motions in the form prescribed by the Court's Individual Rules of Practice may be brought on without further consultation with the Court provided that a Notice of any such motion, in the form specified in the Court's Individual Rules of Practice, is filed <u>no later than one week following the close-of-discovery date (item D-6 above)</u> and provided that the moving papers are served by *August 14, 2008* , answering papers by *August 29, 2008* , and reply papers by *September 9, 2008* [the last of these days being no later than six weeks following the close of discovery]. Each party must file its respective papers with the Clerk of the Court on the same date that such papers are served. Additionally, on the same date that reply papers are served and filed, counsel for the parties must arrange to deliver a courtesy non-electronic hard copy of the complete set of papers to the Courthouse for delivery to Chambers.

*July 24, 2008*

*August 8, 2008*

F.  A final pre-trial conference, as well as oral argument on any post-discovery summary judgment motions, shall be held on *August 15, 2008, at* *4 pm* [date to be inserted by the Court], at which time the Court shall set a firm trial date. The timing and other requirements for the Joint Pretrial Order and/or other pre-trial submissions shall be governed by the Court's Individual Rules of Practice.

G.  All motions and applications shall be governed by Judge Rakoff's Individual Rules of Practice. Counsel shall promptly familiarize themselves with all of the Court's Individual Rules, as well as with the Local Rules for the United States District Court for the Southern District of New York.

SO ORDERED.

_____
JED S. RAKOFF
U.S.D.J.

DATED:  New York, New York
        *3/12/08*

EXHIBIT "O"

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
MITSUBISHI INTERNATIONAL                 :       08 CV 00194(JSR)(GWG)
CORPORATION,
                                         :
           Plaintiff,                            **REPLY AFFIDAVIT**
                                         :
            -against-
                                         :       ECF Case
INTERSTATE CHEMICAL CORPORATION,
                                         :
           Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STATE OF NEW YORK    )
                     )    ss.:
COUNTY OF NEW YORK   )

        ZACK FERGUSON-STEGER, being duly sworn, deposes and says:

        1.  I am the marketing manager of Mitsubishi International

Corporation ("MIC").  I have personal knowledge of the facts set

forth in this reply affidavit, which I make in further support of

plaintiff's motion for summary judgment.

                    Delivery Date of Methanol

        2.  Interstate's allegations that there was some sort of

confusion over the delivery date of the barge of methanol are

disingenuous.  When MIC agreed to sell the methanol to

Interstate, we knew we had a vessel with methanol due to arrive

about mid-December 2007.

3.  Because of potential delays of vessels, MIC always builds a few days of leeway into its delivery dates to make sure it can commit to its sales obligations, and hence only agreed to sell as long as Interstate could accept the shipment. We accordingly told Interstate we could deliver on or after December 20.

4.  At the time of the sale to Interstate, the barge of methanol was part of MIC's floating inventory -- that is, it was on our balance of inventory, and we planned to deliver it to Interstate as per our agreement. As shown in MIC's inventory records for December 2007, the relevant portions of which are annexed hereto as Exhibit 3, MIC had sufficient methanol in its inventory to delivery to Interstate on December 20.

5.  MIC's methanol sales commitments rely upon availability of methanol from Venezuela or other sources. It is not practicable for MIC to keep methanol on inventory indefinitely once it receives a shipment from a supplier; instead, MIC arranges to sell the methanol based on what its suppliers have committed to provide to MIC.

6.  As a result, and as happened with Interstate, MIC does not commit to one specific delivery date, because that date depends in part upon a variety of external factors, such as dock availability, arrival of the buyer's barge, and the weather.

2

Rather, as it did here, MIC committed to a delivery date of December 20 "or later."

7. According to industry practice in the bulk chemical sales industry, contract shipment timing is agreed to on a case-by-case basis. The most common shipment period is the calendar month. However, if the seller has restrictions on part of the month, it can specify restricted periods. In this case, the period started on December 20, 2007, as MIC would not guarantee product availability at an earlier date.

8. Once the delivery period is set, the buyer needs to give the seller five working days' notice for the exact shipment day, according to industry practice.

9. If Interstate required an exception to this standard, it could have said so at the time the parties negotiated the agreement.

10. MIC would not have committed to one definitive sales date when it agreed with Interstate because, if it then turned out that MIC could not deliver until a day or two later, it faced exposure for damages to Interstate if MIC could not deliver on a specified date.

11. I do not recall the phone call Ms. Cirillo alleges we had on December 13, 2007, and MIC has no record of such a call. In any event, as shown in Exhibit 3, MIC had sufficient methanol

3

in its inventory to deliver to Interstate on the agreed-upon delivery date.

12. Ms. Cirillo did not, in any event, make any objections to the contract at any time based on the delivery date.

## US Coast Guard Issue

13. Interstate's assertion that its purchase of methanol from MIC was conditioned upon Interstate's customer's ability to take delivery of the barge in Owensboro, Kentucky is incorrect.

14. At no time before December 18, 2007 did Ms. Cirillo, or anyone from Interstate, mention to me that there might be a problem with its customer taking delivery of the barge, or that Interstate's agreement with MIC was contingent upon a third party's ability to take delivery of the barge.

15. MIC has no interest in what Interstate does with the purchased materials or to whom Interstate resells. MIC's contracts are only with its direct customers and are not contingent on the actions of third parties.

16. Had Interstate's ability to receive the barge been in doubt, MIC would not have agreed to sell to Interstate. Instead, MIC would have sold the barge to another customer at the same price.

4

## Spot Price of Methanol

17. The Jim Jordan & Associates, LLP Global Methanol Report submitted by Interstate (Puntureri Aff., Ex.) is not a definitive statement of the price of methanol on the spot market in December 2007.

18. As shown by the DeWitt Methanol Newsletter covering the same time period, attached hereto as Exhibit 4, the price of methanol did indeed go down to $2.05 per gallon at the end of December 2007.

19. In late December 2007, the methanol market was very thin, and prices were falling. MIC sold the barge Interstate refused to accept on December 21, the last open day before year-end holidays, when most of the market participants were already closed. Liquidity was therefore limited.

20. Prices continued falling throughout early 2008. Had MIC delayed further in selling the barge Interstate refused to purchase, it would have incurred further damages.

## Sale of Barge to Tauber Petrochemical Company

21. Interstate's insinuation that MIC sold the methanol for less than it could have received on the spot market is incorrect. Nor is there any sort of special business relationship between Tauber Petrochemical Company ("Tauber") and MIC. Tauber and MIC are, in fact, competitors.

5

22. Once it became clear that Interstate was not going to perform the purchase contract, MIC, in the face of falling methanol prices, had to arrange a sale of the barge of methanol as quickly as possible.  The most efficient way to do this, and the way MIC makes many sales, was through an independent broker, who, as is customary, received a commission for arranging the sale.  This broker connected MIC as a seller with Tauber as a buyer, for the highest price possible at the time.

23. MIC wanted to, and did, sell for the highest price it could get at the time, faced with falling markets, when it became apparent, after Interstate failed to reply to MIC's ultimatum, that Interstate would not fulfill its obligation.  Had MIC waited longer to sell, it would have lost even more money on the sale.

24. For these reasons, and those in MIC's original moving papers, MIC's motion for summary judgment should be granted.

ZACK FERGUSON-STEGER

Sworn to this 18
day of April, 2008

Notary Public
DIANE G. KNOX
Notary Public, State of New York
No. 02KN6000525
Qualified in New York County
Commission Expires April 12, 2010

6

EXHIBIT "P"

Daniel J. Kornstein (DK-3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
MITSUBISHI INTERNATIONAL            :
CORPORATION,
                                    :
              Plaintiff,                 08 CV 00194 (JSR) (GWG)
                                    :
       -against-
                                    :
INTERSTATE CHEMICAL CORPORATION,
                                    :
              Defendant.
-----------------------------------X


**PLAINTIFF'S REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF SUMMARY JUDGMENT**


Kornstein Veisz Wexler & Pollard, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600
Attorneys for Plaintiff
Mitsubishi International Corporation

## TABLE OF CONTENTS

Page(s)

1. SUMMARY JUDGMENT NOT PREMATURE . . . . . . . . . . . 2

2. INTERSTATE'S OBJECTION UNTIMELY . . . . . . . . . 4

3. INCONSISTENT PROVISIONS . . . . . . . . . . . . . 4

4. NO FORCE MAJEURE . . . . . . . . . . . . . . . . 6

5. MIC RESERVED METHANOL FOR SALE TO INTERSTATE . . . . . 7

6. COMMERCIALLY REASONABLE MITIGATION . . . . . . . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . 10

## TABLE OF AUTHORITIES

Page(s)

<u>Berger v. United States</u>,
    87 F.3d 60 (2d Cir. 1996) . . . . . . . . . . . . . . 2

<u>Bazak Int'l Corp. v. Mast Indus., Inc.</u>,
    73 N.Y.2d 113, 119, 538 N.Y.S.2d 503, 505 (1989) . . . . . 4

<u>Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.</u>,
    769 F.2d 919, 926 (2d Cir. 1985) . . . . . . . . . . . 3

<u>Caslterigg Master Investments Ltd. v. Charys Holding Co., Inc.</u>,
    No. 07 Civ. 9742(GEL), 2008 WL 449690, at *2
    (S.D.N.Y. Feb. 19, 2008) . . . . . . . . . . . . . . 2, 3

<u>General Elec. Co. v. Metals Res. Group Ltd.</u>,
    293 A.D.2d 417, 418, 741 N.Y.S.2d 218, 220
    (1st Dep't 2002) . . . . . . . . . . . . . . . . . . 6

<u>Hellstrom v. U.S. Dep't of Veterans Affairs</u>,
    201 F.3d 94 (2d Cir. 2000) . . . . . . . . . . . . . 2

<u>Kel Kim Corp. v. Cent. Mkts., Inc.</u>,
    70 N.Y.2d 900, 902-03, 524 N.Y.S.2d 384, 385 (1987) . . . 6

<u>MacAlloy Corp. v. Mettalurg, Inc.</u>,
    284 A.D.2d 227, 228, 728 N.Y.S.2d 14, 15
    (1st Dep't 2001) . . . . . . . . . . . . . . . . . . 6

<u>Miller Marine Servs., Inc. v. Travelers Property
    Casualty Ins. Co.</u>,
    197 F. App'x 62, 65 (2d Cir. 2006) . . . . . . . . . . 3

<u>Sutera v. Schering Corp.</u>,
    73 F.3d 13 (2d Cir. 1995) . . . . . . . . . . . . . . 2


<u>Other Authorities</u>

N.Y. U.C.C. § 2-201(1) . . . . . . . . . . . . . . . . . 4

N.Y. U.C.C. § 2-201(2) . . . . . . . . . . . . . . . . . 4

N.Y. U.C.C. § 2-207(3) . . . . . . . . . . . . . . . . 4-5

Daniel J. Kornstein (DK - 3264)
Amy C. Gross (AG - 8836)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
MITSUBISHI INTERNATIONAL            :
CORPORATION,                                    08 CV 00194(JSR)(GWG)
                                    :
          Plaintiff,
                                    :     ECF Case
          -against-
                                    :
INTERSTATE CHEMICAL CORPORATION,
                                    :
          Defendant.
--------------------------------X

## PLAINTIFF'S REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF SUMMARY JUDGMENT

     Defendant's opposing papers present no genuinely disputed questions of material fact. The only material issues are the key terms of the agreement between plaintiff Mitsubishi International Corporation ("MIC") and defendant Interstate Chemical Corporation ("Interstate"), and whether Interstate breached that agreement. Those issues are not disputed. Interstate never denies that it agreed on key terms to buy a barge of methanol from MIC, or that it refused to perform the agreement.

     To the extent Interstate tries to raise any disputed issues of fact, they are immaterial. They have no bearing on the merchants' agreement reached by the parties. That is why summary

judgment is appropriate.

1.  **SUMMARY JUDGMENT NOT PREMATURE**

MIC's summary judgment motion is not too early.  A plaintiff can move for summary judgment "at any time after . . . 20 days have passed from commencement of the action." Fed. R. Civ. P. 56(a).  This action was filed on January 9, 2008, and this motion was filed more than 60 days later, on March 26, 2008.  Interstate has, moreover, answered the complaint, and the Court gave MIC permission to file this motion at the March 12, 2008 preliminary conference.

Early summary judgment is proper here because this case is a simple dispute between two parties to a contract, the essential terms of which are undisputed by the parties and evident in the writings they exchanged.  See Caslterigg Master Investments Ltd. v. Charys Holding Co., Inc., No. 07 Civ. 9742(GEL), 2008 WL 449690, at *2 (S.D.N.Y. Feb. 19, 2008) (granting pre-discovery summary judgment on breached securities agreement).  This case does not present a claim about which Interstate has no information or must inquire into a party's knowledge or motives, unlike the cases cited by Interstate.  Compare Hellstrom v. U.S. Dep't of Veterans Affairs, 201 F.3d 94 (2d Cir. 2000); Berger v. United States, 87 F.3d 60 (2d Cir. 1996); Sutera v. Schering Corp., 73 F.3d 13 (2d Cir. 1995).

As a result, Interstate's bald insistence that it needs

2

more discovery to respond to this motion and that it has properly requested such discovery, is unfounded.  Interstate has submitted no affidavit showing "that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(f).  Such "failure to file such an affidavit under Rule 56(f) is by itself enough to reject a claim that the opportunity for discovery was inadequate."  <u>Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.</u>, 769 F.2d 919, 926 (2d Cir. 1985).  <u>See also, e.g.</u>, <u>Miller Marine Servs., Inc. v. Travelers Property Casualty Ins. Co.</u>, 197 F. App'x 62, 65 (2d Cir. 2006); <u>Caslteriqg Master Investments Ltd.</u>, <u>supra</u>, at *2.

Interstate's insinuations that MIC has refused or failed to meet its discovery obligations are meritless.  The Court has stayed depositions until after oral argument of this motion. Interstate served its document demands on MIC on March 19, 2008, the same day MIC served its required initial disclosures on Interstate.  MIC's response to Interstate's document demands were served today, and a copy is annexed to the accompanying Reply Affidavit of Daniel J. Kornstein dated April 18, 2008. Interstate, by contrast, has failed to make (or even attempt) the required Rule 56(f) showing to justify additional discovery to respond to this motion.  Interstate looks through the wrong end of the telescope when it tries to blame MIC, which has complied with all of its discovery obligations, for its own deficiencies.

3

2.  <u>INTERSTATE'S OBJECTION UNTIMELY</u>

Although Interstate claims its purported December 18, 2007
cancellation occurred ten business days after MIC's December 4,
2007 confirmatory writing, the ten-day objection period under
U.C.C. § 2-201(2) is stated in "days," not "business days."  <u>Def.
Mem.</u> at 10.  Absent any qualifying language, "days" must be given
its plain meaning of calendar days.

3.  <u>INCONSISTENT PROVISIONS</u>

Interstate nowhere raises a disputed issue of material fact
challenging the parties' agreement on the key terms of quantity
and sales price of methanol.  Quantity is the only indispensable
term in a UCC § 2-201 contract such as the one between Interstate
and MIC.  <u>See</u> <u>Bazak Int'l Corp. v. Mast Indus., Inc.</u>, 73 N.Y.2d
113, 119, 538 N.Y.S.2d 503, 505 (1989); <u>see also</u> N.Y. U.C.C.
2-201(1) ("A writing is not insufficient because it omits or
incorrectly states a term agreed upon but the contract is not
enforceable under this paragraph beyond the quantity of goods
shown in such writing.").  Interstate has, therefore, conceded
that the parties agreed on all necessary terms.

Interstate's references to additional terms listed in the
form contract MIC sent to Interstate are red herrings.  As the
U.C.C. states, where the parties have an otherwise confirmed
written contract, "the terms of the particular contract consist
of those terms on which the writings of the parties agree."  N.Y.

4

U.C.C. § 2-207(3).  The writings of the parties here agree on the price and quantity terms.  The additional terms raised by Interstate are immaterial and irrelevant.

MIC has made no attempt to enforce any <u>force majeure</u> or arbitration clause.  Delivery date is a similar non-issue. Interstate tries to create confusion over an alleged "firm delivery date" of December 20, 2007 in the form contract (which Interstate claims it never accepted), the "'December 20 or later'" delivery date it admits the parties agreed to on December 4, and "sometime 'in December 2007.'"  <u>See</u> <u>Cirillo Aff.</u> at ¶¶ 9-10.  MIC accepts Interstate's rejection of a December 20, 2007 firm delivery date, as it is against MIC's practice to set one firm delivery date for shipments such as a barge of methanol. <u>Reply Aff. of Zack Ferguson-Steger</u> dated Apr. 18, 2008 at ¶ 6. But Interstate never alleges that it objected to this slightly later delivery date or tried to cancel the agreement based upon this alleged revision of terms.

Nor could it.  The "December 20 or later" delivery date reflects the uncertainty inherent in the delivery of MIC's sales of methanol due to a variety of external factors affecting movement of the product.  <u>Id.</u>  Rather than commit to one particular delivery date, MIC always builds a few days of leeway into its delivery dates to make sure it can meet its sales obligations.  <u>Id.</u> at ¶ 3.  Regardless of whether MIC told

5

Interstate it could not deliver the methanol until December 24,
MIC was well within the delivery date the parties agreed on,
"December 20 or later," as well as industry practices and MIC's
own practices.

Any possible minor inconsistencies in the parties' accounts
of discussions of the delivery date therefore do not show any
difference on any material point.  In any event, Interstate has
not raised a genuine dispute over the parties' agreement on the
material terms of price and quantity.

4.    NO FORCE MAJEURE

Industry practice is immaterial to the parties' agreement.
Interstate's alleged force majeure -- its client's alleged
inability to accept delivery of the methanol Interstate agreed to
buy from MIC due to Coast Guard regulations -- is not a force
majeure, as a matter of law.

"[O]nly if the force majeure clause specifically includes
the event that actually prevents a party's performance will that
party be excused." Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d
900, 902-03, 524 N.Y.S.2d 384, 385 (1987). See also General
Elec. Co. v. Metals Res. Group Ltd., 293 A.D.2d 417, 418, 741
N.Y.S.2d 218, 220 (1st Dep't 2002); MacAlloy Corp. v. Mettalurg,
Inc., 284 A.D.2d 227, 228, 728 N.Y.S.2d 14, 15 (1st Dep't 2001).

Interstate never alleges that it sought to make its
agreement with MIC contingent on Interstate's customer's ability

6

to take delivery of the methanol.  Interstate also never alleges
that it attempted to include a <u>force majeure</u> clause in its
agreement with MIC, let alone one that would cover the
possibility that Interstate's client might not be able to take
delivery.  Nor could it, as Interstate did not mention its
customer's alleged difficulty with Coast Guard approvals until
December 18, 2007, fourteen days after MIC and Interstate
confirmed their sales agreement.  <u>Ferguson-Steger Reply Aff.</u> at ¶
14; <u>Cirillo Aff.</u> at ¶¶ 16-17; <u>Puntureri Aff.</u> at ¶¶ 13-14.

Interstate's affidavits of alleged industry custom are
therefore irrelevant.  No number of affidavits can overcome
Interstate's failure to seek a <u>force majeure</u> clause until after
the agreement was made and the alleged (yet legally insufficient)
<u>force majeure</u> happened.  The horses had already left the barn.
The remainder of Interstate's "industry custom" argument, that
supply contracts can be canceled regularly and without penalty,
sometimes for "no reason at all" (<u>Puntureri Aff.</u> at ¶ 4;
<u>Swinderman Aff.</u> at ¶ 7), undermines the reliability that the
U.C.C. and basic contract law are meant to uphold.

5.   <u>MIC RESERVED METHANOL FOR SALE TO INTERSTATE</u>

MIC did "reserve" methanol in its inventory for delivery to
Interstate.  When MIC agreed to sell the methanol to Interstate,
the barge was part of MIC's floating inventory -- that is, MIC
listed the methanol in its balance of inventory and planned to

7

deliver it to Interstate as per the agreement. Ferguson-Steger Reply Aff. at ¶ 4. It is impractical for MIC to keep methanol on its inventory indefinitely once it receives a shipment from a supplier. Id. at ¶ 5. Instead, MIC arranges to sell the methanol based on the commitments it receives from its suppliers, as it did with Interstate. Id. Even so, MIC's inventory records show that it had sufficient methanol in its inventory to deliver to Interstate on and after December 20, 2007. Id. at ¶ 4 and Ex. 3.

Interstate offers no reasonable basis to dispute this fact. Interstate's argument that MIC had not yet "loaded" the methanol from its supplier indicates that Interstate expects MIC to break its contracts with suppliers any time a customer seeks to back out of an agreement. This expectation, again, runs counter to the purposes of the U.C.C. and settled contract law. It also fails to challenge MIC and Interstate's agreement on the key contractual terms and Interstate's failure to perform.

6. COMMERCIALLY REASONABLE MITIGATION

Interstate has not shown a failure by MIC to properly mitigate its damages. In late December 2007, by all accounts, prices were falling in the spot methanol market. They continued to do so throughout early 2008. Ferguson-Steger Reply Aff. at ¶¶ 19-20. Had MIC delayed further in selling the barge Interstate

8

refused to purchase, it would have incurred further damages.  <u>Id.</u> at ¶ 20.

The Jim Jordan & Associates, LLP Global Methanol Report submitted by Interstate (<u>Puntureri Aff.</u>, Ex.) is not a definitive statement of the price of methanol on the spot market in December 2007.  <u>Ferguson-Steger Reply Aff.</u> at ¶ 17.  As shown by the DeWitt Methanol Newsletter covering the same time period, the price of methanol did indeed go down to $2.05 per gallon at the end of December 2007.  <u>Id.</u> at ¶ 18 and Ex. 4.

MIC's sale of the barge to Tauber Petrochemical Company ("Tauber") was not, as Interstate suggests with no basis, made at a low price "based upon other business consideration."  <u>Def. Mem.</u> at 20.  Tauber and MIC are, in fact competitors.  <u>Ferguson-Steger Reply Aff.</u> at ¶ 21.

Once it became clear that Interstate was not going to perform the purchase contract, MIC, facing falling methanol prices, had to arrange a sale of the barge of methanol as quickly as possible.  <u>Id.</u> at ¶ 22.  The most efficient way to do this, and the way MIC makes many sales, was through an independent broker, who received a commission for arranging the sale.  <u>Id.</u> This broker connected MIC as a seller with Tauber as a buyer, for the highest price possible at the time.  <u>Id.</u>

MIC would have no reason to sell for less than the highest available price.

9

## CONCLUSION

The only material issues of fact in this case are whether the parties agreed to key terms of the contract and whether Interstate refused to perform. Interstate disputes neither.

For the reasons given here and in our main brief, plaintiff's motion for summary judgment should be granted.

Dated:    New York, New York
          April 18, 2008

Respectfully submitted,

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By:  Daniel J. Kornstein (DK - 3264)
     Amy C. Gross (AG - 8836)

757 Third Avenue
New York, New York 10017
(212) 418-8600

Attorneys for Plaintiff

10