UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MITSUBISHI INTERNATIONAL CORPORATION,

                    Plaintiff,

      -against-

INTERSTATE CHEMICAL CORPORATION,

                    Defendant.

08 Civ. 00194 (JSR)(GWG)

**DEFENDANT'S LOCAL RULE 56.1(b) STATEMENT IN OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT**

Defendant Interstate Chemical Corporation ("Interstate") submits this Local Rule 56.1(b) Statement in opposition to the latest motion for summary judgment filed by plaintiff Mitsubishi International Corporation ("MIC"), and in specific response to the numbered paragraphs of its Local Rule 56.1(a) Statement, dated August 14, 2008 ("MIC's 8/14/08 56.1(a) Statement").

"The Parties and Jurisdiction"

    1.      For purposes of this motion, Interstate does not dispute ¶ 2 of MIC's 8/14/08 56.1(a) Statement.

    2.      Not disputed.

    3.      For purposes of this motion, Interstate does not dispute ¶ 3 of MIC's 8/14/08 56.1(a) Statement.

    4.      Not disputed.

    5.      Not disputed.

"The Agreement"

    6.      Not disputed.

7.    Disputed.  On December 4, 2007, Interstate's Director of Chemical Procurement, Lori Cirillo, inquired with MIC's marketing manager, Zack Ferguson-Steger, regarding the availability of a barge of methanol for possible delivery in late December by MIC to Interstate's customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky.  OGC planned on using the methanol barge for its new biodeisel plant on the Ohio River.  The substance of the December 4, 2007 conversation between Zack Ferguson-Steger of MIC and Lori Cirillo of Interstate was that MIC could load a barge of methanol from its barge loading facility in St. Rose, Louisiana for Interstate, but could not commit to any specific loading date.  *See* April 11, 2008 Affidavit of Lori Cirillo ("Cirillo Aff."), Exhibit H to MIC's 8/14/08 56.1(a) Statement at  ¶¶ 3, 4.

8.    Not disputed.

9.    Not disputed.

10.    Interstate does not dispute that on December 5, 2007, Mr. Ferguson-Steger sent an email to Ms. Cirillo, but does dispute the characterization of the content of that email which speaks for itself.

11.    Interstate concedes that it did not call MIC within the next ten days. However, Mr. Ferguson-Steger of MIC called Ms. Cirillo on December 13, 2007, which was within the ten day time frame.  The substance of this conversation was that MIC could not deliver the barge anytime before December 24, 2007, because that was when MIC "had a vessel coming in" with methanol.  *See* Cirillo Aff. (Ex. H to MIC's 8/14/08 56.1(a) Statement) at ¶ 15).

12.    Not disputed.

13. Disputed. In its May 18, 2008 Memorandum Decision, the Court found the existence of a contract between the parties specifically based on the December 4, 2007 telephone exchange between Mr. Ferguson Steger and Ms. Cirillo and the subsequent December 4 email -- not the "various factual basis" asserted in MIC's initial moving papers. *See* May 18, 2008 Memorandum Decision, MIC's 8/14/08 56.1(a) Statement Ex. M at pg. 4. Significantly, this Court held that the existence of a valid contract "is not the end of the inquiry." *Id.* at 5.

"MIC's Pre-Discovery Summary Judgment Motion"

14. Not disputed.

15. Not disputed.

16. Not disputed.

17. Disputed. Interstate's arguments in opposition to MIC's prior summary judgment motion speak for themselves. Interstate argued that to the extent that an agreement is found to exist between the parties, it includes a broad *force majure* clause in accordance with applicable trade usage that relieves the parties to a spot purchase order of bulk chemicals for any cause beyond their reasonable control. *See* MIC's 8/14/08 56.1(a) St. Ex. G at 2-3.

18. Not disputed.

19. Interstate does not dispute the language quoted from this Court's May 18, 2008 Memorandum Decision.

20. Not disputed.

"Discovery"

21. Not disputed.

22.     Not disputed.

23.     Disputed.  Interstate's April 14, 2008 56.1(b) Statement (Ex. A hereto) included sworn affidavit and declaration testimony from Albert Puntureri, President of Interstate, Rich Jukiewicz, a Senior Purchasing Agent for Research Organics, Inc., a manufacturer and supplier of biochemicals; and Edward Swinderman, a former Methanol Business Manager for Lyondell Chemical.  These sworn statements disclosed the identity of these witnesses, their industry background, as well as the substance of their testimony concerning the usage of trade that relieved both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their reasonable control. (*See* Interstate's April 14, 2008 56.1(b) Statement, Ex. A hereto at Exs. B, F, G). Attached as Exhibit B are Declarations from Messrs. Jukiewicz and Swinderman reflecting that they were not hired or retained by Interstate to provide their testimony in this case, and a Declaration from Mr. Puntureri confirming that his duties as President of Interstate do not regularly include giving expert testimony.

24.     Disputed.  MIC's statement in this paragraph ignores the disclosures contained in the sworn statements of Messrs. Puntureri, Jukiewicz, and Swinderman which were submitted with Interstate's April 14, 2008 56.1(b) Statement.  MIC never requested any further disclosures from these witnesses, nor sought any depositions from them or anyone on behalf of Interstate.  All of MIC's discovery requests in this case are attached as Exhibit C.

25.     MIC's latest summary judgment motion also ignores its own documents and Rule 30(b)(6) deposition testimony concerning its acknowledgement of the

applicable industry custom that excuses a party's performance under a spot purchase

order for any cause beyond their reasonable control:

     (a)    The "General Terms and Conditions of Sale" that MIC proposed to

Interstate included the provision that:

> FORCE MAJEURE: Seller shall not be liable for any delay of for failure
> to perform its obligations hereunder for *any cause beyond its reasonable
> control*, which affects Seller or any other person (whether known or
> unknown to Buyer) involved in the sale, manufacturing, supply, shipment
> or delivery of the Goods.  Shipment or delivery dates shall be extended for
> a period equal to the time lost by reason of any such cause; provided,
> however, that if any such delay exceeds ninety (90) days, either party shall
> have the right to cancel this Contract with respect to such shipment or
> delivery by written notice to the other party without any liabilities to the
> other party.  Force majure shall not excuse any non-payment by Buyer.
> Except as otherwise provided herein, UCC section 2-615 shall govern the
> rights of both parties hereto in the event of such delay or non-
> performance.

(MIC 000006-9)(Exhibit D hereto)(emphasis added).  While this proposed term only

relieved the "Seller" of its obligations as a result of "any cause beyond its reasonable

control, which affects Seller or any other person (whether known or unknown to Buyer)

involved in the sale, manufacturing, supply, shipment or delivery of the Goods," it

otherwise supports Interstate's position that the scope of the industry practice is to relieve

parties to a "spot" purchase order of their obligations for "any cause beyond their

reasonable control."

     (b)    MIC's Rule 30(b)(6) designee, Thomas Reszler, the MIC's Manager for

its Methanol and Ethanol Department, testified that the "General Terms and Conditions

of Sale" that MIC proposed to Interstate, including the clause quoted above, "are fairly

standard" in the industry.  *See* MIC's Rule 30(b)(6) designation and Interstate's Rule

30(b)(6) Deposition Notice, attached as Exhibit E hereto); *see also* Reszler Dep. Tr., Exhibit F hereto at 30:17-31:3).[1]

(c)    Mr. Reszler also testified about the application of this industry practice. Although Mr. Reszler "could not recall" a situation like that presented here where a customer was seeking to cancel a purchase order due to U.S. Coast Guard restrictions preventing delivery of the methanol barge, he otherwise testified that the "any cause beyond their reasonable control" language in MIC's "General Terms and Conditions of Sale" also applied to MIC's customers who experience problems beyond their reasonable control. (Reszler Dep., Exhibit F hereto at 46:20-48:19; 49:12-51:3).

WHEREFORE, based on the points and authorities set forth in Interstate's accompanying Memorandum of Law, MIC's latest Motion for summary judgment should be denied. Interstate also respectfully requests such other and further relief as this Court deems just and proper.

Dated: New York, New York
    August 26, 2008

SIMON•LESSER PC

By:
    Leonard F. Lesser, Esq.
    420 Lexington Avenue
    New York, New York 10170
    T:212.599.5455
    F:212.599.5459
    llesser@simonlesser.com

    Attorneys for defendant Interstate Chemical
    Corporation

---

[1]    Interstate has not submitted those portions of Mr. Reszler's deposition testimony supporting Interstate's defense that MIC did not mitigate any alleged damages in a commercially reasonable manner because MIC's latest motion concedes that there are issues of fact on the issue of the amount of damages, if any, MIC can recover as a result of the alleged breach by Interstate. *See* MIC's Brief at 3. Portions of that testimony were designated by MIC as "confidential" and Interstate is mindful of the Court's June 23, 2008 Protective Order which directs the parties to minimize court filings under seal.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------

MITSUBISHI INTERNATIONAL CORPORATION,

Plaintiff,

-against-

INTERSTATE CHEMICAL CORPORATION,

Defendant.

-------------------------------------------------

08 Civ. 00194 (JSR)(GWG)

**DEFENDANT'S LOCAL
RULE 56.1(b) STATEMENT
IN OPPOSITION TO
PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Defendant Interstate Chemical Corporation ("Interstate") submits this Local Rule 56.1(b)

Statement in opposition to the Motion for summary judgment filed by plaintiff Mitsubishi

International Corporation ("MIC"), and in specific response to numbered paragraphs of its Local

Rule 56.1(a) Statement.

1.    For purposes of this motion, Interstate does not dispute ¶ 1 of MIC's 56.1(a) Statement.

2.    Not disputed.

3.    For purposes of this motion, Interstate does not dispute ¶ 3 of MIC's 56.1(a) Statement.

4.    Not disputed.

5.    Not disputed.

6.    Disputed.  On December 4, 2007, Interstate inquired with MIC about the

availability of a barge of methanol for possible delivery in late December to Interstate's customer

Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant

on the Ohio River.  The substance of the December 4, 2007 conversation between Zack

Ferguson-Steger of MIC and Lori Cirillo of Interstate was that MIC could load a barge of

methanol from its barge loading facility in St. Rose, Louisiana for Interstate, but could not

commit to any specific loading date. *See* April 11, 2008 Affidavit of Lori Cirillo ("Cirillo Aff."),

Exhibit A hereto ¶¶ 3, 4.

    7.     Not disputed.

    8.     Not disputed.

    9.     Interstate does not dispute that on December 5, 2007, Mr. Ferguson-Steger sent an e-mail to Ms. Cirillo, but does dispute the characterization of the content of that e-mail which speaks for itself.

    10.    Disputed.  The "form contract" attached to Mr. Ferguson-Steger's December 5, 2007 e-mail does not "contain the same material terms MIC and Interstate agreed to the day before" as alleged.  Rather, the document contained many terms that were materially different than those discussed by the parties the day before, and also included one-sided terms in MIC's favor never discussed that were inconsistent with industry practice, including, but not limited to:

    (a)    The proposed contract document had a firm delivery date of "December 20th, 2007," which was materially different from the parties' oral discussions, and Mr. Ferguson-Steger's December 4, 2007 e-mail advising only that MIC could deliver a barge "loading Dec. 20 or later."  Even in his Affidavit, Mr. Ferguson-Steger is inconsistent on the delivery term he now claims was included in the alleged "agreement" created by the parties' December 4, 2007 oral discussion.  In one sentence, he asserts that MIC's proposed contract document which had a "Shipment" term of "December 20th, 2007," was the term the parties allegedly agreed to.  *See* Ferguson-Steger Aff. ¶ 8.   Yet in another sentence, he says that the delivery term was just sometime "in December 2007." *See* Ferguson-Steger Aff. ¶ 21.

    (b)    The proposed contract document also had a one-sided *force majure* clause excusing MIC's performance "for any cause beyond its reasonable control."  While it is industry

custom to relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for any cause beyond their reasonable control, it is most certainly not permissible for only one party to the transaction to have the benefit of such relief.

(c)    The proposed contract also contained an arbitration clause requiring arbitration in New York City for any dispute over the transaction.  The parties did not agree to this as MIC acknowledged by the fact that it commenced this litigation as opposed to an arbitration proceeding.  *See* Cirillo Aff. (Ex. A) ¶¶ 8-13; *see also* April 11, 2008 Affidavit of Albert R. Puntureri ("Puntureri Aff."), Exhibit B hereto ¶¶ 3-7.

11.    Disputed.  On Thursday, December 13, 2007, Mr. Ferguson-Steger called Ms. Cirillo to say that MIC could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol.  *See* Cirillo Aff. (Ex. A) ¶ 15.

12.    Interstate disputes the characterization of a "contract" between the parties. Interstate otherwise states that by e-mail the morning of December 18, 2007, Ms. Cirillo of Interstate informed Mr. Ferguson-Steger that it could not take delivery of a barge of Methanol because of OGC's delay in obtaining Coast Guard/Homeland Security approval for its new biodeisel facility on the Ohio River where the barge of methanol was to be delivered.  *See* Cirillo Aff. (Ex. A) ¶¶ 8-13; Puntureri Aff. (Ex. B) ¶¶ 13, 14; *see also* April 10, 2008 Affidavit of Mark Carlisle ("Carlisle Aff."), Exhibit C hereto ¶¶ 3-7.

13.    Interstate does not dispute that on December 19, 2007, Mr. Ferguson-Steger sent an e-mail to Ms. Cirillo, but does dispute the characterization of the e-mail which speaks for itself.

14.    Interstate does not dispute that Ms. Cirillo responded to Mr. Ferguson-Steger's e-mail, but does dispute the characterization of that response which speaks for itself.

15.    Interstate does not dispute that Mr. Ferguson-Steger replied to Ms. Cirillo's response, but does dispute the characterization of that reply which speaks for itself.

16.    Interstate does not dispute that Ms. Cirillo sent additional e-mails to Mr. Ferguson-Steger's on December 19 and 20, but does dispute the characterization of those e-mails which speak for themselves.

17.    Interstate does not dispute that Mr. Ferguson-Steger sent an e-mail to Ms. Cirillo on December 20, 2007, but does dispute the characterization of that e-mail which speaks for itself.

18.    Not disputed.

19.    Disputed.  On Thursday, December 13, 2007, Mr. Ferguson-Steger called Ms. Cirillo to say that MIC could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol.  *See* Cirillo Aff. (Ex. A) ¶ 15.

20.    Disputed.  On Thursday, December 13, 2007, Mr. Ferguson-Steger called Ms. Cirillo to say that MIC could not deliver a barge of methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with methanol.  *See* Cirillo Aff. (Ex. A) ¶ 15.  No evidence has been submitted by MIC that the "vessel it had coming in" on or around December 24, 2007 was ordered after the December 4, 2007 communication between MIC and Interstate.  Interstate also disputes that the methanol MIC alleges it sold to Tauber Petrochemical Company ("Tauber") on December 21, 2007 was product purportedly "reserved for sale" to Interstate."  Exhibit D to MIC's Complaint reflects a sale of 10mb of methanol to Tauber for delivery sometime between December 21, 2007 and January 10, 2008.  No evidence has been submitted by MIC establishing if and when the delivery actually occurred, or where and to whom it was delivered.  Nor has MIC submitted any evidence

establishing this so-called "reservation of inventory" allegedly made as a result of the December 4, 2007 communications between MIC and Interstate. It is Interstate's understanding that MIC produces methanol in Venezuela, and also purchases Venezuelan methanol from importers such as Metcall LLC. MIC then stores the methanol in its facilities for resale to brokers, distributors, and direct customers. Without submitting evidence as to MIC's purchasing and storage activity for the methanol that was sold to Tauber, Interstate has no way of addressing the credibility of MIC's contention that such methanol was "reserved for sale" to Interstate. *See* Puntureri Aff. (Ex. B) ¶¶ 16-19. Interstate has requested such information from MIC, which has not been produced. *See* Interstate's Document Requests, Exhibit D hereto, Request Nos. 7, 8, 11, and 12.

21.    Disputed. Industry market reports reflect that the market price for a "US Spot" barge of methanol for the last two weeks of December, 2007 was between $2.52 per gallon and $2.33 per gallon. Interstate believes that MIC and Tauber had an existing relationship, and that the price paid by Tauber for the barge in question was not at market price, but at a favorable rate in consideration for other business between the companies. *See* Puntureri Aff. (Ex. B) ¶¶ 24-26. Interstate has requested all documents and correspondence concerning MIC's purported "prompt efforts to mitigate" as alleged in ¶ 22 of its Complaint (including the documents listed in MIC's March 19, 2008 Initial Disclosures), as well as all documents and correspondence between MIC and Tauber. *See* Interstate's Document Requests (Exhibit D), Request Nos. 7, 8, 11, and 12; *see also* MIC's Initial Disclosures, Exhibit E hereto. MIC has yet to produce any of the requested disclosure.

22.    Interstate otherwise disputes MIC's core contention that Interstate was obligated to purchase a barge of methanol from MIC at the price of $2.55 per gallon based on the parties' oral and written communications. MIC initially proposed on December 4, 2007 that it could

supply a barge of methanol for Interstate "loading Dec. 20 or later." *See* Cirillo Aff. (Ex. A) ¶¶ 4, 5. On December 13, 2007, MIC modified its proposal by stating that it could not deliver a barge of methanol to Interstate anytime before December 24, 2007 because that was when MIC "had a vessel coming in" with methanol; MIC otherwise made no commitment as to when delivery could and would in fact take place. *See* Cirillo Aff. (Ex. A) ¶ 15. Five days later, on December 18, 2007, Interstate explained to MIC that it could not take delivery of a barge which had yet to be loaded -- and which MIC represented it could not have loaded until sometime after December 24, 2007 at the earliest -- because of the delay in OGC receiving approval from the U.S. Coast Guard and the U.S. Department of Homeland Security for its new biodeisel facility on the Ohio River where the barge was to be delivered. *See* Cirillo Aff. (Ex. A) ¶¶ 16, 17. Interstate had no other place to put the barge. *See* Puntureri Aff. (Ex. B) ¶ 21. Based on industry practice, OGC's inability to take delivery of a barge of methanol that had yet to be loaded should have relieved Interstate from any obligation to pay for the barge. *See* Cirillo Aff. (Ex. A) ¶ 18; Puntureri Aff. (Ex. B) ¶¶ 3-7; 20; April 10, 2008 Affidavit of Rich Jukiewics, Exhibit F hereto ¶¶ 4-5; April 14, 2008 Declaration of Edward Swinderman, Exhibit G hereto ¶¶ 6-9.

WHEREFORE, based on the points and authorities set forth in Interstate's Memorandum of Law, MIC's Motion for summary judgment should be denied as there are several disputed issues of material fact concerning: (a) what terms were included in the parties' alleged agreement; (b) whether Interstate's inability to take delivery of the proposed barge was excused based on industry practice; (c) the credibility of MIC's core contention that it "reserved in its inventory" the barge of methanol for Interstate based on the parties December 4, 2007 communications; and (d) MIC's alleged "prompt efforts to mitigate," and its claimed right to recover from Interstate the difference

between the market price of methanol on December 4, 2007 and the price at which it sold a barge

of methanol to Tauber sometime after December 24, 2007.

Interstate also respectfully requests such other and further relief as this Court deems just

and proper.

Dated: New York, New York
       April 14, 2008

SIMON•LESSER PC

By: _____
     Leonard F. Lesser, Esq.
     420 Lexington Avenue
     New York, New York 10170
     T:212.599.5455
     F:212.599.5459
     llesser@simonlesser.com

Attorneys for defendant Interstate Chemical
Corporation

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MITSUBISHI INTERNATIONAL CORPORATION,<br><br>Plaintiff,<br><br>-against-<br><br>INTERSTATE CHEMICAL CORPORATION,<br><br>Defendant. | 08 Civ. 00194 (JSR)(GWG)<br><br>**<u>AFFIDAVIT</u>** |

STATE OF PENNSYLVANIA   )
                        ) ss.:
COUNTY OF ALLEGHENY      )

Lori Cirillo, being sworn deposes and says:

1.      I am the Director of Chemical Procurement at Interstate Chemical Corporation ("Interstate"). I have personal knowledge of the facts set forth below.

2.      I submit this affidavit to correct some inaccuracies contained in the Affidavit of Zack Ferguson-Steger of Mitsubishi International Corporation ("MIC").

3.      In connection with the anticipated transaction at issue in this lawsuit, I initially spoke with Mr. Ferguson-Steger on December 4, 2007 inquiring about the availability of a barge of Methanol for possible delivery in late December to Interstate's customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River.

4.      Mr. Ferguson-Steger stated that MIC could load a barge of Methanol from barge loading facility in St. Rose, Louisiana on the Mississippi River, but could not commit to any

specific delivery date, which was in line with Interstate's requirements as I had yet to receive confirmation from OGC that it could accept a Methanol barge at its new biodeisel facility.

5.    Following that oral discussion, Mr. Ferguson-Steger sent his e-mail to me dated December 4, 2007 at 4:04 p.m. confirming his oral advice that MIC could load a barge of 10mb of Methanol at the then market price of $2.55 per gallon "loading Dec. 20 or later."

6.    This "or later" cautionary language was critical as MIC would not and did not commit to load on a specific date, nor did I on behalf of Interstate commit to a specific delivery date. Rather, MIC simply stated that a barge could be available for Interstate's purchase sometime after December 20, 2007.

7.    The next day, December 5, 2007, Mr. Ferguson-Steger sent me a proposed contract document for this transaction and asked that I sign it and fax it back to him.

8.    I did not do so as the document contained many terms that were materially different than those we discussed the day before, and also included one-sided terms in MIC's favor that were inconsistent with Interstate's prior dealings with MIC, and inconsistent with industry practice in general.

9.    Most critically, the proposed contract document had a firm delivery date of "December 20th, 2007," which was materially different from my oral discussion with Mr. Ferguson-Steger and his December 4, 2007 e-mail advising that MIC was prepared to deliver a barge loading sometime "December 20 or later."

10.    Even in his Affidavit, Mr. Ferguson-Steger is inconsistent on the delivery terms he now claims were included in alleged "agreement" created by our December 4, 2007 oral discussion. In one sentence he asserts that his proposed contract document with a Shipment term of "December 20th, 2007" was the delivery term we agreed to. *See* Ferguson-Steger Aff. ¶ 8.

2

Yet in another sentence, he says that the delivery term was just sometime "in December 2007."
*See* Ferguson-Steger Aff. ¶ 21.

11.     However, neither inconsistent claim correctly reflects our oral discussion wherein
Mr. Ferguson-Steger just advised that MIC was prepared to deliver a barge loading sometime
"December 20 or later."

12.     The proposed contract also had a one-sided force majure clause excusing MIC's
performance "for any cause beyond its reasonable control." While it is industry custom to
relieve both a buyer and seller of their obligations under a spot purchase of bulk chemicals for
any cause beyond their reasonable control, it is most certainly not permissible for only one party
to the transaction to have the benefit of such relief.

13.     The proposed contract also contained an arbitration clause requiring arbitration in
New York City for any dispute over the transaction. I never agreed to this, nor did MIC.

14.     In his Affidavit, Mr. Ferguson-Steger acknowledges that I did not sign or
otherwise agree to the terms of the proposed contract he transmitted to me on December 5, 2007.
Instead, he says the document "contains the same material terms MIC and Interstate agreed to the
day before." *See* Ferguson-Steger Aff. at ¶ 8. As I've shown, that is not accurate.

15.     On Thursday, December 13, 2007, Mr. Ferguson-Steger called me to say that
MIC could not deliver a barge of Methanol anytime before December 24, 2007 because that was
when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with Methanol.

16.     The following Tuesday, December 18, 2007, I received word from Al Puntureri,
President of Interstate, that OCG could not take delivery of a barge of Methanol because of a
delay in receiving Coast Guard/Homeland Security approval for its new biodeisel facility on the
Ohio River where the barge of Methanol was to be delivered.

17.     Mr. Puntureri instructed me to immediately inform MIC of this fact, which I did by e-mail the morning of December 18, 2007, which was just ten (10) business days after my initial oral discussion with Mr. Ferguson-Steger on December 4, 2007.  My advice to Mr. Ferguson-Steger on December 18 was well before MIC loaded the barge with the Methanol it now claims "it reserved in its inventory" for Interstate.  *See* Ferguson-Steger Aff. at ¶ 18.  It was also a week before MIC even had the ability to deliver any Methanol to Interstate according to what Mr. Ferguson-Steger told me on December 13.

18.     Based on the industry practice and my prior dealings with Mr. Ferguson-Steger, my advice to him on December 18, 2007 concerning OCG's inability to take delivery of a Methanol barge should have relieved Interstate from any obligation to pay MIC for a barge that had yet to be loaded and which was only supposed to be first loaded sometime "December 20 or later."

19.     Instead, Mr. Ferguson-Steger sent me a series of e-mails that threatened to sue Interstate for purported damages.  MIC then followed that threat with this lawsuit.

*Lori Cirillo*
Lori Cirillo

Sworn to before me this
11th day of April, 2008

*Jeanne M Zacherl*
Notary Public

```
          NOTARIAL SEAL
        JEANNE M ZACHERL
          Notary Public
  CITY OF HERMITAGE, MERCER COUNTY
   My Commission Expires Apr 29, 2008
```

4

# <u>Exhibit B</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,    | 08 Civ. 00194 (JSR)(GWG)

                                  Plaintiff,

                 -against-    | **AFFIDAVIT**

INTERSTATE CHEMICAL CORPORATION,

                                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF PENNSYLVANIA    )
                               ) ss.:
COUNTY OF ALLEGHENY    )

       Albert R. Puntureri, being sworn deposes and says:

       1.      I am the President of Interstate Chemical Corporation ("Interstate"), defendant in this action. I have personal knowledge of the facts set forth below.

       2.      I founded Interstate in 1968, and since that time, it has become a preeminent chemical manufacturing and distribution company.

       3.      During my forty (40) years in chemical procurement, I have had substantial experience in contract and "spot" business arrangements both as purchaser and seller.  I also have experience in trading activity where barges of chemicals such as Methanol are either purchased from producers or broker/traders or sold to end customers or other broker/traders.

       4.      During my forty (40) years of experience in the industry, I have witnessed the cancellation of orders placed by both contract and "spot" customers on a regular basis either by the seller or purchaser.  Such cancellations have been the result of lack of inventory, lack of

delivery equipment, force majure, change in requirement needs, or sometimes, even no express reason at all.

5.    On many occasions, Interstate has ordered bulk chemicals from suppliers who canceled the orders without reason and without recourse to Interstate.

6.    It is also industry practice to include as a term in a chemical procurement transaction a broad force majure understanding wherein both buyer and seller may cancel the order for any cause beyond their reasonable control.

7.    Such cancellations are common place in the chemical industry given the dangerous nature of the products, and increased regulation in the industry.  Anytime a broker or customer places an order but is unable to accept delivery for any reason beyond its reasonable control, it is industry practice to permit cancellation of the order without penalty so long as the cancellation takes place before the chemicals have been loaded onto the truck, tank car, or barge and shipped.

8.    I have read the Complaint filed by plaintiff Mitsubishi International Corporation ("MIC"), and the Affidavit of its marketing manager, Zack Ferguson-Steger in support of its Motion for Summary Judgment, and believe that MIC's position is over zealous, at best, and flies in the face of industry practice.

9.    On December 4, 2007, Mr. Ferguson-Steger and Interstate's Director of Chemical Procurement, Lori Cirillo, had an oral discussion wherein Ms. Cirillo inquired about the availability of a barge of Methanol for possible delivery in late December to its customer Owensboro Grain Company, LLC ("OGC"), in Owensboro, Kentucky for its new biodeisel plant on the Ohio River.

10.    Following that oral discussion, Mr. Ferguson-Steger confirmed by his e-mail dated December 4, 2007 at 4:04 p.m. that MIC could deliver a barge of 10mb of Methanol at the then market price of $2.55 per gallon "loading Dec. 20 or later."

11.    By stating that MIC could offer a barge of Methanol "loading Dec 20 or later," MIC was only confirming that it could ultimately supply Interstate with the Methanol barge, although without a firm commitment as to when it would be available for actual shipment.

12.    I understand from Ms. Cirillo that on Thursday, December 13, 2007, Mr. Ferguson-Steger called to tell her that MIC could not deliver a barge of Methanol anytime before December 24, 2007 because that was when MIC "had a vessel coming in" to MIC's facility in St. Rose, Louisiana with Methanol.

13.    The following Tuesday, December 18, 2007, I was informed by OCG that it could not take delivery of the barge of Methanol because of a delay in receiving approval from the U.S. Coast Guard and the U.S. Department of Homeland Security for its new biodeisel facility on the Ohio River where the barge of Methanol was to be delivered.

14.    I immediately instructed Ms. Cirillo to inform MIC of this fact, which she did the morning of December 18, 2007, which was within ten (10) business days after her December 4, 2007 oral discussion with Mr. Ferguson-Steger.

15.    Even more important, Ms. Cirillo's advice to Ferguson-Steger was before MIC loaded the barge with the Methanol it now claims "it reserved in its inventory" for Interstate. *See* Ferguson-Steger Aff. at ¶ 18.

16.    It appears from Exhibit D to its Complaint that MIC is claiming that the Methanol it purportedly "reserved in its inventory" for Interstate was sold to Tauber Petrochemical Company ("Tauber"), which is a chemical broker based in Houston, Texas.

3

17.    That transaction reflects a sale of 10mb of Methanol for delivery sometime between December 21, 2007 and January 10, 2008. No evidence has been submitted by MIC reflecting if and when the delivery actually occurred, or where and to whom it was delivered. Indeed, based on Mr. Ferguson-Steger's advice to Mr. Cirillo on December 13, 2007, MIC was not in a position to deliver any Methanol out of St. Rose, Louisiana before Christmas.

18.    Nor has MIC submitted any evidence establishing this so-called "reservation of inventory" that MIC made as a result of the December 4, 2007 communications between Ms. Cirillo and Mr. Ferguson-Steger.

19.    It is my understanding that MIC is a bulk trader of chemicals and other products. With respect to Methanol, it is my understanding that MIC produces Methanol in Venezuela, and also purchases Venezuelan Methanol from importers such as Metcall LLC. MIC then stores the Methanol in its facilities for resale to brokers, distributors, and direct customers. Without submitting evidence as to MIC's purchasing and storage activity, I have no way of addressing the credibility of MIC's claimed "reservation of inventory" for Interstate. This is especially true in light of Mr. Ferguson-Steger's statement to Mr. Cirillo on December 13, 2007 that MIC was not in a position to deliver any Methanol out of St. Rose, Louisiana before December 24, 2007 because that was when they first "had a vessel coming in" with Methanol. Interstate has requested such information from MIC, which has yet to be produced.

20.    In any event, based on the industry practice I explained above, OCG's inability to take delivery of the barge of Methanol should have relieved Interstate from any obligation to pay for a barge that had yet to be loaded by MIC and, that MIC had only committed to making available "December 20 or later."

4

21.    Instead, MIC decided to sue Interstate because of its inability to take possession

of a Methanol barge yet to be loaded with no place to put it.  Interstate's customer OGC was

unable to take possession of the barge due to the delayed Coast Guard/Homeland Security

approval of its new biodiesel facility.  Interstate had no other place to store the barge of

Methanol.

22.    MIC also now claims that it is entitled to recover from Interstate the price

difference between the market price on December 4, 2007 and the price it sold a Methanol barge

to Tauber.

23.    According to Mr. Ferguson-Steger's Affidavit, the price paid by Tauber was

$2.05 per gallon which was "the highest price [MIC] could get" and which "MIC was forced to

accept." *See* Ferguson-Steger Aff. at ¶¶ 18, 19.

24.    However, industry market reports reflect that the market price for a "US Spot"

barge of Methanol for the last two week of December, 2007 was between $2.52 per gallon and

$2.33 per gallon.  I have attached hereto a copy of the Global Methanol Report issued by Jim

Jordan & Associates ("JJ&A"), the leading market analysis and intelligence provider to the

Global Methanol, Ethanol & Transportation Fuels Industries which reflect such market prices.

25.    It is my belief that MIC and Tauber had an existing relationship, and that the price

paid by Tauber for the barge in question was not at market price, but at a favorable rate in

consideration for other business between the companies.

5

26.    Despite our requests, MIC has failed to produce any documents or correspondence concerning its purported efforts to obtain a market price for a barge of Methanol on or after the morning December 18, 2007, when Ms. Cirillo informed Mr. Ferguson-Steger of Interstate's inability to take delivery of a barge.

_Albert R. Puntureri_
Albert R. Puntureri

Sworn to before me this
11th day of April, 2008

_Jeanne M Zacherl_
Notary Public

NOTARIAL SEAL
JEANNE M ZACHERL
Notary Public
CITY OF HERMITAGE, MERCER COUNTY
My Commission Expires Apr 29, 2008

6



# Global Methanol Report

## JIM JORDAN & ASSOCIATES, LLP        December 21, 2007    ISSUE 239

### Global Prices

Jim Jordan
Marybeth Maloy Gebauer
Etienne Dor
Bob Starkey
Dexter Miller
Shameek Ghosh

**JJ&A USA:**
12941 North Freeway
Suite 226
Houston, TX 77060  USA
Tel:  281-877-7009
Fax: 281-877-7267
www.jordan-associates.com
info@jordan-associates.com

**JJ&A Europe:**
Brussels, Belgium
+32 10 45 42 81
etienne.dor@skynet.be

| North America | DECEMBER CPG | DECEMBER US $/mt | | | NOVEMBER CPG | NOVEMBER US $/mt |
|---|---|---|---|---|---|---|
| US Contract Index - range | 245-280 | 815-931 | ↑ | index range | 195-205 | 649-682 |
| US Contract Index - wtd avg | 257.5 | 856 | ↑ | index wt avg | 199 | 662 |
| Methanex - US MNDRP | 250 | 832 | ↑ | | 200 | 665 |
| SCC - US MPP | 280 | 931 | ↑ | | 205 | 682 |
| US Spot   GC barge | | | | | | |
| Wk Dec 21 | 233.00-235.00 | 775-782 | ↔/↓ | Wk Nov 30 | 260.00-270.00 | 865-898 |
| Wk Dec 14 | 233.00-252.00 | 775-838 | | Wk Nov 23 | 275.00-280.00 | 915-931 |
| Wk Dec 07 | 245.00-260.00 | 815-865 | | Wk Nov 16 | 280.00-285.00 | 931-948 |
| | | | | Wk Nov 09 | 285.00-295.00 | 948-981 |
| | | | | Wk Nov 02 | 255.00-265.00 | 848-881 |
| | | | | spot wtd avg | 276.6 | 920 |
| Truck/Railcar terminal postings | CPG | US $/mt | | | CPG | US $/mt |
| FOB US GC | 287.00-295.00 | 955-981 | ↑ | | 222.00-260.00 | 738-865 |
| FOB US NE | 287.00-295.00 | 955-981 | ↑ | | 222.00-240.00 | 738-798 |
| FOB US SE | 287.00-290.00 | 955-965 | ↑ | | 222.00-240.00 | 738-798 |
| FOB US MW | 300.00-308.00 | 998-1024 | ↑ | | 235.00-245.00 | 782-815 |
| Ashland - Chicago net benchmark | suspended | suspended | | | 237.00 | 788 |
| Ashland - FOB GC net benchmark | suspended | suspended | | | 222.00 | 738 |
| SCCD - Distribution price  FOB terminal | 305.00 | 1014 | ↑ | | — | — |
| Methanex - W Canada distributor | CAD $932/mt | US$936 | ↑ | | CAD $765/mt | US$792 |
| US Natural Gas | | $/MMBtu | | | | $/MMBtu |
| 'Inside Ferc' | Houston Ship Channel | 6.87 | | | | 6.92 |
| Nymex, front month | COB Dec 20 | 7.137 | | | | |
| Asia | CPG | US $/mt | | | CPG | US $/mt |
| China, CFR (notional) | 132-135 | 440-450 | ↓ | | 135-150 | 450-500 |
| SE Asia, CFR (notional) | 168-171 | 560-570 | ↓ | | 162-183 | 540-610 |
| Taiwan, CFR (notional) | 168-171 | 560-570 | ↓ | | 165-180 | 550-600 |
| Korea, CFR (notional) | 171-174 | 570-580 | ↓ | | 168-186 | 560-620 |
| Methanex AP Contract | 216 | 720 | ↑ | | 186 | 620 |
| Europe | €/mt | US $/mt | | | €/mt | US $/mt |
| Contract -      Q4 2007 | 380 | 546 | ↑ | | 380 | 551-563 |
| Methanex (MEPCP) Q4 2007 | 390 | 560 | ↑ | | 390 | 566-578 |
| Spot FOB Rdam T2, nominal | 480-505 | 690-725 | ↓ | | 500-540 | 725-791 |

**Inside This Issue -**

Global production          2-3
update & price
snapshot

Americas update          3-5

Europe market              6
update

Asia market update        7

US natural gas              8
update

©Copyright 2003-2007
Jim Jordan & Associates, LLP
All Rights Reserved

Currency: $1 USD = € 0.6961; GBP 0.504; JPY 113.97; CNY 7.3685; CAD $0.995; BRL 1.789; MX peso 10.821

Case 1:08-cv-00194-JSR    Document 27-2    Filed 08/26/2008    Page 21 of 50



**World Methanol Prices**

| US Dec Contract Postings | | |
|---|---|---|
| | cpg | $/mt |
| Methanex | 250.00 | 832 |
| SCC | 280.00 | 931 |

| US Nov Contract Postings | | |
|---|---|---|
| Methanex | 200.00 | 665 |
| SCC | 205.00 | 682 |

| JJ&A US Contract Index | | |
|---|---|---|
| Nov | 199.00 | 662 |

| US Spot - FOB GC | | |
|---|---|---|
| | cpg | $/mt |
| current month | 233.00-235.00 | 775-782 |
| Trend: down | | |

| Europe Spot - FOB T2 | | |
|---|---|---|
| | €/mt | $/mt |
| Rotterdam | 480-505 | 690-725 |
| Trend: down | | |

| Europe Contract | | |
|---|---|---|
| Q4 2007 | 380 | 546 |

| Methanex Posted Contract Price | | |
|---|---|---|
| Q4 2007 | 390 | 560 |

| Asia Spot | | |
|---|---|---|
| China FOB* | 530-560 | $/mt |
| China CFR | 440-450 | $/mt |
| SE Asia CFR | 560-570 | $/mt |
| Taiwan CFR | 560-570 | $/mt |
| Korea CFR | 570-580 | $/mt |

Trend: downward pressure

\* Not all China FOB export product meets IMPCA specifications

| Methanex A-P Contract | | |
|---|---|---|
| December | 720 | $/mt |
| November | 620 | $/mt |

| India - CFR WC | |
|---|---|
| cpg | $/mt |
| 165-171 | 550-570 |

## Global Production Update

### Americas

In **Chile**, 3 plants totalling about 3 million MT per were down from early June through November due to natural gas constraints. Through November, we estimate that Chile volume lost this year exceeds 1.4 million metric tons. There is no speculation on how much gas will be available and how soon from Chile. Nothing has changed with the Argentina situation, but hopes for any significant gas from that country anytime soon appear to be fading.

### Europe/Middle East/Africa

In the **Netherlands**, the BioMCN unit has rescheduled its 5-7 day shutdown for some bio-unit tie-in work to early next year.

In the **Middle East** and **Africa**, a number of planned outages have been delayed. The Atlantic Methanol plant in Equatorial Guinea has delayed its planned outage of approximately 10 days to some time in the 1st quarter of 2008. The outage will include the installation of a new compressor which is expected to increase capacity from approximately 1 million MT/year to 1.15 million.

In **Algeria**, the ENIP Arzew plant (120kTpa) suffered an explosion earlier in November and force majeure conditions were declared. Production is planned to be restarted end-December/early January.

### Asia

The 600 KTA methanol plant at Hainan Island in **China** experienced an unexpected shutdown in early November. It is expected to restart late December or early January. In **Indonesia**, KMI has postponed its planned November outage of the 660 KTA plant until January 7th when the plant will be taken down for a planned 3 weeks.

**JJ&A  Global Methanol Report**  |  **December 21, 2007**  |  **Issue 239**  |  **Page 3**

## Global Snapshot

Things heated up in **Europe** this week as many consumers began insisting that the Q1 contract be settled at a number below the €500/MT level.  In support of this position, one major consumer/producer made numerous spot sales at €480/MT in a market that most observers believed was above €500/MT.  Ultimately, it appears that buyers prevailed with several consumers agreeing with one producer at €490 and at least one other producer accepting that level.  More details on this situation will be discussed in the Europe market section of this report.



**Global Methanol Spot Prices**

The **US** market was very quiet this week in the pre-holiday period.  Many market players were more focused on holiday activities than the market and the period from now through January 1st most likely will be very dull with more focus celebrating the Holidays.  As many had anticipated, Methanex notified customers on Wednesday, that the company is rolling its Methanex Non-discounted Reference Price (MNDRP) at 250 cpg ($831.50/MT) for January.  Thus far, Southern Chemical has not notified the market of their intentions.  The direction of spot pricing is down although the market was relatively quiet this week.

In **Asia**, markets were quiet this week, but sentiment is down as buyers say spot methanol is becoming more available at prices that continue to favor buyers.  Most markets saw spot prices erode this week between $10 and $20/MT.

## North America Update

We completed our calculation for the December contract index price this week.  The range was quite wide, with sellers reporting numbers as low as 245 cpg ($815/MT) up to the high end of 280 cpg ($931/MT).  Our weighted average for the month is 257.5 cpg ($856 per MT) up a sizeable 58.5 cpg ($195 per MT) from November.  Spreads such as we see this month can create multiple problems for buyers and sellers.  Newsletter indexes are likely to be wide ranging.  Our index is well above some posted prices.  Others likely will be as well.  Will 'meet competition



**US Methanol Spot & Contract, TX Gulf Coast**

clauses' be imposed?  Will contracts that are indexed have to be modified or at least exceptions granted? These are confusing times and when producers see the market so differently, it does create unusual circumstances.

Case 1:08-cv-00194-JSR    Document 27-2    Filed 08/26/2008    Page 23 of 50

*North America Update, continued*

The US market showed further signs of softness this week and consumers continue to comment that they believe the worst is over. Most were not at all surprised that Methanex held the MNDRP at 250 cpg for January, but most consumers believe that future months will see declining prices. The Southern Chemical price for December is 280 cpg ($931/MT). Southern commented they will announce their price ideas for January next week. News that the European market appears headed for a €490 (214 cpg) settlement for Q1 will have US buyers pressing hard for prices that do not put them at a competitive disadvantage with their competitors in Europe. There is no way producers will drop US prices that much for January, but later in the quarter, the pressure will be on from consumers.

The continuing demise of the housing industry cannot be ignored as a possible precursor to recession in the US. Housing starts for single family homes are at the lowest level in 16 years. Starts in November were down 24 percent from November of last year. This is getting very serious. While the numbers of starts do not tell the entire story, they cannot be ignored. The average home size is going up and homes today contain more formaldehyde resins based products than in the early 1990's so fewer homes contain more formaldehyde, but the magnitude of the decline still has an almost unprecedented impact on those formaldehyde and acetic acid



**U.S. Privately-Owned Housing Unit Starts**

—●—U.S. Housing Starts (000) Units

based products that go into the housing industry. At this stage, it is questionable that the Fed can do much more to turn the situation around. Interest rates are certainly low enough that financing should not be a problem, but it is becoming more difficult to qualify for loans since many lenders have lost billions of dollars due to default on sub-prime loans that are coming due and decimating not only the lenders, but the homeowners that cannot afford to make the new (increased) payment amounts.

The methanol **spot** market was relatively quiet in the typical pre-Christmas/New Year holiday lull—but there was a steady flow of business conducted behind the scenes. Most of the attention was focused on January trading, although some residual December business was conducted as well. December prices generally consolidated towards the low end of last week's trading range, with general bid/ask ideas near 230/235 cpg ($765/782 per MT) for most of the week—although a few players were still holding selling offers as high as 240 cpg ($798). Firm selling offers in the low 230's failed to attract buying interest for most of the week. Light trade was confirmed within the aforementioned 230-235 cpg range on a private and confidential basis.

January spot prices were in a much wider range this week, as price ideas began to slip rather sharply week-on-week. Early in the week, bid/ask ideas were in a range of 210-220 cpg ($698-732), and several p+c deals were confirmed within this range. Sub-210 cpg January business was reported later in the week.

Case 1:08-cv-00194-JSR    Document 27-2    Filed 08/26/2008    Page 24 of 50

## US Methanol Imports

The latest trade data for October was released this week by the US Census Bureau.  As shown in the map below, we see the first shipment of methanol into the Columbia-Snake River Region of the Pacific Northwest (the result of the closure of Canadian methanol production).

### United States Methanol Trade 2007

IMPORTS in MT

| Country | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD 2007 | YTD 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Trinidad | 285,340 | 411,240 | 330,278 | 261,422 | 262,968 | 344,810 | 224,200 | 367,864 | 232,240 | 250,183 | | | 2,970,545 | 3,493,821 |
| Venezuela | 51,209 | 64,485 | 32,473 | 74,421 | 36,242 | 52,928 | 71,707 | 49,423 | 53,772 | 42,661 | | | 529,321 | 935,565 |
| Eq. Guinea* | 82,000 | - | 40,242 | 28,351 | 72,197 | 31,190 | 40,723 | 76,395 | 40,742 | 59,581 | | | 471,421 | 259,480 |
| Chile | 40,301 | 152 | 121 | 76,047 | 40,071 | 87,456 | 18,341 | 21,307 | 3,988 | 142 | | | 287,926 | 119,321 |
| Argentina | 33,295 | - | 41,648 | 15,227 | 24,464 | 11,848 | - | 4,721 | - | 31,736 | | | 162,939 | 178,209 |
| Bahrain | - | 5,246 | 14,989 | 5,318 | 9,995 | 10,057 | 12,304 | 6,095 | - | - | | | 64,004 | 54,980 |
| Canada | 15,215 | 13,181 | 10,927 | 11,540 | 1,266 | 11 | - | 85 | 33 | 229 | | | 52,487 | 306,970 |
| Russia | - | - | - | - | - | - | - | - | 11,450 | - | | | 11,450 | 51,109 |
| China | - | 92 | 106 | 67 | 330 | 57 | 359 | 193 | 441 | 1,751 | | | 3,396 | - |
| Other | 511 | | | 114 | 128 | 7 | 23 | 123 | 117 | 120 | | | 1,143 | - |
| TOTAL | 507,871 | 494,396 | 470,678 | 472,507 | 447,661 | 538,364 | 367,657 | 526,206 | 342,783 | 386,403 | | | 4,554,632 | 5,399,455 |



### US Methanol Imports - YTD OCT 2007

**Alaska**

| Canada | 1.0 |
|---|---|

**Seattle**

| Chile | 64.6 |
|---|---|
| Canada | 20.9 |
| Trinidad | 27.3 |

**Columbia-Snake**

| Trinidad | 8.5 |
|---|---|

**Great Falls**

| Canada | 24.3 |
|---|---|

**Pembina**

| Canada | 1.6 |
|---|---|

**Duluth**

| Canada | 3.4 |
|---|---|

**Detroit**

| Trinidad | 0.3 |
|---|---|
| Canada | - |

**Upstate NY**

| Trinidad | 38.3 |
|---|---|
| Canada | 0.8 |

**Maine**

| Chile | 1.2 |
|---|---|
| Canada | .3 |

**NY City**

| Venezuela | 112.0 |
|---|---|
| Bahrain | 23.7 |
| Trinidad | 5.3 |
| Russia | 1.7 |

**Wilmington**

| Trinidad | 303.3 |
|---|---|
| Bahrain | 13.0 |
| Venezuela | 0.0 |

**Charleston**

| Trinidad | 47.7 |
|---|---|
| Venezuela | 6.3 |

**Savannah**

| Trinidad | 81.7 |
|---|---|

**Virgin Isl.**

| Venezuela | 0.0 |
|---|---|

**Puerto Rico**

| Trinidad | 6.3 |
|---|---|

**US Methanol Imports YTD OCT 2007 (in KT)**

| | Oct 2007 | YTD 2007 |
|---|---|---|
| Total | 386.4 | 4,554.6 |

**Gulf Coast, TX/LA (port not specified)**

| Equatorial Guinea | 471.4 |
|---|---|

**Pt. Arthur, TX**

| Trinidad | 221.0 |
|---|---|
| Chile | 41.0 |

**Houston**

| Trinidad | 1,169.5 |
|---|---|
| Venezuela | 246.5 |
| Argentina | 162.9 |
| Chile | 81.3 |
| Bahrain | 27.2 |
| Russia | 9.7 |

**New Orleans**

| Trinidad | 953.2 |
|---|---|
| Venezuela | 164.3 |
| Chile | 86.0 |
| Bahrain | 0.0 |

**Mobile**

| Trinidad | 107.5 |
|---|---|
| Chile | 13.4 |

**JJ&A Global Methanol Report**     **December 21, 2007**     **Issue 239**     **Page 6**

## Europe Methanol Update

It was quite an interesting week on the European methanol scene. While the public positions of the various players did not demonstrate a lot of flexibility, negotiations seemingly blocked and opinions irreconcilable, behind the scene discussions and analyses showed no lack of determination and/or tactical creativity.

Producers' opinions bravely stuck behind their interpretation of the S/D situation, best summarised by "… improving but still dangerously stretched…" while consumers increasingly pointed to eroding spot prices in



all regions to back their claims for a contract price that by "all means" would have to be below €500 FOB Rotterdam.

Spot transactions recorded during the week indeed showed price erosion … but were also the subject of lots of criticism by many players as to their "validity". A December shipment was done at €505 FOB R'Dam and Jan/Feb transactions were done at €480 FOB. These transactions are confirmed, the buyers include consumer(s), producer(s) and the sellers are multiple: they fully qualify under the usual criteria for spot "postings", but are essentially the result of an unprecedented move by methanol consumer(s). Discouraged to consume high-priced methanol into the derivate sector, a consumer decided to offer unneeded product on the spot market. While the quantities are not negligible, it is not enough to solve the structural S/D short-falls. But these sales did influence the spot market which "otherwise" had been stable in the €520-525 range. If not accepted by all, many players were advocating that in essence this is "tactically" no different than producers buying, or "drying-up" the spot market to "achieve their goals". We can only say that **in both** cases we are far from the usual understanding of market operations where sellers **always** sell with the objective to MAXIMISE the price and buyers **always** buy to MINIMISE the price and both players negotiating within these rules (no different treatment depending on who the buyer/seller is).

Resulting from the above, the contract negotiations suddenly accelerated during the last days prior to the Christmas holidays. On Thursday, a major consumer publicly stated his frustration about the ongoing deadlock and threatened to harden his position if no solution could be found before January. On Friday morning Methanex announced their intention to post their MEPCP for Q1 at €525 FOB Rotterdam, below the publicly announced levels, but "around" what was understood to be the "negotiable position" of EQCP producers.

To many players it came as a surprise, but mid-Friday the announcements came out that agreements had been reached between several buyers and a producer for a Q1 EQCP at €490 ($712/MT) FOB Rotterdam. This was subsequently followed by more buyers and at least one more producer. Other producers prefered to "digest" the news before making their position known (but it will be difficult to generate another consensual number).

Similarly, Methanex has decided not to officially post a MEPCP before having had the time to make a full analysis of the market and will communicate with its customers within the next few days. If many are relieved by the fact that the holiday season can now really start, some will not be celebrating without some heartburn. The €490 contract number is clearly below what most producers anticipated, and we must say, also below what many consumers anticipated just 2-3 weeks ago.

Case 1:08-cv-00194-JSR    Document 27-2    Filed 08/26/2008    Page 26 of 50

## Asia Methanol Update

Consumers in Asia seem to be winning the waiting game as spot prices continued a steady downward trend again this week. Price ideas across the entire region softened this week as China sellers continued lowering their offers to attract buyers in Korea and elsewhere. News that multiple spot deals were getting done in Europe at €480 ($690/MT) encouraged buyers that global prices were declining and few bids were heard— and those that were bidding were only looking for "deals". Offers near the levels of last week received no interest whatsoever.

In **Southeast Asia,** no deals were reported, but sentiment was clearly down as most market participants were winding down for the holidays. Regional sellers continue to comment that the market is delicately balanced to short, but concede that buyers are no longer interested in spot numbers above the $550-$560 level. Most are covered on term contracts and closely watching inventories at year-end with the expectation that prices will fall further during the first quarter of next year. **Taiwan** was similarly quiet this week as no bids were heard and offers from China at numbers that would net $560-$565/MT on an FOB basis had no interest for consumers.

Buyers in **Korea** remained on the sidelines, expressing no interest in China offers of $540-$560 FOB China. Korea buyers are speculating that the Methanex contract price announcement for January will be down, in recognition of declining spot values and falling prices in China. **India** prices are nominally lower with little activity heard. Buyers appear to be adequately covered with contract volumes and prices continue under downward pressure with offers for export heard at around $550/MT FOB, but no buyers stepped forward as prices in Europe and the US continue to experience downward pressure. No buyer wants to commit at current prices, not knowing how far prices could fall before arrival at a potential customer location. Buyers are not interested in a declining market.

In **China** this week, it is more of the same. Local prices continue to fall with weak demand and export opportunities declining. There were some mixed signals this week as local prices were placed in a very wide range, between CNY 3300 and 3500, depending on the source. There is clearly some confusion and price ideas are quite different depending on the source and which day of the week. However, the trend is down and with the Lunar New Year holidays looming, sellers are hoping for a resurgence within the next 2 weeks; but buyers seem very scarce with demand still quite sluggish. Offers for export continue to be heard between $530 and $560 FOB and while some export sales are quietly being concluded, some sellers are concerned that when the Hainan Island plant re-starts (planned early January), there will be additional downward pressure on prices.

## JJ&A Holiday Publishing Schedule

JJ&A's offices will be closed December 24, 2007 through January 1, 2008. We will not be publishing a Global Methanol Report the week of December 24th in observation of the Holiday Season.

Our warmest thoughts and best wishes for a wonderful Holiday and Happy New Year.

Case 1:08-cv-00194-JSR    Document 27-2    Filed 08/26/2008    Page 27 of 50

## Natural Gas Snapshot

Near-month futures prices were relatively steady this week.  Since moving into front month position at the end of November, the January natural gas futures contract on the NYMEX has traded in an average range either side of $7.00-7.40 per MMBtu.  The January futures contract closed the report week Thursday at $7.137 per MMBtu, posting a week-on-week decline of $0.056 per MMBtu.

The 12-month natural gas futures strip on the NYMEX  (Jan 2008 — Dec 2008) closed the week Thursday at $7.588, posting a very slight week-on-week decrease of $0.016.  At $7.588, the 12-month strip was trading at a premium of $0.408 to the Henry Hub spot price.  The lowest priced contract over the next 12 months is the near-month January 2008 contract, which closed the week at $7.137 per MMBtu, as noted above.  The highest priced contract over the next 12 months is the December 2008 contract, which closed the week at $8.541 per MMBtu.  The average futures strip price for the remaining winter heating season contracts (Jan 2008 - March 2008) was $7.215 per MMBtu, which is down from the week-ago level of $7.284 per MMBtu.

Henry Hub spot prices were fairly steady this week, trading in a relatively narrow range.  The average Henry Hub spot price closed the week at $7.18, which was down $0.21 per MMBtu from last week's close.

The U.S. EIA's latest storage report for the week ending December 14th showed a 121 Bcf net withdrawal from underground storage, which was below average expectations for a 133 Bcf withdrawal.  Total gas in storage is now reported at 3,173 Bcf.  According to EIA data, this week's 121 Bcf withdrawal compares with  the 5 year average net withdrawal of 128 Bcf and the year-ago net withdrawal of 85 Bcf for the same report week.  The current level of gas in U.S. storage is now 4 Bcf (0.1 percent) less than last year's level of 3,177 and 266 Bcf (9.2 percent) above the 5-year average inventory level of 2,907 Bcf for the report week.



**U.S. Natural Gas & Crude Oil**
near-month futures

| U.S. Natural Gas Prices | | | | | |
|---|---|---|---|---|---|
| Benchmark | Dec 14 | Dec 17 | Dec 18 | Dec 19 | Dec 20 |
| Henry Hub cash | 7.09 | 7.07 | 7.16 | 7.18 | 7.18 |
| Jan futures contract | 7.025 | 7.035 | 7.141 | 7.179 | 7.137 |
| Feb futures contract | 7.153 | 7.176 | 7.278 | 7.299 | 7.237 |
| 'Inside FERC' - **Dec** | | | | | |
| Houston Ship Channel | 6.87 | | | | |
| Henry Hub | 7.21 | | | | |
| Chicago city-gates | 7.78 | | | | |
| U.S. national average | 6.87 | | | Natural Gas Prices in US $/MMBtu | |
| *TCPL Alberta, AECO-C# | 6.21 | | | *TCPL Alberta, AECO-C# prices are in Canadian$/GJ | |

| U.S. EIA Energy Price Outlook | | | | |
|---|---|---|---|---|
| | Year | | | |
| forecast as of *Nov 2007* | 2005 | 2006 | 2007 | 2008 |
| Crude oil; WTI, $/bbl | 56.49 | 66.02 | 71.36 | 80.00 |
| Natural gas; Henry Hub, $/mcf | 9.00 | 6.90 | 7.30 | 8.01 |

JJ&A



**U.S. Natural Gas In Underground Storage**
Billion Cubic Feet - Week ending December 14, 2007

Source: U. S. Energy Information Administration

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                              Plaintiff,

        -against-

INTERSTATE CHEMICAL CORPORATION,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)


**AFFIDAVIT**


STATE OF KENTUCKY  )
                   ) ss.:
COUNTY OF DAVIES   )

        Mark Carlisle, being sworn deposes and says:

        1.      I am the Vice President of Operations for the Owensboro Grain Company, LLC

("OGC").  I have personal knowledge of the facts set forth below.

        2.      OGC produces edible oils and soy products at its headquarters near the Ohio River

in western Kentucky.

        3.      In or about November, 2007, OGC began commissioning its new biodiesel plant.

The new biodiesel plant will have a capacity of some 50 million gallons of yearly biodiesel, and

is one of the largest biodiesel plants in the entire continental United States.

        4.      At that time, it was our intention to order a barge of methanol for use in the

biodiesel plant.

        5.      Given the size of the plant and its location on the Ohio River, before we could

accept delivery of a barge of methanol at the plant, OGC needed to obtain approvals from the

United States Coast Guard and from the United States Department of Homeland Security.  OGC

had previously submitted its Operations Manual and newly developed Security Plan to the Coast Guard.

6.      Although OGC had anticipated such approvals to be received by the end of 2007, to date, such approvals have not been received. As of today's date, the United States Coast Guard is still reviewing the Security Plan and considering Homeland Security issues that still prevents OGC from receiving methanol by barge at the plant.

7.      I understand that Interstate Chemical Company ("Interstate") placed an order with Mitsubishi International Corporation ("Mitsubishi") for a methanol barge to be delivered to us at the end of December, 2007. However, due to the delays in receiving approvals from the United States Coast Guard and the United States Department of Homeland Security, OGC was unable to receive that barge, and is still unable to receive it today.

Mark Carlisle

Sworn to before me this
10 th day of April, 2008

Notary Public

2

# __Exhibit D__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MITSUBISHI INTERNATIONAL CORPORATION,

                    Plaintiff,

        -against-

INTERSTATE CHEMICAL CORPORATION,

                    Defendant.

---

08 Civ. 00194 (JSR)(GWG)

**DEFENDANT'S FIRST SET
OF DOCUMENT REQUESTS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, defendant Interstate Chemical Corporation ("Interstate") demands that plaintiff Mitsubishi International Corporation ("Mitsubishi") produce for inspection, examination and copying the following documents and tangible things at the offices of Simon Lesser PC, 420 Lexington Avenue, New York, New York 10170, or such other location as the parties may designate, within thirty (30) days from the date of service hereof.

## RULES OF CONSTRUCTION

1.      These document requests are to be regarded as continuing to the extent set forth in Rule 26(e) of the Federal Rules of Civil Procedure, and Mitsubishi is required to provide supplementary responses in accordance with that Rule within ten (10) days of obtaining or becoming aware of additional information pertaining to these document requests.

2.      "Mitsubishi," "Plaintiff," and "you" means the plaintiff in this action, including all of its parents, affiliates, subsidiaries, officers, directors, employees, agents, and representatives.

3.     Mitsubishi is required in responding to these document requests to obtain and furnish all information that is in its possession or under its control, or in the possession or the control of any of its representatives, employees, agents, servants or attorneys.

4.     If any of the documents requested below are withheld under a claim of a privileged communication, you are requested for each such document withheld, to state that you are claiming a privilege thereof and the ground(s) on which said privilege rests, and to identify the document for which the privilege is claimed by specifying:

(a)     its title or other identifying data;

(b)     the identity of the author thereof, the parties thereto, and any person who assisted in its preparation;

(c)     the date of the document or if no date appears thereon, the approximate date;

(d)     the exact nature and substance of the document;

(e)     the identity of each person having possession, care, custody, or control of the original and any copies thereof; and

(f)     the identity of each person to whom the document's contents were disclosed.

5.     If any documents requested herein were, but no longer are in Mitsubishi's possession or subject to Mitsubishi's control, identify such documents and state what disposition was made of such documents.

6.     If any documents requested herein have been destroyed, or otherwise discarded, you are requested for each such document to state the reason for its destruction or

discard, identify the person(s) who authorized such destruction or discard, and identify the document by specifying:

      (a)    its title or other identifying data;

      (b)    the identity of the author thereof, the parties thereto, and any person who assisted in its preparation;

      (c)    the date of the document or if no date appears thereon, the approximate date;

      (d)    the exact nature and substance of the document;

      (e)    the identity of each person who had possession, care, custody, or control of the original and any copies thereof; and

      (f)    the identity of each person to whom the document's contents were disclosed.

7.    If any information or data is withheld because such information is stored only electronically, Mitsubishi shall identify such information by the subject matter of the information or data, the storage mode, and the place or places where such information is maintained.

8.    Each document request which seeks information relating in any way to communications to, from or within a business and/or corporate entity, is hereby designated to mean, and should be construed to include, all communications by and between representatives, employees, agents and/or servants of the business and/or corporate entity.

9.    No answer is to be left blank. If the response to the document request in none or unknown, the words "none" or "unknown" must be written and supplied as the

response. If the response to a document request is inapplicable, "n/a" must be written and supplied as the response.

10.    Unless expressly indicated otherwise, the time period covered by these document requests is January 1, 2004 through the trial of this action.

## DEFINITIONS

Interstate adopts, and Mitsubishi is directed to observe the uniform definitions for discovery requests set forth in subparagraphs (c) and (d) of Rule 47 of the Joint Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, in addition to the following definitions which are applicable to these document requests.

## DOCUMENT REQUESTS

1.    All documents concerning the "agreement" as alleged in the Complaint.

2.    All documents concerning any and all communications concerning the "agreement" as alleged in the Complaint.

3.    All written communications between Mitsubishi and Interstate.

4.    All documents concerning any and communications between Mitsubishi and Interstate.

5.    All documents concerning any and all transactions between Mitsubishi and Interstate prior to December 4, 2007.

6.    All documents concerning the allegation in ¶ 20 of the Complaint that "MIC was willing and able to deliver the methanol to Interstate. . . ."

7.    All documents evidencing the "prompt efforts to mitigate" as alleged in ¶ 21 of the Complaint.

4

8.    All written communications between Mitsubishi and Tauber Petrochemical Company since January 1, 2006.

9.    All documents concerning any and communications between Mitsubishi and Tauber Petrochemical Company since January 1, 2006.

10.    All documents concerning any and all transactions between Mitsubishi and Tauber Petrochemical Company since January 1, 2006.

11.    All documents concerning the price Mitsubishi paid for the Methanol it allegedly sold at $2.05 per gallon as alleged ¶ 27 of the Complaint.

12.    All documents concerning the allegation in ¶ 26 of the Complaint that "in reliance upon Interstate's promise, MIC reserved the barge of methanol in its inventory," including but not limited to any and all documents evidencing such "reservation."

13.    All documents, to the extent not produced in response to the foregoing Requests, that Mitsubishi will rely upon to support its claims or to rebut Interstate's Affirmative Defenses.

Dated: New York, New York
        March 19, 2008

SIMON LESSER PC

By:    _____
        Leonard F. Lesser, Esq. (LL-4054)
        420 Lexington Avenue
        New York, New York 10170
        t: 212.599.5455
        f: 212.599.5459
        Attorneys for defendant Interstate Chemical
        Corporation

5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                 Plaintiff,

    -against-

INTERSTATE CHEMICAL CORPORATION,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**NOTICE OF DEPOSITION**

      PLEASE TAKE NOTICE that pursuant to Rules 30 and 34 of the Federal Rules of Civil Procedure, defendant Interstate Chemical Corporation ("Interstate") will conduct the deposition of plaintiff Mitsubishi International Corporation ("Mitsubishi"), by one or more of its officers, directors, managing agents, employees or other persons whom it shall designate pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure as having the most knowledge concerning the matters set forth in Schedule A annexed hereto.

      The deposition will commence on April 30, 2008, beginning at 9:30 a.m. and continue from day to day until completed. The deposition will be stenographically recorded. The deposition will take place at the offices of Simon Lesser PC, 420 Lexington Avenue, New York, New York 10170. In addition, Mitsubishi is requested to provide the undersigned counsel, at least five (5) days before the deposition, with a written designation of the names and positions of each designee who will testify on behalf of Mitsubishi, and the subject matter categories set forth in Schedule A as to which each designee will testify.

You are invited to attend and cross-examine.

Dated: New York, New York
      March 19, 2008

                                 SIMON LESSER PC

                                 By: _____
                                      Leonard F. Lesser, Esq.
                               420 Lexington Avenue
                               New York, New York 10170
                               t: 212.599.5455
                               f: 212.599.5459
                               Attorneys for defendant Interstate Chemical
                               Corporation

## SCHEDULE A

## SUBJECTS OF INQUIRY

1.     The documents produced in response to Interstate's First Set of Document Requests, dated March 19, 2008.

2.     The allegations contained in the Complaint.

3.     All transactions between Mitsubishi and Interstate.

4.     All transactions between Mitsubishi and Tauber Petrochemical Corporation.

5.     The price Mitsubishi paid for the methanol it sold at $2.05 per gallon as alleged in ¶ 27 of the Complaint.

3

# __Exhibit E__

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MITSUBISHI INTERNATIONAL            :
CORPORATION,                              08 CV 00194(JSR)(GWG)
                                    :
                                          **PLAINTIFF'S INITIAL**
            Plaintiff,              :      **DISCLOSURES PURSUANT**
                                          **TO RULE 26(a)(1)**
            -against-              :
                                          ECF Case
INTERSTATE CHEMICAL CORPORATION,   :

                                    :
            Defendant.
------------------------------------X

        In accordance with Rule 26(a)(1), Fed. R. Civ. P., plaintiff
Mitsubishi International Corporation makes the following initial
disclosures:

A.    Name, address, and telephone number of each individual
      likely to have discoverable information that the disclosing
      party may use to support its claims or defenses, including
      subjects of the information:

      i.    Zack Ferguson-Steger
            Mitsubishi International Corporation
            655 Third Avenue
            New York, New York 10017
            (212) 605-2000

            Mr. Ferguson-Steger has knowledge of the circumstances
            surrounding the negotiation and confirmation of the
            agreement between Mitsubishi International Corporation
            and Interstate Chemical Corporation for the sale of a
            barge of methanol that is the subject of the complaint
            in this action, as well as Interstate Chemical
            Corporation's refusal to perform that agreement.

      ii.   Lori Cirillo
            Interstate Chemical Corporation
            2797 Freedland Road

Hermitage, Pennsylvania 16148
(724) 981-3771

Ms. Cirillo has knowledge of the circumstances
surrounding the negotiation and confirmation of the
agreement between Mitsubishi International Corporation
and Interstate Chemical Corporation for the sale of a
barge of methanol that is the subject of the complaint
in this action, as well as Interstate Chemical
Corporation's refusal to perform that agreement.

B.   Description by category and location of all documents, data
     compilations, and tangible things in possession, custody, or
     control of the party that the party may use to support its
     claims or defenses:

          Plaintiff has in its possession, custody or control the
          following documents:

               • Documents regarding the negotiation and
                 confirmation of the agreement between
                 Mitsubishi International Corporation and
                 Interstate Chemical Corporation for the sale
                 of a barge of methanol that is the subject of
                 the complaint in this action.

               • Documents detailing Interstate Chemical
                 Corporation's refusal to perform the
                 agreement that is the subject of the
                 complaint in this action.

               • Documents detailing Mitsubishi International
                 Corporation's attempts to mitigate the
                 damages caused by Interstate Chemical
                 Corporation's breach of the agreement.

               • Documents setting forth the spot price for
                 methanol during the dates relevant to the
                 action.

C.   Computation of any category of damages claimed by the
     disclosing party:

          Mitsubishi International Corporation has been damaged
          by defendant's breach in the amount of at least
          $210,000 plus interest.  This reflects the difference

2

between the purchase price of methanol agreed upon by the parties (420,000 gallons of methanol at $2.55 per gallon, or $1,071,000.00) and the price Mitsubishi International Corporation received on the spot market when it was forced to sell the barge of methanol it had been reserving for defendant in order to mitigate its damages (420,000 gallons of methanol at $2.05 per gallon, or $861,000).

D. Any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment:

On information and belief, there are no relevant insurance agreements.

Dated:     New York, New York
           March 19, 2008

KORNSTEIN VEISZ WEXLER & POLLARD, LLP

By:  Daniel J. Kornstein (DK - 3264)

757 Third Avenue
New York, New York 10017
(212) 418-8600

Attorneys for Plaintiff
Mitsubishi International Corporation

TO:  Leonard F. Lesser, Esq.
     SIMON LESSER PC
     420 Lexington Avenue
     New York, New York 10170
     Attorneys for Defendant
     Interstate Chemical Corporation

3

# Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                         Plaintiff,

     -against-

INTERSTATE CHEMICAL CORPORATION,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)


**AFFIDAVIT**

STATE OF OHIO              )
                             ) ss.:
COUNTY OF CUYAHOGA   )

      Rich Jukiewicz, being sworn deposes and says:

      1.     I am a Senior Purchasing Agent for Research Organics, Inc. ("Research Organics"). I have personal knowledge of the facts set forth below.

      2.     Research Organics is a primary manufacturer and leading worldwide supplier of high purity biochemicals for use in molecular biology, diagnostics, cell culture, pharmaceuticals, biopharmaceuticals, life sciences and biotechnology.

      3.     I have been involved as a commercial purchaser of chemical products for forty (40) years.

      4.     It is industry practice that purchase orders for chemicals be cancelled or changed on a frequent basis. Such cancellations frequently occur when end customers cancel their orders with us, causing a domino effect of having to cancel the order for material from our supplier and the end user is now unavailable.

5.    It is also industry practice for purchase orders to be cancelled as a result of *force majure*, such as when the end customer is unable to take the material as a result of government intervention, transportation issues, weather related issues, and other events that are beyond our control.

_____
Rich Jukiewicz

Sworn to before me this
10th day of April, 2008

_____
Notary Public

DIANN C. HARLAN
NOTARY PUBLIC-STATE OF OHIO
MY COMMISSION EXPIRES 7/2/11

2

# <u>Exhibit G</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                       Plantiff,

    -against-

INTERSTATE CHEMICAL CORPORATION,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**AFFIDAVIT**

STATE OF TEXAS       )
                       ) ss,:
COUNTY OF HARRIS   )

       Edward Swinderman says:

    1.     I am currently an independent contract in the Chemical Trading

Industry.  I have personal knowledge of the facts set forth below.

    2.     Previous to this and other entities, I retired in 2003 as the Methanol Business

         Manager for Lyondell Chemical.

    3.     Previous assignments with ARCO Chemical and Oxirane Chemical included

numerous duties in marketing and production.

    4.     During my 25 years of commercial experience with the firms mentioned above, I

         have experience

in contract and or spot business arrangements with numerous customers.

    5.     I also have experience in trading activity where barges of chemicals were either

purchased from producers or broker/trader or sold to end user customers or other broker/traders.

    6.     In my years of experience, I have witnessed cancellations of orders that

have been placed by both contract and spot customers on a regular basis.

7.    There cancellations have been as a result of

A:    lack of inventory

B:    lack of equipment

C:    force majeure

D:    change in requirement need

E:    no reason at all

Each of these cancellations that are commonplace in the Chemical Industry and most have occured without penalty.

8.    If a truck, tank car or barge is already loaded and shipped, then on occasion there is a charge for diverting the loaded equipment to another buyer.  Usually the freight differential that would be charged for the change of destination.

9.    Anytime a prospect or customer places an order and is unable to receive the material, for whatever reason, it is no uncommon practice to allow the cancellation without penalty to maintain good customer relations.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Edward Swinderman

4/14/08

Index No.: 08 Civ. 00194 (JSR)(GWG)                    Year 2008
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

MITSUBISHI INTERNATIONAL CORPORATION,
                        Plaintiff,

        -against-


INTERSTATE CHEMICAL CORPORATION,
                        Defendant.

---

## DEFENDANT'S LOCAL RULE 56.1(b) STATEMENT
## IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

---

**SIMON LESSER  PC**
Attorneys for Defendant
INTERSTATE CHEMICAL CORPORATION
Office and Post Office Address
**420 LEXINGTON AVENUE, SUITE 345-6
NEW YORK, NEW YORK 10170
(212) 599-5455**

---

**ATTORNEY'S CERTIFICATION**
STATE OF NEW YORK, COUNTY OF
The undersigned, an attorney admitted to practice in the State of New York, does hereby certify, pursuant to
Section 2105 CPLR, that I have compared the within
with the original and have found it to be a true and complete copy thereof.
Dated:                    20

**NOTICE OF ENTRY OR SETTLEMENT**
PLEASE TAKE NOTICE that an order
__ **NOTICE OF ENTRY**
of which the within is a (true) (certified) copy of a          duly entered in the office of the clerk of the within
named court on                    20
__ **NOTICE OF SETTLEMENT**
will be presented for settlement to the Hon.                        one of the judges of the within named Court, at
            on        20        at            o'clock  M.
Dated:                    20

**Dated: April 14, 2008**
**Signature Pursuant to 22 NYCRR 130-1.1** _____

                                        **Leonard F. Lesser, Esq.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MITSUBISHI INTERNATIONAL CORPORATION,

Plaintiff,

-against-

INTERSTATE CHEMICAL CORPORATION,

Defendant.

08 Civ. 00194 (JSR)(GWG)

**<u>DECLARATION</u>**

STATE OF OHIO                    )
                                 ) ss.:
COUNTY OF CUYAHOGA               )

Rich Jukiewicz, being sworn deposes and says:

1.      I am a Senior Purchasing Agent for Research Organics, Inc. ("Research Organics").

I have personal knowledge of the facts set forth below.

2.      I submit this Declaration to supplement my April 10, 2008 Affidavit in this case.

3.      I have not been retained or specifically employed by Interstate in this case, nor am I

an employee of Interstate.  I am not being compensated or paid for my testimony in this case.

4.      My April 10, 2008 Affidavit sets forth my conclusions concerning what I have

witnessed in the chemical procurement industry with respect to cancellations of orders.  I have

not considered any data or information other than what I have personally witnessed in the

industry over the past forty (40) years.  I have no "exhibits" to be used as a summary of or

support for the matters addressed in my April 10 Affidavit.  I have not testified as an expert at

trial or by deposition within the past four (4) years.

5.    My experience in the chemical procurement industry is as follow: from 1996

through the present, I have been Senior Purchasing Agent for Research Organics; from 1984

through 1996, I was the Senior Purchasing Agent for Loctite Corporation, Inc., which

manufactures a wide range of adhesives; from 1981 through 1984, I was a purchasing agent for

Sentinel Consumer Products; and from 1969 through 1981, I was a plant buyer of chemicals for

Sherman Williams Company.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: Cleveland, Ohio
          August 25, 2008

                                                    _____
                                                    Rich Jukiewicz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                        Plaintiff,

     -against-

INTERSTATE CHEMICAL CORPORATION,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**DECLARATION**

Edward Swinderman, hereby declares and states as follows:

1.     I am a Director of Perin Resources, LLC, an international and domestic chemical trading company. I have personal knowledge of the facts set forth below.

2.     I submit this Declaration to supplement my April 9, 2008 Declaration in this case.

3.     I have not been retained or specifically employed by Interstate in this case, nor am I an employee of Interstate. I am not being compensated or paid for my testimony in this case.

4.     My April 9 Declaration sets forth my conclusions concerning what I have witnessed in the chemical procurement industry with respect to cancellations of orders. I have not considered any data or information other than what I have personally witnessed in the industry over the past thirty (30) years. I have no "exhibits" to be used as a summary of or support for the matters addressed in my April 9 Declaration. I have not testified as an expert at trial or deposition within the past four (4) years. A copy of my resume is attached.

5.     From October 2003 through October 2005, I was employed by Jim Jordan & Associates, a market analysis firm, and developed a gasoline blendstocks weekly newsletter that presented worldwide supply and demand information, analysis of legislative impacts, weekly

pricing analysis, and perceived future problems/opportunities.  I also authored five multi-client

studies on ethanol, and five single-client studies on various topics.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: Houston, Texas
        August 25, 2008

Edward Swinderman

2

# Edward M. Swinderman, P.E.

**25510 Lyon Springs Court**
**Spring, Texas 77373**

281-528-9276
emswinde@yahoo.com

## OBJECTIVE

Sales and marketing position in the basic chemicals industry.

## SUMMARY

Successful sales/purchasing/marketing professional with proven track record in multiple chemical product areas. Strong analytical, contracting, negotiating, and organizational skills. From 1997-2003 the improved bottom line by over $13 MM. Received President's Club award in 1992 and 1996 for outstanding performance in sales and marketing. Successful start-up of four new companies in 2003-2007.

## PROFESSIONAL EXPERIENCE

**PERIN Reources, LLC,** Houston, Texas                    **2007-08**

    Independent Contractor

Chemical trading with primary emphasis on methanol and glycerin.

**BioSelect Fuels,** Houston, Texas                    **2006-07**

    Vice President-Sales

Assisted in the start-up of a grassroots biodiesel plant in Galveston, Texas. Developed and implemented an international sales and marketing plan when the domestic market netbacks became negative.

**Vertical North America,** Houston, Texas                    **2005-06**

    Senior Vice President

Responsible for developing fuel and industrial ethanol sales in North America. Exceeded yearly sales record in four months and generated profits exceeding $1.5 MM. Presented supply and demand scenarios at two OPIS conferences and the Nebraska Ethanol Board.

**Jim Jordan & Associates,** Houston, Texas                    **2003-05**

    Vice President-Fuels

Primary developer of a gasoline blendstocks weekly newsletter that grew to 32 clients in one year and 46 at the end of two years. This newsletter presents worldwide supply and demand information, analysis of legislative impacts, weekly pricing analysis, and perceived future problems/opportunities. Authored five multi-client studies on fuel ethanol and five single client studies on various topics. Revenues exceeded $220 thousand at the end of the first year and $240 and the end of year two. Presented papers at the National Ethanol Conference ant two. OPIS conferences.

**Southern Garrett, LLC,** Houston, Texas                    **2003**

    Vice President- Methanol Sales

Provided startup assistance of sales, marketing and business planning for a new methanol distribution company.
- Increased sales price by 2 ¢ per gallon on 40 MM gallon per year sales.

**Lyondell Chemical Company**, Houston, Texas                    **1978-2003**

### Business Manager – Methanol, Hydrogen and Heavy Fuels-(2000-2003)

Responsible for the P/L and marketing of Lyondell's 300MM gallon per year methanol business, 10 MM barrel per day heavy fuel business, and 25 MM SCF per day hydrogen business.
- Testified as an expert witness and developed the strategy in a methanol arbitration case that netted the company $8 MM out of a possible $8 MM.
- Improved netback on heavy fuels by 20-25¢ per barrel ($750 M per year).
- Participated in a Strategic Business Analysis of the methanol business and determined that the business could not be profitable past 2004. Negotiated with buyers to sell the contract list and prepare for exiting the business.
- Purchased 140 MM gallons per year of methanol for the MTBE business at a price lower than Lyondell's methanol sales price.

### Marketing Manager-Methanol, Butylenes, Alkylate, Hydrogen, MTBE-(1997-2000)

Responsible for product pricing, customer portfolio evaluation, contract development and negotiation, quality, and commercial development.
- Initiated process changes on a MTBE unit that realized savings of $1.5 MM per year.
- Increased revenue/margin of the hydrogen and butylenes sales by renegotiating contracts and selling to higher netback customers ($2.5-3.0 MM per year).
- Participated in the restructuring of the US methanol business (450 MM gallons per year).
- Additionally, this position had the management of the order entry and inventory control product specialists.

### Account Manager (Lyondell Petrochemical) – Petrochemical Sales-(1989-1997)

Responsible for the product development and sales of ethylene, propylene, butadiene, benzene, toluene, orthoxylene, dicyclopentadiene, methanol, and resin oil in the Northeast section of the country.
- Sales increased from $15 MM per year in 1989 to $65 MM per year in 1996.
- Received the President's Club Award in 1992 and 1996 for outstanding performance in sales and marketing.

### Methanol Product Manager-(1985-1987)

Responsible for the inventory, delivery, invoicing, and quality of methanol.
- Developed and administered tolls, storage agreements, and exchanges with customers and competitors to minimize logistics expenses.
- Provided market intelligence for pricing decisions.
- Made sales calls on customers to assist the sales manager with his high workload.

### Propylene Product Manager (Arco Chemical), (1985-1987)

Responsible for the inventory, delivery, invoicing, and quality of chemical grade, polymer grade, and refinery grade propylene.
- Negotiated a new refinery grade tolling contract that saved $2.5 MM per year.
- Developed project to debottleneck propylene splitter at an incremental profit of $2.5 MM per year.

### Manager of Contracts, (1983-1985)

Responsible for the purchasing of propylene, butadiene, toluene, and xylenes.
- Developed and negotiated a cogeneration project.

### Process Engineering Supervisor (Oxirane/Arco Chemical) (1978-1983)

Supervised five engineers who provided technical service to the production department.

**Amoco Chemicals**, Texas City, Texas                                    **1974-1978**

       Senior Process Engineer

Responsible for the process optimization of the styrene, polybutene, and Resin 18 units.
- Designed a forty percent expansion of the polybutene unit which reduced operating costs by $1 MM per year.


**Firestone Synthetic Rubber**, Orange, Texas                            **1971-1974**

       Production Engineer

Responsible for daily optimization and troubleshooting of the feed preparation area of a solution polybutadiene plant.
- Team leader for the training and startup of new feed preparation area.

**Shell Oil Company**, Deer Park, Texas                                  **1969-1971**

       Operations Engineer

Responsible for daily optimization and troubleshooting in the catalytic cracking department.


## EDUCATION

      Bachelor in Chemical Engineering, University of Dayton
      Masters in Engineering, Lamar University

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

                      Plaintiff,

    -against-

INTERSTATE CHEMICAL CORPORATION,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**DECLARATION**

STATE OF PENNSYLVANIA   )
                        ) ss.:
COUNTY OF ALLEGHENY    )

    Albert R. Puntureri, being sworn deposes and says:

    1.      I am the President of Interstate Chemical Corporation ("Interstate"), defendant in this action.  I have personal knowledge of the facts set forth below.

    2.      I submit this Declaration to supplement my April 11, 2008 Affidavit to make clear that that I do not regularly give expert testimony in my capacity as President of Interstate, and that I have never testified as an expert on behalf of Interstate or any other entity or individual.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Hermitage, Pennsylvania
       August 26, 2008

                                 _____
                                Albert R. Puntureri

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MITSUBISHI INTERNATIONAL              :
CORPORATION,                                      08 CV 00194(JSR)(GWG)
                                      :
        Plaintiff,
                                      :   **PLAINTIFF'S FIRST**
        -against-                         **REQUEST FOR**
                                      :   **PRODUCTION OF DOCUMENTS**
INTERSTATE CHEMICAL CORPORATION,
                                      :   ECF Case
        Defendant.
----------------------------------X

    PLEASE TAKE NOTICE that pursuant to Rule 34 of the Federal
Rules of Civil Procedure, and the applicable Local Rules,
plaintiff Mitsubishi International Corporation, by the
undersigned counsel, hereby propounds the following document
requests to defendant Interstate Chemical Corporation.  Defendant
shall produce the requested documents for inspection and copying
at the offices of Kornstein Veisz Wexler & Pollard, LLP, 757
Third Avenue, New York, New York 10017, within 30 days from the
date of service.  The Definitions and Instructions set forth
below constitute an integral part of these Document Requests.

## DEFINITIONS AND INSTRUCTIONS

    The following definitions, rules of construction, and
instructions shall apply to each of the requests set forth below.

1.    "Plaintiff" means Mitsubishi International Corporation
and, where applicable, any agents, employees, attorneys,
representatives, accountants, or any persons acting on behalf of
plaintiff.

2.    "Defendant" means defendant Interstate Chemical
Corporation and, where applicable, any agents, employees,
attorneys, representatives, accountants, or any persons acting on
behalf of defendant.

3.    The "Methanol" shall mean the 10 mb of methanol that
defendant allegedly agreed to purchase from plaintiff as set
forth in the complaint in this action.

4.    The definitions set forth in Local Rule 26.3 shall
apply to these requests, and Local Rule 26.2 shall govern
assertions of privilege.

5.    Unless otherwise indicated, these requests are meant to
include all documents dated or generated on or after November 1,
2007, up to the date of defendant's response to these requests.

6.    Documents shall be produced in a manner that reasonably
indicates which particular documents are being produced in
response to specific requests.

7.    The requirements of this demand for production of
documents are continuing in nature so as to require supplemental
answers if defendant discovers or obtains additional responsive
documents after the initial response to these requests.

2

DOCUMENT REQUESTS

1.   All documents and/or communications, electronic or otherwise, between plaintiff and defendant concerning the negotiation of the terms of sale of the Methanol.

2.   All documents and/or communications, electronic or otherwise, between plaintiff and defendant concerning any other aspect of the Methanol.

3.   All documents and/or communications, electronic or otherwise, between plaintiff and any third party concerning any aspect of the Methanol.

4.   All other documents and/or communications, electronic or otherwise, concerning the Methanol.

5.   All documents and/or communications, electronic or otherwise, concerning the price of methanol for the month of December 2007 including but not limited to any daily breakdown of the price of methanol during the month of December 2007.

6.   All other documents and/or communications, electronic or otherwise, from any date, regarding any defense asserted by defendant in this action based on plaintiff's responsibility to mitigate damages.

7.   All documents and/or communications, electronic or otherwise, regarding the "coast guard issue" referred to in Lori Cirillo's email message to Zack Ferguson-Steger dated December

3

19, 2007 and attached as part of Exhibit B to the complaint in this action.

8.    All documents and/or communications, electronic or otherwise, regarding the customer cancellation referred to in Lori Cirillo's email message to Zack Ferguson-Steger dated December 19, 2007 and attached as part of Exhibit B to the complaint in this action.

9.    All documents and/or communications, electronic or otherwise, from January 1, 2006 to the present, regarding defendant's ability and/or capacity to receive and store bulk methanol.

10.    All other documents and/or communications, electronic or otherwise, from any date, that defendant intends to rely upon to oppose plaintiff's claims or support any affirmative defenses in this action.

Dated:    New York, New York
          March 18, 2008


                    KORNSTEIN VEISZ WEXLER & POLLARD, LLP

                    _____
                    By:  Daniel J. Kornstein (DK - 3264)

                    757 Third Avenue
                    New York, New York 10017
                    (212) 418-8600

                    Attorneys for Plaintiff
                    Mitsubishi International Corporation

4

```
TO:   Leonard F. Lesser, Esq.
      SIMON LESSER PC
      420 Lexington Avenue
      New York, New York 10170
      Attorneys for Defendant
      Interstate Chemical Corporation
```

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MITSUBISHI INTERNATIONAL          :
CORPORATION,                             08 CV 00194(JSR)(GWG)
                                  :
          Plaintiff,
                                  :
                                        **PLAINTIFF'S FIRST**
          -against-                     **SET OF INTERROGATORIES**
                                  :
INTERSTATE CHEMICAL CORPORATION,         ECF Case
                                  :
          Defendant.
----------------------------------X

     PLEASE TAKE NOTICE that pursuant to Rule 33 of the Federal

Rules of Civil Procedure, and the applicable Local Rules,

plaintiff Mitsubishi International Corporation, by the

undersigned counsel, hereby requests that defendant Interstate

Chemical Corporation answer the following interrogatories fully

in writing and under oath within 30 days from the date of service

hereof.  The Definitions and Instructions set forth below

constitute an integral part of these interrogatories.

<u>DEFINITIONS AND INSTRUCTIONS</u>

     The following definitions, rules of construction, and

instructions shall apply to each of the interrogatories set forth

below.

     1.   "You," "your," and "defendant" means defendant

Interstate Chemical Corporation and, where applicable, any agents, employees, attorneys, representatives, accountants, or any persons acting on behalf of defendant.

2. "Including" shall be construed to mean "without limitation."

3. The definitions set forth in Local Rule 26.3 shall apply to these interrogatories, and Local Rule 26.2 shall govern assertions of privilege.

4. The requirements of these interrogatories are continuing in nature so as to require supplemental answers if defendant discovers or obtains additional responsive information after the initial answers to these interrogatories.

5. If the party answering these interrogatories is incapable of answering an interrogatory with the level of detail requested, the party shall provide all information that the party is capable of providing with respect to the subject matter of the interrogatory.

## INTERROGATORIES

1. Identify all individuals with knowledge of information relevant to the subject matter of this action.

2. Please provide and explain your computations of plaintiff's damages for the alleged breach of contract in this action, including your calculations supporting your claim that plaintiff did not adequately mitigate damages.

2

3.    Please: (i) list each category of documents you possess relevant to this action, including but not limited to pertinent insurance agreements, as well as other physical evidence or information of a similar nature; (ii) identify the custodian(s) of each category of documents; (iii) give the location of each category of documents; and (iv) provide a general description of the relevant documents in each category.

Dated:    New York, New York
          March 19, 2008


                        KORNSTEIN VEISZ WEXLER & POLLARD, LLP

                        By:  Daniel J. Kornstein (DK - 3264)

                        757 Third Avenue
                        New York, New York 10017
                        (212) 418-8600

                        Attorneys for Plaintiff
                        Mitsubishi International Corporation


TO:  Leonard F. Lesser, Esq.
     SIMON LESSER PC
     420 Lexington Avenue
     New York, New York 10170
     Attorneys for Defendant
     Interstate Chemical Corporation


                              3



# Mitsubishi International Corporation

655 Third Avenue, New York, NY 10017
Tel: (212) 605-2447     Fax: (212) 605-1058

December 5, 2007

To:    Interstate Chemical co.
Attn:  Lori Cirillo
Fax:   724-981-3675

RE:    Methanol Sales FOB StRose, LA, December 20, 2007

Dear Lori:

We are pleased to reconfirm the details of our sales transaction agreed on December 4, 2007 as follows:

| | |
|---|---|
| 1. Contract type | Sales |
| 2. Contract number | S-MeOH-1284 |
| 3. Seller | Mitsubishi International Corporation<br>655 Third Avenue<br>New York, NY 10017 |
| 4. Buyer | Interstate Chemical Co.<br>2797 Freedland Road<br>Hermitage, PA 16148 |
| 5. Product | Methanol in bulk |
| 6. Shipment | December 20th, 2007. Buyer to provide seller with a five (5) working days notice. Such notice to be received by 12.00 noon EST, any nomination received later will be considered next business day. |
| 7. Quality | As per ASTM D-1152-97 |
| 8. Delivery | FOB IMTT StRose, LA into buyer's nominated barge |
| 9. Volume | 10,000 bbls +/- 5% at buyer's option |
| 10. Price | Fixed and flat at $2.5500/gallon |
| 11. Payment | In US dollars, by wire transfer net thirty (30) days from B/L date into seller's designated account. |
| 12. Inspection | Inspection on both quality and quantity at seller's shore tank prior to the loading at the loading port carried out by an independent surveyor appointed by mutual agreement shall be taken as final. Inspector fees to be equally shared among all parties involved. |
| 13. Maritime conditions | as per charter party |
| 14. Public Terminal Clause | Barges loading at a public terminal are loaded on a first come first served basis only. Mitsubishi International will not be held responsible for any delays incurred due to dock congestion |



| 16. Incoterms | Incoterms 2000 and latest amendments are applicable, unless stated otherwise herein. |
| 17. Law | New York Law to govern this transaction. |
| 18. Others | Mitsubishi International Corp. General Terms and Conditions to apply where not inconsistent with the above. |

| 19. Contact for scheduling | Zack Ferguson-Steger<br>Tel 212-605-2419<br>Fax 212-605-1058<br>Email: zack.ferguson-steger@mitsubishicorp.com |

This confirmation constitutes the entire contract and represents our understanding of the terms and conditions of our agreement. We are pleased to have concluded this transaction with you. Any apparent discrepancies or omissions must be brought to our attention within the next two working days or are deemed waived.

## GENERAL TERMS AND CONDITIONS OF SALE

1.      **WARRANTIES:** Seller warrants only that the Goods conform to the description stated on the face hereof. **SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, OR ARISING UNDER LAW OR EQUITY OR CUSTOM OF TRADE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.** No agent, employee or representative of Seller has any authority to bind Seller to any affirmation, representation or warranty concerning the Goods not expressly included herein.

2.      **SOLE REMEDY; LIMITATION OF LIABILITY:** Seller's sole liability and Buyer's exclusive remedy in connection with the transaction(s) described on the face hereof will be replacement of any non-conforming goods or, at Seller's option, refund of all or a portion of the purchase price. **IN NO EVENT WILL SELLER BE LIABLE FOR, AND BUYER HEREBY WAIVES ANY RIGHT TO, ANY LOST PROFITS, LOSS OF USE, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED AND, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, WHETHER OR NOT EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.** Buyer shall confirm the accuracy of all shipments, as to the identity, quantity and quality of the Goods upon receipt. Buyer waives all claims of non-conformity with respect to the Goods or their shipment or delivery unless made in writing by Buyer to Seller, specifically stating the details of such non-conformity, within five (5) days after Buyer receives the Goods. Non-conforming goods may be returned to Seller only with prior notice by Buyer to Seller and with Seller's approval for such return. **Seller's liability shall in no event be greater in amount than the purchase price of the Goods in respect of which damages are claimed.** Any action by Buyer for breach of contract must be commenced within one (1) year after the cause of action has accrued.

3.      **TAXES; INCREASED COSTS:** Buyer shall pay all taxes, excises, fees or charges with respect to the sale or transportation of the Goods. Any increase in Seller's costs of performance after the date stated in the box marked DATE OF CONTRACT on the face hereof resulting from increased freight rates, increased or additional freight surcharges, additional taxes, duties, assessments or other charges imposed or collected by any governmental or taxing authority, increased insurance rates, and all other additional charges relating to the sale, loading, unloading, delivery, storage, and transportation of the Goods, shall be for Buyer's account.

4.      **SHIPMENT:** All shipment or delivery dates are approximate. The date of the bill of lading shall constitute conclusive evidence of the date of shipment. Partial shipment and/or transshipment shall be permitted. No non-conforming tender, or delay or failure in the shipment or delivery of any one lot shall excuse Buyer from accepting tender of any remaining installments hereunder. In case of failure of performance by Buyer hereunder, Seller may defer or suspend further shipments or deliveries or, at its option, cancel this Contract as to any Goods which have not been



# Mitsubishi International Corporation

### 655 Third Avenue, New York, NY 10017
### Tel: (212) 605-2447     Fax: (212) 605-1058

shipped or delivered, and any losses, liabilities, costs or expenses resulting from such deferral or cancellation shall be for Buyer's account.

**5.     BUYER'S SOLVENCY; PURCHASE MONEY SECURITY INTEREST:** Buyer represents and warrants to Seller that it is not insolvent, as that term is defined in the Uniform Commercial Code (U.C.C.). Buyer hereby grants to Seller a purchase money security interest in the Goods identified on the face hereof.

**6.     FORCE MAJEURE:** Seller shall not be liable for any delay of or failure to perform its obligations hereunder for any cause beyond its reasonable control, which affects Seller or any other person (whether known or unknown to Buyer) involved in the sale, manufacturing, supply, shipment or delivery of the Goods. Shipment or delivery dates shall be extended for a period equal to the time lost by reason of any such cause; provided, however, that if any such delay exceeds ninety (90) days, either party shall have the right to cancel this Contract with respect to such shipment or delivery by written notice to the other party without any liabilities to the other party. Force majeure shall not excuse any nonpayment by Buyer. Except as otherwise provided herein, U.C.C. Section 2-615 shall govern the rights of both parties hereto in the event of such delay or non-performance.

**7.     INDEMNIFICATION:** Seller shall not be liable to Buyer in any way for losses, liabilities, settlements, costs or expenses (including attorneys' fees) paid or incurred by Buyer resulting from any claim that the Goods or their sale infringe any patent, trademark, copyright, design or other intellectual or industrial property right of any third party and, if Buyer has furnished the specifications for the Goods, Buyer shall indemnify and defend Seller against any and all losses, liabilities, settlements, costs and expenses (including attorneys' fees) paid or incurred by Seller resulting from any such claim. Buyer agrees to defend, indemnify and hold Seller harmless against claims by any third party (including Buyer's employees and customers) arising out of Buyer's use, storage, handling or resale of the Goods.

**8.     LATE CHARGE; SETOFF RIGHTS; COLLECTION COSTS:** If any invoice amount is not paid in full when due, Seller reserves the right to request advance payment for future shipments. If any of the purchase price is not paid in full when due, Buyer shall pay a late charge on the amount unpaid for each day from the due date until paid in full at a rate of five percent above the prime commercial lending rate announced from time to time by the Chase Manhattan Bank, N.A. at its principal New York City office or the maximum lawful rate allowed under permitted applicable law, whichever is lower. Late charges shall be payable upon demand. The parties hereby agree that if for any reason, Buyer has not made payment in full to Seller for any amount owing to Seller on or prior to the due date for such amount, Seller may, in its sole discretion, set off such outstanding amount against any amount owed by Seller that is or becomes due and payable. In the event that Buyer fails to cure any nonpayment within thirty (30) days after Buyer's receipt of notice from Seller describing such breach, then Buyer agrees to pay all of Seller's costs of collection, including, but not limited to, reasonable attorneys' fees.

**9.     TERM AND TERMINATION:** This Contract shall take effect on the DATE OF CONTRACT on the face hereof. Either party may terminate this Contract immediately without giving notice under the following conditions associated with the other party: (1) Insolvency or bankruptcy; (2) Assignment for the benefit of creditors; (3) Expropriation of business assets; (4) Dissolution or liquidation; or (5) Appointment of a trustee or receive for all or any part of assets. Seller may terminate this Contract in the event that Buyer fails to cure any breach of the Contract within thirty (30) days after Buyer's receipt of notice from Seller describing such breach. Purchase orders confirmed by Seller cannot be cancelled or modified by Buyer without the prior written consent of Seller.

**10.     ENTIRE AGREEMENT; AMENDMENT AND NON-WAIVER:** Acceptance of Buyer's purchase order is expressly conditioned upon Buyer's acceptance of the terms and conditions herein and the exclusion of any conflicting terms that may be contained in Buyer's purchase order. Any objection to any terms herein must be in writing and shall not be deemed timely unless received by Seller within seven (7) days of the date of this Contract. This Contract, including the face hereof, is intended by the parties as the final, complete, and exclusive expression of their agreement relating to the subject matter hereof, and supersedes any prior agreement or understanding between them. No parol evidence, course of dealing, conduct, performance or usage of the trade shall be relevant to supplement or explain it. No waiver, amendment modification of any of the provisions hereof shall be effective, unless made in writing and signed by both parties. Failure by either party to exercise or enforce any right conferred by this Contract shall not be deemed to be a waiver of any such right nor operate so as to bar the exercise or enforcement thereof or any other right on any later occasion.



11.    **NO ASSIGNMENT:** Buyer shall not assign its rights or delegate its duties under this Contract without the prior written consent of Seller.

12.    **GOVERNING LAW; ARBITRATION:** This Contract shall be governed by and construed in accordance with the law of the State of New York, without regards to its choice-of-law provisions. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to any purchases made hereunder. Seller and Buyer agree that any controversy or claim arising out of or relating to this Contract, or the breach hereof, shall be settled by arbitration in New York, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The award of the arbitrator(s) shall be final and binding upon the parties hereto and judgment on the award may be entered in any court of competent jurisdiction.
jurisdiction.

13.    **SELLER'S RIGHT FOR DEMANDING ADEQUATE ASSURANCE:** If Buyer's failure to make payment or otherwise perform its obligations hereunder is reasonably anticipated, Seller may demand adequate assurance, satisfactory to Seller, of the due performance of this Contract by Buyer and withhold shipment or delivery of the undelivered Goods. Unless Buyer gives Seller such assurance within forty-eight (48) hours of Seller's demand, Seller may, without prejudice to any other remedies it may have, cancel the portion of this Contract which relates to the undelivered Goods, and all accounts payable by Buyer to Seller for the Goods delivered under this contract shall, upon Seller's declaration, become immediately due and payable in cash in full.

14.    **SELLER'S RIGHTS AND REMEDIES:** If any of the following events shall occur:(a) failure by the Buyer to perform any provision of this Contract or any other agreement with Seller, if any, and such failure not being cured within thirty (30) days after the date of notice thereof being dispatched by the Seller to the Buyer requiring the Buyer to remedy such failure;(b) insolvency, bankruptcy, liquidation or dissolution of the Buyer;(c) institution of any proceeding against the Buyer under the provisions of any insolvency or bankruptcy law or any law for the relief of debtors;(d) appointment of a trustee, receiver, administrator or liquidator over any of the Buyer's assets or property;(e) issuance of an order for the attachment of the Buyer's assets or property; (f) general assignment by the Buyer for the benefit of its creditors; (g) cancellation or deduction of trade credit insurance coverage insured for Seller against risk of Buyer's failure to make the payment of contract price or any other amount payable by Buyer to Seller hereunder in such way as Seller reasonably judges that such cancellation or deduction would impair Seller's interest or benefit from this Contract, or (h) any material adverse change (as determined by MIC in its sole discretion) shall have occurred in (x) Buyer's financial condition or (y) Buyer's business, or any other change shall have occurred that may have an adverse effect on Buyer's ability to perform its obligations under this Contract, then the Seller may, without prejudice to the other rights and remedies which it may have,(i) forthwith terminate this Contract in whole or in part by notice in writing to the Buyer,(ii) delay or suspend shipment or delivery of the Goods,(iii) stop the Goods in transit, and/or (iv) forthwith demand immediate payment of all sums payable by the Buyer under this Contract or any other agreement with the Buyer, whereupon the same shall become immediately due and payable.

Interstate Chemical Co.             Mitsubishi International Corp.

_____             _____
By:                                 By:
Title:                              Title:

**THOMAS RESZLER**

12/18/2007 07:03 PM

To:    ZACK FERGUSON-STEGER/AM/MITSUBISHI CORP@MITSUBISHI CORP

cc:    KATHY FLOOD/AM/MITSUBISHI CORP@MITSUBISHI CORP

bcc:

Subject:    Re: Methanol 

We can delay the shipment of course, but no way to cancel.


----- Original Message -----
From: zack.ferguson-steger
Sent: 12/18/2007 06:40 PM EST
To: THOMAS RESZLER
Cc: KATHY FLOOD
Subject: Fw: Methanol


Thomas,
Pls see email below.
I think we should tell them we can push it to next month but keep the same price. ?
Zack


----- Original Message -----
From: "Lori Cirillo" [lcirillo@interstatechemical.com]
Sent: 12/18/2007 11:28 AM EST
To: ZACK FERGUSON-STEGER
Cc: "Janice Perilli" <jperilli@interstatechemical.com>
Subject: RE: Methanol


Zack -

We are having a problem with this barge.  We are planning to ship this to Owensboro, KY and there is still not coast guard approval yet for receiving barges at this destination.  We do not have another home for this barge.

Can we cancel this barge because of this coast guard issue?


Lori Cirillo
Director of Chemical Procurement
724-981-3771  #1118

MIC 000054

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MITSUBISHI INTERNATIONAL CORPORATION,

               Plaintiff,

    -against-

INTERSTATE CHEMICAL CORPORATION,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 Civ. 00194 (JSR)(GWG)

**<u>NOTICE OF DEPOSITION</u>**

      PLEASE TAKE NOTICE that pursuant to Rules 30 and 34 of the Federal Rules of Civil Procedure, defendant Interstate Chemical Corporation ("Interstate") will conduct the deposition of plaintiff Mitsubishi International Corporation ("Mitsubishi"), by one or more of its officers, directors, managing agents, employees or other persons whom it shall designate pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure as having the most knowledge concerning the matters set forth in Schedule A annexed hereto.

      The deposition will commence on April 30, 2008, beginning at 9:30 a.m. and continue from day to day until completed. The deposition will be stenographically recorded. The deposition will take place at the offices of Simon Lesser PC, 420 Lexington Avenue, New York, New York 10170. In addition, Mitsubishi is requested to provide the undersigned counsel, at least five (5) days before the deposition, with a written designation of the names and positions of each designee who will testify on behalf of Mitsubishi, and the subject matter categories set forth in Schedule A as to which each designee will testify.

You are invited to attend and cross-examine.

Dated: New York, New York
      March 19, 2008

                        SIMON LESSER PC

                        By:
                              Leonard F. Lesser, Esq.
                        420 Lexington Avenue
                        New York, New York 10170
                        t: 212.599.5455
                        f: 212.599.5459
                        Attorneys for defendant Interstate Chemical
                        Corporation

## SCHEDULE A

## SUBJECTS OF INQUIRY

1.    The documents produced in response to Interstate's First Set of Document Requests, dated March 19, 2008.

2.    The allegations contained in the Complaint.

3.    All transactions between Mitsubishi and Interstate.

4.    All transactions between Mitsubishi and Tauber Petrochemical Corporation.

5.    The price Mitsubishi paid for the methanol it sold at $2.05 per gallon as alleged in ¶ 27 of the Complaint.

Daniel J. Kornstein (DK - 3264)
KORNSTEIN VEISZ WEXLER & POLLARD, LLP
757 Third Avenue
New York, New York 10017
(212) 418-8600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
MITSUBISHI INTERNATIONAL          :
CORPORATION,                                      08 CV 00194(JSR)(GWG)
                                  :
          Plaintiff,                      **PLAINTIFF'S DESIGNATION**
                                  :       **OF INDIVIDUAL TO SERVE**
          -against-                       **AS WITNESS FOR DEPOSITION**
                                  :       **PURSUANT TO RULE 30(b)(6)**
INTERSTATE CHEMICAL CORPORATION,
                                  :       ECF Case
          Defendant.
-----------------------------------X

     Plaintiff Mitsubishi International Corporation ("MIC"), in

response to defendant's Notice of Deposition dated March 19,

2008, hereby designates Thomas Reszler, Department Manager,

Methanol and Ethanol, as MIC's Rule 30(b)(6) witness.  MIC hereby

objects to Subjects of Inquiry 3-5 on Schedule A attached to the

Notice of Deposition on grounds including, but not limited to,

that they seek information that is not material and necessary to

the prosecution and defense of this action and not reasonably

calculated to lead to the discovery of admissible evidence.

Dated:      New York, New York
            April 25, 2008

                        KORNSTEIN VEISZ WEXLER & POLLARD, LLP


                        By:  Daniel J. Kornstein (DK - 3264)

                        757 Third Avenue
                        New York, New York 10017
                        (212) 418-8600

                        Attorneys for Plaintiff

TO:  Leonard F. Lesser
     SIMON LESSER PC
     420 Lexington Avenue
     New York, New York 10170
     (212) 599-5455
     Attorneys for Defendant

2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

MITSUBISHI INTERNATIONAL CORPORATION,

                 Plaintiff,

   -against-

INTERSTATE CHEMICAL CORPORATION,

                 Defendant.

----------------------------------------x

                August 12, 2008
                10:05 a.m.

    Deposition of THOMAS RESZLER, taken
by the plaintiff pursuant to Rule 30(b)(6),
and held at the offices of Kornstein Veisz
Wexler & Pollard, LLP, 757 Third Avenue,
New York, New York 10017, before Michael
Catania, a Shorthand Reporter and Notary
Public of the State of New York.

2  (Pages 2 to 5)

| | Page 2 |
|---|---|
| 1 | |
| 2 | A P P E A R A N C E S : |
| 3 | |
| 4 | KORNSTEIN VEISZ WEXLER & POLLARD, LLP |
| 5 | Attorneys for the Plaintiff |
| 6 | 757 Third Avenue |
| 7 | New York, New York 10017 |
| 8 | BY: DANIEL J. KORNSTEIN, ESQ. |
| 9 | - and - |
| 10 | AMY C. GROSS, ESQ., |
| 11 | of Counsel |
| 12 | |
| 13 | SIMON LESSER, P.C. |
| 14 | Attorneys for the Defendant |
| 15 | The Graybar Building |
| 16 | 420 Lexington Avenue |
| 17 | New York, New York 10170 |
| 18 | BY: LEONARD F. LESSER |
| 19 | - and - |
| 20 | ANDREW DEAN, ESQ., |
| 21 | of Counsel |
| 22 | |
| 23 | ALSO PRESENT: |
| 24 | DIANE KNOX, Senior Counsel |
| 25 | Mitsubishi International Corporation |

| | Page 3 |
|---|---|
| 1 | |
| 2 | IT IS HEREBY STIPULATED AND AGREED, |
| 3 | by and between the parties hereto, |
| 4 | through their respective counsel, that |
| 5 | the certification, sealing and filing of |
| 6 | the within examination will be and the |
| 7 | same are hereby waived. |
| 8 | IT IS FURTHER STIPULATED AND AGREED |
| 9 | that all objections, except as to the |
| 10 | form of the question, will be reserved to |
| 11 | the time of the trial. |
| 12 | IT IS FURTHER STIPULATED AND AGREED |
| 13 | that the within examination may be signed |
| 14 | before any Notary Public with the same |
| 15 | force and effect as if signed and sworn |
| 16 | to before this Court. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | Thomas Reszler |
| 2 | T H O M A S   R E S Z L E R , |
| 3 | having been first duly sworn by |
| 4 | a Notary Public of the State of |
| 5 | New York, was examined and |
| 6 | testified as follows: |
| 7 | EXAMINATION BY |
| 8 | MR. LESSER: |
| 9 | Q. Good morning. I am Len Lesser. I |
| 10 | represent Interstate Chemical Company in this |
| 11 | action. |
| 12 | Can you state your for me your |
| 13 | position with Mitsubishi International |
| 14 | Corporation? |
| 15 | A. The department manager for the |
| 16 | methanol and ethanol department. |
| 17 | Q. And the methanol and ethanol |
| 18 | department is part of the chemicals group of |
| 19 | Mitsubishi International Corporation? |
| 20 | A. That is correct. |
| 21 | Q. Is it also correct that Mitsubishi |
| 22 | International Corporation is a wholly-owned |
| 23 | subsidiary of Mitsubishi Corporation, the |
| 24 | Japanese corporation? |
| 25 | A. Correct. |

| | Page 5 |
|---|---|
| 1 | Thomas Reszler |
| 2 | Q. For how long have you been the |
| 3 | methanol and ethanol department manager? |
| 4 | A. April 1st, 2007. |
| 5 | Q. What what was your position prior |
| 6 | to April '07? |
| 7 | A. Marketing manager for the methanol |
| 8 | and fiber intermediates department. |
| 9 | Q. Can you describe that department? |
| 10 | A. That was split after, on April 1st |
| 11 | '07, just to various products together, fiber |
| 12 | intermediates. And that's it. |
| 13 | Q. Methanol was part of that |
| 14 | department at that time? |
| 15 | A. Yes. |
| 16 | Q. After that time, they split it off |
| 17 | and you became the department manager for |
| 18 | ethanol and methanol? |
| 19 | A. That is correct. |
| 20 | Q. For how long were you the marketing |
| 21 | manager before that split? |
| 22 | A. About seven years. |
| 23 | Q. Did you hold any other title for |
| 24 | Mitsubishi International Corporation? |
| 25 | A. When I started, I was assistant |

| Page 6 |
|---|

Thomas Reszler

1    manager.
2        Q.    When did you start?
3        A.    I started in August 1999.
4        Q.    When did you assume the role of
5    marketing manager?
6        A.    I believe it was about 2001.
7        Q.    Can you briefly describe for me
8    your duties and responsibilities as the
9    department manager for the methanol and
10    ethanol department of the chemicals group?
11        A.    I set the strategy for the
12    department, the long-term, mid long-term views
13    on the market, and making the decisions on
14    market growth.
15        I also make the day-to-day trading
16    activities for the department, whether buying
17    or selling or short or long.
18        I run the department in terms of
19    hiring employees and running the budget and
20    checking costs, accounting, financials for the
21    department.
22        Q.    Who do you report to, sir?
23        A.    I report to the vice president of
24    petrochemicals, Kevin Fallon.

| Page 7 |
|---|

Thomas Reszler

1        Q.    Do you have any other direct
2    reports other than Mr. Fallon?
3        A.    I have another vice president,
4    Mr. Kato.  He is a VP chemicals.
5        Q.    Both of these individuals are VPs
6    of MIC as opposed to MC?
7        A.    That's right.
8        Q.    Any other direct reports other than
9    these two vice presidents?
10        A.    No.
11        Q.    How many people report to you, sir,
12    approximately?
13        A.    Five.
14        Q.    Who are they?
15        A.    Zack Ferguson-Steger, Khawar
16    Ingbal, Ryoichi Murao, Kathy Flood, and Nancy
17    Walsh.
18        Q.    What is Mr. Ferguson-Steger's
19    position?
20        A.    Marketing manager.
21        Q.    What are his responsibilities?
22        A.    He markets and sells methanol in
23    the northeast, U.S. Gulf, and he is also in
24    charge of some logistics.

| Page 8 |
|---|

Thomas Reszler

1        Q.    I did see in the documents
2    Ms. Flood's name.  What is her position?
3        A.    She's a logistics manager.
4        Q.    What are her responsibilities?
5        A.    She arranges all of the logistics
6    for methanol movement in the U.S. Gulf.  Also
7    she is -- she has some clerical work for -- in
8    supervising and accounting.
9        Q.    Mr. Ferguson-Steger reports to you
10    directly and there is no intermediary that he
11    reports to?
12        A.    No.
13        Q.    Can you describe for me in sum and
14    substance the business of the methanol and
15    ethanol department of the chemicals group of
16    MIC generally, what it does?
17        A.    We buy, sell methanol.  We store it
18    with logistics in the operation.
19        Q.    From whom do you purchase methanol?
20        A.    We buy from the -- from some subs
21    that produce methanol in Venezuela.
22        Q.    When you say some subs, subs of MC?
23        A.    Of MC.
24        Q.    What is name of the sub?

| Page 9 |
|---|

Thomas Reszler

1        A.    Methanol de Oriente.
2        Q.    Methanol de Oriente is a subsidiary
3    of --
4        A.    It's a joint venture.
5        Q.    A joint venture between whom?
6        A.    Between Mitsubishi Corporation of
7    Tokyo, Mitsubishi International Corporation
8    Gas Chemical, and Polar and Pecquivan and IFC.
9        Q.    Just to be clear, because I think
10    there might have been testimony that the --
11    strike that.
12        Is it the case that the methanol
13    and ethanol department of MIC chemical group
14    purchases methanol solely from this joint
15    venture?
16        A.    No.
17        Q.    From whom else?
18        A.    We buy on the market.  We buy in
19    Europe.  We buy everywhere where it makes
20    sense for us.
21        Q.    In terms of percentages, does the
22    methanol and ethanol department buy more from
23    the joint venture than from other sources?
24        A.    No.  Less than 50 percent.

4 (Pages 10 to 13)

Page 10

Thomas Reszler

1
2   Q.  The purchases that the methanol and
3 ethanol department of the chemicals group
4 makes from the joint venture, is that pursuant
5 to some contract or is that fluctuating,
6 depending on the market or society factors?
7   A.  Can you rephrase the question?
8   Q.  The purchases that MIC chemical
9 group makes of methanol from the joint
10 venture, is that pursuant to a global
11 agreement?
12   A.  Yes.
13   Q.  Does that agreement provide for
14 monthly purchases, weekly purchases, or
15 purchases on some other time frame?
16   A.  It depends on the agreement between
17 the joint venture and Mitsubishi International
18 Corporation.
19   Q.  Have you seen the agreement?
20   A.  Yes.  It is monthly.  But we can
21 differently.
22   Q.  Monthly volume?
23   A.  Yes.
24   Q.  What is the monthly volume pursuant
25 to that arrangement or agreement?

Page 11

Thomas Reszler

1
2   A.  In average, 10,000 tons.
3   Q.  This 10,000 tons, the average
4 10,000 tons is purchased from where?
5   A.  From Venezuela.
6   Q.  It is imported from Venezuela into
7 the USA?
8   A.  Yes.
9   Q.  Into which port or ports?
10   A.  Into New Jersey, into Louisiana,
11 and Texas.
12   Q.  And in Louisiana that is St. Rose,
13 and in Texas, Houston?
14   A.  Yes.
15   Q.  How is it determined which of the
16 three ports the monthly volume will be
17 imported into?
18   A.  It depends on the needs every
19 month.
20   Q.  The chemicals group also sells
21 methanol, does it not?
22   A.  Correct.
23   Q.  To whom?
24   A.  Various parties.
25   Q.  What types of parties?

Page 12

Thomas Reszler

1
2   A.  Consumers, traders, producers as
3 well.  It depends.  We have long-term
4 contracts and we have spot contracts.
5   Q.  Approximately how many long-term
6 contracts are there currently?
7   A.  Ten.
8   Q.  Has that number gone up or down
9 over the past few years?
10   A.  It varies.
11   Q.  In terms of spot contracts, can you
12 compare generally the volume of sales pursuant
13 to long-term contracts as opposed to spot
14 contracts?
15   A.  It varies in years, but 50/50.  And
16 it can be 60/40 or 40/60.
17   Q.  For currently 2008, what would you
18 say it is?
19   A.  I would say probably 60 percent
20 contracts and 40 percent spot.
21   Q.  60 percent long-term contracts and
22 40 percent spot?
23   A.  Yes.
24   Q.  For 2007?
25   A.  I would say probably the reverse;

Page 13

Thomas Reszler

1
2 more spots, 60 percent spots and 60 percent
3 contracts.
4   Q.  What about 2006?
5   A.  60 percent spots, 40 percent
6 contracts.
7   Q.  What type of traders does
8 Mitsubishi International Corporation sell
9 methanol to?
10   A.  Any trader who we have a credit
11 line with who we are allowed to sell to.
12   Q.  Approximately how many traders have
13 such credit lines?
14   A.  Five to ten.
15   Q.  You said that the company sells to
16 producers as well?
17   A.  Occasionally.
18   Q.  When you say occasionally in terms
19 of sales volume, how much percentage of sales
20 volume, let's say for the last year, was to
21 producers as opposed to either consumers or
22 traders?
23   A.  10, 15 percent of total spot sales.
24   Q.  I took the liberty of doing some
25 research on Mitsubishi International

Page 14

Thomas Reszler

1
2  Corporation, and I was able to find on the MIC
3  Web site some information about the company,
4  as well as a bio about you.
5          I take it that you have seen this
6  before from the 2007 June Trade Winds
7  publication?
8      A.   Yes.
9      Q.   In it, it says:  As the methanol
10  and ethanol department manager, he has been
11  charged with the task of helping the methanol
12  business double by 2010 by concurrently
13  developing the methanol business.
14          Was that an accurate statement in
15  2007 in June when it was included in the
16  report?
17      A.   Yes.
18      Q.   Has Mitsubishi International
19  Corporation worked to double the methanol
20  business?
21      A.   We're working on it.
22      Q.   What is the volume today compared
23  to the volume when you took over the
24  management of the department?
25      A.   Similar.

Page 15

Thomas Reszler

1
2      Q.   What is that?
3      A.   Similar; growing lightly.
4      Q.   Continuing to grow?
5      A.   We're trying to grow, but growth
6  depends on profit.
7      Q.   How is the profit; has it been
8  increasing, decreasing, or remained constant
9  over the past two years?
10      A.   Increasing.
11      Q.   Between 2006 and 2007, can you
12  estimate the growth of profit percentage-wise?
13      A.   600 percent -- 500 percent.
14      Q.   Between 2007 and 2008, can you
15  estimate the growth?
16      A.   Negative growth.
17      Q.   Approximately by how much?
18      A.   In profit or volume?
19      Q.   Let's talk about profit first.
20      A.   It's early to say, but it should be
21  1/5 or less on the 2007 profit.
22      Q.   So that 2007 profit was up by
23  500 percent in 2006, and you are estimating
24  that the 2008 profit will be down by 500
25  percent?

Page 16

Thomas Reszler

1
2      A.   Yes, it will be down.
3      Q.   It's hard to say?
4      A.   It's very early; it's very hard to
5  say now.
6      Q.   The 500 percent growth in 2007, is
7  that based upon an annual year, or is your
8  fiscal year different than the annual year?
9      A.   That was a fiscal year.
10      Q.   What is the fiscal year?
11      A.   April 1st to March 31st.
12      Q.   April 1st, 2006 to March 31st,
13  2007?
14      A.   Correct.
15      Q.   Okay.
16          MR. LESSER:  Mark the notice of
17  deposition as Defendant's Exhibit A.
18          (Defendant's Exhibit A, notice of
19  deposition, marked for identification, as
20  of this date.)
21          MR. LESSER:  Mark as Defendant's
22  Exhibit B, plaintiff's designation of
23  individual to serve as a witness for
24  deposition pursuant to Rule 30(b)(6).
25          (Defendant's Exhibit B, plaintiff's

Page 17

Thomas Reszler

1
2  response to deposition notice, marked for
3  identification, as of this date.)
4  BY MR. LESSER:
5      Q.   I hand you what has been marked for
6  identification as Defendant's Exhibits A and
7  B.  Defendant's Exhibit A is the notice of
8  deposition sent pursuant to Rule 30(b)(6), and
9  B being the plaintiff's designation and
10  response to the deposition notice.
11          Do you understand that you have
12  been designated as the 30(b)(6) witness for
13  MIC for the purpose of this deposition?
14      A.   Yes.
15      Q.   If you look at the third page of
16  Exhibit A, the subjects of inquiry, subject
17  number one are the documents produced in
18  response to Interstate's document request.
19          Do you see that?
20      A.   Yes.
21      Q.   Are You familiar, sir, with the
22  documents that were introduced to Interstate
23  in this case?
24      A.   Yes.
25      Q.   Is that based on personal knowledge

6 (Pages 18 to 21)

Page 18

Thomas Reszler

1 Thomas Reszler
2 or upon review of the documents?
3     A.   Both.
4     Q.   Sir, number two the allegations in
5 the complaint, the same question:  Your
6 designation as the 30(b)(6) witness, is that
7 based upon personal knowledge or information
8 you were provided by other corporate
9 representatives for the purpose of this
10 deposition?
11     A.   Personal knowledge.
12     Q.   Items 3, 4 and 5 were the subject
13 of an objection in Exhibit B. I'm going to
14 ask you a couple of questions about those
15 numbered items.
16         First with respect to number 3, all
17 transactions between Mitsubishi International
18 Corporation and Interstate, do you have
19 personal knowledge of the transactions, the
20 historical transactions between Mitsubishi
21 International Corporation and Interstate?
22     A.   Yes.
23     Q.   The same question for number 4, do
24 you have personal knowledge concerning the
25 transactions between Mitsubishi International

Page 19

Thomas Reszler

1 Thomas Reszler
2 Corporation and Tauber?
3     A.   Yes.
4     Q.   And the same thing for number 5, do
5 you have personal knowledge with respect to
6 the prices that Mitsubishi International
7 Corporation paid for the methanol that it sold
8 to Tauber, as alleged in the complaint?
9     A.   Yes.
10     Q.   Let's go to item number 1, which
11 are the documents that were produced to
12 Interstate in this case.
13         MR. LESSER:  Mark this group of
14     documents as Defendant's Exhibit C.
15         (Defendant's Exhibit C, group of
16     documents, marked for identification, as
17     of this date.)
18 BY MR. LESSER:
19     Q.   I hand you what has been marked for
20 identification as Defendant's Exhibit C.
21 Defendant's Exhibit C is a copy of the
22 July 2nd, 2008 cover letter from counsel,
23 two-page privileged log, and redaction log,
24 and the MIC documents Bates numbered 1 through
25 129.

Page 20

Thomas Reszler

1 Thomas Reszler
2     You have personal knowledge with
3 respect to the documents that were produced;
4 is that correct?
5     A.   Yes.
6     Q.   Do you know how these documents
7 were culled, and I mean gathered?
8     A.   We were requested to provide
9 everything that we had related to the case.
10     Q.   From whose files did you obtain
11 documents that comprise those included within
12 Defendant's Exhibit C?
13     A.   From my files, from Mr. Ferguson's
14 files.
15     Q.   Anybody else's files?
16     A.   No.
17     Q.   What files do you maintain in
18 connection with the transaction that is the
19 subject matter of this lawsuit?
20     A.   Can you -- what do you mean?
21     Q.   I will clarify the question based
22 on how I maintain my own files.  I keep
23 electronic as well as e-mail and paper and a
24 separate file of contracting documents, a
25 separate file of background materials, and

Page 21

Thomas Reszler

1 Thomas Reszler
2 things of that nature.
3         The question to you concerning your
4 files that you testified in part comprises
5 Defendant's Exhibit C, what files did you
6 review in order to produce documents to
7 Interstate?
8     A.   Files of all of the contracts, all
9 the e-mail exchanges, and other documents that
10 are necessary for running the department.
11     Q.   Do you keep a separate file for all
12 of your customers?
13     A.   For contracts, separate files.
14     Q.   For example, what files do you
15 maintain in your office concerning Interstate
16 Chemical?
17     A.   We just -- I just have one file
18 with all contracts by month, and Interstate
19 would be in there.
20     Q.   Do you keep a separate file for
21 customers as well?
22     A.   No.
23     Q.   With respect to --
24     A.   Let me correct this.  For spots I
25 have a file by month for all contracts down.

Page 22

Thomas Reszler

1
2    And for long-term customers I have a file for
3    the customer.  Interstate falls into spots.
4        Q.   I understand that.  I take it that
5    Interstate is not a long-term customer?
6        A.   No.
7        Q.   Has it ever been?
8        A.   No.
9        Q.   Is Tauber a long-term customer?
10       A.   No.
11       Q.   Have they ever been?
12       A.   No, no.
13       Q.   For December 2007, how many
14   contracts or how many spot contracts do you
15   have in your file?
16       A.   20 to 30.
17       Q.   Aside from the actual documents
18   that comprise the spot contracts, do you keep
19   some sort of spreadsheet that lists all of
20   these contracts on a monthly basis?
21       A.   Yes.
22       Q.   What do you call that?
23       A.   Contract summary file.
24       Q.   What is in the contract summary
25   file?

Page 23

Thomas Reszler

1
2        A.   It's the date of the contract, the
3    date of the shipment, the buyer or seller,
4    depending if it's a buy or sell, the name of
5    the buyer or seller, the price and the volume,
6    and whether there was a broker involved or
7    not.
8        Q.   Who maintains this file?
9        A.   I do.
10       Q.   How is the information input into
11   the file?
12       A.   On every sale.
13       Q.   This is a computer-based file; is
14   that correct?
15       A.   Yes.
16       Q.   MIC has the ability to access for
17   any particular month the contract summary file
18   which will list all of the transactions for
19   that particular month?
20       A.   Yes.
21       Q.   Is that contract summary file
22   separated with spot transactions in one file
23   and long-term transactions in a different
24   file, or are they combined into one total
25   file?

Page 24

Thomas Reszler

1
2        A.   It's only spots.
3        Q.   How do you record the transactions
4    pursuant to the long-term customer agreements,
5    if at all?
6        A.   We just have a contract and -- a
7    paper contract that is signed by both parties
8    normally.
9        Q.   The contract summary file that you
10   are describing, did that comprise both
11   purchases and sales?
12       A.   Correct.
13       Q.   Mitsubishi International
14   Corporation purchases methanol at times
15   pursuant to spot contracts?
16       A.   Correct.
17       Q.   Does Mitsubishi International
18   Corporation also purchase ethanol pursuant to
19   long-term contracts?
20       A.   Yes.
21       Q.   And one of the long-term contracts
22   is with the joint venture that we talked
23   about?
24       A.   Correct.
25       Q.   The contract summary file, does

Page 25

Thomas Reszler

1
2    that include both purchases and sales, or are
3    they separate; is there a purchase file and a
4    sales file, are they separate?
5        A.   Both purchases and sales are in
6    there.
7        Q.   In the one file?
8        A.   In the one file.
9        Q.   Is this contract summary file
10   something that you personally maintain?
11       A.   Correct.
12       Q.   Did you produce this file in
13   connection with this case?
14       A.   No, we did not.
15       Q.   What documents did you produce from
16   your personal files?
17       A.   The contract, all e-mail exchanges
18   that are in reference to the transactions with
19   Interstate, the contract with Interstate, and
20   the contract with Tauber.
21       Q.   How do you define the contract with
22   Interstate that you are testifying about?
23       A.   It's a spot contract.
24       Q.   How is that evidenced, this
25   contract?

8  (Pages 26 to 29)

| Page 26 |
| --- |

Thomas Reszler

1
2    A.    It is evidenced with their
3    willingness to purchase a barge from
4    Mitsubishi International Corporation in early
5    December and with our subsequent contracts.
6    Q.    Take a look in Defendant's
7    Exhibit C at MIC 4, specifically the
8    December 4th, 2007 e-mail at 4:04 p.m. from
9    Mr. Ferguson-Steger to Ms. Cirillo.
10            Is that what you are claiming to be
11    the contract at issue in this case?
12    A.    This is a reconfirmation before
13    sending the contract.
14    Q.    When you say the contract, are you
15    referring to the document that has been
16    produced as MIC 6 through 9?
17    A.    That is correct.
18    Q.    This document 6 through 9, is this
19    a form that your company uses, sir?
20    A.    Correct.
21    Q.    Were you at all involved in its
22    preparation?
23    A.    This is a standard form that is
24    prepared by our legal department.
25    Q.    Is this a standard form used

| Page 27 |
| --- |

Thomas Reszler

1
2    throughout the chemicals division of MIC, if
3    you know?
4    A.    I don't know.
5    Q.    But it certainly is a form used by
6    the methanol and ethanol division of the
7    chemicals group?
8    A.    That's correct.
9    Q.    For how long has this form been
10    utilized by your group, sir?
11    A.    For two to three years.
12    Q.    Who typically signs these forms on
13    behalf of MIC?
14    A.    If we sign, I would sign them.  But
15    it is rare that we actually sign them.
16    Q.    Why is it rare that you actually
17    sign them?
18    A.    It is not customary for the spot
19    market to sign a contract.  If we have
20    10 percent that are signed, that would be a
21    lot.
22    Q.    Why is it not customary in the spot
23    market for Mitsubishi International
24    Corporation to sign the contract documents or
25    forms that is prepares?

| Page 28 |
| --- |

Thomas Reszler

1
2    A.    Typically an e-mail reconfirming is
3    usually enough, and we don't require
4    signature.
5    Q.    Why do you use these forms then?
6    A.    Formality.  Some companies need and
7    Sarbanes-Oxley tried to have more
8    documentation.
9    Q.    How long, sir, have you been
10    involved in what I will describe as the bulb
11    chemicals industry?
12    A.    Since 1999.
13    Q.    Is it fair to say that during that
14    approximate eight-year period that you have
15    familiarity with the customs and practice of
16    the industry?
17    A.    Yes.
18            MR. KORNSTEIN:  I'm going to object
19    to questions other than fact questions.
20    He's not an expert; he's not here as an
21    expert witness.  You don't have the right
22    to ask him expert questions.
23            MR. LESSER:  Thank you.  I will not
24    ask him any questions concerning opinion
25    testimony.

| Page 29 |
| --- |

Thomas Reszler

1
2    I'm going to limit my questions to
3    fact testimony based upon the witness'
4    experiences in the industry and his
5    familiarity with the customs and
6    practices in the industry that he has
7    worked in.
8            MR. KORNSTEIN:  That is expert
9    testimony.  I will note my objection.
10            MR. LESSER:  That's fine.
11            MR. KORNSTEIN:  It is not a subject
12    on your list of subjects of inquiry in
13    the notice of deposition.
14    BY MR. LESSER:
15    Q.    Did you review the terms that
16    Mitsubishi International Corporation included
17    in the form contract that is attached as pages
18    6 through 9?
19    A.    I don't remember.
20    Q.    Do you recall providing any comment
21    when these terms and conditions were prepared?
22    A.    I instruct Mr. Ferguson on the
23    price, and he takes it from there and
24    negotiates.
25    Q.    I'm focusing on the general terms

Page 30

Thomas Reszler

1
2  and conditions of sale set forth on pages 7
3  through 9 of the document.
4          Did you provide any input in terms
5  of the language selected for use in these
6  general terms and conditions of sale?
7      A.   No.  These are provided by our
8  legal department.
9      Q.   Did the legal department transmit
10  to you a draft of the general terms and
11  conditions for your review before the final
12  terms were selected for use?
13     A.   Yes.
14     Q.   Did you provide comments concerning
15  the terms and conditions?
16     A.   I don't remember.
17     Q.   Would you describe the terms and
18  conditions set forth in the document, pages 7
19  through 9, as consistent with the industry
20  practices that you are familiar with over the
21  past eight years?
22         MR. KORNSTEIN:  I will object to
23     the question.
24         You may answer.
25         But I'm objecting for the reasons

Page 31

Thomas Reszler

1
2  previously stated.
3      A.   I believe they are fairly standard.
4      Q.   Thank you.  We have digressed a
5  bit.
6          I want to return to the materials
7  in your files that you reviewed for the
8  purpose of producing to Interstate.
9          You talked about the e-mail
10  exchanges, about the contract.  Is there
11  anything else from your files?
12     A.   I don't think so.
13     Q.   I believe you stated that in
14  addition to your files, the files of
15  Mr. Ferguson-Steger were reviewed for
16  documents to be reviewed to Interstate?
17     A.   Correct.
18     Q.   Did you personally do that review?
19     A.   I reviewed his files, too.
20     Q.   Do you know what files Mr. Ferguson
21  provided to you for your review before it was
22  produced to Interstate?
23     A.   Yes.
24     Q.   What files, sir?
25     A.   E-mail exchanges, there was

Page 32

Thomas Reszler

1
2  inventory data, there was internal e-mails.
3  There were internal reports regarding sales,
4  and exchange e-mails between Interstate and
5  Mr. Steger.
6      Q.   The inventory data, what are you
7  referring to, sir?
8      A.   To the IMTT St. Rose inventories.
9      Q.   How is that data maintained by the
10  company?
11     A.   This is data provided by the
12  terminal.
13     Q.   Does Mitsubishi International
14  Corporation maintain data reflecting its
15  inventory for specific periods of time of
16  methanol in the United States?
17     A.   Yes.
18     Q.   How is that data maintained?
19     A.   It's maintained as needed.
20     Q.   For example, if I wanted to see for
21  the month of December 2007 inventory levels
22  that Mitsubishi International Corporation had
23  for methanol both in St. Rose, in New Jersey
24  and at Houston, where would I look to find
25  that information?

Page 33

Thomas Reszler

1
2      A.   In -- the most accurate is the
3  inventory data released by the terminal that
4  holds it for us.
5      Q.   Is that data released by the
6  terminals on a shipment-by-shipment basis, a
7  weekly basis, monthly basis, or some other
8  basis?
9      A.   Monthly basis.
10     Q.   I take it that Mitsubishi
11  International Corporation receives this
12  monthly data from three separate sources in
13  the United States, New Jersey, St. Rose, and
14  Houston?
15         MR. KORNSTEIN:  Let me note a
16     continuing objection to this line of
17     questioning.  It is not one of the
18     subjects of inquiry.  It's beyond the
19     scope.
20         He can answer, but it is beyond
21     what you listed as the subject matter of
22     inquiry.
23         MR. LESSER:  I will note for the
24     record that I would respectfully disagree
25     with counsel.  It is certainly within the

10  (Pages 34 to 37)

---

Page 34

Thomas Reszler

1  scope of --
2       MR. KORNSTEIN:  We don't have to
3  argue about it.
4       MR. LESSER:  It's within the scope
5  of the allegations in the complaint.  We
6  don't need to argue.
7  A.    That is correct.
8  Q.    Is that data then culled together
9  in one location within the company's files?
10 A.    Yes.
11 Q.    You keep a spreadsheet, in other
12 words?
13 A.    Yes.
14 Q.    It's a computerized spreadsheet?
15 A.    The one we receive from the
16 terminal is the paper.  It depends on the
17 terminal.  Some are just Excel spreadsheets
18 and some are just TDF.
19 Q.    Does Mitsubishi International
20 Corporation incorporate the data it receives
21 from the terminal into an electronic database
22 maintained by Mitsubishi International
23 Corporation for inventory of methanol?
24 A.    Yes.

---

Page 35

Thomas Reszler

1  Q.    What is that spreadsheet or what is
2  that called?
3  A.    Inventory sheets.
4  Q.    These inventory sheets, are they
5  maintained by Mitsubishi International
6  Corporation on a monthly basis, weekly basis,
7  or some other basis?
8  A.    As needed; whenever there is a
9  change.
10 Q.    For any time there is a change in
11 inventory, the inventory sheet is updated; is
12 that correct?
13 A.    Correct.
14 Q.    Can you access the inventory sheet
15 and see what the inventory levels were for any
16 period of time?
17 A.    I believe so.
18 Q.    For example, if I wanted to see the
19 inventory levels of methanol of Mitsubishi
20 International Corporation for the period
21 December 1st, 2007 to January 10th, 2008, you
22 can provide that information to me?
23 A.    Correct.
24 Q.    Have the inventory sheets been

---

Page 36

Thomas Reszler

1  provided to Interstate in response to its
2  discovery request?
3  A.    We provided the inventory sheet
4  from the terminal, yes.
5  Q.    What about the internal Mitsubishi
6  International Corporation inventory sheet that
7  you testified to that is a compilation of the
8  inventory data received from the terminals?
9  A.    I don't recall.
10 Q.    Can you take a moment and look at
11 Defendant's Exhibit C and see if you can find
12 the Mitsubishi International Corporation
13 inventory sheet that you are testifying about?
14     MR. KORNSTEIN:  I want to note to
15 that many of the questions before we had
16 the deposition notice copied many of the
17 questions by counsel that went into
18 business relationships and details of
19 plaintiff's business are outside the
20 scope of this deposition.  I'm just
21 noting it for the record.
22     MR. LESSER:  Obviously I
23 respectfully disagree.
24 A.    I don't think we provided our own

---

Page 37

Thomas Reszler

1  internal inventories which actually show the
2  same data that is in there.
3  Q.    That is in where, sir?
4  A.    In those inventories provided by
5  IMTT on page 37 of Exhibit C.
6  Q.    Okay.  You are referring to
7  page 37.  I will ask you to look at pages 37
8  through page 41, because it looks to be all
9  part of the same document.
10     Is that correct, that 37 through 41
11 are part of the same document?
12 A.    That is correct.
13 Q.    This is not a document that is
14 employed by MIC?
15 A.    No.
16 Q.    You are familiar with this
17 document, I take it?
18 A.    Yes.
19 Q.    What is this document then?
20 A.    This shows any movement in and out
21 of the tank we have in IMTT, and the
22 deliveries show the volumes shipped out and
23 the book balance after the deliveries.
24 Q.    IMTT, what does that refer to?

---

Page 38

Thomas Reszler

1
2    A.    International Maytex Tank Terminal.
3    Q.    And this is the terminal that you
4  are referring to in St. Rose, Louisiana?
5    A.    Yes.
6    Q.    There's a reference to tank number
7  116. I take it that is a tank that is
8  Mitsubishi International Corporation uses?
9    A.    Yes.
10   Q.    Does Mitsubishi International
11 Corporation use any other tanks other than
12 tank 116 in St. Rose?
13   A.    No.
14   Q.    So that this document entitled
15 cumulative inventory listing for 12/07 through
16 12/07, this is the inventory listing provided
17 to Mitsubishi International Corporation from
18 IMTT for tank 116?
19   A.    That's correct.
20   Q.    Look at the left-hand column on the
21 far left inventory date, and then it has dates
22 with a number below it. Do you know what the
23 number below signifies?
24   A.    I believe it's called release
25 number.

Page 39

Thomas Reszler

1
2    Q.    On the top it looks like there are
3  columns for transfers in, deliveries, and
4  transfers out. Do you see that?
5    A.    Yes.
6    Q.    I had difficulty in seeing that
7  this report shows the transfers in and out.
8  Can you show me if it does?
9          I see delivery, but it's hard to
10 see whether they were coming into the tanks or
11 being released from the tank. Or maybe I'm
12 just misreading something?
13   A.    Deliveries are transfers out as
14 well, but --
15   Q.    As well as transfers, no?
16   A.    No. First, I'm not the logistics
17 specialist, so I don't review documents
18 frequently. Transfers in is blank because we
19 probably didn't have any delivery in the tank
20 in that period.
21         Deliveries are products taken out
22 of the tank going into either trucks or rail
23 cars, and are usually small quantities; in
24 here, about 4,000 gallons to 28,000 gallons.
25         Transfers out are either barge

Page 40

Thomas Reszler

1
2  loadings or by pipeline transfer to another
3  tank.
4    Q.    For example, looking at page 37, on
5  December 1st there appears to be a transfer
6  out of about 867,000 gallons.
7          Looking at this document, are you
8  able to determine if there was a transfer out
9  to a barge or a pipeline transfer?
10   A.    I can't tell.
11   Q.    The only one that I see on this
12 report that looks to be a transfer out of
13 significant volume is on December 12th in the
14 amount of 429,000 gallons. Do you see that?
15   A.    Yes.
16   Q.    Is it your testimony that you don't
17 believe that there were any transfers in
18 during the month of December?
19   A.    Let me correct this. I see one on
20 page 38 on December 11st. It shows AMBASSADOR
21 NORRIS.
22   Q.    Is that a freighter?
23   A.    That's a vessel, yes, a tanker.
24 That delivered us 1.3 million gallons.
25   Q.    And then it looks like there was

Page 41

Thomas Reszler

1
2  another delivery on December 19th; is that
3  correct? Or maybe not?
4    A.    On December 19th, that's a
5  delivery.
6    Q.    Okay. That's a transfer out?
7    A.    That's a transfer out.
8    Q.    What about on December 29th? I see
9  something referencing JOSE BRIGHT, and about
10 750,000 gallons.
11   A.    That's another transfer in.
12   Q.    According to this report in the
13 beginning of December, as of December 1st,
14 2007, there was approximately 2.06 million
15 gallons of methanol in tank 116?
16   A.    Correct.
17   Q.    At the end of December, the month
18 of December 31st, it was down to
19 1.4 million gallons; is that correct?
20   A.    Correct.
21   Q.    The transaction, the pipe transfer
22 transaction to Tauber that is at least
23 referenced in the complaint, that is not shown
24 on this document, is it, sir?
25   A.    I do not see it on this document.

12 (Pages 42 to 45)

Page 42

Thomas Reszler

1
2  Q.  Take a look at page 36.  Do you see
3  that?
4  A.  Yes.
5  Q.  What is this, sir?
6  A.  That is an order, what we call an
7  order sheet that we send either to our
8  terminal or to a vendor when we have an order
9  for a barge or pipeline transfer.
10  Q.  My read of this document -- and
11  correct me if I'm wrong -- is that the tank
12  transfer to Tauber of approximately 420,000
13  gallons was loaded on January 2nd, 2007.
14  A.  It says it's required to be loaded
15  on January 2nd.
16  Q.  Do you know whether it was actually
17  loaded or transferred?
18  A.  I don't recall the exact date.
19  Q.  Was it sometime in January?
20  A.  Yes, I believe so.
21  Q.  What is the basis of that belief,
22  sir?
23  A.  If it is ordered on January 2nd,
24  usually it will be loaded very close to that
25  date.  I don't recall the exact date of

Page 43

Thomas Reszler

1
2  shipment, but I believe it might be in that
3  document.
4  Q.  Do you believe that it would be --
5  in looking at page 37 through 41 -- it would
6  be reflected in the cumulative inventory
7  listing for January '08 through January '08?
8  A.  I believe so.
9  Q.  And you have that document in your
10  files, I take it?
11  A.  I believe so.
12  MR. LESSER:  I will call for the
13  production of that document.
14  Q.  Before we started talking about
15  this inventory list that is provided to
16  Mitsubishi International Corporation from
17  IMTT, we were talking about the records that
18  Mitsubishi International Corporation itself
19  maintains based upon the information that is
20  provided by the various terminals, including
21  IMTT.
22  Would Mitsubishi International
23  Corporation internally report its inventory
24  reflected in that tank transfer?
25  A.  Yes.

Page 44

Thomas Reszler

1
2  Q.  I take it that Mitsubishi
3  International Corporation internal records
4  would reflect its inventory levels for both
5  December '07, January '08, February '08, and
6  beyond; is that correct?
7  A.  Yes.
8  MR. LESSER:  I will call for the
9  production of that as well.
10  Q.  These inventory records, are they
11  maintained by you or by them that report to
12  you within the department?
13  A.  By people who report to me.
14  Q.  Who specifically?
15  A.  Kathy Flood, Mr. Ferguson,
16  Mr. Ingbal.
17  Q.  Okay.  I will switch gears for a
18  moment.
19  Do you recall, sir, in or about
20  mid-December being informed that Interstate
21  Chemical had reported to Mitsubishi
22  International Corporation a Coast Guard issue
23  concerning the destination that -- strike
24  that.
25  Do you recall receiving information

Page 45

Thomas Reszler

1
2  about Interstate Chemical having trouble with
3  the order that was placed in early December?
4  A.  Yes.
5  Q.  Who did you receive that
6  information from?
7  A.  Mr. Ferguson-Steger.
8  Q.  Look at Bates page 12, please.
9  This appears to be an e-mail string, the top
10  e-mail from Mr. Steger to you on
11  December 18th, 2007 at approximately 6:40 p.m.
12  attaching an e-mail he received from
13  Ms. Cirillo earlier that day.
14  Is that how you first received
15  information from Mr. Steger about the trouble
16  that Interstate was reporting?
17  A.  He might have mentioned it orally
18  before, I don't recall.
19  Q.  Do you recall receiving this
20  e-mail?
21  A.  Yes.
22  Q.  I take it from just looking at the
23  e-mail that Mr. Steger was looking to you to
24  make the decision as to how to respond to
25  Interstate?

Page 46

```
 1              Thomas Reszler
 2      A.    Correct.
 3      Q.    Did you provide him with directions
 4  on how to respond?
 5      A.    Yes.
 6      Q.    What did you say?
 7      A.    I agreed with the statement that we
 8  could -- if it helped Interstate -- delay the
 9  shipment later, as long as they would fulfill
10  their obligations.
11      Q.    Look at Bates page 54, specifically
12  the top e-mail in this e-mail string reflected
13  on the page which appears to be a response
14  from you at 7:03 on December 18th to
15  Mr. Steger's e-mail to you; is that correct?
16      A.    Correct.
17      Q.    So that this is your response to
18  him?
19      A.    Correct.
20      Q.    When you say we can delay the
21  shipment, of course, what type of delay did
22  you contemplate?
23      A.    It depends on what they need.
24  Typically when companies have problems, we are
25  usually willing to cooperate with them and
```

Page 47

```
 1              Thomas Reszler
 2  to -- so it could be in a week to a month.  It
 3  depends.
 4      Q.    I take it that that was not the
 5  first time in your experience with Mitsubishi
 6  International Corporation that a party to an
 7  agreement with Mitsubishi International
 8  Corporation had trouble or had a problem?
 9      A.    No.  There are barge delays because
10  of weather, so we have to be able to be a bit
11  flexible.
12      Q.    Have you ever experienced, either
13  on the purchasing side or the selling side,
14  difficulty with the United States Coast Guard?
15      A.    No.
16      Q.    You never had any Coast Guard
17  issues in any of the ports?
18      A.    Not that I recall.
19      Q.    Never had any Coast Guard issues
20  with any of your customers' facilities?
21      A.    Not that I recall.
22      Q.    Aside from Coast Guard issues,
23  Department of Homeland Security issues,
24  anything like that?
25      A.    Not that I can recall.
```

Page 48

```
 1              Thomas Reszler
 2      Q.    Have you ever dealt with any type
 3  of government regulations, problems with
 4  respect to any shipment on the buying side or
 5  on the selling side?
 6      A.    I don't think so.
 7      Q.    Aside from the weather, do you
 8  recall, as you sit here today, in your
 9  approximate to eight to nine years worth of
10  experience what, if any, other types of
11  problems you have encountered in your career?
12      A.    We could have a consumer who has a
13  plant problem and has shut down and needs to
14  delay.
15      Q.    Any others?
16      A.    We could have, on the other side,
17  the supplier who has a vessel delay and is not
18  able to supply on time, and asks us to delay.
19  That's the most obvious that comes to my mind.
20      Q.    I believe you testified that MIC,
21  at least in part, purchases methanol from the
22  joint venture in Venezuela?
23      A.    Yes.
24      Q.    Have you ever experienced any
25  political or governmental issues concerning
```

Page 49

```
 1              Thomas Reszler
 2  Venezuelan release of methanol that you have
 3  encountered in your career?
 4      A.    No major problems.
 5      MR. KORNSTEIN:  Note for the record
 6  my objection to the line of questioning.
 7  It is beyond the scope of a 30(b)(6)
 8  deposition by definition.  These are not
 9  30(b)(6) types of questions.
10      MR. LESSER:  Again, I respectfully
11  disagree with counsel.
12      Q.    Looking back at the document that
13  comprises the general terms and conditions of
14  sale that Mitsubishi International Corporation
15  uses and, from your testimony has signed
16  approximately 10 percent of the time,
17  specifically paragraph 6 where it says:
18      Force majeure:  Seller shall not be
19  liable for any delay of or failure to perform
20  its obligation hereunder for any cause beyond
21  its reasonable control which affects seller or
22  any other person, whether known or unknown to
23  buyer, involved in the sale, manufacturing,
24  supply, shipment, or delivery of the goods.
25  Shipment or delivery dates shall be extended
```

14 (Pages 50 to 53)

Page 50

Thomas Reszler
1
2  for a period equal to the time lost by reason
3  of any such cause; provided, however, that if
4  any such delay exceeds 90 days, either party
5  shall have the right to cancel this contract
6  with respect to such shipment or delivery by
7  written notice to the other party without any
8  liabilities to the other party. Force majeure
9  shall not excuse any nonpayment by buyer.
10 Except as otherwise provided herein, UCC
11 Section 2-615 shall govern the rights of both
12 parties hereto in the event of such delay or
13 non-performance.
14       Has your company ever dispersed its
15 rights pursuant to this provision in item 6?
16     A.    We did once in 2002.
17     Q.    For what reason or what was the
18 delay caused by?
19     A.    When there was a general strike in
20 Venezuela.
21     Q.    Aside from that time, do you recall
22 any other time?
23     A.    No.
24     Q.    Do you recall any time when any of
25 your customers attempted to exercise its

Page 51

Thomas Reszler
1
2  rights under this provision?
3     A.    I don't recall.
4     Q.    With respect to the situation in
5  2002 where there was the general strike, did
6  that strike cause a delay beyond the 90 days?
7     A.    It did cause a delay. I can't
8  really recall the duration of the delay.
9     Q.    Did it ultimately result in a
10 cancellation of the transaction?
11     A.    We actually performed all of our
12 contracts. Legally the joint venture declares
13 force majeure Tisasi (phonetic) and Mitsubishi
14 International Corporation declared force
15 majeure.
16     Q.    Do you know how long the delay
17 lasted before you were able to find other
18 sources of methanol as a result of the strike?
19     A.    I don't recall.
20     Q.    Let's return to Bates page 54 and
21 your e-mail to Mr. Steger saying: We can
22 delay the shipment of course, but no way to
23 cancel.
24       Was that your decision to make?
25     A.    Yes.

Page 52

Thomas Reszler
1
2     Q.    Do you know if Mr. Steger
3  communicated that to Interstate?
4     A.    Yes, I believe so. I don't recall
5  the means of communication, but he
6  communicated the answer.
7     Q.    Were you at all involved in the
8  direct communication between Mitsubishi
9  International Corporation and Interstate
10 concerning this issue?
11     A.    Mr. Ferguson had a communication
12 with Interstate.
13     Q.    I will rephrase the question for
14 you. Did you personally have any
15 communications with anyone from Interstate?
16     A.    No.
17     Q.    You delegated that to Mr. Steger?
18     A.    Correct.
19     Q.    And to the best of your knowledge,
20 he kept you abreast of his communication with
21 Interstate?
22     A.    Correct.
23     Q.    Did you understand that in response
24 to your directive and Mr. Ferguson informing
25 Interstate that we will not cancel, Interstate

Page 53

Thomas Reszler
1
2  attempted to explain the situation with the
3  Coast Guard in an effort to allow it to cancel
4  as a result of that?
5       MR. KORNSTEIN: Objection to form.
6       You may answer if you understand.
7     A.    Correct.
8     Q.    That was reported to you by
9  Mr. Steger either orally or through e-mails he
10 forwarded to you?
11     A.    Yes, correct.
12     Q.    Did any of that communication
13 between Mr. Steger and the people at
14 Interstate cause to you rethink or reconsider
15 your original conclusion that you would agree
16 to delay shipment but would not allow them to
17 walk away?
18       MR. KORNSTEIN: Objection to form.
19       You may answer.
20     A.    No.
21     Q.    Did you attempt to inquire as to
22 the specifics of the Coast Guard issue?
23     A.    No.
24     Q.    Take a look at Bates page 21, for
25 example, and specifically Ms. Cirillo's

Page 54

Thomas Reszler

1
2  December 19th, 2007 e-mail to Mr. Steger where
3  she says at the bottom:  This puts me in the
4  middle of a real jam.  Would it help if we can
5  commit to the next spot barge where our tanks
6  are at level where we can hold the spot barge?
7          Do you recall receiving a copy of
8  that e-mail?
9      A.    Yes.
10     Q.    Did that cause you to reconsider
11 the issue in any way?
12         MR. KORNSTEIN:  Objection to form.
13         You may answer.
14     A.    No.
15     Q.    You took a position and you did
16 change that position, sir?
17     A.    Correct.
18     Q.    Had Mitsubishi International
19 Corporation done business with Interstate
20 prior to December 2007?
21     A.    Yes.
22     Q.    What type of volume?
23     A.    Similar.
24     Q.    Did you consider them a good
25 customer?

Page 55

Thomas Reszler

1
2      A.    I have no opinion as long as they
3  pay and -- perform and pay.
4      Q.    Do you recall there being an issue
5  with respect to them paying you or performing?
6      A.    Not prior to this case.
7      Q.    Take a look at Bates page 53, and
8  specifically the e-mail string here.  It
9  appears that you are cc'd in the e-mail from
10 Mr. Steger and Mr. Velez which responds to an
11 e-mail from Mr. Velez concerning a 38,000
12 balance on the Interstate account.
13         Does that --
14     A.    Yes, I see that.
15     Q.    Do you recall in or about the time
16 frame that you made the decision that although
17 you would agree to delay the shipment, you
18 would not let Interstate walk away?
19     A.    No, I don't recall that.
20     Q.    Take a look at Bates page 28.  And
21 there is, on the top, there is a redaction and
22 cross-reference of the privilege and redaction
23 log.
24         I would like to get confirmation
25 that the only thing that is redacted is an

Page 56

Thomas Reszler

1
2  e-mail from Mr. Steger to Ms. Knox with a
3  carbon copy to you of a --
4          MR. KORNSTEIN:  Yes.
5          MR. LESSER:  Do you have the
6  unredacted?  Because there some questions
7  that I have and maybe during the break to
8  the extent that we can do it attorneys'
9  eyes only, we can deal with those issues.
10         MR. KORNSTEIN:  We will deal with
11 it when you read.
12         MR. LESSER:  That's fine.
13     Q.    At some point after you advised
14 Mr. Steger that although you would allow the
15 delivery to be delayed, you would not allow
16 Interstate to walk away from the decision it
17 made to sell 10 MB to another customer?
18     A.    I'm sorry.  Can you rephrase?
19         MR. LESSER:  I will withdraw that
20 question.
21         Mark this reply affidavit as
22 Defendant's Exhibit D.
23         (Defendant's Exhibit D, reply
24 affidavit, marked for identification, as
25 of this date.)

Page 57

Thomas Reszler

1
2          MR. LESSER:  Mark this affidavit as
3  Defendant's Exhibit E.
4          (Defendant's Exhibit E, affidavit,
5  marked for identification, as of this
6  date.)
7  BY MR. LESSER:
8      Q.    I hand you what has been marked for
9  identification as Defendant's Exhibits D and
10 E.  I will refer you first to Mr. Steger's
11 reply affidavit.
12         Have you seen this affidavit
13 before, sir?
14     A.    Yes.
15     Q.    In paragraph two Mr. Steger states
16 that:  When MIC agreed to sell the methanol to
17 Interstate, we knew that we had a vessel with
18 methanol due to arrive about mid-December
19 2007.
20         Do you see that?
21     A.    Yes.
22     Q.    If you will look at Bates page 18
23 of Defendant's Exhibit C marked for
24 identification, and specifically Mr. Steger's
25 e-mail to Ms. Cirillo dated December 19th,

16 (Pages 58 to 61)

---

Page 58

Thomas Reszler

1
2  2007, specifically the third sentence says:
3  We reserve this product in our inventory and,
4  if we liquidate now -- and he goes on.
5      Where Mr. Steger states that we
6  reserve this product in our inventory, what is
7  he referring to?
8      MR. KORNSTEIN: Objection to form.
9      You may answer if you know.
10     A.  This means we have agreed to a sale
11 to Interstate for 10,000 barrels.  And if we
12 hadn't sold to Interstate, then we would have
13 sold it to somebody else before that at the
14 time of the sale.  So we have a book with
15 purchase and sales, and we have a balance.
16     That means that we sold to them and
17 it's down in our book or in our P&L.  If we
18 hadn't sold to Interstate, we would have sold
19 to somebody else at that time at the similar
20 price.
21     Q.  The reservation of inventory, is
22 that noted in this book?
23     A.  No.  In this case we have the
24 inventory, so we have the product for them.
25 But we could also have -- because we buy a

---

Page 59

Thomas Reszler

1
2  lot, we could also have purchased it in
3  purchase contracts with another supplier,
4  another vendor.  In this case we happened to
5  have the product in the tank.
6      Q.  So that the product that was
7  reserved for Interstate, according to
8  Mr. Steger, was in tank number 116?
9      A.  In that case, yes.
10     Q.  When was it put into tank 116, this
11 product that was reserved for Interstate?
12     A.  In this case, judging from the
13 inventory statement, it was available all
14 along in the month of December.
15     Q.  Let's look at that inventory list
16 again, pages 37 through 41.  The question is
17 the methanol that Mr. Steger represented to
18 Ms. Cirillo was reserved for Interstate, where
19 is that reflected in this cumulative inventory
20 listing for December '07?
21     A.  You can see that the book balance
22 is also greater than 420,000 gallons.
23     Q.  So that the reservation of
24 inventory based upon your testimony took place
25 on December 4th, 2007 when there was this

---

Page 60

Thomas Reszler

1
2  e-mail confirmation?
3      A.  At the time of confirmation, we
4  make sure we have product available at the
5  time for the time agreed shipment.  In that
6  case it's December 20th.
7      So on December 4th, we thought we
8  might not have the product before
9  December 20th.  But things change, and it
10 happened that we had it all along.
11     Q.  The reservation of inventory that
12 Mr. Steger represented to Ms. Cirillo in his
13 e-mail to her, that was not actually done on
14 December 4th?
15     A.  I'm sorry.  Can you repeat?
16     Q.  I'm not exactly clear based upon
17 your testimony.  I want to return to his
18 e-mail?
19     MR. KORNSTEIN:  What page number?
20     MR. LESSER:  18.
21     Q.  Steger told Ms. Cirillo:  We
22 reserve this product in our inventory.
23     Do you see that?
24     A.  Yes.
25     Q.  What I'm trying to understand is

---

Page 61

Thomas Reszler

1
2  two things; when this reservation took place
3  and what documents, if any, or other evidence
4  that you have that evidence this reservation.
5      A.  We reserved it on December 4th and
6  we agreed that we would have 420,000 gallons
7  for Interstate on December 20th or later and
8  we don't have the document to support that,
9  although the inventory shows it, but at some
10 point we could have less -- we could have had
11 less at that time and we can commit to what we
12 can do.  We never -- we strive to perform and
13 fulfill our obligation to our customer.
14     Q.  I understand that.  I'm trying to
15 understand when this reservation occurred.
16 And it sounds based upon your testimony that
17 you have no documents evidencing any
18 reservation of 10 MB of methanol specifically
19 for Interstate in December '07; is that
20 correct?
21     MR. KORNSTEIN:  I object to the
22 question.  It is mischaracterizing the
23 prior testimony.  He already said --
24     MR. LESSER:  Counsel, please.  You
25 know what you can and cannot do in

---

Global Deposition Services, Inc
212-867-7766

Page 62

Thomas Reszler

1  response to a question. And this is a
2  critical question as far as Interstate is
3  concerned. I would respectfully request
4  there be no speaking objections. Let the
5  witness answer the question, please.
6      A.   We reserve it by the fact that we
7  have it in the tank and we guarantee to
8  Interstate we have the product in the tank or
9  in other form. We can buy for example from
10 another supplier in St. Rose so we guaranteed
11 on December 4th that for December 20 or later
12 we have 420,000 gallons for them.
13     Q.   Prior to December 20th, according
14 to the cumulative inventory listing, there was
15 the lowest volume of methanol in tank 116 was
16 804,000 gallons, right?
17     A.   Yes.
18     Q.   That was on December 10; is that
19 correct?
20     A.   804, that is correct. Actually 723
21 on December 29.
22     Q.   I'm sorry. You're right 723 on
23 December 9 and then on -- on December 29, on
24 that same day the JOSE BRIGHT came in and

Page 63

Thomas Reszler

1  unloaded 756,000 gallons into tank 116, right?
2      A.   Yes.
3      Q.   Take a look at Exhibit D
4  Mr. Steger's reply affidavit and specifically
5  paragraph two, second sentence when MIC agreed
6  to sell the methanol to Interstate we knew
7  that we had a vessel with methanol due to
8  arrive by mid December '07.
9          Do you see that?
10     A.   Yes.
11     Q.   Which vessel is he talking about?
12     A.   He is --
13     Q.   Is he talking about the JOSE
14 BRIGHT?
15     A.   Probably the AMBASSADOR NORRIS on
16 December 11th.
17     Q.   You say probably, do you know?
18     A.   Yes, I believe it is this one, the
19 AMBASSADOR NORRIS.
20     Q.   Did you review Ms. Cirillo's
21 affidavit submitted to the court in opposition
22 to Mitsubishi International Corporation's
23 prior summary judgment motions where she
24 talked about a call that she had with Steger

Page 64

Thomas Reszler

1  on December 13 where he told there would be a
2  delay at the end of December because they were
3  waiting for a vessel to come in?
4      A.   I heard it, but I don't recall that
5  telephone call.
6      Q.   So you don't know one way or other
7  if it actually took place?
8      A.   No.
9      Q.   Paragraph 4 of Mr. Steger's reply
10 affidavit refers to MIC floating inventory.
11 Do you see that?
12     A.   Yes.
13     Q.   What does that mean, floating
14 inventory?
15     A.   That's terminology we use for
16 saying that it's just inventory. I don't
17 think it has a specific meaning, floating
18 inventory.
19     Q.   Do you utilize that term in your
20 business, sir, floating inventory?
21     A.   Occasionally, but --
22     Q.   You don't know?
23     A.   -- floating inventory would be
24 technically on a vessel.

Page 65

Thomas Reszler

1      Q.   You mean inventory that is floating
2  in the water?
3      A.   Right. When we say inventory --
4  floating inventory when we load in Venezuela
5  it's already on our books and we have a
6  floating inventory at St. Rose or some other
7  place.
8      Q.   Is it your testimony that the
9  methanol that was reserved for Interstate as a
10 result of the December 4th, 2007 e-mail was
11 floating inventory, meaning on a vessel from
12 Venezuela heading to the United States?
13     A.   Or some other place. This is an
14 ongoing operation and we don't weight to have
15 the product in the tank to make the actual
16 sale and that's why we when we make sales when
17 we have a vessel that is due to arrive on a
18 certain date we will sell at that date usually
19 plus a wreak or so to leave some room for
20 change, un expected events.
21     Q.   Which vessel was the methanol that
22 was reserved for Interstate, on which vessel?
23     A.   I believe that it was the
24 AMBASSADOR NORRIS.

18  (Pages 66 to 69)

Page 66

Thomas Reszler

1  
2  Q.  The AMBASSADOR NORRIS which came
3  into report for December 2007 came in to port
4  on December 11 according to the cumulative
5  inventory listing; is that correct?
6  A.  Yes.
7  Q.  When Mitsubishi International
8  Corporation reserves for specific customer
9  inventory of methanol that is floating,
10  meaning on a vessel, does it noted some place
11  in its files which vessel has been designated
12  as the reserved inventory for a particular
13  customer?
14  A.  No, we don't do that.
15  Q.  If you will look at Defendant's
16  Exhibit E which is Mr. Steger's affidavit
17  dated or sworn to on March 26, 2008 and
18  specifically I'm going to refer you to
19  paragraph 20 which states:
20  As a result, MIC lost a $210,000
21  difference between the price of the barge of
22  methanol at 12.55 purchase price Interstate
23  agreed to and the 2.5 price that MIC was
24  forced to accept on December 21?
25  Do you see that?

Page 67

Thomas Reszler

1  
2  A.  Yes.
3  Q.  Do you agree with Mr. Steger's
4  characterization that MIC, your company, was
5  forced to accept the 2.5 price?
6  A.  2.5 was the only bid on the market
7  on that day.
8  Q.  Who was responsible for obtaining
9  bids on the market?
10  A.  I did.
11  Q.  What did you do to obtain bids or
12  attempt to obtain bids on the market?
13  A.  I called the broker.
14  Q.  Did you call GFK or Star Supply?
15  A.  Yes.
16  Q.  I will call them GFI or Star Supply
17  based on the information I received from the
18  Web; is that fair?
19  A.  Yes.
20  Q.  Why did you call GFI Star Supply?
21  A.  Because they are the only broker
22  brokering methanol.
23  Q.  When did you first call them?
24  A.  I believe I called them on the
25  morning of the 21 of December.

Page 68

Thomas Reszler

1  
2  Q.  Was this the first time you called
3  GFI Star Supply?
4  A.  No I --
5  Q.  In connection with this issue with
6  Interstate?
7  A.  Yes, to replaces that barge to
8  Interstate, yes, that is the first time.
9  Q.  You did not call them on the 19 or
10  the 20?
11  A.  Yes, I did the.  I call every day.
12  I check the market every day.
13  Q.  When you say you check the market
14  what do you mean by that?
15  A.  I check where the bids and the
16  offers on that day or on that moment.
17  Q.  Where are did you check on the bids
18  and the offers at that moment, was that on the
19  Internet?
20  A.  With GFI.
21  Q.  You solely went through this one
22  broker to check the market?
23  A.  When I check the market I call
24  usually a broker and I call -- I might call
25  traders directly but methanol is not a liquid

Page 69

Thomas Reszler

1  
2  market and there is very -- it there can be
3  days without any bids or any offers or
4  sometimes weeks so the most liquid or the fast
5  test way to sell a barge or buy a barge is
6  through the broker.
7  Q.  Is GFI Star Supply the only broker
8  that deals in methanol in the United States?
9  A.  That I know.
10  Q.  Did you call any of the traders?
11  A.  I don't recall calling any traders
12  because it was -- I was on my way to the
13  airport.
14  Q.  Where were you going?
15  A.  I was going abroad.
16  Q.  Did you direct any of your
17  subordinates such as Mr. Steger to call
18  traders or other entities to find a potential
19  buyer?
20  A.  No; just the trader.
21  Q.  What time did you call GFI on the
22  way to the airport, was it an early morning
23  night, new recall?
24  A.  I don't remember exactly.  I think
25  I called in the morning and it was the day

Global Deposition Services, Inc
212-867-7766

Page 70

                        Thomas Reszler

1

2    before and there was no market.  I think I --

3    I think I should have made the sales at the

4    end of the day, at the ends of the afternoon.

5         Q.    I take it that you did not call any

6    traders later on in the day after your flight

7    landed or before you decide to do make this

8    transactions through GFI?

9         A.    The fast test way to find the

10   market is through a broker.

11        Q.    I understand that might be fast

12   tested way but it is not the only way is it,

13   sir?

14        A.    No.

15        Q.    I understand that you were looking

16   for the fastest way to enter into a

17   transaction, but I'm trying to find out what

18   efforts, if any, you made to find the best

19   price possible aside from doing it as

20   expeditiously as possible.

21        A.    It is also the best prices because

22   in a small market, all of the traders call

23   that same broker.

24        Q.    Did you contact any of your

25   long-term supply customer or any other